## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AARON RICH

                    Plaintiff,

     v.

EDWARD BUTOWSKY,
MATTHEW COUCH,
AMERICA FIRST MEDIA,
and
THE WASHINGTON TIMES,

                    Defendants.

Civil Action No. 1:18-cv-00681-RJL

Hon. Richard J. Leon

**ORAL ARGUMENT REQUESTED**

## <u>MEMORANDUM IN OPPOSITION TO</u>
## <u>DEFENDANTS' MOTIONS TO DISMISS</u>

BOIES SCHILLER FLEXNER LLP
MICHAEL J. GOTTLIEB (D.C. Bar No. 974960)
JOSHUA RILEY (D.C. Bar No. 1026900)
MERYL C. GOVERNSKI (D.C. Bar No. 1023549)
ANDREA R. FLORES (*Admission Pending*)
1401 New York Ave NW
Washington, DC  20005
Tel: (202) 237-2727
Fax: (202) 237-6131
mgottlieb@bsfllp.com
jriley@bsfllp.com
mgovernski@bsfllp.com
aflores@bsfllp.com

RANDALL W. JACKSON (D.C. Bar No. 490798)
575 Lexington Ave
7th Floor
New York, NY 10022
Tel: (212) 303-3650
Fax: (212) 446-2350
rjackson@bsfllp.com

*Attorneys for Plaintiff Aaron Rich*

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

    A.    Defendant Butowksy ...................................................................................... 4

    B.    Defendants Couch and AFM .......................................................................... 6

STANDARD OF REVIEW ............................................................................................ 9

ARGUMENT ................................................................................................................. 9

I.    DEFENDANTS' ACTIONS OUTSIDE D.C. HAVE CAUSED TORTIOUS
INJURY IN D.C., AND DEFENDANTS MEET THE "PLUS FACTORS,"
SUFFICIENT TO CONFER JURISDICTION UNDER SECTION 13-423(a)(4).......... 11

    A.    Aaron Suffered Injury Tortious Injury In D.C. ................................................ 12

    B.    Butowsky's Activities Outside D.C. Harmed Rich In D.C., And Butowsky
Satisfies The "Plus Factors." ........................................................................ 14

        1.    Butowsky's Activities Outside D.C. Caused Rich Injury In D.C. ........... 14

        2.    Butowsky's Activities In D.C. Satisfy The "Plus Factors" .................... 15

    C.    Couch's And AFM's Activities Outside D.C. Harmed Rich In D.C., And
Couch And AFM Satisfy The "Plus Factors." ................................................ 17

        1.    Couch's And AFM's Activities Outside D.C. Caused Rich Injury
In D.C. .................................................................................................. 17

        2.    Couch's And AFM's Activities Satisfy The "Plus-Factors" ................. 17

II.    DEFENDANTS HAVE TRANSACTED BUSINESS IN D.C. SUFFICIENT TO
CONFER JURISDICTION UNDER SECTION 13-423(a)(1)....................................... 20

    A.    Butowsky Has Transacted Business In D.C. Sufficient To Confer
Jurisdiction Under Section 13-423(a)(1). ...................................................... 22

    B.    Couch And AFM Have Transacted Business In D.C. Sufficient To Confer
Jurisdiction Under Section 13-423(a)(1). ...................................................... 28

III.    DEFENDANTS' ACTIONS IN D.C. HAVE CAUSED TORTIOUS INJURY IN
D.C. SUFFICIENT TO CONFER JURISDICTION UNDER SECTION 13-
423(a)(3). ...................................................................................................................... 32

    A.    Butowsky's Actions In D.C. Caused Rich's Tortious Injury In D.C. ............... 32

    B.    Couch's And AFM's Actions In D.C. Caused Rich's Tortious Injury In
D.C.…………... ........................................................................................... 33

IV.    THE COURT HAS PERSONAL JURISIDICTION OVER DEFENDANTS
BUTOWSKY, COUCH, AND AFM BASED ON OVERT ACTS IN THE
FORUM IN FURTHERANCE OF THEIR CONSPIRACY. .......................................... 34

V.    ALTERNATIVELY, JURISDICTIONAL DISCOVERY IS WARRANTED. ............. 35

CONCLUSION ............................................................................................................... 36

# TABLE OF AUTHORITES

<u>CASES</u>

*Akbar v. New York Magazine Co.*,
490 F. Supp. 60 (D.D.C. 1980) ............................................................ 11, 12, 20, 32

*Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*,
607 F. Supp. 2d 185 (D.D.C. 2009) ................................................................. 25

*Blumenthal v. Drudge*,
992 F. Supp. 44 (D.D.C. 1998) ................................................................. passim

*Bochan v. La Fontaine*,
68 F. Supp. 2d 692 (E.D. Va. 1999) ................................................................. 19

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ................................................................................. 28

*Capel v. Capel*,
272 F.Supp.3d 33 (2017) ................................................................. 25, 26, 33

*Chambers v. Chambers*,
2011 WL 3512140 (D. Md. Aug. 8, 2011) ................................................... 16, 29

*Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Indus. Materials
Corp.*, 859 F. Supp. 2d 1 (D.D.C. 2012)................................................... 34

*Crane v. New York Zoological Soc.*,
894 F.2d 454 (D.C. Cir. 1990) ................................................................. 13, 35

*Dooley v. United Techs. Corp.*,
786 F. Supp. 65 (D.C. Cir. 2008)................................................... 24, 28, 34

*Family Fed'n for World Peace v. Hyun Jin Moon*,
129 A.3d 234 (D.C. 2015) ................................................................. 21, 25, 26

*FC Inv. Grp. LC v. IFX Markets, Ltd.*,
529 F.3d 1087 (D.C. Cir. 2008) ................................................................. 28

*Founding Church of Scientology of Washington, D.C. v. Verlag*,
536 F.2d 429 (D.C.Cir.1976) ................................................................. 20

*Gatewood v. Fiat, S. p. A.*,
617 F.2d 820 (D.C. Cir. 1980) ................................................................. 20

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
843 F.3d 958 (D.C. Cir. 2016) ................................................................. 11

*Gorman v. Ameritrade Holding Corp.,*
    293 F.3d 506 (D.C. Cir. 2002) ........................................................................... 28, 30, 31, 35

*Heroes, Inc. v. Heroes Found.,*
    958 F. Supp. 1 (D.D.C. 1996) ...................................................................................... passim

Holder v. Haarmann & Reimer Corp.,
    779 A.2d 264 (D.C. 2001) ............................................................................................... 25, 26

Hourani v. Psybersolutions LLC,
    164 F. Supp. 3d 128 (D.C. Cir. 2017) ................................................................................. 33

*Calder v. Jones,*
    465 U.S. 783 (1984) ............................................................................................ 23, 24, 28, 29

*Keeton v. Hustler Magazine, Inc.,*
    465 U.S. 770 (1984) ............................................................................................ 13, 14, 24, 29

Kopff v. Battaglia,
    425 F. Supp. 2d 76 (D.D.C. 2006) ...................................................................................... 34

*Lewy v. S. Poverty Law Ctr., Inc.,*
    723 F. Supp. 2d 11 (D.D.C. 2010) ............................................................................... passim

Mandelkorn v. Patrick,
    359 F. Supp. 692 (D.D.C. 1973) ......................................................................................... 34

Manifold v. Wolf Coach, Inc.,
    231 F. Supp. 2d 58 (D.D.C. 2002) ............................................................................. 9, 21, 24

Margoles v. Johns,
    483 F.2d 1212 (D.C. Cir.1973) ............................................................................................ 33

*Massey Energy Co. v. United Mine Workers,*
    69 Va. Cir. 118, 2005 WL 3476771 (2005) ............................................................. 24, 32, 34

Mouzavires v. Baxter,
    434 A.2d 988 (D.C. 1981) .................................................................................................... 21

Ning Ye v. Hong Bao Zhang,
    No. 2006 WL 1102832, (D.D.C. 2006) .......................................................................... 9, 15

Novack v. Nat'l Hot Rod Ass'n,
    231 A.2d 22 (1967) ............................................................................................... 21, 25, 26

Parisi v. Sinclair,
    806 F. Supp. 2d 93 (D.D.C. 2011) .................................................................................. 19, 20

Rochon v. F.B.I.,
    691 F. Supp. 1548 (D.D.C. 1988) .................................................................................. 26, 35

*Rundquist v. Vapiano SE*,
    2012 WL 5954706 (D.D.C. 2012) ............................................. 10, 22, 29

*Shirlington Limousine & Transp., Inc. v. San Diego Union-Tribune*,
    566 F. Supp. 2d 1 (D.D.C. 2008) .......................................................... 32

*\*Shoppers Food Warehouse v. Moreno*,
    746 A.2d 320 (D.C. 2000) ........................................................... passim

*Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*,
    647 F.2d 200 (D.C. Cir. 1981) ......................................................... 16, 24

*\*Steinberg v. Int'l Criminal Police Org.*,
    672 F.2d 927 (D.C. Cir. 1981) ...................................................... passim

*Tate v. Blue Cross of Washington & Alaska*,
    59 Md. App. 206 (1984) .......................................................................... 26

*Tavoulareas v. Comnas*,
    720 F.2d 192 (D.C. Cir. 1983) ............................................................... 33

*Van Wagenberg v. Van Wagenberg*,
    241 Md. 154 (1966) ............................................................................... 26

## STATUTES & RULES

D.C. Code Ann. § 13-423(a)(4) ..................................................... passim

D.C. Code § 13-423(a)(1) .............................................................. passim

D.C. Code § 13-423(a)(3) ........................................................... 10, 32, 33

Fed. R. Civ. P. 12(h) ........................................................................... 11

Fed. R. Civ. P. 15 ............................................................................... 36

## OTHER AUTHORITIES

Americans First Radio, *Facebook*, (last visited June 7, 2018),
    available at https://www.facebook.com/AmericansFirstRadio/ .............................................. 7

CNN, *Ed Butowsky on retracted story (full interview)* (Aug. 2, 2017),
    available at https://www.cnn.com/videos/cnnmoney/2017/08/02/butowsky-fox-news-
    seth-rich-cuomo-intv-ctn-full-interview.cnn ......................................................... 6

*Ed Butowsky*, Talk Media News, (collection of video clips from interviews at the 2017
    State of the Union), (Mar. 1, 2017),
    available at http://www.talkmedianews.com/author/ed-butowsky/ ....................................... 6

Ed Butowsky, Flickr, *Inauguration 2017, view from my seat*, (Jan. 23, 2017),
   available at https://www.flickr.com/photos/edbutowsky/32433354626/ ............................... 6

Mike Pompeo, Remarks at Center for Strategic and International Studies
   (Apr. 13, 2017),  *available at* https://www.cia.gov/news-information/speeches-
   testimony/2017-speeches-testimony/pompeo-delivers-remarks-at-csis.html .......................... 1

Memorandum In Opposition To Defendants' Motions To Dismiss

Plaintiff Aaron Rich ("Aaron") submits this memorandum of points and authorities opposing the Motions to Dismiss filed by Defendants Edward Butowsky, Matthew Couch, and America First Media ("AFM").[1]   *See* Dkt. 19 (Butowsky's Motion to Dismiss); Couch and AFM's Motion to Dismiss.[2]

## INTRODUCTION

On July 10, 2016, Aaron's brother, Seth Rich, was murdered.   The murder was committed in Washington, D.C., and the perpetrators have not yet been apprehended.   Aaron has dedicated himself to assisting law enforcement in every way possible since his brother's murder. At the same time, Aaron is a private person who has consistently sought to grieve in private. Defendants have trampled upon Aaron's desires by engaging in a relentless campaign to spread false, defamatory, and damaging statements about him—they have done so to advance their partisan agendas, gain notoriety, and reap financial benefits.

