# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AARON RICH

                Plaintiff,

    v.

EDWARD BUTOWSKY,
MATTHEW COUCH, and
AMERICA FIRST MEDIA

                Defendants.

Civil Action No. 1:18-cv-00681-RJL
Hon. Richard J. Leon

**PLAINTIFF'S MOTION AND MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE THE COURT'S ORDER REQUIRING DEFENDANT COUCH TO PRODUCE DOCUMENTS AND TO REMEDY DEFENDANT COUCH'S REFUSAL TO ANSWER QUESTIONS DURING HIS DEPOSITION**

JOSHUA P. RILEY
MERYL C. GOVERNSKI
BOIES SCHILLER FLEXNER LLP
1401 New York Ave NW, Washington DC 20005

MICHAEL J. GOTTLIEB
WILLKIE FARR GALLAGHER LLP
1875 K Street NW, Washington, DC 20006

***Attorneys for Plaintiff Aaron Rich***

## INTRODUCTION

Plaintiff Aaron Rich sued Defendant Matthew Couch after Defendant Couch published false statements about Plaintiff, including statements alleging that Plaintiff and his brother, Seth Rich, were involved in the leak of Democratic National Committee ("DNC") emails in the summer of 2016.  Although Defendant Couch publicly has boasted that he has "mountains of evidence" to support his statements and that he could "prove everything except for who pulled the trigger" in the death of Plaintiff's brother, discovery in this case has revealed something quite different: Defendant Couch has no evidence to support his statements.  Instead, Defendant Couch has admitted in written discovery and at his deposition that all of his "information" about Plaintiff's alleged connection with the DNC email leak came from Defendant Edward Butowsky.

Plaintiff has asked Defendant Couch (via deposition questions and requests for production of documents) to produce and testify about his communications with Defendant Butowsky (and anyone else whom Defendant Couch claims to be a source of Defendant Couch's "information" about Plaintiff or his brother).  After Defendant Couch failed to respond to Plaintiff's written discovery requests, the Court entered an order compelling Defendant Couch to do so, and the Court subsequently denied Defendant Couch's motion for reconsideration of that order.  Nonetheless, Defendant Couch still refuses to produce documents about conversations he has had about Plaintiff with Defendant Butowsky and two other individuals—Tore Lindeman and ███████—whom Defendant Couch has identified as "sources" on which he has relied in making statements about Plaintiff or Plaintiff's brother.  Defendant Couch also refused to answer questions on nearly seventy occasions during his recent deposition.

Defendant Couch claims that he is entitled to invoke a "reporter's privilege" over the information he is withholding.  Defendant Couch's position is baseless, and this Court should

reject it.  First, assuming arguendo that Defendant Couch is eligible for protection under such a privilege, Defendant Couch waived any privilege by failing to assert it timely and, indeed, not until over six months after his response to Plaintiff's document requests was due and four months after this Court entered its order requiring Defendant Couch to respond in full to Plaintiff's discovery requests.  In the interim, Defendant Couch raised various other arguments about and objections to Plaintiff's discovery requests—but never a reporter's privilege—and Defendant Couch took actions directly contrary to the assertion of any such privilege, including by disclosing, relying on, and in some instances publicly touting, his supposed "sources."  The Court should not permit Defendant Couch to use his communications with "sources" as a sword in this litigation while simultaneously shielding those communications from discovery and scrutiny.

Second, even if Defendant Couch had not waived the reporter's privilege, that privilege would not apply to Defendant Couch because he cannot meet his burden of showing that he is a reporter.  Rather, he is an Internet provocateur and a purveyor of inflammatory clickbait who uses social media to publish content without regard to truth or falsity in an attempt to generate followers and solicit funds.  Defendant Couch has admitted—whether to this Court or under oath in deposition—that: ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████ (and in fact describes America First Media Group, the brand under which he posts content, as nothing but a "moniker" ███████████████████

2

████████████████████████████████████████████████.  To conclude that Defendant Couch is entitled to a reporter's privilege would cheapen the notion of bona fide journalism and distort the reporter's privilege beyond recognition.

Third, even if the Court concluded that Defendant Couch is a journalist and that he has not waived an assertion of privilege, any purported privilege must give way because the information Defendant Couch seeks to withhold goes to the heart of Plaintiff's case as well as Defendants' various defenses.  Unlike members of the news media who receive third-party subpoena requests for documents and testimony, and who receive robust protection under the First Amendment in those circumstances, the argument for applying the "reporter's privilege" is at its weakest, and the interests in requiring disclosure are at their apex, when the party asserting the privilege is a defendant in a defamation action.  To sustain Defendant Couch's objection under these circumstances would allow Defendant Couch and Defendant Butowsky to reap the benefit of purported "information" on which they claimed to rely in making statements about Plaintiff while depriving Plaintiff of the ability to probe Defendants' position, prosecute Plaintiff's case, and establish the truth.

The Court should order Defendant Couch immediately to produce the documents he is withholding and the Court should give Defendant Couch a choice as between stipulating to certain facts, which are set out in the Proposed Order accompanying this Motion, or sitting for three-and-a-half additional hours of deposition questioning at his (or his counsel's) expense.

## BACKGROUND

Plaintiff's only brother, Seth Rich, was a DNC staffer whose July 2016 murder remains unsolved, although law enforcement suspects that the murder was the result of a botched robbery,

consistent with a spate of armed robberies in the neighborhood at the time.[1]  Defendant Couch and

Defendant Butowsky have exploited the circumstances of Seth Rich's murder to promote a

baseless conspiracy theory that Plaintiff and/or Seth Rich were responsible for leaking DNC

documents to WikiLeaks in the run-up to the 2016 presidential election.  *See generally* Dkt. 3.