Defendants have falsely stated that Aaron conspired with Seth to steal emails from the Democratic National Committee ("DNC") and gave those emails to Wikileaks[3] in exchange for money deposited into Aaron's personal bank account; that Aaron learned in advance that his

---

[1] The other defendant in this case, The Washington Times, did not file a motion to dismiss.  For purposes of this opposition, "Defendants" refers to Defendants Butowsky, Couch, and AFM unless otherwise specified.

[2] All "Dkt." references relate to the Docket in this case unless otherwise specified.  Couch served a motion to dismiss and supporting declaration via email and informed Aaron's counsel that he would be mailing his papers to the Court.  However, at the time of this filing, there is no docket entry to which to cite for Couch's and AFM's motion, so this opposition cites those materials as "Couch and AFM Motion to Dismiss" and "Declaration of Couch and AFM."  Plaintiff does not concede that Couch and AFM have properly filed their motion, nor that AFM has properly challenged personal jurisdiction, as discussed *infra* Argument at 11.

[3] Former CIA Director Mike Pompeo declared Wikileaks to be a hostile intelligence service. Mike Pompeo, Remarks at Center for Strategic and International Studies (Apr. 13, 2017), *transcript available at* https://www.cia.gov/news-information/speeches-testimony/2017-speeches-testimony/pompeo-delivers-remarks-at-csis.html.

brother was going be assassinated and did nothing to stop it; and that Aaron has refused to cooperate with law enforcement's investigation into his brother's murder.  In short, Defendants have falsely stated that Aaron committed theft and treason, was complicit in the causes and cover-up of his brother's murder, and now is obstructing justice.  Those statements have no basis whatsoever in reality, and they are defamatory.

Washington, D.C., is the epicenter of this case.  Defendants Butowsky, Couch, and AFM have published their defamatory statements to at least hundreds of thousands (and likely millions) of people—including by intentionally targeting an audience of news consumers in D.C.—through a barrage of social media posts, website content, and online videos.  Defendants caused The Washington Times, which is based in D.C. and has a significant readership here, to publish a defamatory article about Aaron in its print and online editions.[4]  Defendants have travelled to D.C. for the express purpose of holding meetings designed to advance their conspiracy theory.  Couch and AFM have solicited funds from people in D.C. to support their defamatory campaign and to pay for their trips to D.C.   Defendants have caused Aaron significant harm in D.C., where his career, clients, and security clearance is based, in part by accusing Aaron of committing crimes that (if they had occurred) would violate D.C. law.

Jurisdiction is proper in this Court on *any* of four independent grounds discussed below—(1) Defendants took actions elsewhere that caused harm here while also meeting various "plus factors;" *see infra* Section I; (2) they transacted business here, *see infra* Section II; (3) they took actions here that caused harm here, *see infra* Section III; and (4) they conspired with The Washington Times, which is based here and does not contest jurisdiction, *see infra*

---

[4] The Washington Times removed the online version of the article after this lawsuit was filed. To date, however, it has not issued a retraction.

Section IV.  This is not a case in which out-of-state residents have only touched this District by happenstance—Defendants intentionally reached into the District, made use of persons and resources within it, and deliberately caused actions to be taken here that damaged Aaron's reputation here.  In sum, this case arises out of Defendants' conduct that targeted and caused harm in D.C., and it is fair and appropriate for Defendants to be haled into this Court as a result of their deliberate conduct.

## BACKGROUND

Aaron has devoted his professional life to protecting U.S. national security: he has worked for the same defense contractor, which is based in the D.C. Metropolitan Area, for nearly a decade, and he possesses a security clearance granted and adjudicated by federal agencies located in and around D.C.  Dkt. 3 ("Compl.") ¶¶ 3; 21.  Aaron's professional opportunities and reputation depend on the favorable opinions of and relationships with individuals located in D.C.  *Id.*  In addition to routine travel to D.C. for work, Aaron also travelled to D.C. in November 2017 to testify voluntarily before a grand jury convened in D.C. in connection with Seth's murder.  Compl. ¶¶ 4; 21.

Seth was murdered in D.C. on July 10, 2016, in what law enforcement has described as an armed robbery.  Compl. ¶¶ 25-26.  In part because Seth had worked for the DNC (in D.C.), and in part because his murder occurred just months before the 2016 presidential election, certain conspiracy theorists created an unfounded narrative that Seth was assassinated for stealing emails from the DNC and leaking those emails to Wikileaks.  Compl. ¶ 2.  By Defendants' own admission, a purpose of this conspiracy theory has been to advance a counter-narrative to the intelligence community's conclusion that the Russian Government interfered in the 2016 election.  Compl. ¶¶ 6; 31; 45; 50.

### A.  Defendant Butowksy

Butowsky inserted himself into the Rich family's tragedy in early 2017 when he contacted the family to offer to pay a former D.C. police investigator, Rod Wheeler, whom Butowsky had first met in D.C., to lead a D.C.-based "private investigation" into Seth's murder. Compl. ¶¶ 5; 27; Governski Decl. Ex. 1 at 40:6-42:16.  Butowsky does not dispute that he paid Mr. Wheeler for his services.  Dkt. 19-1 at ¶ 4; Governski Decl. Ex. 1 at 42:20-43:6.  Butowsky personally arranged and attended multiple meetings with Mr. Wheeler in D.C., for the purpose of advancing the same D.C.-centric conspiracy theory about Seth's murder.  Compl. ¶¶ 20; 28. Butowsky admits to arranging and attending a meeting with Mr. Wheeler and then-White House Press Secretary, Sean Spicer, at the White House on April 20, 2017, and Butowsky does not dispute that he arranged and attended a meeting with Mr. Wheeler and a Fox News reporter in D.C. on February 28, 2017.  Compl. ¶ 28; Dkt. 19-1 at ¶ 9.  The purpose of those meetings was to discuss Butowsky's narrative about the murder of Seth Rich.  Compl. ¶¶ 20; 28.

Butowsky, along with the Fox News reporter with whom he met in D.C., successfully urged Fox News to publish a story about Seth's murder that quoted Mr. Wheeler as having proof that Seth had leaked DNC documents to WikiLeaks.  Compl. ¶¶ 5; 29.  Mr. Wheeler almost immediately disavowed the statement, and within weeks, Fox News retracted the story. Compl. ¶¶ 5; 29-30.  Mr. Wheeler has since initiated a lawsuit against Butowsky for defamation and, during a recent hearing in that matter, counsel for Butowsky confirmed that Butowsky served as an "intermediary" and "helped facilitate" interactions between Mr. Wheeler and the author of the now-redacted Fox News article, Governski Decl. Ex. 1 at 40:12-43:6, which included putting them together for a meeting in D.C. in February 2017, Compl. ¶ 28.

In August 2017, Butowsky, with help from Couch and AFM, inserted Aaron into their conspiracy theory.  Compl. ¶¶ 1; 39-43.  Since then, Defendants repeatedly and falsely have

accused Aaron of committing various crimes including: working with Seth to steal DNC emails (from DNC Headquarters in D.C.), Compl. ¶¶ 36; 44; 50-52; 55; 65; 67; 80; 82; receiving funds from WikiLeaks into his personal bank account, provided in exchange for the stolen emails, Compl. ¶¶ 40-43; 50-52; 67; knowing in advance that his brother (who lived and worked in D.C.) was going to be murdered, Compl. ¶ 53; and engaging in obstruction of justice to thwart law enforcement's D.C.-based investigation of Seth's death and to cover-up his own involvement in related crimes, Compl. ¶¶ 32; 37; 44; 50; 54; 65; 69.

In March 2018, The Washington Times repeated, amplified, and expanded upon these defamatory statements by publishing an article, both in print and online, stating that Aaron "downloaded the DNC emails and was paid by Wikileaks for that information" (which is false) and implying that Aaron had not "been interviewed" by law enforcement (when he had been). Compl. ¶¶ 9; 73-74.  Butowsky was the only named source in The Washington Times' article, and Butowksy admits that he spoke with the author, with whom he previously served on a non-governmental D.C.-based commission.  Dkt. 19-1 at ¶ 7; Compl. ¶¶ 9; 72-75.  Couch has explained that The Washington Times' publication was "put out to help vindicate our team" and that "everything in that article was from America First Media Group."  Compl. ¶¶ 9; 75.

Butowsky has repeatedly communicated with (and given quotes and interviews to) Cassandra Fairbanks, who writes about D.C. gossip for a number of publications and has confirmed that Butowsky is her source for stories relating to Aaron and his brother. Compl. ¶¶ 32; 81-82.  Ms. Fairbanks has authored at least three articles about Aaron on BigLeaguePolitics.com, one of which falsely stated that Aaron was "actively attempting to shut down anyone looking into the WikiLeaks connection" and falsly implying that Aaron was involved in the DNC hack by virtue of his working for a company that provides cybersecurity.