     For example, Defendant Butowsky was involved in ███████████████ a subsequently

retracted Fox News article stating that Seth Rich was WikiLeaks' source for the DNC emails.[2]

After Fox News retracted the article, Defendant Butowsky turned to Defendant Couch, among

others, to serve as a mouthpiece for Defendant Butowsky's conspiracy theory about Plaintiff and

his brother.[3]  Defendant Butowsky provided Defendant Couch with money as Defendant Couch

tried to ████████████████████████████████"[4]  After a series of August 2017

conversations between Defendant Couch and Defendant Butowsky—several of which Defendant

---

[1] *See* Dkt. 3 ¶¶ 2; 26; *see also* Governski Decl. Ex. 1 at 38:8-20 (D. Sines, Tr. of Conspiracyland Episode 1), Ex. 2 at 48:4-50:9 (L. Parsons, MPD, Tr. of Conspiracyland Episode 6).

[2] Governski Decl. Ex. 3 (WHEELER0000493, 5/15/17 Email from E. Butowsky to S. Doocy, et al. ("I'm actually the one who's been putting this together but as you know I keep my name out of things because I have no credibility.")).

[3] *See, e.g.*, Governski Decl. Ex. 4 (Couch Dep. Ex. 63, MC000010 at -104, 3/20/18 Text from E. Butowsky to M. Couch ██████████████████████████████████████████████████████ ), Ex. 5 (Couch Dep. Ex. 73, MC000008, 8/13/17 Email correspondence between E. Butowsky and M. Couch ██████████████████████ ), Ex. 6 (Butowsky 0001042, 8/7/17 Email correspondence between E. Butowsky and C. Fairbanks).

[4] *See* Dkt. 3 ¶¶ 56-63; Governski Decl. Ex. 7 at 391:21-392:5 (Couch Dep. Tr. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ )), Ex. 4 (Couch Dep. Ex. 63, MC000010 at -33, -36, 12/26/17 Text from M. Couch to E. Butowsky ███████████████████████████████████████████████████████████████ .

Couch admitted he has recorded but has not produced—Defendant Couch began publishing false statements about Plaintiff, including for example:

- "Aaron Rich had money from WikiLeaks go into his personal account. Think about that. Aaron Rich had WikiLeaks money go into his personal account." Dkt. 3 ¶ 41.

- "We know for a fact that Aaron Rich and Seth Rich were involved and did the leaks together." *Id*. ¶ 51.

- "Aaron Rich is involved. We know from Ed Butowsky that Aaron Rich took money from WikiLeaks. We've proved that." *Id*. ¶ 52.

- "Aaron Rich definitely knew the hit was coming, because we know—we know for a fact that Aaron Rich is the one that told Kelsey Mulka to break up with Seth Rich . . . Aaron Rich contacted Kelsey Mulka and told her to break up with Seth Rich because he knew the hit was coming for her safety. Aaron Rich told Kelsey that she needed to get out of town." *Id*. ¶ 53.

Defendants' public statements about Seth Rich and Plaintiff were intended to undermine the Intelligence Community's and Justice Department's conclusion that Russia hacked the DNC in its efforts to interfere with the 2016 election. For example, Defendant Butowsky has explained his interest in Seth Rich's murder as follows:

> "[T]he most important thing is this: Everyone—there—there's so many people throughout Trump's, you know, four years—and maybe eight years—are always gonna fall back on the idea that he's not legitimate and the Russians got him elected. This changes all of that."[5]

He similarly has explained that "[o]ne of the big conclusions we need to draw from" the allegation that Seth Rich leaked the DNC emails "is that the Russians did not hack into our computer systems and steel [sic] emails and there was no collusion like trump with the Russians."[6] Similarly,

---

[5] Governski Decl. Ex. 8 at 24:5-13 (Butowsky 0000790, Transcript of recorded call between E. Butowsky and S. Hersh).

[6] Governski Decl. Ex. 3.

Defendant Couch has explained that "the Russian narrative dies" when he "exploded the heat . . . of the Seth Rich story."   Dkt. 3 ¶ 45.  Defendant Couch also has profited financially from the defamatory content he has published about Plaintiff, having used that content to solicit financial donations and accumulate "followers" on social media.[7]

As relevant to this Motion, Plaintiff has asked Defendant Couch to disclose, and produce discovery relevant to, all of Defendant Couch's purported bases for the false statements he has made about Plaintiff.  After all, Defendant Couch has stated publicly that he has "mountains of evidence" and "so many recordings," "so many text messages, so many voicemails, so many emails" that would "prove" that Plaintiff and his brother leaked the DNC emails and that Defendant Couch could in fact "prove everything except for who pulled the trigger" in the Seth Rich's murder. *See* Dkt. 71 at Section II (citing exhibits).  It now appears, however, that Defendant Couch's only basis for his statements about Plaintiff is the "information" that Defendant Butowsky provided to Defendant Couch:  Defendant Couch publicly has acknowledged that Defendant Butowsky was the source of Defendant Couch's "information" relating to Plaintiff, and Defendant Couch has since stated in written discovery that "[a]ll" information Defendant Couch "reported" on "Aaron Rich, WikiLeaks, Money, and Emails came from defendant Butowsky."[8]

---

[7] Governski Decl. Ex. 7 at 393:7-397:9 ███████████████████████████████████████████████████████████████████████████████████████; *see* Matt Couch (@realmattcouch), Twitter   (Jan.   26,   2019,   12:00   PM),   https://twitter.com/RealMattCouch/status/ 1089251771409682432 (advertising America First Media "Fund A Thon" and stating, "We cannot do what we do without our supporters.  Who will be our first $40 donation today?  #sethrich . . . ."); Matt   Couch   (@realmattcouch),   Twitter   (Feb.   25,   2018,   2:00   PM), https://twitter.com/RealMattCouch/status/967881933702213632   (Advertising   America   First Media "Fund A Thon" and stating, "We're returning in our Seth Rich Murder Investigation.  We need your help.  Anything helps . . . .").