Compl. ¶ 32.   On the same March 2018 evening that The Washington Times launched its defamatory Butowsky-sourced publication about Aaron, Butowsky had a telephone conversation with Ms. Fairbanks, after which she authored a Gateway Pundit article titled "*Exclusive=> Insider Ed Butowsky: Seth Rich's Father Confirmed His Son Was the Wikileaks Leaker*" that states that "Ed Butowsky, the man who offered to assist the family of Seth Rich with the cost of hiring a private investigator, has told the Gateway Pundit that during a December 2016 conversation with the father of the slain staffer he confirmed that he 'knew what his sons did.'"   Compl. ¶ 82.

In an interview with CNN, Butowsky publicly stated "I go to Washington often."[5] Online postings reveal Butowsky's frequent presence in D.C. for political events, such as President Trump's Inauguration[6] and, apparently, serving as an interviewer for an online publication from the State of the Union in 2017.[7]

### B.  Defendants Couch and AFM

Couch is the founder, host, and registered agent and incorporator/director of AFM, which is registered in Arkansas as a nonprofit organization.   Compl. ¶¶ 15-16.   Defendants Couch and AFM maintain a constant presence on the Internet with multiple social media profiles (including Periscope, Twitter, YouTube, and Facebook), fundraising sites (including Fundly, PayPal, and Patreon), and AFM's website.   Compl. ¶ 33.   As explained more fully below, Defendants'

---

[5]  CNN, *Ed Butowsky on retracted story (full interview)* (Aug. 2, 2017), at 8:25, https://www.cnn.com/videos/cnnmoney/2017/08/02/butowsky-fox-news-seth-rich-cuomo-intv-ctn-full-interview.cnn.

[6]  Ed     Butowsky,     Flickr     (Jan.     23,     2017), https://www.flickr.com/photos/edbutowsky/32433534626/ ("Inauguration 2017, view from my seat").

[7]  Talk Media News, *Ed Butowsky* (Mar. 1, 2017), http://www.talkmedianews.com/author/ed-butowsky/ (collection of video clips from interviews at the 2017 State of the Union).

defamatory statements about Aaron have been published in tweets, blog posts, social media posts, and videos. *Infra* at Section I(C)(1); *see also* Compl. ¶¶ 33-55; 65; 67; 69; 80.   Couch and AFM admit that Butowsky is the sole source of their information about Aaron:

> "Defendants AFM and Mr. Couch never mentioned Aaron Rich and Wikileaks together until having conversations in early August of 2017 with Defendant Butowsky.  Any statements made after intel was given to AFM and Mr. Couch were from our source Defendant Butowsky."

Declaration of Couch and AFM at ¶ 5; *see also id.* at ¶¶ 7; 19; Compl. ¶¶ 41-43.

Couch and AFM use their online presence to target D.C.-focused political content to the D.C. market, including by encouraging residents of D.C. to provide 'information" to their team, and by targeting D.C. law enforcement in an effort to influence the D.C.-based investigation. Compl. ¶¶ 20; 50; 57.  Couch and AFM also have used their online platforms to raise tens of thousands of dollars, including from individuals in D.C., and they use those funds to finance trips to D.C.  *Id.*  For example, on September 28, 2017, AFM tweeted that it was "raising funds to meet our budget" and that there were "more trips to DC planned."  Compl. ¶ 57.

Couch and AFM have in fact come to D.C. at least ten times in the past 11 months, during which time they have expressly sought to advance their narrative against Aaron. Compl. ¶¶ 20; 35; 75; Declaration of Couch and AFM at ¶¶ 3; 22.  AFM has at least one team member who lives in the D.C. area, Compl. ¶ 20, and AFM lists "Washington, District of Columbia" as its location on its Facebook page.[8]  Couch and his AFM "team" traveled to D.C. in July 2017 to mark the one-year anniversary of Seth's murder and to gain publicity for their "investigation."  Compl. ¶ 35.  While in D.C., Couch and AFM posted content, including five videos, about Seth's murder on social media and other online websites, and Couch also appeared

---

[8] Americans First Radio, *Facebook*, https://www.facebook.com/AmericansFirstRadio/.

on a broadcast story on One America News Network.  Compl. ¶ 35.  On July 7, 2017, Defendant Couch tweeted that "We need your help to continue our investigation please Donate Today! We are on the Ground in Washington, D.C." and included the link to AFM's Go Fund Me page.  *Id*. In another tweet on the same day, Couch wrote "we're on the ground" and asked his followers to "Help us out! We cannot do it without you."  Compl. ¶ 57.  Within days of their visit to D.C., Defendants Couch and AFM publicly disclosed Aaron's place of employment and the fact that he holds a security clearance, and they implied that Aaron has the "IT know how" to hack documents from the DNC.  Compl. ¶ 36.

On September 8, 2017, Couch posted a video online in which he said: "If you're in the Washington, D.C. area, Virginia area, Maryland area and you knew Seth Rich or you knew Sean Lucas and you want to talk, reach out to my team . . . We're heading back to Washington D.C." Compl. ¶ 57.  In October 2017, Defendant Couch alerted his audience that he and AFM would be "back in Washington, D.C. soon and basically one day soon you're just gonna see us in D.C." *Id*.  Couch and AFM have stated that they intend to "have a very large presence in Washington D.C., as well as our contacts on the ground in Washington D.C." *Id*.

Couch and AFM traveled to D.C. again in March 2018 to further the activities of the conspiracy.  Compl. ¶¶ 20; 75.  On March 27, 2018, Couch and AFM were served with the Complaint and summons in their hotel in Northern Virginia.  Dkt. 8; Dkt. 10.  After being served with the Complaint and while still in the D.C. area, Defendant Couch continued to accuse Aaron and his family of obstructing justice, stated that he and AFM "should counter-sue for obstructing a murder investigation" and that he and AFM "just want to find out who killed your son and your brother. Why don't you?"[9]  Two days ago, Couch and AFM published a post on its website

___

[9] Matt Couch, *Let's Talk* (March 27, 2018), https://www.pscp.tv/w/1OyKANOyokbGb.

Memorandum In Opposition To Defendants' Motions To Dismiss

called "What **AFM** has done so far in 2018, critiques [*sic*] be damned" in which they admit to having raised $15,000 year to date and having spent $5,490 in connection with a trip in D.C., including for "Hotel Rooms for 5 days in D.C. $1800; Meals for Team for 5 days in D.C. $900" and "Ubers into Washington, D.C. $120."[10]  The same article explains that they separately flew into D.C. to meet with a "Source" in Baltimore.  *Id.*

## STANDARD OF REVIEW

When addressing a Rule 12(b)(2) jurisdictional challenge, a plaintiff need only make "a *prima facie* showing that the court has personal jurisdiction" over the defendants, *Ning Ye v. Hong Bao Zhang*, No. 2006 WL 1102832, at *1 (D.D.C. Mar. 31, 2006), and the Court "must resolve any factual discrepancies with regard to the existence of personal jurisdiction in favor of the plaintiff," *Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp. 2d 116, 119 (D.D.C. 2010); *see also Manifold v. Wolf Coach, Inc.*, 231 F. Supp. 2d 58, 60 (D.D.C. 2002) ("in evaluating the defendant's motion, the Court will assume all the factual allegations set forth in the complaint, and will construe the complaint liberally in favor of the plaintiff.").

## ARGUMENT

Defendants' personal jurisdiction arguments, to the extent Defendants have even made any, are meritless.  "A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from" any of several circumstances, including:

> I.     the person "causing tortious injury in the District of
>        Columbia by an act or omission outside the District of
>        Columbia if he regularly does or solicits business, engages
>        in any other persistent course of conduct, or derives
>        substantial revenue from goods used or consumed, or

---

[10] America First Media Group, *What **AFM** has done so far in 2018, critiques be damned* (June 5, 2018), https://af-mg.com/2018/06/05/what-afm-has-done-so-far-in-2018-critiques-be-damned/.

> services rendered, in the District of Columbia," D.C. Code Ann. § 13-423(a)(4);
>
> II.    the person "transacting any business in the District of Columbia, *id.* § 13-423(a)(1);
>
> III.   the person "causing tortious injury in the District of Columbia by an act or omission in the District of Columbia, *id.* § 13-423(a)(3).

Section 13-423(a)'s "nexus" requirement—i.e., that "a claim for relief aris[es] from" one of the foregoing circumstances—is satisfied "if the claim either arises out of *or* relates to the nonresident defendant's business activity" as long as there is "some 'discernible relationship'" between the two. *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 332, 335 (D.C. 2000) (emphasis in original); *see also Rundquist v. Vapiano SE*, 2012 WL 5954706, at *8 (D.D.C. Nov. 9, 2012) ("'This is not a particularly high threshold' and '[a] claim only fails to have a 'discernible relationship' when it is 'unrelated to the acts forming the basis for personal jurisdiction.'" (internal citations omitted)).[11]  In addition to all of the foregoing, and as a separate basis for jurisdiction, if a complaint alleges a conspiracy and an overt act by one co-conspirator within the jurisdiction in furtherance of the claimed conspiracy, then jurisdiction is proper over all conspirators.  *See infra* Section IV.  As explained below, Aaron's Complaint alleges facts sufficient to satisfy each of the foregoing bases for jurisdiction, including the nexus requirement—although satisfying even one basis would suffice to defeat Defendants' Motions.[12]

---

[11] However, as explained in the immediate following section, (a)(4)'s "plus factors" need not be related to the cause of action. *Blumenthal v. Drudge*, 992 F. Supp. 44, 54 (D.D.C. 1998).

[12] Asserting jurisdiction over the Defendants in this case comports with due process for the reasons set forth in this brief as to why their conduct satisfies multiple prongs of the D.C. long-arm statute. *See Ning Ye*, 2006 WL 1102832, at *3 (D.D.C. Mar. 31, 2006) (explaining that Due Process requires that a defendant has "minimum contacts" with D.C. "such that he should reasonably anticipate being haled into court there" (quotation marks omitted)).  Defendants do not argue otherwise; their Motions do not even mention "minimum contacts" or "Due Process."