[8] *See* Dkt. 71-4 at 4 (6/23/19 Couch Resp. to Interrogatory No. 2) (authenticated as Couch Deposition Exhibit 70, *see* Governksi Decl. Ex. 9 at 9-11); *see, e.g.*, Dkt. 3 ¶ 41 ("I'm going to follow Ed's lead here.  Ed and I have had a couple of phone calls, where we had a couple of great

Yet Defendant Couch refuses to produce communications, including audio recordings of communications, about Plaintiff that Defendant Couch has had with Defendant Butowsky, along with three other individuals—Tore Lindeman, ██████, and another "source" whom he refuses to disclose.  Overall, Defendant Couch is withholding at least eleven such communications.[9]  In addition, during his deposition, Defendant Couch refused to answer questions on nearly seventy occasions, including questions about his communications with Defendant Butowsky, Dr. Lindeman, and ███████.[10]

---

talks, and Ed just put it out there—Aaron Rich accepted money."); *id.* ¶ 43 ("A huge thanks to Ed Butowsky, who I guess at this point, I mean hell it's out, Ed joined my Periscope, yea he's one of my sources America."); *id.* ¶ 35 ("Joel Rich told one of our sources 'I know what my two boys did.'"); *id.* ("Money went into Aaron Rich's personal bank account from WikiLeaks, per Ed Butowsky on our program . . ."); *see also* Governski Decl. Ex. 10 at 5-7, ¶¶ 5, 7, 19 (Couch Dep. Ex. 65, Couch Mot. To Dismiss and Supporting Declaration of AFM & Matt Couch), Ex. 7 at 77:19-80:3.

[9] The withheld documents that currently are known to exist are set forth in lines 21 to 31 of Defendant Couch's privilege log, which is included as an exhibit to this Motion.  *See* Governski Decl. Ex. 11 (Couch Dep. Ex. 77, Couch Privilege Log). ██████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████  *See* Governski Decl. Ex. 7 at 327:9-331:17, 429:25-430:20, 449:20-23, 458:16-22, 494:5-495:20. ██████████████████████████████████████████████████████████████ ████████  *Id.* at 458:8-15. ████████████████████████████████████████████████ █████████████████  Plaintiff also notes that Defendant Couch has yet to provide an updated privilege log delineating his email exchanges with Ty Clevenger (noted on line 33 of the privilege log), over which Defendant Couch has asserted Attorney-Client Privilege and Attorney Work Product.  *See* Dkt. 36 at 4-5 (with respect to communications with counsel prior to date of complaint, the privilege log must "at a minimum, include the author of the document, any recipients (i.e. To, CC, or BCC) of the document, the date of the document, the subject line or file name of the document (if not, itself, privileged), the basis for the privilege (e.g., work product, attorney-client), and a brief description of the document" so that Plaintiff can assess if the privilege has been properly asserted ).

[10] Exhibit 12 to this Motion provides excerpts of each of the nearly seventy instances during the deposition when Defendant Couch refused to answer questions, over fifty of which were based on assertions of source privilege.

## ARGUMENT

Defendant Couch has waived any purported reporter's privilege. *See infra* Section I. First, he did not timely assert that privilege, and this Court already has ordered Defendant Couch to respond in full to Plaintiff's discovery requests (and it has denied Defendant Couch's motion seeking reconsideration of that order). *See infra* Section I(A). Second, Defendant Couch is attempting to use relevant information as a sword (to argue that he had bases for his false statements about Plaintiff) while simultaneously trying to shield it from discovery—which the law does not permit. *See infra* Section I(B). Third, Defendant Couch is seeking to assert the reporter's privilege, not in furtherance of any newsgathering activities, but instead for the benefit of Defendant Butowsky, who does not have standing to assert the privilege. *See* Section I(C). Any one of those three bases would be sufficient to find waiver and that, in turn, would be sufficient to require Defendant Couch to provide the information he currently is withholding—and the Court need not go any further in granting this Motion.

However, even if Defendant Couch had preserved his right to assert a reporter's privilege (which he has not), he does not qualify for any such privilege—because he is not a reporter. *Infra* Section II. Defendant Couch has no journalism training, no press credentials, no news journalism experience, no familiarity with journalism ethics, no affiliation with a press entity, and no policies or practices that are standard among journalists. *See id*. He merely is an Internet provocateur who has used social media to cultivate a following by posting conspiracy theories online. Courts that have considered the reporter's privilege in similar situations have held that it does not apply. *See id*. And that is for good reason—if someone like Defendant Couch is deemed a reporter entitled to the reporter's privilege, then anyone with access to the Internet who calls himself a "journalist" or bestows upon himself the "moniker" of a "media group" would be able to defame others with

near immunity, hiding behind real or fictitious but never disclosed "sources" as the bases for their statements.

Finally, even if Defendant Couch had preserved his ability to assert a reporter's privilege (which he has not), and even if Defendant Couch qualified for such a privilege (which he does not), the privilege still would not apply here because Defendant Couch is withholding information that goes to the heart of this matter, and courts have recognized that the reporter's privilege must give way to the rights of a victim of defamation in such circumstances. *Infra* Section III(A).