Defendants' Motions ignore the majority of the factual allegations in the Complaint and instead rest on a handful of conclusory arguments that are both false and without legal support. As explained below, jurisdiction is proper over Butowsky, Couch, *and* AFM.  Specifically with respect to AFM, it has waived the right to challenge personal jurisdiction because Couch's motion to dismiss fails to advance any argument as to why this Court does not have jurisdiction over AFM.  *See* Couch and AFM Motion to Dismiss at 1-3; Fed. R. Civ. P. 12(h); *see also Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 964 (D.C. Cir. 2016) (discussing waiver).

I.  **DEFENDANTS' ACTIONS OUTSIDE D.C. HAVE CAUSED TORTIOUS INJURY IN D.C., AND DEFENDANTS MEET THE "PLUS FACTORS," SUFFICIENT TO CONFER JURISDICTION UNDER SECTION 13-423(a)(4).**

Jurisdiction is proper where, as is the case here, a tortious injury within D.C. was caused by a defendant's act outside D.C. and the defendant "had one of three enumerated 'minimum contacts'" with D.C.—he "regularly does or solicits business" in D.C.; he engages in any other persistent course of conduct in D.C.; or he derives substantial income from goods used or consumed, or services rendered, in D.C.   D.C. Code. § 13-423(a)(4); *Akbar v. New York Magazine Co.*, 490 F. Supp. 60, 63 (D.D.C. 1980).  These so-called "plus factors" are a "safeguard" intended "to ensure that the party being haled into this jurisdiction's courts has more than a 'scant' connection to the forum." *Lewy*, 723 F. Supp. 2d at 123–24 (internal citations and quotation marks omitted).  "Thus, a defendant's contacts need not be great to satisfy subsection (a)(4); they need only be sufficient to establish a real connection to the District of Columbia such that a party might expect to be subjected to jurisdiction here." *Id.* at 124.  Importantly, the "plus factors" need not be related to the cause of action, but rather are designed to "demonstrate some reasonable connection between the jurisdiction in which the court sits separate from and in addition to the injury caused in the jurisdiction." *Blumenthal v. Drudge*, 992 F. Supp. 44, 54

(D.D.C. 1998) (internal quotation marks omitted).  As explained next, jurisdiction is proper over each Defendant here based on Aaron's injury in D.C. that was caused by the Defendants' acts outside of D.C., combined with each Defendant's conduct sufficient to meet the "plus factor" requirement.

### A.  Aaron Suffered Injury Tortious Injury In D.C.

Aaron's livelihood has been based in D.C. since the day he graduated from college. Compl. ¶ 3.  Although Aaron resides in Colorado, the federal agencies and clients with whom Aaron works are located in the D.C. Metropolitan area.  Compl. ¶ 21.  The federal agencies and clients that grant and adjudicate Aaron's security clearance are located in D.C.  *Id*.  Aaron suffered injury in D.C. when the Defendants accused him of committing theft of property and other crimes in D.C. by: acting with his brother to steal documents from the DNC, which is located in D.C.; accepting money from and conspiring with a hostile intelligence service to leak internal documents; knowing that his brother was going to be killed; and participating in a cover-up of that murder.  *See Akbar*, 490 F. Supp. at 64 (harm to "professional standing caused by a defamation constitutes an injury 'in the District of Columbia' for the purposes of the District's long-arm statute").  To the extent that any of these crimes had actually been committed, jurisdiction to prosecute them surely would lie in D.C.  Jurisdiction over the Defendants who have perpetrated these defamatory statements also should lie in D.C.

It does not matter for purposes of jurisdiction that Aaron lives in Colorado.  As the D.C. Circuit has explained:

> Quite clearly, economic loss resulting from defamation is most likely to be felt in one's place of business whatever the locus of its publication; and mental suffering is self-evidently experienced where the mind is located. It may also be true that ***injury to reputation can occur even when publication occurs outside the jurisdiction in which the plaintiff lives or works:*** given the rapid flow of information and people in our society across state and

> national borders, *a defamation published in one place might
> well affect the general estimation in which that plaintiff is held in
> another place*, without a second publication occurring there.

*Crane v. New York Zoological Soc.*, 894 F.2d 454, 457-58 (D.C. Cir. 1990) (emphasis added).  In *Crane*, the court concluded that jurisdiction was proper where, as here, the plaintiff "asserted that he conducts his business in the District of Columbia and that as a direct and proximate result of the [defamatory statements], his business has suffered."  *Id.* at 457.  Similarly, in *Steinberg v. Int'l Criminal Police Org.*, 672 F.2d 927 (D.C. Cir. 1981), the Court found jurisdiction in D.C. where a Florida resident alleged that a publication calling him a wanted international criminal was transmitted to and circulated in D.C.  *Id.* at 931.

Defendants' sole argument as to this jurisdictional provision cannot be squared with the decisions in *Crane* and *Steinberg*.  Butowsky asserts that Aaron "did not suffer injury in D.C." because injury occurs where the "defamed person is located," and Aaron is "located in Colorado."  Dkt. 19 at 4.  Butowsky, however, cites no authority supporting the proposition that a defamed person is "located" *solely* where he lives.  Indeed, there is no such authority: as *Crane* and *Steinberg* demonstrate, an individual residing in one state can suffer a cognizable injury to reputation in another.

Butowsky relies upon the Supreme Court's decision in *Keeton*, but that case *rejected* the very position Butowsky advances.  *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984).  *Keeton* held that the exercise of personal jurisdiction may be appropriate even where the plaintiff's *only* connection to the forum was "the circulation there of copies of a magazine" that defamed her.  *Id.* at 772.  The Court explained that the "reputation of the libel victim may suffer harm *even in a state in which he has hitherto been anonymous*" because defamatory content "may create a negative reputation among the residents of a jurisdiction where the plaintiff's

previous reputation was, however small, at least unblemished." *Id.* (emphasis added).  As the Court explained:

> *[P]laintiff's residence in the forum State is not a separate requirement*, and lack of residence will not defeat jurisdiction established on the basis of defendant's contacts. . . .  It is undoubtedly true that the bulk of the harm done to petitioner occurred outside New Hampshire.  But that will be true in almost every libel action brought somewhere other than the plaintiff's domicile.  *There is no justification for restricting libel actions to the plaintiff's home forum.*  The victim of a libel, like the victim of any other tort, may choose to bring suit in any forum with which the defendant has "certain minimum contacts ... such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"

*Id.* at 780–81 (internal citations and footnotes omitted) (emphasis added).

### B. Butowsky's Activities Outside D.C. Harmed Aaron In D.C., And Butowsky Satisfies The "Plus Factors."

#### 1.   Butowsky's Activities Outside D.C. Caused Aaron Injury In D.C.

In addition to Butowsky's activities in D.C. described below, *infra* at Section III(A),  and in the Complaint, Compl. ¶¶ 9; 21; 81-82, Butowsky also engaged in activity outside D.C. that caused Aaron's injury in D.C.  Butowsky has defamed Aaron by falsely accusing him of leaking documents to WikiLeaks in exchange for money—both by making his own statements online, Compl. ¶¶  40; 65; 80, and by feeding them to Couch and AFM to state publicly, Compl. ¶¶ 41-44; 47; 50; 52; 54; Declaration of AFM and Matt Couch at ¶¶ 5; 7; 19.  Couch and AFM admit that Butowsky was the sole source of their defamatory statements about Aaron.  Declaration of Couch and AFM at ¶ 5; *see also* ¶¶ 7; 19; Compl. ¶¶  41-43.  Butowsky admits to having spoken from Texas with the author of The Washington Times' publication, which contains defamatory statements out of which this litigation arose.  Dkt. 19-1 at ¶ 7; Compl. ¶¶ 9; 72.

These allegations satisfy the second prong of § 13-423(a)(4) because Butowsky made false and defamatory statements about Aaron from outside of D.C. that caused injury in D.C.  In

*Steinberg*, the D.C. Circuit concluded that jurisdiction over a non-D.C. resident was proper where that defendant "initiated a publication" of a defamatory article from France and "transmitted the offending publication to its liaison in the District of Columbia, as well as to others in Interpol's network here and abroad" for dissemination in D.C. 672 F.2d at 929; *see also Lewy*, 723 F. Supp. 2d at 120 (jurisdiction proper over Alabama defendant under (a)(4) in connection with a publication distributed to D.C. residents falsely accusing the plaintiff "of corruption, fraud, and even commission of a crime"). Here, too, Butowsky transmitted defamatory content to a newspaper in D.C. and to D.C. residents on interactive websites (including not just The Washington Times, but all of AFM's social media platforms), and in doing so has caused Aaron injury in D.C. for which Butowsky can be sued in D.C.

2.    <u>Butowsky's Activities In D.C. Satisfy The "Plus Factors".</u>

Butowsky has engaged in a "persistent course of conduct" that satisfies the "plus factors" required by § 13-423(a)(4). *See* Background at 4-6; *Ning Ye*, 2006 WL 1102832, at *3 (to satisfy the "persistent course of conduct" prong, "all that is required is some 'reasonable connection' between" the Defendant and forum); *Steinberg*, 672 F.2d at 931 (the "persistent course of conduct" prong "denotes connections considerably less substantial than those required to establish general, 'all purpose' jurisdiction on the basis of 'doing business' in the forum"). Butowsky's connections to D.C. include:

- meeting, hiring, and paying for a D.C.-based private detective to investigate a D.C. based murder in D.C., Governski Decl. Ex. 1 at 40:6-43:6; Compl. ¶¶ 5; 27; Dkt. 19-1 at ¶ 4;

- arranging and attending multiple meetings in D.C., Compl. ¶¶ 5; 20; 28-29; 32; 72-75; Dkt. 19-1 at ¶ 9;

- causing the publication of statements that directly target a D.C. audience, including by focusing on a D.C.-based murder and

15

accusing the plaintiff of committing crimes in D.C.  Compl. ¶¶ 28; 32; 40; 65; 72-75; 80; 82;

- facilitating and encouraging the publication of content in D.C.-based publications, Governski Decl. Ex. 1 at 42:20-43:6; Compl. ¶¶ 5; 28-29; 32; 72-75; Dkt. 19-1 at ¶ 7;

- speaking to individuals who publish content in D.C.-based publications, Compl. ¶¶ 28; 32; 72-75; 82;

- meeting in D.C. with a Fox News journalist to discuss the publication of materials about a D.C.-centric narrative, Compl. ¶ 5; 28-29; Dkt. 19-1 at ¶ 9;

- "go[ing] to Washington often," *see supra* note 5;

- attending political events in Washington, including President Trump's inauguration, and interviewing reactions to the President's State of the Union address, *see supra* note 6; and

- participating as a member on a D.C.-based commission, Dkt. 19-1 at ¶ 7; Compl. ¶¶ 72-75.