## I. DEFENDANT COUCH HAS WAIVED ANY PURPORTED REPORTER'S PRIVILEGE.

### A. Defendant Couch Waived The Reporter's Privilege By Failing Timely To Assert It.

A party waives the right to assert a privilege by failing to raise an objection at the time when responses to discovery requests are due. *See* Fed. R. Civ. P. 34(b)(2); *Embassy of the Fed. Republic of Nigeria v. Ugwuonye*, No. 10-cv-1929 (BJR), 2012 WL 13047525, at *2-*3 (D.D.C. Oct. 17, 2012); *Byrd* v. *Reno*, No. CIV.A.96-2375CKK JMF, 1998 WL 429676, at *8 (D.D.C. Feb. 12, 1998). Defendant Couch has waived any purported reporter's privilege here by failing to assert it timely—and indeed not until over six months after it was due.

Plaintiff served his First Request for Production of Documents ("First RFP") on Defendant Couch on April 23, requesting, *inter alia*, all communications, including audio recordings of such communications, with Defendant Butowsky and with any individual on whom Defendant Couch intended to rely as a basis for Defendant Couch's false statements about Plaintiff. *See* Dkts. 71-1, 71-2. Over the course of the next several months, Defendant Couch failed to assert a reporter's privilege:

- Defendant Couch did not assert a reporter's privilege on May 22, the Federal Rules' deadline for Defendant Couch's response to the First RFP, at which point the privilege was waived. *See* Fed. R. Civ. P. 34(b)(2); Dkt. 71 at 7.

- Defendant Couch did not assert a reporter's privilege on June 23, when he responded to Plaintiff's First Sets of Interrogatories. *See* Dkt. 71-4. Instead, Defendant Couch did the opposite, identifying Defendant Butowsky as Defendant Couch's source for Defendant Couch's statements about Plaintiff. *Id.* at 4 ("All information reported on Aaron Rich, Wikileaks, Money, and Emails came from defendant Butowsky.").

- Defendant Couch did not assert a reporter's privilege on July 31 when he participated by telephone in the Court's July 31 hearing on Plaintiff's motion to compel Defendants to respond to Plaintiff's discovery requests, which motion the Court subsequently granted. *See* Dkt. 75 at 5:11-12; 7/31/19 Minute Order.

- Defendant Couch did not assert a reporter's privilege on August 16, when, with assistance from counsel, he filed a motion for reconsideration of the Court's Order granting Plaintiff's motion to compel. *See* Dkts. 76, 79. (The Court denied Defendants' Motion for Reconsideration on November 4. *See* 11/4/2019 Minute Order.)

- Defendant Couch did not assert a reporter's privilege on August 21 when, with assistance from counsel, he purported to serve untimely objections to the First RFP. *See* Governski Decl. Ex. 13 (8/21/19 Couch Responses and Objections to Plaintiff's RFP and 8/21/19 AFM Responses and Objections to Plaintiff's RFP).

- Defendant Couch did not assert a reporter's privilege on August 26, when he produced 50 documents, including a handful of emails with Defendant Butowsky.

- Defendant Couch did not assert a reporter's privilege on September 27 or October 8, when he purported to untimely supplement his prior responses to the First Interrogatories. *See* Governski Decl. Ex. 14 (Couch Dep. Ex. 74, 9/27/19 Couch Responses and Objections to Plaintiff's First Interrogatories), Ex. 15 (Couch Dep. Ex. 75, 10/8/19 Couch Supp. Responses and Objections to Plaintiff's First Interrogatories). Rather, Defendant Couch again acted contrary to any privilege when he described two conversations Defendant Couch had with Defendant Butowsky in August 2017 and made reference to a "naval intelligence source" as a basis for his statements. *Id.* Ex. 14 at 2-3; *see* Dkt. 71-4 at 4.

- Defendant Couch did not assert a reporter's privilege in response to October 8 correspondence from Plaintiff's counsel stating "our understanding that Mr. Couch has not asserted privilege over any other document or conversation, with any individual other than with you, and on any grounds other than attorney-client and work-product." Governski Decl. Ex. 16 at 2 (10/8/19 Letter from M. Governski to E. Quainton).

On October 25, Defendant Couch indicated for the first time that he planned to withhold

"various items" based on a purported reporter's privilege. *See* Governski Decl. Ex. 17 at 2

(10/25/17 Letter from E. Quainton to M. Governski).   On November 21, Defendant Couch responded to Plaintiff's second set of Interrogatories and asserted a reporter's privilege over the identity of and communications with Dr. Lindeman—even though Defendant Couch previously had identified Dr. Lindeman on his Initial Disclosures as someone with "knowledge about communications between Aaron Rich and [Seth Rich's girlfriend] relating to Seth Rich." Governski Decl. Ex. 18 at 4 (Couch Dep. Ex. 76, 11/21/19 Couch Responses and Objections to Plaintiff's Second Interrogatories), Ex. 19 at 3 (8/18/19 Couch Initial Disclosures).   Even then, Defendant Couch did not purport to assert a reporter's privilege over communications with Defendant Butowsky.   *See* Governski Decl. Ex. 20 (12/3/19 Email from E. Quainton to M. Governski).

It was not until December 6—less than a week prior to Defendant Couch's deposition, over six months after the response to the First RFP was due, over four months after the Court ordered Defendant Couch to respond in full to the First RFP, and over a month after the Court denied Defendant Couch's motion for reconsideration of that order—that Defendant Couch stated for the very first time that he was withholding documents, including audio or video files, pursuant to a purported reporter's privilege over his communications with Defendant Butowsky and two other "sources," ███████ and one other unknown individual.[11]   *See* Governski Decl. Ex. 11; *see also id.* Ex. 7 at 327:9-331:17, 429:25-430:20, 449:20-23, 458:16-22, 494:5-495:20.