These allegations more than satisfy the persistent course of conduct plus factor.  *See, e.g., Steinberg* 672 F.2d at 931 (jurisdiction proper where defendant attends meetings in D.C. and communicates with a D.C. liaison to whom it "regularly sends information to and receives information"); *Chambers v. Chambers*, 2011 WL 3512140, at *4 (D. Md. Aug. 8, 2011) (jurisdiction proper where defendants "created blogs, posted comments on websites, and sent emails to Maryland residents and towns in an effort to defame Plaintiff").[13]

---

[13] Congress modeled D.C.'s long-arm statute on the long-arm statutes of its neighbors, therefore court decisions "applying Virginia and Maryland law are persuasive authority in the District of Columbia." *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty. Ltd.*, 647 F.2d 200, 206 fn.13 (D.C. Cir. 1981).

### C.  Couch's And AFM's Activities Outside D.C. Harmed Aaron In D.C., And Couch And AFM Satisfy The "Plus Factors."

1.  <u>Couch's And AFM's Activities Outside D.C. Caused Aaron Injury In D.C.</u>

Couch and AFM have transmitted defamatory statements about Aaron from outside D.C., including on Periscope, Twitter, YouTube, and Facebook, and their own website: they have falsely accused Aaron of stealing DNC emails, Compl. ¶¶ 36; 44; 50-51; 55; 65; 67; 80; 82, in exchange for money from WikiLeaks, Compl. ¶¶ 40-43; 50-52; 67, and knowing in advance that his brother was going to be assasinated, Compl. ¶ 53, and obstructing justice in connection with the DNC hack and Seth's death, Compl. ¶¶ 44; 54; 65; 69.  Couch does not deny having made the statements alleged in the Complaint, and in some cases implicitly admits to having done so. *See* Declaration of Couch and AFM at ¶¶ 5; 7; 12; 16; 19.

2.  <u>Couch's And AFM's Activities Satisfy The "Plus-Factors".</u>

Couch and AFM have engaged in a persistent course of conduct and regular solicitation of business by visiting D.C. in person and maintaining D.C.-centric interactive websites that are constantly available to D.C. residents and providing the ability for the direct exchange of information, communication, and fundraising.[14]

The factual circumstances of *Drudge*, in which a court in this district found the defendant met the "plus factors" in connection with online conduct, are highly similar to those here.  In *Drudge*, the court found jurisdiction under Section 13-423(a)(4) because the defendant's "non-Internet related contacts with the District of Columbia, coupled with the interactive nature of Drudge's web site, which particularly focuses on Washington gossip, are contacts that together are sufficient to establish that defendant Drudge engaged in a persistent course of conduct" in

---

[14] The reasons why Couch and AFM meet the "transacting business" prong (*see infra* Section II(B)) apply equally to the "plus factor" analysis, although the latter is more expansive because the conduct need not be related to the cause of action.  *See Drudge*, 992 F. Supp. at 54.

D.C. *Drudge*, 992 F. Supp. at 54. The court rejected the defendant's argument that he was not subject to its jurisdiction because he had "not specifically targeted" his content or fundraising efforts to people in D.C., received only $200 from D.C. residents, and traveled to D.C. in an "infrequent and sporadic" manner because the defendant:

- produced online content specifically about D.C. and of particular interest to D.C. residents;

- maintained online content available 24 hours a day to D.C. residents;

- solicited and collected money from people in D.C. who read his content;

- traveled to D.C. two times including to participate in an interview on C-SPAN to promote his content; and

- communicated with "District residents who supply him with gossip."

*Id*. The court explained that a defendant that "specifically targets readers in the District of Columbia by virtue of the subjects he covers and even solicits gossip from District residents and government officials who work here" and covers subject matter that "is quintessentially 'inside the Beltway' gossip and rumor" "should have had no illusions that he was immune from suit" in D.C.. *Id*. at 56-57.

Like *Drudge*, Couch and AFM "should have had no illusions" that they would not be immune from suit in D.C., including because they:

- produce online content specifically about D.C. and of particular interest to D.C. residents;

- maintain online content available 24 hours a day to D.C. residents;

- solicit and collect money from people in D.C.;

- specifically target readers in D.C. by virtue of the D.C.-centric subjects they cover;

- solicit and claim to receive information from "sources" in D.C.;

- specifically address D.C.-based law enforcement officers;

- attempt to influence a D.C.-based investigation; and

- have traveled about a dozen days in the past year to the D.C. area, including to participate in media to promote his and AFM's content.

Under *Drudge*, these activities are sufficient to meet either of the first two plus-factors under Section 13-423(a)(4). *See also Lewy*, 723 F. Supp. 2d at 126 (jurisdiction proper where defendant "created a network of contacts in the District of Columbia through its website and other means to distribute" copies of its magazines, solicit "donations to support its operations," "sent its employees to the District of Columbia for training programs and conferences and collected information on hate groups in the District of Columbia" (internal quotation marks omitted); *Heroes, Inc.,* 958 F.Supp. at 4–5 (jurisdiction proper where defendant solicited donations on the Internet on a site that is "always available to District residents" and "constitutes a 'reasonable connection between the defendant and the forum'" (internal citations omitted)); *Bochan v. La Fontaine*, 68 F. Supp. 2d 692, 701 (E.D. Va. 1999) (jurisdiction proper where defendant "solicited business in Virginia by promoting and advertising his computer hardware company on the Internet through its website, accessible to Virginia Internet users 24 hours a day").

Couch's and AFM's conduct is easily distinguishable from the fact pattern before this Court in *Parisi v. Sinclair*, 806 F. Supp. 2d 93 (D.D.C. 2011), where there was no evidence that the defendant's website targeted D.C. residents, provided user interactivity, or allowed interaction directly with the defendant, or that there were any non-Internet contacts. *Id.* at 98. In contrast, the Complaint in this case makes detailed allegations about Couch and AFM's

continuous and repeated Internet and non-Internet activity that satisfy the (a)(4) requirements, including as articulated by this Court in *Parisi*.

In addition, Couch and AFM meet the third plus-factor under Section 13-423(a)(4) (although meeting just one of the three plus factors is sufficient) because they have derived substantial revenue from D.C.  To determine whether revenue is "substantial," courts look "both at the absolute amount and at the percentage of total sales, and determines which is 'substantial' on the facts of each case." *Akbar*, 490 F. Supp. at 65 (quotation omitted).  A defendant may be subject to jurisdiction under the "substantial revenue" plus-factor even where D.C.-based revenue accounts for less than one-percent of overall revenue.[15]  Here, Couch and AFM have raised at least $35,000 through various fundraising platforms, including from residents of D.C. Compl. ¶¶ 58-59.  While the total amount raised and the percentage of funds coming from D.C. currently is not known to Aaron, even if Couch and AFM received only $350 from D.C. residents (totaling one percent of the amount the Complaint alleges they have received), that would be sufficient to find "substantial revenue" in D.C. given the quality of their contacts with D.C.

## II.   DEFENDANTS HAVE TRANSACTED BUSINESS IN D.C. SUFFICIENT TO CONFER JURISDICTION UNDER SECTION 13-423(a)(1).

Jurisdiction is also proper because Defendants have transacted business in D.C. under the "transacting any business" provision of D.C.'s long-arm statute, D.C. Code Ann. § 13-423(a)(1). Under that provision, even "a small amount of in-jurisdiction business activity is generally enough to permit the conclusion that a nonresident defendant has transacted business

---

[15] *See Gatewood v. Fiat, S. p. A*., 617 F.2d 820, 827, (D.C. Cir. 1980) (one-and-a-half percent of volume of car sales); *Church of Scientology*, 536 F.2d at 432-33 ($26,000 of revenue, which represented 1% of total revenue); *Akbar*, 490 F. Supp. at 65 ($32,897.04 of revenue, which represented approximately 0.7% of total revenue).

here."  *Shoppers Food*, 746 A.2d at 326 (internal citations and quotations omitted).  "Business"

is "not necessarily limited to acts which are part of commerce or of transactions for profit, but

include acts which constitute purposeful activity within the state."  *See Novack v. Nat'l Hot Rod

Ass'n*, 231 A.2d 22, 26 (1967) (cited approvingly in *Steinberg*, 672 F.2d at 931 fn.7) (emphasis

added); *see also Family Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 242 (D.C.

2015) (under D.C. law, a non-resident, non-profit defendant need not have operated a for-profit

enterprise within D.C. in order to have transacted "any business" for purposes of the long-arm

statute).  Instead, so long as the defendant's activity is related to the plaintiff's claim, the inquiry

under § 13-423(a)(1) is whether the defendant engaged in *any* transaction of business in D.C.

The D.C. Court of Appeals has explained that:

> the sweep of the 'transacting any business' provision  . . . *covers
> any transaction of business in the District of Columbia that can be
> reached jurisdictionally without offending the due process clause*.
> Thus, to determine whether the statute can reach the conduct at
> issue, we must consider whether appellees had sufficient contacts
> with the District such that the assertion of personal jurisdiction
> comports with due process.

*Mouzavires v. Baxter*, 434 A.2d 988, 993 (D.C. 1981) (internal citation omitted) (emphasis

added); *see also Heroes, Inc. v. Heroes Found.*, 958 F. Supp. 1, 2 (D.D.C. 1996) ("The

'transacting any business' clause of the District's long-arm statute provides jurisdiction to the

full extent allowed by the Due Process Clause.").  When analyzing jurisdiction under § 13-

423(a)(1), courts look to whether the defendant's "contacts are voluntary and deliberate or only

random, fortuitous, tenuous and accidental," *Shoppers Food*, 746 A.2d at 329, and "must

consider the 'quality and nature'" of the defendants contacts with D.C.  *Manifold*, 231 F. Supp.

2d at 62.