On these facts, there can be no serious question that Defendant Couch has waived any reporter's privilege he might conceivably hold over the withheld communications.   Though a single waiver is sufficient, Defendant Couch has waived the right to assert any purported reporter's

---

[11] Notably, Defendant Couch did not assert a privilege over his communications with Defendant Butowsky until after Defendant Couch's counsel began representing Defendant Butowsky as well.

privilege on multiple occasions by failing to raise it, even when he was represented by counsel and even when he had an obligation to do so.[12]   The Court need not go any further in ordering Defendant Couch to produce the documents he currently is withholding on the basis of a reporter's privilege.

### B.     Defendant Couch Waived The Reporter's Privilege By Selectively Using Purportedly Privileged Material As A Sword While Asserting The Privilege As A Shield.

One waives the reporter's privilege when one selectively uses purportedly privileged material as a sword (i.e., to build one's case or defenses) while simultaneously invoking the privilege as a shield over purportedly privileged material.  *See Anderson v. Nixon*, 444 F. Supp. 1195, 1199 (D.D.C. 1978).[13]   That is precisely what Defendant Couch has done here.

For example, in his Response to Plaintiff's Interrogatory No. 2, Defendant Couch has relied on certain August 2017 conversations with Defendant Butowsky and his communications with a former naval intelligence "source"[14] as a purported basis for his statements about Plaintiff and his family; however, he simultaneously refuses to answer questions about these communications.  *See*

---

[12] Defendant Couch's decision to proceed *pro se* for sixteen months of this litigation does not excuse his waiver of any purported privilege.  *See, e.g.*, *Jideani v. Wash. Metro. Area Transit Auth.*, 979 F. Supp. 2d 77, 83 (D.D.C. 2013); *Harrison v. Spellings*, No. 03-2514 PLF/DAR, 2005 WL 8168153, at *1 (D.D.C. May 25, 2005).  Regardless, several instances of waiver occurred after Defendant Couch was represented by counsel.

[13] *See Wheeler v. Goulart*, 593 A.2d 173, 175 (D.C. 1991) (reporter "cannot follow an 'on-and-then-off' practice of maintaining the confidentiality of her source"); *cf. Koch v. Cox*, 489 F.3d 384, 390 (D.C. Cir. 2007) (party waives privilege when "selectively disclose[s] part of a privileged communication in order to gain an advantage in litigation" because parties cannot "employ privileges both as a sword and as a shield" (brackets in original) (citations and internal quotations omitted));  *Byrd v. Reno*, No. CIV.A. 96–2375CKKJMK, 1998 WL 429767, at *1 (D.D.C. Mar. 18, 1998) ("If the holder of the privilege offers the matter in evidence, then whatever privilege attended is necessarily extinguished[.]").

[14] Plaintiff is fairly certain that this "source" is Dr. Lindeman, whom Defendant Couch also acknowledged is a former naval intelligence officer and a "source."

Governski Decl. Ex. 14 at 4-5, Ex. 7 at 149:13-150:3, 429:25-430:9.  As another example, Defendant Couch's counsel solicited Defendant Couch's testimony as to Defendant Couch's communications with ▮▮▮▮▮▮ as a basis for Defendant Couch's statements about the Rich brothers but then instructed Defendant Couch not to answer Plaintiff's counsel's questions about those same communications.[15]   Defendant Couch also relies on his communications with Defendant Butowsky to form the basis for his statements that Plaintiff and his brother provided DNC emails to, and received money from, WikiLeaks,[16] yet Defendant Couch's counsel instructed Defendant Couch not to answer any questions probing the content of his sworn interrogatory responses, limiting his testimony to "the specific words that he wrote" in those responses:



---

[15] See Governski Decl. Ex. 7 at 485:1-486:11, 493:7-498:5.

[16] See, e.g., Governski Decl. Ex. 10 at 5-7, ¶¶ 5, 7, 19 ("Defendants AFM and Mr. Couch never mentioned Aaron Rich and Wikileaks together until having conversations in early August of 2017 with Defendant Butowsky.  Any statements made after intel was given to AFM and Mr. Couch were from our source Defendant Butowsky."), Ex. 14 at 2-5; Dkt. 71-4 at 4 ("All information reported on Aaron Rich, Wikileaks, Money, and Emails came from defendant Butowsky.").



Governski Decl. Ex. 7 at 284:13-287:3; *see also* Governski Decl. Ex. 12.

Defendant Couch has waived the reporter's privilege by relying on purportedly privileged communications in his defense (i.e., using purportedly privileged communications as a sword) but refusing to produce other purportedly privileged communications (i.e., invoking the privilege as a shield).

### C.   Defendant Couch Has Waived The Reporter's Privilege By Admitting That He Is Asserting It On Defendant Butowsky's Behalf.

Only a reporter, and not a source, holds the reporter's privilege. *See Anderson*, 444 F. Supp. at 1198-99 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 695 (1972)). Here, Defendant Couch has admitted that he is not asserting a reporter's privilege over his conversations with Defendant Butowsky to protect any purported "newsgathering" process—the sole reason why such a privilege exists in the first place, *see Anderson*, 444 F. Supp. at 1198-99—but rather is asserting the privilege at the insistence of Defendant Butowsky—who does not hold the privilege and has no standing to assert it (either directly or, as here, indirectly through Defendant Couch, who is represented by the same counsel). During his deposition, Defendant Couch testified ███

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████  *See* Governski Dec. Ex. 7 at 263:11-265:24, 496:25.