### A. Butowsky Has Transacted Business In D.C. Sufficient To Confer Jurisdiction Under Section 13-423(a)(1).

Butowsky is subject to this Court's jurisdiction because Aaron's claims relate directly to Butowsky's decision to voluntarily, deliberately, and directly transact business in D.C.  *See Rundquist*, 2012 WL 5954706, at *8 (finding a "discernable relationship" between the plaintiff's copyright infringement claims and the defendant's role in controlling the work of the D.C. architect and sending employees into D.C. because a "claim only fails to have a 'discernible relationship' when it is 'unrelated to the acts forming the basis for personal jurisdiction'" (internal citations omitted)).   Butowsky arranged and attended multiple professional meetings in D.C. for the specific purpose of advancing the D.C.-focused narrative at the heart of this matter—namely, accusing Aaron of committing a crime in D.C. that would be enforceable under the laws of D.C.  *See* Compl. ¶¶ 28; 32; 72-75.   He distributed false and defamatory information about Aaron and his family to at least three different individuals who write content about D.C. for blogs and publications to encourage the publication of false and defamatory content in at least four different publications—The Washington Times, Fox News, The Gateway Pundit, BigLeaguePolitics.com.  *See* Compl. ¶¶ 28; 32; 72-75; 82.   That content was in fact published and disseminated to D.C. residents.   Compl. ¶ 9; 29; 32; 71; 81-82.   Butowsky also paid a former D.C. police detective, Rob Wheeler, to conduct an "investigation" in D.C. about Seth Rich's murder, which took place in D.C.  *See* Governski Decl. Ex. 1 at 40:6-42:16; *see also* Compl. ¶¶ 20-21.   Butowsky first met Mr. Wheeler in D.C., and then arranged multiple meetings with Mr. Wheeler in D.C.  *See* Governski Decl. Ex. 1 at 40:6-42:16; Compl. ¶ 28.[16]   Aaron's claims in this case are directly related to Butowsky's conduct in D.C.—Butowsky

---

[16] Butowsky does not deny that he offered to pay for Mr. Wheeler's private investigative services.  *See* Dkt. 19-1 at ¶ 4.  Nor does he deny, and in some cases he has admitted, that he

intentionally reached into D.C. to encourage the publication of content about the Rich family and this case directly relates to the publication of content about Aaron Rich, including in a D.C.-based publication.

This case falls well within the heartland of cases in which courts have exercised jurisdiction over non-resident defendants.  For example, in *Calder v. Jones*, the United States Supreme Court held that a California court properly asserted jurisdiction consistent with Due Process—the same test courts in this Circuit apply to the Section 13-423(a)(1) inquiry—over Florida-based defendants in connection with a publication that "impugned the professionalism of an entertainer whose television career was centered in California."  465 U.S. 783, 788-789 (1984).  The *Calder* Court reasoned that the Florida defendants could "reasonably anticipate being haled into court [in California] to answer for the truth of the statements" because California was the "focal point" of the defamatory article and the defendants' "intentional, and allegedly tortious, actions were expressly aimed at California" and "would have a potentially devastating impact" on the plaintiff in California.  *Id.* at 788–90.  As the Court explained: "An

---

arranged and participated in these meetings or conversations.  *See* Dkt. 19-1 at ¶¶ 7; 9; Compl. ¶18; *see also* Governski Decl. Ex. 1 at 30:4-42:16.

individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly caused the injury in California." *Id.* at 790.[17]

Here, too, Butowsky's actions were expressly aimed at D.C. such that he could have, and should have, anticipated being haled into court in D.C. to answer for the truth of his statements. *Id.* at 788-89.  Aaron need not go to Texas to seek redress from Butowsky who knowingly caused injury in D.C.  *Id.* at 790.  By accusing Aaron of having committed crimes (including theft from the DNC and obstruction of justice) in D.C., encouraging the publication of defamatory content about Aaron and his family in D.C., including via conversations that occurred in D.C. and with individuals in the D.C. area,  Butowsky is subject to jurisdiction pursuant to (a)(1).

Butowsky asserts that he does not have "any business relationship" with D.C. and that he works as a financial adviser in Texas.  Dkt. 19 at 1; *see also* Dkt. 19-1 at ¶ 3 ("I do not conduct

---

[17] *See Keeton,* 465 U.S. 770 (1984) (New Hampshire court could assert personal jurisdiction over non-resident defendant that circulated copies of a defamatory magazine article in the forum); *Steinberg*, 672 F.2d at 932 (concurring, Wright, J.) (Section 13-423(a)(1)'s "broad reach" covers defendant's "constant communications" with an organization in D.C. and "in particular from appellee's alleged publication of a defamatory notice in the District"); *see also Dooley v. United Techs. Corp.*, 786 F. Supp. 65, 72 (D.C. Cir. 2008) (jurisdiction where defendants "sought out" a D.C.-based entity "to become the conduit" for one of the acts at issue in the litigation); *Heroes.*, 958 F. Supp. at 3 (jurisdiction where defendant approved and "specifically" placed content alleged to have infringed on the plaintiff's trademarks in a forum's local newspaper); *Stabilisierungsfonds*, 647 F.2d at 205 (jurisdiction "where a nonresident defendant ships goods to an intermediary with the expectation that the intermediary will distribute the goods in a region that includes the District of Columbia" even if the defendant has no direct contacts with the forum); *Manifold*, 231 F. Supp. 2d at 62 (jurisdiction where the defendant's "single act" in D.C. of negotiating the sale of a van into the district constituted transacting business); *Shoppers Food*, 746 A.2d at 331  (jurisdiction where defendant "purposefully direct[ed] advertisements for its Maryland and Virginia stores at a potential customer base in the District of Columbia"); *Massey Energy Co. v. United Mine Workers*, 2005 WL 3476771, at *7 (2005) (defendants "must have foreseen the possibility that they would be haled into a Virginia court" by having "caused a defamatory advertisement to be broadcast into the Commonwealth via a television station that regularly broadcast into the Commonwealth").

business in the District of Columbia, nor do I have any clients in the District of Columbia"). That Butowsky works as a financial adviser in Texas is inapposite to whether he transacted business in D.C.  *Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc.*, 607 F. Supp. 2d 185, 190 (D.D.C. 2009) (finding it "largely irrelevant" that the defendant has "more contacts" with another state than with D.C. "because the assertion of jurisdiction over a defendant pursuant to Section 423(a)(1) does not require that the District of Columbia have the *most* contacts vis a vis another forum…" (emphasis in original)).  Whether Butowsky provides financial advice to clients in D.C. is irrelevant to the jurisdictional question in this case. A defendant need not make a profit from his conduct in D.C. to have transacted business here. *See Novack*, 231 A.2d at 26 (1967); *Family Fed'n for World Peace*, 129 A.3d at 242.[18]   The appropriateness of exercising jurisdiction under (a)(1) does not turn on Butowsky's personal financial advisory business; it turns on whether he created sufficient contacts with D.C. by engaging in a campaign to advance conspiracy theories about Aaron and his family in D.C., and encouraging the creation of related content in a business that is headquartered and operates in D.C.

Plaintiff recognizes that this Court has recently interpreted the "transacting any business" prong to require engaging in "some type of *commercial or business-related activity directed* at District residents," but that opinion does not foreclose finding that Butowsky's conduct constituted business-related activity in D.C.  *See Capel v. Capel*, 272 F.Supp.3d 33, 39 (2017) (emphasis in original) (citing *Holder v. Haarmann & Reimer Corp.,* 779 A.2d 264, 270–71 (D.C. 2001) (finding a defendant was not subject to jurisdiction in D.C. because it did not advertise,

---

[18] Even if Butowsky having a "business relationship" with anyone in D.C. were dispositive, this Court "must resolve any factual discrepancies with regard to the existence of personal jurisdiction in favor of the plaintiff." *Lewy*, 723 F. Supp. 2d at 118–19.

sell, produce, distribute, or engage in any "deliberate and voluntary" associates with D.C.).[19] There is no requirement that the "some type" of "commercial or business-related activity" must be related to the defendant's *own profit-generating* business, *see Novack*, 231 A.2d at 26 (1967); *Family Fed'n for World Peace*, 129 A.3d at 242, nor should there be.  Such a ruling would immunize schemes involving commercial fraud in D.C. from jurisdiction whenever the fraudster happens to keep a day job in another state.  Further, the D.C. Circuit has expressed skepticism that "transacting any business" excludes all activity that is not "commercial" in nature, *see Steinberg*, 672 F.2d at 931 fn.7 (collecting cases); *see also Rochon v. F.B.I.*, 691 F. Supp. 1548, 1560 (D.D.C. 1988) (rejecting defendants argument that "business contacts can lead to personal jurisdiction under the long-arm statute only where that business is commercial in nature" because not only "does this argument fly in the face of the actual language of the long-arm statute— which speaks of 'transacting *any* business,' it is flatly contradicted by case law" (internal citations omitted) (emphasis in original) (citing  *Steinberg,* 672 F.2d at 931 n. 7)).[20]

This Court should find that Butowsky is subject to jurisdiction under (a)(1) because Butowsky has engaged in "business-related activity" by working willfully to cause the publication of defamatory content targeting Aaron that would not otherwise exist.  Compl. ¶¶ 28; 32; 72-75; 82.  In so doing, Butowsky's conduct is analogous to the defendant in *Shoppers Food*,

---

[19] Butowsky has engaged in voluntary and intentional activity in D.C. that distinguishes his contacts from the defendants in both *Capel* and *Holder*, where the defendants had not engaged in any minimum contacts with D.C.

[20] *See, cf, Van Wagenberg v. Van Wagenberg*, 241 Md. 154, 170 (1966) (the "transacting business" prong of New York's long-arm statute "is not limited in terms to commercial transactions nor does it contain an exclusion of transactions not entered into for profit"); *Tate v. Blue Cross of Washington & Alaska*, 59 Md. App. 206, 215 (1984) (applying the reasoning of *Wagenberg* to Maryland's long-arm).

whose sole business transaction within the District was purposefully publishing advertising in a major D.C. newspaper to target D.C. residents.  746 A.2d at 322.

In his Motion to Dismiss, Butowsky wrongly asserts that the Complaint "makes only one specific factual allegation for purposes of establishing jurisdiction over Mr. Butowsky, namely that Mr. Butowsky 'encouraged the publication of defamatory content about the Plaintiff in [a] D.C.-based publication.'"  Dkt. 19 at 3.  Butowsky ignores both the facts and the law.