That is not how the reporter's privilege works; it is intended to protect reporters' bona fide newsgathering processes, and the Court should not permit it to be used simply to protect one defendant's communications with another defendant.[17]

## II.   EVEN IF DEFENDANT COUCH HAD NOT WAIVED THE REPORTER'S PRIVILEGE, HE DOES NOT QUALIFY FOR ITS PROTECTIONS.

The law recognizes both a qualified federal reporter's privilege rooted in the First Amendment of the U.S. Constitution and either a qualified or absolute reporter's privilege rooted in state statute. *See Zerilli v. Smith*, 656 F.2d 705, 711-14 (D.C. Cir. 1981); *Carey v. Hume*, 492 F.2d 631, 636 (D.C. Cir. 1974); D.C. Code §§ 16-4702, 16-4703.  Section 16-4702 of the D.C. Code affords a reporter's privilege to "any person who is or has been employed by the news media in a news gathering or news disseminating capacity."  D.C. law defines "news media" as "(1) Newspapers; (2) Magazines; (3) Journals; (4) Press associations; (5) News agencies; (6) Wire services; (7) Radio; (8) Television; or (9) Any printed, photographic, mechanical, or electronic means of disseminating news and information to the public."  D.C. Code § 16-4701.[18]  Regardless of the privilege invoked—qualified or unqualified, state or federal—the party asserting the reporter's privilege has the burden of showing, as a threshold matter, that he qualifies for the protection.  *See Estate of Klieman v. Palestinian Auth.*, 293 F.R.D. 235, 241 (D.D.C. 2013).

---

[17] Defendant Butowsky has filed numerous lawsuits, including against certain of Plaintiff's counsel, based in part on the very statements over which Defendant Couch now is asserting privilege on Defendant Butowsky's behalf. ███████████████████████████ ████████████  Governski Decl. Ex. 7 at 54:21-55:3 ██████

[18] "When a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows." *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 586 (2008); *see also Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 221 (D.C. Cir. 2007).

Defendant Couch cannot meet that burden here.  He bears none of the indicia of a journalist entitled to a federal or state reporter's privilege, and his "newsgathering" process bears no resemblance to that within the profession:



*See* Governski Decl. Ex. 7 at 413:11-417:17, 419:13-421:21, 425:22-426:6, 448:6-8, 501:18-502:2.

Defendant Couch testified that

*Id.* at 19:7-14, 83:6-23; *see also* Governski Decl. Ex. 17 at 4 ("You have been informed that AFMG, Inc. is an inactive corporation that does not have an EIN or a bank account and has never taken any corporate action whatsoever.").  And

---

[19]

*See* Governski Decl. Ex. 7 at 415:2-417:17.

Defendant Couch has admitted to this Court that he does not have an "actual employer," Dkt. 75 at 4:4-8, so he cannot possibly be "employed by the news media," as contemplated by the plain text of D.C. Code § 16-4701.

Plaintiff is unaware of any case from a court within this Circuit analyzing whether, and in what circumstances, an Internet provocateur who publishes content primarily on his own social media deserves to be cloaked with the reporter's privilege and relieved from discovery obligations in civil litigation pursuant to a federal privilege. However, cases from at least two other jurisdictions in which courts applied statutes similar to the D.C. shield law are instructive.

First, in *Too Much Media, LLC v. Hale*, the court considered whether New Jersey's reporter's privilege—which it described as the "broadest in the in nation"—"extends to a self-described journalist who posted comments on an Internet message board" about her investigation into "criminal activity" and "corruption" based on speaking with "sources on a confidential basis." 206 N.J. 209, 216, 218-19, 223, 228 (2011). The *Too Much Media* court explained that "in view of the totality of the evidence, defendant has exhibited *none* of the recognized qualities or characteristics traditionally associated with the news process, nor has she demonstrated an established connection or affiliation with any news entity," which is necessary lest any of the "millions of bloggers who have no connection to traditional media," or "anyone with a Facebook account, could try to assert the privilege." *Id.* at 222–23, 242 (emphasis in original); *see also id*. at 235-36 ("Therefore, even under the most liberal interpretation of the statute, defendant's use of a message board to post her comments is not covered under the Shield Law.").

Second, in *Obsidian Finance Group, LLC v. Cox*, the court rejected a claim of privilege by a "self-proclaimed 'investigative blogger'" who had merely labelled herself a journalist, explaining:

17

> "Defendant fails to bring forth any evidence suggestive of her status as a journalist.  For example, there is no evidence of (1) any education in journalism; (2) any credentials or proof of any affiliation with any recognized news entity; (3) proof of adherence to journalistic standards such as editing, fact-checking, or disclosures of conflicts of interest; (4) keeping notes of conversations and interviews conducted; (5) mutual understanding or agreement of confidentiality between the defendant and his/her sources; (6) creation of an independent product rather than assembling writings and postings of others; or (7) contacting 'the other side' to get both sides of a story."

No. CV–11–57–HZ, 2011 WL 5999334, at *1, *5 (D. Or. Nov. 30, 2011).

While Plaintiff is unaware of any cases in this Circuit that address analogous facts involving an Internet provocateur, various decisions from this District Court are instructive in that they show the types of facts that are not present here but which could support invocation of the reporter's privilege.