As to the facts, Aaron has alleged far more than the mere encouragement of the Washington Times article.  Indeed, the Complaint alleges that Butowsky engaged in extensive activities *in D.C.* or *directed at D.C.*, including meetings, solicitations, phone calls, and electronic communications with persons in D.C., as well as active efforts to provide and exchange information from persons (including numerous media representatives) in D.C.  Compl. ¶¶ 5; 20; 28; 32; 72-75; 82; Dkt. 19-1 at ¶¶ 7; 9.  Those efforts resulted in false and defamatory statements being published *in D.C.*, about events that happened *in D.C.*, and which statements injured Aaron *in D.C.* because (in part) they alleged crimes committed *in D.C.*  *See supra* Background at 4-6; Section I(A)-(B).  Butowsky is not here by happenstance or accident—he has deliberately sought to alter Aaron's reputation in D.C. by taking actions in D.C., and he may fairly be held responsible for those effects to the extent they are unlawful.  In sum, Butowsky's actions are "of such a quality and nature that they manifest a deliberate and voluntary association with [the District and its residents]."  *Shoppers Food*, 746 A.2d at 331) (quoting *Mouzavires v. Baxter*, 434 A.2d 988, 995 (D.C.1981)).

Legally, Butowsky's argument also fails because a non-resident may transact business in D.C. without setting foot in the District.  Courts in this Circuit have held that phone calls into this jurisdiction may be sufficient to constitute "transacting business."  *See, e.g.*, *Dooley v.*

*United Techs. Corp.*, 786 F. Supp. 65, 72 (D.C. Cir. 2008), *abrogated on other grounds by FC Inv. Grp. LC v. IFX Markets, Ltd.*, 529 F.3d 1087 ("Courts, including this one, have found that telephone calls and mailings to Washington, D.C. constitute 'transacting business' under Section 13–423(a)(1)."); *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 511 (D.C. Cir. 2002) ("transactions by mail and telephone could be the basis for personal jurisdiction notwithstanding the defendant's lack of physical presence in the forum.").  In fact, the Supreme Court in *Calder* expressly rejected Butowsky's argument when it held that transmitting defamatory content from outside of a forum into the forum could satisfy the requirements of due process.  *See Calder*, 465 U.S. at 787 ("The fact that the actions causing the effects in California were performed outside the State did not prevent the State from asserting jurisdiction over a cause of action arising out of those effects."); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (cannot avoid jurisdiction "merely because the defendant did not *physically* enter the forum State" because "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines").

## B. Couch And AFM Have Transacted Business In D.C. Sufficient To Confer Jurisdiction Under Section 13-423(a)(1).

Defendants Couch and AFM transact business in D.C. by maintaining interactive, 24-7 Internet websites and web profiles on which they post the defamatory content that is focused on issues in D.C., including those at the center of this case.  Compl. ¶¶ 33-55; 64-69.  Couch and AFM use their website and social media platforms to communicate directly with their audience about their D.C.-based conspiracy, and they solicit and receive information from "sources" in D.C. about events in D.C.  *See* Compl. ¶¶ 20; 33; 58.  Couch and AFM use their websites to purposefully solicit funds, including from individuals in D.C., to pay for travel to D.C.  *See* Compl. ¶¶ 20; 57-60.

In addition to their extensive online activity, Couch and AFM admit to having traveled to D.C. multiple times—they claim to have visited D.C. "10-12 days" in the last year and a half—for the express purpose of conducting their business: namely, to "investigate" Seth Rich's murder, which happened in D.C. and out of which their defamatory statements arise. Compl. ¶¶ 20; 57-60.  Couch and AFM publicly have claimed to anticipate having a "very large presence in Washington D.C." during one of these trips.  Compl. ¶ 57.  While in D.C., they have raised money for their business operations and attempted to garner greater visibility for their defamatory campaign.  *See* Compl. ¶ 35.  This alone is sufficient to confer jurisdiction over Couch and AFM.[21]

Couch and AFM's combination of on-line and in-person activity confers jurisdiction, as it gives rise to a reasonable expectation that Couch and AFM could be haled into this Court to answer for the truth of the statements they have made about Aaron.  For example, in *Heroes.*, 958 F. Supp. at 5, the court found that jurisdiction was proper where "the defendant's home page explicitly solicits contributions," is "always available to District residents," and "contains the defendant's allegedly infringing trademark and logo, the subject of the plaintiffs underlying claims."  In those circumstances, "the defendant has purposefully availed itself of the privilege of conducting activities within the District, and could reasonably anticipate the possibility of being haled into court there."  *Id.*[22]  Here, Couch and AFM conduct online activity that constitutes the

---

[21] *See, e.g., Rundquist*, 2012 WL 5954706, at *8 (D.D.C. Nov. 9, 2012) (jurisdiction proper where defendants "reached out to the District of Columbia numerous times to further their economic interests" including by visiting D.C. multiple times).

[22] *See also Calder*, 465 U.S. at 788-89;  *Keeton*, 465 U.S. at 774 (jurisdiction proper where defendant's "general course of conduct in circulating magazines throughout the state was purposefully directed at New Hampshire, and inevitably affected persons in the state"); *Chambers*, 2011 WL 3512140, at *5 (jurisdiction proper where defendants "posted on websites, sent emails to Maryland residents, and created blogs that all contain information regarding a

transaction of business in D.C. for purposes of Section 13-423(a)(1), and the case for jurisdiction is even stronger here than in *Heroes* because Couch and AFM have traveled to D.C. at least ten times for the express purpose of conducting business operations in connection with the very activities at issue in this case.

Defendant Couch repeats verbatim the same factually and legally incorrect statement as Butowsky that the "Plaintiff makes only one specific factual allegation for purposes of establishing jurisdiction over Mr. Couch, namely that Mr. Couch 'encouraged the publication of defamatory content about the Plaintiff in [a] D.C.-based publication." Couch and AFM Motion to Dismiss at 3. What the Complaint actually alleges, *inter alia*, is that Couch and AFM engaged in extensive activities in D.C. by visiting *D.C.* repeatedly to advance the narrative at issue in this case coupled with maintaining interactive websites directed to and available 24/7 by *people in D.C.* that regularly publish content about a *D.C.*-centric conspiracy theory, ask *D.C. sources* for information, attempt to influence a *D.C.* investigation into a *D.C.* murder, and solicit and receive funds *from D.C. See supra* Background at 6-9; Section I(C)(1). Like Butowsky, Defendant Couch's argument also is wrong as a matter of law. *See supra* Section II(A).

Defendants Couch and AFM ignore altogether how their online conduct bears directly on this Court's jurisdictional analysis and properly serves as a basis for asserting jurisdiction. *See*

---

Maryland estate proceeding" and where defendants "intentionally sought out Maryland residents when making the alleged defamatory statements about Plaintiff in an effort to harm her reputation"); *Gorman*, 293 F.3d at 513 (jurisdiction proper where defendant maintained a website that "allows it to engage in real-time transactions with District of Columbia residents while they sit at their home or office computers 'in the District of Columbia'"); *Shoppers Food*, 746 A.2d at 331 (jurisdiction proper where defendant engaged in "purposeful, affirmative activity within the District of Columbia" by purposefully soliciting customers from D.C. "with the expectation that they would purchase products" (internal quotation marks and citations omitted)).

*Gorman*, 293 F.3d at 516 (instructing that a defendant "is quite wrong in treating 'cyberspace' as if it were a kingdom floating in the mysterious ether, immune from the jurisdiction of earthly courts.");[23] *see also Heroes*, 958 F. Supp. at 4 (rejecting "attempts to soft-pedal the significance of its web site" because the home page maintains "sustained contact with the District" by being constantly available, soliciting donations, and includes content at issue in the underlying claims).

To the extent that Defendants Couch and AFM are implicitly arguing that they qualify for the "newsgathering exception" to either (a)(1) or (a)(4), that argument fails. That exception is intended for news organizations whose "*only* persistent course of conduct in the District is the maintenance of an office there for gathering news from being subject to the jurisdiction of the District's courts.'" *Lewy*, 723 F. Supp. 2d at 125-27 (emphasis added). There is no "newsgathering exception" for content "aimed at a national audience that **includes D.C. residents**." *Id*. at 127 (internal footnote omitted) (emphasis added). Even assuming *arguendo* that Defendants Couch and AFM are entitled to the same type of protections as a newspaper, the law does not support application of the exception where their persistent course of conduct is not

---

[23] "'Cyberspace,' however, is not some mystical incantation capable of warding off the jurisdiction of courts built from bricks and mortar. Just as our traditional notions of personal jurisdiction have proven adaptable to other changes in the national economy, so too are they adaptable to the transformations wrought by the Internet. In the last century, for example, courts held that, depending upon the circumstances, transactions by mail and telephone could be the basis for personal jurisdiction notwithstanding the defendant's lack of physical presence in the forum. There is no logical reason why the same should not be true of transactions accomplished through the use of e-mail or interactive websites. Indeed, application of this precedent is quite natural since much communication over the Internet is still transmitted by ordinary telephone lines." *Id.* at 510–12 (internal citations and footnotes omitted)

*only* the maintenance of an office in D.C., but rather also includes interactive websites directly targeting D.C. content and residents.[24]

## III.   DEFENDANTS' ACTIONS IN D.C. HAVE CAUSED TORTIOUS INJURY IN D.C. SUFFICIENT TO CONFER JURISDICTION UNDER SECTION 13-423(a)(3).

Jurisdiction is proper under Section 13-423(a)(3) where there was a tortious injury within the District caused by a defendant's act or omission within the District. *Akbar*, 490 F. Supp. at 63. Both of these elements are met as to each Defendant. Aaron suffered a tortious injury in D.C. for the reasons set forth in Section I(A) *supra*.