First, the district court in *Tripp v. Department of Defense* considered whether "a reporter for the DOD Armed Forces Newspaper *Stars and Stripes*, is entitled to invoke the 'reporter's privilege.'" 284 F. Supp. 2d 50, 52 (D.D.C. 2003).  Noting testimony from *Stars and Stripes*' editorial director that the publication was editorially independent and had "[e]ditorial policies and practices . . . in accordance with journalistic standards governing U.S. daily commercial newspapers of the highest quality," *id*. at 57 (brackets in original), the court concluded that *Stars and Stripes* was "the type of publication to which the reporter's privilege is intended to apply," *id*. at 55.

Turning next to whether a reporter for *Stars and Stripes* was entitled to invoke the reporter's privilege, the court noted that "this Circuit has not articulated a standard to be applied when an individual's actions rise to the level of 'newsgathering' for purposes of entitling the reporter to assert the 'reporter's privilege,'" and it described an "intent-based" test from other

Circuits under which "a reporter must demonstrate that (1) the information was obtained for the purpose of dissemination to the public; and (2) the reporter had this intent at the time the information was obtained," noting that "a person's prior experience as a professional journalist is persuasive evidence of present intent to gather for the purpose of dissemination." *Id*. at 57-58. The court concluded that the reporter for *Stars and Stripes* was entitled to the reporter's privilege, explaining that the reporter "was employed in a journalistic capacity" and had "engaged in traditional journalistic activities as a reporter for *Stars and Stripes*, an organization whose sole purpose is to disseminate commercial news and information to individuals involved in the military." *Id*. at 58 (citations omitted).

Second, in *Alexander v. FBI*, the court considered whether ABC News' George Stephanopoulos was entitled to a reporter's privilege in connection with questions being asked of him at a deposition about activities he had undertaken in the course of writing a book about the White House. 186 F.R.D. 21, 48-49 (D.D.C. 1998). In concluding that Mr. Stephanopoulos was entitled to the privilege, the court explained that Stephanopoulos had submitted an affidavit from an ABC News executive stating "that Stephanopoulos has been employed in a journalistic capacity by ABC News since January 1997" and "that Stephanopoulos' duties in this capacity include regular appearances as a news commentator and news analyst on the ABC News Sunday morning interview and analysis program *This Week with Sam Donaldson and Cokie Roberts* and frequent appearances as a news commentator and news analyst on other ABC News programs." *Id*. at 50.

Here, Defendant Couch has not met his burden of showing that he is a reporter who is "acting as a journalist." *Id*. Defendant Couch is much more like the bloggers and producers of online content in *Too Much Media* and *Obsidian Finance Group*—for whom claims of privilege were rejected—than he is like ABC reporter George Stephanopoulos in *Alexander* or the reporter

19

for *Stars and Stripes* newspaper in *Tripp*.  He has no nexus with the news media (traditional or otherwise), does not abide by any recognized newsgathering process, and does not bear any of the indicia of a journalist that would entitle him to claim privilege over his communications with his "sources."  *See supra* at 16.  He does not publish information in furtherance of fostering a more informed public but rather to peddle conspiracy theories and to build a social media following from which he can generate revenue-by-click and solicit donations.  Defendant Couch ought not be permitted to avail himself of the reporter's privilege simply by calling himself a "journalist" and posting content on social media and elsewhere online.

To expand the concept of "the press" as Defendant Couch proposes would weaken the First Amendment, not protect it.  The reporter's shield is a statutory protection for the news media above and beyond the constitutional protections provided by the First Amendment—while all persons enjoy First Amendment protections to engage in political speech free from government interference, only the press enjoys a broader immunity from otherwise lawful judicial process under media shield laws.  In exchange for that immunity, the press is expected to follow certain objective professional standards—such as, for example, fact checking, the use of standard journalistic ethics under various canons, adherence to standards, providing the opportunity for comment, and the like.  Limiting the scope and applicability of the "reporter's shield" immunity is not only appropriate, it also is essential, because otherwise the immunity that is intended to encourage the publication of truthful information would extend universally to anyone with a Twitter, Facebook, Instagram, Periscope, or YouTube account, including individuals dedicated to the publication of disinformation.  The consequence would not only be an effective invalidation of statutory and common law causes of action that pre-date the Republic, but also a corruption of the marketplace of ideas with a flood of deliberately false information, which would render useless

the remedy of counterspeech for private individuals such as Aaron Rich.  *Cf.* Ari Ezra Waldman, *The Marketplace of Fake News*, 20 U. Pa. J. Const. L. 845, 866 (2018) ("[D]emonstrable falsehoods were never part of the intellectual tradition of the [marketplace of ideas] metaphor" and to "include them now bastardizes the doctrine and erodes the very freedoms the First Amendment . . . is meant to protect."); *see also* John G. Roberts, Jr., Chief Justice of the United States Supreme Court, *2019 Year-End Report on the Federal Judiciary* 2 (Dec. 31, 2019) ("In our age, when social media can instantly spread rumor and false information on a grand scale, the public's need to understand our government, and the protections it provides, is ever more vital.").

## III.   WHATEVER REPORTER'S PRIVILEGE MAY EXIST IN THIS CASE IS OVERCOME BECAUSE THE INFORMATION SOUGHT GOES TO THE HEART OF PLAINTIFF'S CASE.

Even though "freedom of the press is basic to free society," it must yield "to a paramount public interest in the fair administration of justice" because "basic too are courts of justice, armed with the power to discover truth" and "the concept that it is the duty of a witness to testify in a court of law has roots fully as deep in our history as does the guarantee of a free press."  *Carey*, 492 F.2d at 634-35 (internal quotation marks omitted); *see also Lee v. Dep't of Justice*, 401 F. Supp. 2d 123, 141 (D.D.C. 2005).