### A.  Butowsky's Actions In D.C. Caused Aaron's Tortious Injury In D.C.

The causal link between Butowsky's conduct in D.C. and Aaron's injury here is obvious: Butowsky personally encouraged and facilitated the publication and circulation of defamatory content about Aaron in publications published in D.C. and/or directly targeting a D.C. audience. *See* Compl. ¶¶ 9, 20, 32, 72, 81-82. The allegations in the Complaint are sufficient to establish that Butowsky engaged in an act in D.C. under Section 13-423(a)(3) by causing the defamatory content to be published in D.C. *See, e.g.*, *Massey Energy*, 2005 WL 3476771, at *7 (jurisdiction proper under identical provision in Virginia's long-arm statute where defendants were "alleged

---

[24] The case Defendant Couch cites in his motion (Couch and AFM Motion to Dismiss at 2), *Shirlington Limousine & Transp., Inc. v. San Diego Union-Tribune*, 566 F. Supp. 2d 1, (D.D.C. 2008), does not support applying the newsgathering exception here. Unlike Couch and AFM, the newspaper defendant in that case engaged in "*no functions* aside from newsgathering" from an office in D.C., including by maintaining a website with "limited user interactivity" that was "designed for use principally by San Diego residents." *Id.* at 3-4 (emphasis added). Aaron's Complaint does not allege jurisdiction on the basis of the mere presence of an office in D.C., but rather specific conduct, targeted at a D.C. audience, alleging that Plaintiff committed criminal acts in D.C., with the intent of influencing Plaintiff's reputation within D.C.

to have caused a defamatory advertisement to be broadcast into the Commonwealth via a television station that regularly broadcast into the Commonwealth").

This case is unlike this Court's decision in *Capel*, where the only defamatory "act" in question was the plaintiff's uttering of defamatory statements over the phone from out of state. 272 F.Supp.3d at 40. Here, Butowsky did more than simply utter defamatory content to a third party over the phone (though he did that); his "act" was causing that defamatory message to be published and circulated in D.C. to the D.C. community. *Contrast* Dkt. 19 at 1, 3 *with* Compl. ¶¶ 9; 21; 81-82. The cases on which Butowsky relies to argue that his phone calls from Texas do not subject him to jurisdiction here therefore are inapposite for the same reason *Capel* is factually distinct. *See Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128 (D.C. Cir. 2017) (complaint failed to allege any injury in D.C.); *Tavoulareas v. Comnas*, 720 F.2d 192 (D.C. Cir. 1983) (no jurisdiction where *all* of defendant's acts were telephone calls from outside of forum); *Margoles v. Johns,* 483 F.2d 1212 (D.C. Cir.1973) (same).

### B.  Couch's And AFM's Actions In D.C. Caused Aaron's Tortious Injury In D.C.

Couch and AFM have travelled to D.C. for the express purpose of "investigating" Seth Rich's murder.  Compl. ¶ 20; 35; 57; 59; *see supra* Background at 7-9.  For more than a year, Defendants Couch and AFM made repeated visits to D.C. to advance their defamatory campaign against Aaron, including by soliciting funds while on the ground in D.C., posting online content about their conspiracy theory, and appearing on One America News Network to talk about their conspiracy theory.[25]  This is a case involving defendants who specifically travelled to D.C. to

---

[25] After being served with the Complaint in the D.C. area, Couch made defamatory statements in the D.C. area, including statements accusing Aaron and his parents of not wanting "to find out who killed your son and your brother," of "covering up the murder" of Seth, and of "obstructing a murder investigation."  *Supra* at Background 8-9.

injure Aaron in D.C.  That satisfies Section 13-423(a)(3) under the cases cited above, *supra* at Section III(A).

## IV.     THE COURT HAS PERSONAL JURISIDICTION OVER DEFENDANTS BUTOWSKY, COUCH, AND AFM BASED ON OVERT ACTS IN THE FORUM IN FURTHERANCE OF THEIR CONSPIRACY.

Where a plaintiff alleges a conspiracy among multiple defendants, and where one of those defendants takes an overt act in furtherance of the conspiracy in D.C., jurisdiction is proper over all defendants.  *See Dooley*, 786 F. Supp. at 79 (explaining that conspiracy-based jurisdiction is "an extension of the jurisdiction conferred upon a court by the enactment of a long-arm statute" that is "based on the agency relationship between the co-conspirators"); *Mandelkorn v. Patrick*, 359 F. Supp. 692 (D.D.C. 1973) ("Assuming as true the unchallenged allegations of conspiracy and an overt act in the District of Columbia in furtherance of the conspiracy, this Court sees no injustice in requiring the New York and Florida Defendants to submit to suit here.").[26]

Here, the Complaint includes detailed allegations of a conspiracy amongst all of the Defendants, *including The Washington Times*, which has conceded that it is subject to this Court's jurisdiction, operates in D.C., and published in D.C. an article at issue in this litigation. Dkt. 17 at ¶¶ 8; 17; 19.  Butowsky is the only named source in the publication, Compl. ¶¶ 72-75, and Couch and AFM have stated that the Times publication was "put out to help vindicate our team" and that "everything in that article was from America First Media Group."  Compl. ¶ 75.

---

[26] *See also Companhia Brasileira Carbureto de Calcio-CBCC v. Applied Indus. Materials Corp.*, 859 F. Supp. 2d 1, 6 (D.D.C. 2012) (jurisdiction proper where complaint alleged that one of the "alleged coconspirators took an overt act in the forum" even though other defendants were "not alleged to have taken any action within the forum"); *Kopff v. Battaglia*, 425 F. Supp. 2d 76, 81 fn.4 (D.D.C. 2006) ("agency clause of section 13–423 to extend the reach of the long-arm statute to an individual whose only contact with the forum consists of the acts of a co-conspirator."); *see also Massey Energy*, 69 Va. Cir. 118, , at *5 (jurisdiction proper over nonresident defendants in connection with purchasing defamatory advertisements that reached viewers in Virginia).

The Times' overt act—printing, publishing, and disseminating a defamatory article in D.C. from which the claims in this case arise that furthered the conspiracy to defame Aaron—extends jurisdiction over Butowsky, Couch, and AFM.[27]

## V.    ALTERNATIVELY, JURISDICTIONAL DISCOVERY IS WARRANTED.

Even if this Court determines that it cannot assert personal jurisdiction over Defendants Butowsky, Couch, and AFM (which the Plaintiff does not concede), dismissal of this action would not be appropriate because the Complaint has "pointed to links" between each Defendant and D.C. "sufficient at least to permit further inquiry regarding personal jurisdiction, so that the statutory and constitutional questions can be resolved on a fuller record."  *Crane*, 814 F.2d at 760 (vacating the district court's dismissal because it provided "no opportunity for discovery on the issue of personal jurisdiction); *see also Gorman,* 293 F.3d at 513 ("Because the plaintiff has 'demonstrate[d] that it can supplement its jurisdictional allegations through discovery, . . . jurisdictional discovery is justified' and should have been afforded.");  *Rochon*, 691 F. Supp. at 1560 (permitting jurisdictional discovery where there is support for finding that proper jurisdiction "may lie" in D.C. to more "precisely tie each defendant to actions within" D.C.).

Jurisdictional discovery in this matter would be focused and targeted narrowly at generating evidence directly related to the Defendants' contacts with D.C.  Plaintiff submits that jurisdictional discovery would be likely to show that Butowsky has transacted business in, and intentionally and persistently reached into D.C., for years.  Such supporting evidence would be likely to include: emails from Butowsky repeatedly attempting to arrange meetings in D.C. with members of the Rich family and related acquaintances; social media postings showing

---

[27] For the reasons explained above, the other Defendants also have engaged in overt acts in D.C. in furtherance of the conspiracy, *supra* at Background, and that, too, is sufficient to confer jurisdiction over the other Defendants.

Butowsky's presence in D.C.; and testimony reflecting attempts by Butowsky while in D.C. to force meetings with individuals in D.C. related to the issues of this litigation.  We also anticipate that jurisdictional discovery would provide evidence relating to Couch's and AFM's contacts with D.C., including details relating to how much money they have received from individuals in D.C., the "sources" with whom they have met and to whom they have spoken in D.C., and the extent of their viewers and followers in D.C.  Additionally, jurisdictional discovery would provide further details about the conspiracy amongst the Defendants, including communications between Defendants and with Defendant The Washington Times.[28]

## CONCLUSION

For the forgoing reasons, Aaron respectfully requests that the Court deny the Motions to Dismiss filed by Defendants Butowsky, Couch, and AFM.

DATED:  June 7, 2018                                         Respectfully submitted,

By: /s/ Michael J. Gottlieb

MICHAEL J. GOTTLIEB (D.C. Bar No. 974960)
JOSHUA RILEY (D.C. Bar No. 1026900)
MERYL C. GOVERNSKI (D.C. Bar No. 1023549)
ANDREA R. FLORES (Admission Pending)
1401 New York Ave NW
Washington, DC  20005
Tel: (202) 237-2727
Fax: (202) 237-6131
mgottlieb@bsfllp.com
jriley@bsfllp.com
mgovernski@bsfllp.com
aflores@bsfllp.com

---

[28] Irrespective of whether the Court determines that jurisdictional discovery is warranted, it should not dismiss the case without first permitting Aaron to file an amended Complaint.  Fed. R. Civ. P. 15 ("The court should freely give leave" to amend complaints "when justice so requires."); *Christensson v. Hogdal*, 199 F.2d 402, 406 (D.C. Cir. 1952) ("The modern rule is liberal in permitting the amendment of pleadings to show that the court has jurisdiction.").

RANDALL JACKSON (D.C. Bar No. 490798)
575 Lexington Ave
7th Floor
New York, NY 10022
Tel: (212) 303-3650
Fax: (323) 446-2350
rrjackson@bsfllp.com

*Attorneys for Plaintiff Aaron Rich*

Memorandum In Opposition To Defendants' Motions To Dismiss

## **CERTIFICATE OF SERVICE**

I hereby certify that on June 7, 2018, this document was filed with the Clerk of the Court of the U.S. District Court of the District of Columbia by using the CM/ECF system, which will automatically generate and serve notices of this filing to all counsel of record.

Additionally, a copy of the foregoing document was emailed to Defendants Couch and AFM via Defendant Couch at mattcouch@af-mg.com (pending appointment of counsel).  These Defendants consented in writing to receive filings via email pending registration to receive electronic notification of filings.

Dated: June 7, 2018

/s/ *Michael J. Gottlieb*

MICHAEL J. GOTTLIEB (D.C. Bar No. 974960)
1401 New York Ave NW
Washington, DC  20005
Tel: (202) 237-2727
Fax: (202) 237-6131
mgottlieb@bsfllp.com