The United States Circuit Court of Appeals for the District of Columbia has established a balancing test of "the facts on a case-by-case basis in the course of weighing the need for the testimony in question against the claims of the newsman that the public's right to know is impaired," wherein the privilege must give way where the information sought goes "to the heart" of a "libel action" and where the plaintiff has exhausted attempts to secure the information from the source itself.  *Carey*, 492 F.2d at 636-37.[20]  In a civil case, where the journalist is a party and

---

[20] The analysis for whether the privilege gives way is the same whether the court is applying the D.C. statute or the federal privilege.  *See Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 336 (1994)

"successful assertion of the privilege will effectively shield him from liability, the equities weigh somewhat more heavily in favor of disclosure." *Zerilli*, 656 F.2d at 714; *see also Anderson*, 444 F. Supp. at 1199.

For example, in *Carey*, as here, the libel defendant refused to answer questions regarding the source on whom he relied for the defamatory statement as issue in the case. 492 F.2d at 633. The Court of Appeals for the District of Columbia upheld an order compelling the defendant to testify in *Carey* because the "information sought" went "to the heart" of the plaintiff's libel action, namely whether the defendant "had no reliable sources, that he misrepresented the reports of his sources, or that reliance upon those participate sources was reckless." *Id*. at 636-37. Similarly, in *Anderson*, the court explained:

> "[The reporter's] version of what he was told must be tested against the recollection of others with knowledge of the disclosure, including the source itself. Moreover, in some respects plaintiff acknowledges his own memory is fuzzy or incomplete. The sources are presumably persons with firsthand knowledge, otherwise plaintiff would not have given them credence in his column. They have highly relevant data, not all of which was necessarily relayed to plaintiff, that must be tested through the accepted adversary process. If not, defendants lose critically significant rights."

444 F. Supp. at 1199 (emphasis added); *see also Byrd*, 1998 WL 429767, at *1 (compelling a defendant to produce audio recordings for which there is "literally no substitute"); *Dowd v. Calabrese*, 577 F. Supp. 238, 244 (D.D.C. 1983) (concluding that defendants "may not rely upon the existence of any unidentified source as evidence of truth or lack of malice" because if media "defendants were to use the existence of these sources as proof of the truth of [a defendant's] article and of defendants' lack of malice, plaintiffs would be at a very substantial disadvantage

---

(finding "criteria for applying the conditional privilege for the news or information set forth in the District's Free Flow of Information Act closely track those set forth in *Zerilli*").

which they would be unable to overcome irrespective of what evidence to the contrary they may have gathered and would be able to adduce.").

Here, too, any purported reporter's privilege is overcome because the information Plaintiff seeks—including the recordings of the calls between Defendant Butowsky and Defendant Couch that allegedly provide the basis for Defendant Couch's defamatory statements—goes to the heart of Plaintiff's claims and there is no substitute for an audio recording of the conversations between Defendant Couch and Defendant Butowsky to test the reasonableness of Defendant Couch relying exclusively on what Defendant Butowsky conveyed to him about Plaintiff. [21]   Plaintiff would be at a significant and unfair disadvantage if he were deprived of the information Defendant Couch is withholding while Defendant Couch and Defendant Butowsky were able to present their own un-tested versions of those conversations, including to form a key part of their defense.  This is particularly so where Defendant Couch has admitted to having difficulty remembering events from two to three years ago and has stated in his sworn interrogatory responses that—notwithstanding that he is in possession of recordings of the first two phone calls he had with Defendant Butowsky—he "does not recall all the details of [his first] two conversations" with Mr. Butowsky.[22]

---

[21] Plaintiff has met the exhaustion requirement by serving party discovery and serving discovery on dozens of third parties including those listed in Defendant Couch's Initial Disclosures, such as Dr. Lindeman.

[22] *See* Governski Decl. Ex. 14 at 2, Ex. 7 at 67:23-69:8.

**CONCLUSION**

For the reasons herein discussed, Plaintiff respectfully requests that the Court grant this Motion and enter the accompanying Proposed Order.[23]

Dated: January 3, 2020

/s/ _Joshua P. Riley_
JOSHUA P. RILEY (D.C. Bar No. 1026900)
MERYL C. GOVERNSKI (D.C. Bar No. 1023549)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave NW, Washington DC 20005
Tel: (202) 237-2727 / Fax: (202) 237-6131
jriley@bsfllp.com
mgovernski@bsfllp.com

MICHAEL J. GOTTLIEB (D.C. Bar No. 974960)
WILLKIE FARR GALLAGHER LLP
1875 K Street NW, Washington, DC 20006
Tel: (202) 303-1442 / Fax: (202) 303-2000
mgottlieb@willkie.com

**_Attorneys for Plaintiff Aaron Rich_**

---

[23] Pursuant to Local Rule 7(m), counsel for Plaintiff conferred with opposing counsel, who indicated Defendant Couch would oppose this motion.

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on January 3, 2020, the foregoing document was filed through the CM/ECF system and thereby served electronically on counsel for Defendant Edward Butowsky and Matthew Couch. A courtesy copy of the foregoing document also was emailed to their counsel, Eden Quainton, at equainton@gmail.com. Mr. Quainton has agreed to convey served and filed documents to Defendant America First Media through Defendant Couch as necessary.

Dated: January 3, 2020

/s/ *Joshua P. Riley*
JOSHUA P. RILEY (D.C. Bar No. 1026900)
MERYL C. GOVERNSKI (D.C. Bar No. 1023549)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave NW, Washington DC 20005
Tel: (202) 237-2727 / Fax: (202) 237-6131
jriley@bsfllp.com
mgovernski@bsfllp.com