# EXHIBIT 20

| | |
|---|---|
| **From:** | Eden Quainton |
| **To:** | Joshua Riley; Meryl Governski; Michael Gottlieb; Sam Hall |
| **Subject:** | Rich v. Butowsky -- Third Party Subpoenas |
| **Date:** | Wednesday, January 8, 2020 11:41:32 PM |
| **Attachments:** | Notice of Intent to Serve Subpoena Brad Bauman.pdf |
| | Notice of Intent to Serve Subpoena Kelsey Mulka .pdf |
| | Notice of Intent to Serve Subpoena Estate of Seth Rich .pdf |

Attached please find three third party subpoenas to testify addressed to Brad Bauman, Kelsy Mulka and Aaron Rich, as administrator of the Estate of Seth Rich.

Please provide some available dates for Aaron Rich's deposition and the location of the deposition no later than **Friday, January 10 at 12:00 pm**.  Because Mr. Rich's address has been sealed we do not know where to conduct the deposition and need your assistance in scheduling the deposition.  In addition, please note that we will be providing you separately a deficiency letter relating to Mr. Rich's production to date.  If the deficiencies are not cured by the date of Mr. Rich's deposition, we reserve the right to keep the deposition open.

Sincerely,

Eden P. Quainton
Quainton Law, PLLC
1001 Avenue of the Americas, 11th Floor
New York, NY 10018
Tel: 212.813.8389
Fax: 212.813.8390
Cell: 202.360.6296
www.quaintonlaw.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

AARON RICH

                    Plaintiff,

v.

EDWARD BUTOWSKY,
MATTHEW COUCH, and
AMERICA FIRST MEDIA,

                    Defendants.

---

Civil Action No. 1:18-cv-00681-RJL

Hon. Richard J. Leon

**DEFENDANT EDWARD BUTOWSKY'S NOTICE OF INTENT TO SERVE THIRD-PARTY SUBPOENA**

TO PLAINTIFF:

PLEASE TAKE NOTICE, that pursuant to Rule 45 of the Federal Rules of Civil

Procedure, Defendant Edward Butowsky intends to serve a third-party subpoena ad

testificandum and duces tecum on Brad Bauman.

The subpoena is attached to this Notice.

Dated: January 8, 2019
      New York, NY

                    QUAINTON LAW, PLLC
                    By: *Eden P. Quainton*
                    Eden P. Quainton
                    1001 Avenue of the Americas, 11th Floor
                    New York, NY 10018
                    Telephone: (212) 813- 8389
                    Facsimile: (212) 813-8390
                    equainton@gmail.com
                    *Attorneys for Defendant Edward Butowsky*

To:    Joshua Riley
        Meryl C. Governski
        BOIES SCHILLER FLEXNER LLP
        1401 New York Ave, N.C
        Washington, DC 2005
        jriley@bsfllp.com
        mgovernski@bsfllp.com
        *Attorneys for Plaintiff Aaron Rich*

Michael J. Gottlieb
Samuel Hall
WILLKIE FARR & GALLAGHER LLP
1875 K. Street, N.W.
Washington, D.C. 20006
mgottlieb@willkie.com
shall@willkie.com
*Attorneys for Plaintiff Aaron Rich*

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| Aaron Rich | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   18-cv-0681 (RJL) |
| Edward Butowsky et al. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                                      Brad Bauman
Redacted for Personal Information - FRCP 5.2

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Baptiste & Wilder, PC, 1150 Connecticut Avenue, N.W. Washington D.C. 20038 | Date and Time: 01/24/2020 9:30 am |
|---|---|

The deposition will be recorded by this method:    Stenographic and audio-visual means

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:
         Items set forth on the attached Supoena Addendum.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    01/08/2020

         *CLERK OF COURT*

                                      OR

         _____            _____
         *Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*    Edward Butowsky
_____ , who issues or requests this subpoena, are:

Eden P. Quainton, 1001 Avenue of the Americas, 11th Fl., New York, NY 10018, equainton@gmail.com, 212-813-8389

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   18-cv-0681 (RJL)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ❑ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

    ❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

                                       _____

                                              *Server's signature*

                                       _____

                                              *Printed name and title*

                                       _____

                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
        **(i)** is a party or a party's officer; or
        **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
        **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
        **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

        **(i)** fails to allow a reasonable time to comply;
        **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
        **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
        **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

        **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
        **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
        **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
        **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
        **(i)** expressly make the claim; and
        **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

---

AARON RICH

                Plaintiff,                 Civil Action No. 1:18-cv-00681-RJL

v.                                    Hon. Richard J. Leon

EDWARD BUTOWSKY,
MATTHEW COUCH, and
AMERICA FIRST MEDIA,

                Defendants.

---

## SUBPOENA ADDENDUM

The subpoena commands the production of the items or things listed below. Each individual Request for Documents (collectively the "Requests"), shall be read and interpreted in accordance with the definitions and instructions identified below.

## GENERAL DEFINITIONS

Plaintiff incorporates by reference all the instructions, definitions, and rules contained in the Federal Rules of Civil Procedure and for purposes of this Subpoena, the following definitions shall apply:

1.  Unless words or terms have been given a specific definition herein, each word or term used herein shall be given its usual and customary dictionary definition.

2.  The terms defined herein should be construed broadly to the fullest extent of their meaning in a good faith effort to comply with the Federal Rules of Civil Procedure.

3.  "Communication" means, in addition to its customary and usual meaning, every contact of any nature, whether documentary, electronic, written or oral, formal or informal, at any time or place and under any circumstances whatsoever whereby information of any nature is transmitted or transferred by any means, including, but not limited to letters, memoranda, reports, emails, text

messages, instant messages, Social Media, telegrams, invoices, telephone conversations, voicemail messages, audio recordings, face-to-face meetings and conversations, or any other form of communication, and any Document relating to such contact, including, but not limited to, correspondence, memoranda, notes or logs of telephone conversations, e-mail, electronic chats, text messages, instant messages, direct or private messages, correspondence in "meet ups" or chat rooms, and all other correspondence on Social Media. Without limiting the foregoing in any manner, commenting as well as any act of expression that is not directed at a specific person, or otherwise may not be intended to provoke a response (such as a Social Media posting, "likes," "shares," or any other form of reacting to another's use of Social Media), are forms of communication.

4.   The term "relating to" means "concerning," "referring to," "describing," "evidencing," or "constituting."

5.   "Document" or "Documents" means documents broadly defined in Rule 34 of the Federal Rules of Civil Procedure and includes (i) papers of all kinds, including, but not limited to, originals and copies, however made, of letters, memoranda, hand-written notes, notebooks, work-pads, messages, agreements, rough drafts, drawings, sketches, pictures, posters, pamphlets, publications, news articles, advertisements, sales literature, brochures, announcements, bills, receipts, credit card statements, and (ii) non-paper information of all kinds, including, but not limited to, any computer generated or electronic data such as digital videos, digital photographs, audio recordings, podcasts, Internet files (including "bookmarks" and browser history), online articles and publications, website content, electronic mail (e-mail), electronic chats, instant messages, text messages, uploads, posts, status updates, comments, "likes", "shares", direct messages, all Social Media activity, or any other use of ephemeral communications services or Social Media, and (iii)

any other writings, records, or tangible objects produced or reproduced mechanically, electrically, electronically, photographically, or chemically. Without limiting the foregoing in any way, every Communication is also a Document.

6.  The term "Electronically Stored Information" or "ESI" is defined to be synonymous in meaning and equal in scope to the usage of "electronically stored information" in Fed. R. Civ. 34(a)(1)(A). "ESI" includes data on all servers, including IP addresses, MAC 3 addresses, archived data, deleted data, and legacy data, as well as data on removable electronic media and in any other location where documents relevant to the Requests may be found.

7.  "Social Media" means any forum, website, application, or other platform on which persons can create, transmit, share, communicate, or comment upon any information, ideas, or opinions, or otherwise engage in social networking, including, but not limited to: Twitter, Gab, MeWe, Periscope, Facebook, Discord, Reddit, Imgur, SnapChat, Instagram, Google+, 4chan, 8chan, Tumblr, Youtube, LinkedIn, Flikr, Reddit, Quora, Disquis, Slack, Whisper, Yik Yak, Medium, WordPress, and instant messaging services such as Signal, WhatsApp, Facebook Messenger, Hangouts, Skype, Line, KakaoTalk, Telegram, and CyberDust. Without limiting the foregoing in any manner, and by way of example only, the following are examples of Social Media activity: uploading, posting, commenting, reacting (e.g., "liking" a post), sharing, and communicating on comment sections of Social Media.

## SPECIFIC DEFINITIONS

1. Aaron Rich refers to "Aaron Nathan Rich," the plaintiff in the above-captioned litigation.

2. "Seth Rich" refers to Seth Conrad Rich, the brother of the plaintiff in the above captioned litigation.

3. "Joel Rich" refers to the father of Seth Rich.

4. "Mary Rich" refers to the mother of Seth Rich.

5. "You," "Your," or "Yours" refers to Brad Bauman, and includes all of Your agents, representatives, or other persons, organizations, or others acting or purporting to act on Your behalf, or under Your control.

## INSTRUCTIONS

Plaintiff incorporates by reference all the instructions, definitions, and rules contained in the Federal Rules of Civil Procedure and for purposes of this Subpoena, the following instructions shall apply:

A.  Your responses to the following Requests shall be based on all knowledge and information (whether or not hearsay or admissible) in Your possession, custody, or control.

B.  Produce all responsive documents in Your possession, custody, or control, regardless of whether such documents are possessed directly by You or persons or entities under Your control.

C.  Produce each responsive document in its entirety including with all attachments or other matters affixed thereto. Documents attached to each other should not be separated.

D.  Any alteration of a responsive document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications, and other versions of a document, is a responsive document in its own right and must be produced.

E.  If no responsive documents exist for a specific Request, specifically state that no responsive documents exist.

F.   Certify that Your production is complete and correct in accordance with specifications of the attached Certification that Response is Complete and Correct form provided as Exhibit A.

G.   If any otherwise responsive document was, but is no longer, in existence or in Your possession, custody, or control, identify the type of information contained in the document, its current or last known custodian, the location/address of such document, and the identity of all persons having knowledge or who had knowledge of the document, and also describe in full the circumstances surrounding its disposition from Your possession or control.

H.   If You object to production in response to a specific request, You shall state with particularity the basis for all objections with respect to such request. You shall respond to any and all portions of any request that do not fall within the scope of Your objection.

I.   Whether or not You object, You must preserve all Documents and Communications relevant to the above-captioned matter, including all Documents and Communications responsive to the Requests.

J.   Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, documents shall be produced either (a) as they are kept in the usual course of business (in which case they shall be produced in such fashion as to identify the department, branch, or office in whose possession it was located and, where applicable, the natural person in whose possession it was found or the server or central file in which it was found, and the address of each document's custodian(s)), or (b) segregated as responsive to a specific Request enumerated in the Request, with such specific Request identified.

K.   All Documents produced in electronic form shall include related metadata. Produce in TIFF or native format (i.e., Word documents as .DOC or .DOCX files, Outlook emails as .PST files, Excel spreadsheets as .XLS or .XLSX files, Adobe PDF documents as .PDF files). For all forms of ESI, ensure that ESI is provided in unencrypted form and free of password protection.

L.  In the event any Document or Communication is withheld on the basis of the attorney-client privilege, work product doctrine, or any other right of non-disclosure on any other basis, You shall produce a privilege log.

## **DOCUMENTS TO BE PRODUCED**

1.      All Documents and Communications referring or relating to any of Seth Rich, Aaron Rich, Joel Rich, or Mary Rich, including any such Communications between or involving You and any member of law enforcement, including any member of the Washington D.C. metropolitan police force, any United States attorney or assistant United States attorney, the Federal Bureau of Investigations or the Secret Service; any member of the Democratic National Committee; any member of Congress; any member of the Central Intelligence Agency; any member of the National Security Agency; any representative of the Office of the Special Counsel; any reporter with, or representative, employee or agent of, the New York Times, the Washington Post, the Los Angeles Times, the Daily Beast, Buzzfeed, Vox, Politico, CNN, MSNBC, Fox News, CBS, ABC and NBC; and any of Muriel Bowser, Cathy Lanier, Theresa Grafenstine, Joey Della Camera, Joe Capone, Kelsey Mulka, Dov Friedman, Christine Trankheim, Shawn Lucas, Deborah Wasserman Schultz, Donna Brazile, John Podesta, Hilary Clinton, Bernie Sanders, Imran Awan, Pratt Wiley, Amy Dacey, Andrew Therriault, Michael Cass Antony, Rob Placek and Roberto Alonso.

## EXHIBIT A
## CERTIFICATION THAT RESPONSE IS CORRECT AND COMPLETE

I, _____ , certify as follows:

1.   The enclosed production of Documents and Communications were prepared and assembled under my personal supervision;

2.   The Documents and Communications contained in this production to the Subpoena are authentic, genuine and what they purport to be;

3.   Attached is a true and accurate record of all persons who prepared and assembled any productions and responses to the Subpoena, all persons under whose personal supervision the preparation and assembly of productions and responses to the Subpoena occurred, and all persons able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be; and

4.   Attached is a true and accurate statement of those requests under the Subpoena as to which no responsive Documents were located in the course of the aforementioned search.

Signature: _____ Date: _____

Printed Name: _____

Address, e-mail and telephone number:_____

_____

_____

## <u>CERTIFICATE OF SERVICE</u>

I, EDEN P. QUAINTON, hereby certify that on this 8th day of January 2020, a copy of the documents entitled:

Notice of Intent to Serve Third Party Subpoena
Subpoena
Subpoena Addendum

Were served via electronic document transfer to the following parties.

Joshua Riley
Meryl C. Governski
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, N.C
Washington, DC 2005
jriley@bsflip.com
mgovernski@bsflip.com

Michael J. Gottlieb
Samuel Hall
WILLKIE FARR & GALLAGHER LLP
1875 K. Street, N.W.
Washington, D.C. 20006
mgottlieb@willkie.com
shall@willkie.com

*/s/ Eden Quainton*
EDEN P. QUAINTON, ESQ.

1001 Avenue of the Americas, 11th Floor
New York, New York 10018
Telephone: (212) 813-8389
equainton@gmail.com

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

AARON RICH

                    Plaintiff,

v.

EDWARD BUTOWSKY,
MATTHEW COUCH, and
AMERICA FIRST MEDIA,

                    Defendants.

Civil Action No. 1:18-cv-00681-RJL

Hon. Richard J. Leon

**DEFENDANT EDWARD
BUTOWSKY'S NOTICE OF
INTENT TO SERVE
THIRD-PARTY SUBPOENA**

---

TO PLAINTIFF:

PLEASE TAKE NOTICE, that pursuant to Rule 45 of the Federal Rules of Civil

Procedure, Defendant Edward Butowsky intends to serve a third-party subpoena ad

testificandum and duces tecum on Aaron Rich, as Administrator of the Estate of Seth Rich.

The subpoena is attached to this Notice.

Dated: January 8, 2020
      New York, NY

                    QUAINTON LAW, PLLC
                    By: *Eden P. Quainton*
                    Eden P. Quainton
                    1001 Avenue of the Americas, 11thFloor
                    New York, NY 10018
                    Telephone: (212) 813- 8389
                    Facsimile: (212) 813-8390
                    equainton@gmail.com
                    *Attorneys for Defendant Edward Butowsky*

To:    Joshua Riley
        Meryl C. Governski
        BOIES SCHILLER FLEXNER LLP
        1401 New York Ave, N.C
        Washington, DC 2005
        jriley@bsfllp.com
        mgovernski@bsfllp.com
        *Attorneys for Plaintiff Aaron Rich*

Michael J. Gottlieb
Samuel Hall
WILLKIE FARR & GALLAGHER LLP
1875 K. Street, N.W.
Washington, D.C. 20006
mgottlieb@willkie.com
shall@willkie.com
*Attorneys for Plaintiff Aaron Rich*

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia

| | | |
|---|---|---|
| Aaron Rich | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   18-cv-0681 (RJL) |
| Edward Butowsky, et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:           Aaron Rich, as Administrator of the Estate of Seth Rich,
c/o Kerri Castellini, Price Benowitz LLP, 509 7th St. # 215, Washington D.C. 20004

*(Name of person to whom this subpoena is directed)*

✔ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Baptiste & Wilder, 1150 Connecticut Avenue, N.W. Washington D.C. 20038 | Date and Time: 01/23/2020 9:30 am |
|---|---|

The deposition will be recorded by this method:   Stenographic and audio-visual means

✔ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: Each and every electronic device capable of being used for communication belonging to Seth Conrad Rich, including every laptop computer, desktop computer, tablet, cell phone or smart watch, for inspection and identification.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   01/08/2020

        *CLERK OF COURT*

                                                                OR

_____                    _____
    *Signature of Clerk or Deputy Clerk*                        *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Edward Butowsky
_____ , who issues or requests this subpoena, are:
Eden P. Quainton, 1001 Avenue of the Americas, 11th Fl., New York, NY 10018, equainton@gmail.com, 212-813-8389

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  18-cv-0681 (RJL)

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
      (i) is a party or a party's officer; or
      (ii) is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
   (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
   (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

   (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      (i) fails to allow a reasonable time to comply;
      (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
      (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      (iv) subjects a person to undue burden.
   (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      (i) disclosing a trade secret or other confidential research, development, or commercial information; or
      (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
   (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      (i) expressly make the claim; and
      (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## CERTIFICATE OF SERVICE

I, EDEN P. QUAINTON, hereby certify that on this 8th day of January 2020, a copy of the documents entitled:

Notice of Intent to Serve Third Party Subpoena
Subpoena

Were served via electronic document transfer to the following parties.

Joshua Riley
Meryl C. Governski
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, N.C
Washington, DC 20005
jriley@bsfllp.com
mgovernski@bsfllp.com

Micahel J. Gottlieb
Samuel Hall
WILLKIE FARR & GALLAGHER LLP
1875 K. Street, N.W.
Washington, D.C. 20006
mgottlieb@willkie.com
shall@willkie.com

/s/ Eden Quainton
EDEN P. QUAINTON, ESQ.

1001 Avenue of the Americas, 11th Floor
New York, New York 10018
Telephone: (212) 813-8389
equainton@gmail.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

AARON RICH

                  Plaintiff,

v.

EDWARD BUTOWSKY,
MATTHEW COUCH, and
AMERICA FIRST MEDIA,

                  Defendants.

Civil Action No. 1:18-cv-00681-RJL

Hon. Richard J. Leon

**DEFENDANT EDWARD BUTOWSKY'S NOTICE OF INTENT TO SERVE THIRD-PARTY SUBPOENA**

---

TO PLAINTIFF:

PLEASE TAKE NOTICE, that pursuant to Rule 45 of the Federal Rules of Civil Procedure, Defendant Edward Butowsky intends to serve a third-party subpoena ad testificandum and duces tecum on Kelsey Mulka.

The subpoena is attached to this Notice.

Dated: January 8, 2020
      New York, NY

                  QUAINTON LAW, PLLC
                  By: *Eden P. Quainton*
                  Eden P. Quainton
                  1001 Avenue of the Americas, 11th Floor
                  New York, NY 10018
                  Telephone: (212) 813- 8389
                  Facsimile: (212) 813-8390
                  equainton@gmail.com
                  *Attorneys for Defendant Matthew Couch*

To:    Joshua Riley
       Meryl C. Governski
       BOIES SCHILLER FLEXNER LLP
       1401 New York Ave, N.C
       Washington, DC 2005
       jriley@bsfllp.com
       mgovernski@bsfllp.com
       *Attorneys for Plaintiff Aaron Rich*

Michael J. Gottlieb
Samuel Hall
WILLKIE FARR & GALLAGHER LLP
1875 K. Street, N.W.
Washington, D.C. 20006
mgottlieb@willkie.com
shall@willkie.com
*Attorneys for Plaintiff Aaron Rich*

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| Aaron Rich | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   18-cv-0681 |
| Edward Butowsky, et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: Redacted for Personal Information - FRCP 5.2 Kelsey Mulka

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place:   Walt Johnson, 4474 Cedardale, Flushing MI 48433 | Date and Time:   01/22/2020 9:30 am |
|---|---|

The deposition will be recorded by this method:   Stenographic and Audio-visual means

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: Items set forth on Subpoena Addendum.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   01/08/2020

| *CLERK OF COURT* | | |
|---|---|---|
| _____ | OR | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Edward Butowsky
_____ , who issues or requests this subpoena, are:

Eden P. Quainton, 1001 Avenue of the Americas, 11th Fl., New York, NY 10018, equainton@gmail.com, 212-813-8389

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   18-cv-0681

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***

  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    (i) disclosing a trade secret or other confidential research, development, or commercial information; or
    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

AARON RICH

                Plaintiff,

v.

EDWARD BUTOWSKY,
MATTHEW COUCH, and
AMERICA FIRST MEDIA,

                Defendants.

Civil Action No. 1:18-cv-00681-RJL

Hon. Richard J. Leon

---

## SUBPOENA ADDENDUM

The subpoena commands the production of the items or things listed below.  This subpoena for

documents, including each individual Request for Documents (collectively the "Requests"), shall

be read and interpreted in accordance with the definitions and instructions identified below.

## GENERAL DEFINITIONS

Plaintiff incorporates by reference all the instructions, definitions, and rules contained in the

Federal Rules of Civil Procedure and for purposes of this Subpoena, the following definitions shall

apply:

1.  Unless words or terms have been given a specific definition herein, each word or term used

herein shall be given its usual and customary dictionary definition.

2.  The terms defined herein should be construed broadly to the fullest extent of their meaning in

a good faith effort to comply with the Federal Rules of Civil Procedure.

3.  "Communication" means, in addition to its customary and usual meaning, every contact of any

nature, whether documentary, electronic, written or oral, formal or informal, at any time or place

and under any circumstances whatsoever whereby information of any nature is transmitted or

transferred by any means, including, but not limited to letters, memoranda, reports, emails, text

messages, instant messages, Social Media, telegrams, invoices, telephone conversations, voicemail messages, audio recordings, face-to-face meetings and conversations, or any other form of communication, and any Document relating to such contact, including, but not limited to, correspondence, memoranda, notes or logs of telephone conversations, e-mail, electronic chats, text messages, instant messages, direct or private messages, correspondence in "meet ups" or chat rooms, and all other correspondence on Social Media. Without limiting the foregoing in any manner, commenting as well as any act of expression that is not directed at a specific person, or otherwise may not be intended to provoke a response (such as a Social Media posting, "likes," "shares," or any other form of reacting to another's use of Social Media), are forms of communication.

4.  The term "relating to" means "concerning," "referring to," "describing," "evidencing," or "constituting."

5.  "Document" or "Documents" means documents broadly defined in Rule 34 of the Federal Rules of Civil Procedure and includes (i) papers of all kinds, including, but not limited to, originals and copies, however made, of letters, memoranda, hand-written notes, notebooks, work-pads, messages, agreements, rough drafts, drawings, sketches, pictures, posters, pamphlets, publications, news articles, advertisements, sales literature, brochures, announcements, bills, receipts, credit card statements, and (ii) non-paper information of all kinds, including, but not limited to, any computer generated or electronic data such as digital videos, digital photographs, audio recordings, podcasts, Internet files (including "bookmarks" and browser history), online articles and publications, website content, electronic mail (e-mail), electronic chats, instant messages, text messages, uploads, posts, status updates, comments, "likes", "shares", direct messages, all Social Media activity, or any other use of ephemeral communications services or Social Media, and (iii)

any other writings, records, or tangible objects produced or reproduced mechanically, electrically, electronically, photographically, or chemically. Without limiting the foregoing in any way, every Communication is also a Document.

6.  The term "Electronically Stored Information" or "ESI" is defined to be synonymous in meaning and equal in scope to the usage of "electronically stored information" in Fed. R. Civ. 34(a)(1)(A). "ESI" includes data on all servers, including IP addresses, MAC 3 addresses, archived data, deleted data, and legacy data, as well as data on removable electronic media and in any other location where documents relevant to the Requests may be found.

7.  "Social Media" means any forum, website, application, or other platform on which persons can create, transmit, share, communicate, or comment upon any information, ideas, or opinions, or otherwise engage in social networking, including, but not limited to: Twitter, Gab, MeWe, Periscope, Facebook, Discord, Reddit, Imgur, SnapChat, Instagram, Google+, 4chan, 8chan, Tumblr, Youtube, LinkedIn, Flikr, Reddit, Quora, Disquis, Slack, Whisper, Yik Yak, Medium, WordPress, and instant messaging services such as Signal, WhatsApp, Facebook Messenger, Hangouts, Skype, Line, KakaoTalk, Telegram, and CyberDust. Without limiting the foregoing in any manner, and by way of example only, the following are examples of Social Media activity: uploading, posting, commenting, reacting (e.g., "liking" a post), sharing, and communicating on comment sections of Social Media.

## SPECIFIC DEFINITIONS

1.  Aaron Rich refers to "Aaron Nathan Rich," the plaintiff in the above-captioned litigation.

2.  "Seth Rich" refers to Seth Conrad Rich, the brother of the plaintiff in the above captioned litigation.

3. "Joel Rich" refers to the father of Seth Rich.

4. "Mary Rich" refers to the mother of Seth Rich.

5. "You," "Your," or "Yours" refers to Kelsey Mulka, and includes all of Your agents, representatives, or other persons, organizations, or others acting or purporting to act on Your behalf, or under Your control.

## **INSTRUCTIONS**

Plaintiff incorporates by reference all the instructions, definitions, and rules contained in the Federal Rules of Civil Procedure and for purposes of this Subpoena, the following instructions shall apply:

A.  Your responses to the following Requests shall be based on all knowledge and information (whether or not hearsay or admissible) in Your possession, custody, or control.

B.  Produce all responsive documents in Your possession, custody, or control, regardless of whether such documents are possessed directly by You or persons or entities under Your control.

C.  Produce each responsive document in its entirety including with all attachments or other matters affixed thereto. Documents attached to each other should not be separated.

D.  Any alteration of a responsive document, including any marginal notes, handwritten notes, underlining, date stamps, received stamps, endorsed or filed stamps, drafts, revisions, modifications, and other versions of a document, is a responsive document in its own right and must be produced.

E.  If no responsive documents exist for a specific Request, specifically state that no responsive documents exist.

F.   Certify that Your production is complete and correct in accordance with specifications of the attached Certification that Response is Complete and Correct form provided as Exhibit A.

G.   If any otherwise responsive document was, but is no longer, in existence or in Your possession, custody, or control, identify the type of information contained in the document, its current or last known custodian, the location/address of such document, and the identity of all persons having knowledge or who had knowledge of the document, and also describe in full the circumstances surrounding its disposition from Your possession or control.

H.   If You object to production in response to a specific request, You shall state with particularity the basis for all objections with respect to such request. You shall respond to any and all portions of any request that do not fall within the scope of Your objection.

I.   Whether or not You object, You must preserve all Documents and Communications relevant to the above-captioned matter, including all Documents and Communications responsive to the Requests.

J.   Pursuant to Rule 45(e) of the Federal Rules of Civil Procedure, documents shall be produced either (a) as they are kept in the usual course of business (in which case they shall be produced in such fashion as to identify the department, branch, or office in whose possession it was located and, where applicable, the natural person in whose possession it was found or the server or central file in which it was found, and the address of each document's custodian(s)), or (b) segregated as responsive to a specific Request enumerated in the Request, with such specific Request identified.

K.   All Documents produced in electronic form shall include related metadata. Produce in TIFF or native format (i.e., Word documents as .DOC or .DOCX files, Outlook emails as .PST files, Excel spreadsheets as .XLS or .XLSX files, Adobe PDF documents as .PDF files). For all forms of ESI, ensure that ESI is provided in unencrypted form and free of password protection.

L.  In the event any Document or Communication is withheld on the basis of the attorney-client privilege, work product doctrine, or any other right of non-disclosure on any other basis, You shall produce a privilege log.

## DOCUMENTS TO BE PRODUCED

1.      All Documents and Communications referring or relating to any of Seth Rich, Aaron Rich, Joel Rich, or Mary Rich, including any such Communications between or involving You and any of the following: any member of law enforcement, including any member of the Washington D.C. metropolitan police force, any United States attorney or assistant United States attorney, the Federal Bureau of Investigations or the Secret Service; any member of the Democratic National Committee; any member of Congress; any member of the Central Intelligence Agency; any member of the National Security Agency; any representative of the Office of the Special Counsel; any reporter with, or representative, employee or agent of, the New York Times, the Washington Post, the Los Angeles Times, the Daily Beast, Buzzfeed, Vox, Politico, CNN, MSNBC, Fox News, CBS, ABC and NBC; and any of Muriel Bowser, Cathy Lanier, Theresa Grafenstine, Joey Della Camera, Joe Capone, Brad Bauman, Dov Friedman, Christine Trankheim, Shawn Lucas, Deborah Wasserman Schultz, Donna Brazile, John Podesta, Hilary Clinton, Bernie Sanders, Dimitri Alperowitch, Shawn Henry, Imran Awan, Pratt Wiley, Amy Dacey, Andrew Therriault, Michael Cass Antony, Rob Placek and Roberto Alonso.

## **EXHIBIT A**

## **CERTIFICATION THAT RESPONSE IS CORRECT AND COMPLETE**

I, _____ , certify as follows:

1.   The enclosed production of Documents and Communications were prepared and assembled under my personal supervision;

2.   The Documents and Communications contained in this production to the Subpoena are authentic, genuine and what they purport to be;

3.   Attached is a true and accurate record of all persons who prepared and assembled any productions and responses to the Subpoena, all persons under whose personal supervision the preparation and assembly of productions and responses to the Subpoena occurred, and all persons able competently to testify: (a) that such productions and responses are complete and correct to the best of such person's knowledge and belief; and (b) that any Documents produced are authentic, genuine and what they purport to be; and

4.   Attached is a true and accurate statement of those requests under the Subpoena as to which no responsive Documents were located in the course of the aforementioned search.

Signature: _____ Date: _____

Printed Name: _____

Address,      e-mail      and      telephone      number:_____

_____

_____

## <u>CERTIFICATE OF SERVICE</u>

I, EDEN P. QUAINTON, hereby certify that on this 8th day of January, 2020, a copy of the documents entitled:

Notice of Intent to Serve Third Party Subpoena
Subpoena
Subpoena Addendum

Were served via electronic document transfer to the following parties:

Joshua Riley
Meryl C. Governski
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, N.C
Washington, DC 2005
jriley@bsfllp.com
mgovernski@bsfllp.com

Michael J. Gottlieb
Samuel Hall
WILLKIE FARR & GALLAGHER LLP
1875 K. Street, N.W.
Washington, D.C. 20006
mgottlieb@willkie.com
shall@willkie.com

*/s/ Eden Quainton*
EDEN P. QUAINTON, ESQ.

1001 Avenue of the Americas, 11th Floor
New York, New York 10018
Telephone: (212) 813-8389
equainton@gmail.com

# EXHIBIT 21

| | |
|---|---|
| **From:** | Eden Quainton |
| **To:** | Joshua Riley; Meryl Governski; Michael Gottlieb; Sam Hall |
| **Subject:** | Rich v. Butowsky -- Notice of Intent to Serve Third Party Subpoena |
| **Date:** | Monday, January 13, 2020 3:48:02 PM |
| **Attachments:** | Notice of Intent to Serve Subpoena DellaCamera.pdf |
| | Notice of Intent to Serve Subpoena Capone.pdf |

Attached please find two notices of intent to serve third-party subpoenas.

Eden P. Quainton
Quainton Law, PLLC
1001 Avenue of the Americas, 11th Floor
New York, NY 10018
Tel: 212.813.8389
Fax: 212.813.8390
Cell: 202.360.6296
www.quaintonlaw.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————————

AARON RICH

               Plaintiff,

v.

EDWARD BUTOWSKY,
MATTHEW COUCH, and
AMERICA FIRST MEDIA,

               Defendants.

———————————————————————————

Civil Action No. 1:18-cv-00681-RJL

Hon. Richard J. Leon

**DEFENDANT EDWARD BUTOWSKY'S NOTICE OF INTENT TO SERVE THIRD-PARTY SUBPOENA**

TO PLAINTIFF:

PLEASE TAKE NOTICE, that pursuant to Rule 45 of the Federal Rules of Civil

Procedure, Defendant Edward Butowsky intends to serve a third-party subpoena on Joseph

DellaCamera.

The subpoena is attached to this Notice.

Dated: January 13, 2020
      New York, NY

               QUAINTON LAW, PLLC
               By: *Eden P. Quainton*_____
               Eden P. Quainton
               1001 Avenue of the Americas, 11th Floor
               New York, NY 10018
               Telephone: (212) 813- 8389
               Facsimile: (212) 813-8390
               equainton@gmail.com
               *Attorneys for Defendant Edward Butowsky*

To:    Joshua Riley
       Meryl C. Governski
       BOIES SCHILLER FLEXNER LLP
       1401 New York Ave, N.C
       Washington, DC 2005
       jriley@bsfllp.com
       mgovernski@bsfllp.com
       *Attorneys for Plaintiff Aaron Rich*

Michael J. Gottlieb
Samuel Hall
WILLKIE FARR & GALLAGHER LLP
1875 K. Street, N.W.
Washington, D.C. 20006
mgottlieb@willkie.com
shall@willkie.com
*Attorneys for Plaintiff Aaron Rich*

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| Aaron Rich | ) | |
| _Plaintiff_ | ) | |
| v. | ) | Civil Action No.   18-cv-0681 (RJL) |
| Joseph DellaCamera | ) | |
| | ) | |
| _Defendant_ | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:   Joseph DellaCamera, c/o the District of Columbia Metropolitan Police Department General Counsel
         300 Indiana Ave., N.W., Room 41125, Washington, D.C. 20001
                         _(Name of person to whom this subpoena is directed)_

☑ _Testimony:_ **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place:  Baptise & Wilder 1150 Connecticut Ave. N.W., Suite 315, Washington D.C. 20036 | Date and Time: <br> 01/27/2020 1:00 pm |
|---|---|

      The deposition will be recorded by this method:   Stenographic and audiovisual means

☐ _Production:_ You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

      The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   01/13/2020

           _CLERK OF COURT_               OR

           _Signature of Clerk or Deputy Clerk_               _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_   Edward Butowsky
                               , who issues or requests this subpoena, are:
Eden P. Quainton, 1001 Avenue of the Americas, 11th Fl., New York, NY 10018, equainton@gmail.com, 212-813-8389

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  18-cv-0681 (RJL)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ __0.00__ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 (1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
   (i) is a party or a party's officer; or
   (ii) is commanded to attend a trial and would not incur substantial expense.

 (2) *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 (1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 (2) *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
   (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
   (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 (3) *Quashing or Modifying a Subpoena.*

  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

   (i) fails to allow a reasonable time to comply;
   (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
   (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
   (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

   (i) disclosing a trade secret or other confidential research, development, or commercial information; or
   (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
   (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
   (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 (1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 (2) *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
   (i) expressly make the claim; and
   (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

AARON RICH

                Plaintiff,

v.

EDWARD BUTOWSKY,
MATTHEW COUCH, and
AMERICA FIRST MEDIA,

                Defendants.

Civil Action No. 1:18-cv-00681-RJL

Hon. Richard J. Leon

**DEFENDANT EDWARD BUTOWSKY'S NOTICE OF INTENT TO SERVE THIRD-PARTY SUBPOENA**

---

TO PLAINTIFF:

PLEASE TAKE NOTICE, that pursuant to Rule 45 of the Federal Rules of Civil

Procedure, Defendant Edward Butowsky intends to serve a third-party subpoena on Joe Capone.

The subpoena is attached to this Notice.

Dated: January 13, 2020
     New York, NY

                            QUAINTON LAW, PLLC
                            By: *Eden P. Quainton*
                            Eden P. Quainton
                            1001 Avenue of the Americas, 11th Floor
                            New York, NY 10018
                            Telephone: (212) 813- 8389
                            Facsimile: (212) 813-8390
                            equainton@gmail.com
                            *Attorneys for Defendant Edward Butowsky*

To:   Joshua Riley
       Meryl C. Governski
       BOIES SCHILLER FLEXNER LLP
       1401 New York Ave, N.C
       Washington, DC 2005
       jriley@bsfllp.com
       mgovernski@bsfllp.com
       *Attorneys for Plaintiff Aaron Rich*

Michael J. Gottlieb
Samuel Hall
WILLKIE FARR & GALLAGHER LLP
1875 K. Street, N.W.
Washington, D.C. 20006
mgottlieb@willkie.com
shall@willkie.com
*Attorneys for Plaintiff Aaron Rich*

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia

| | |
|---|---|
| Aaron Rich | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   18-cv-0681 (RJL) |
| Edward Butowsky et al. | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:                              Joe Capone
LOU'S CITY BAR, 1400 IRVING STREET NORTHWEST, WASHINGTON, DC,
*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Baptise & Wilder 1150 Connecticut Ave., N.W., Suite 315 Washington, D.C. 20036 | Date and Time: 01/27/2020 9:30 am |
|---|---|

The deposition will be recorded by this method:    Stenographic and audio-visual method

☐ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    01/13/2020

CLERK OF COURT                                  OR

_____                 _____
*Signature of Clerk or Deputy Clerk*                  *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Edward Butowsky
_____ , who issues or requests this subpoena, are:
Eden P. Quainton, 1001 Avenue of the Americas, 11th Fl., New York, NY 10018, equainton@gmail.com, 212-813-8389

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  18-cv-0681 (RJL)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify a subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## <u>CERTIFICATE OF SERVICE</u>

I, EDEN P. QUAINTON, hereby certify that on this 13th day of January 2020, a copy of the documents entitled:

Notice of Intent to Serve Third Party Subpoena
Subpoena

Were served via electronic document transfer to the following parties.

Joshua Riley
Meryl C. Governski
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, N.C
Washington, DC 20005
jriley@bsfllp.com
mgovernski@bsfllp.com

Michael J. Gottlieb
Samuel Hall
WILLKIE FARR & GALLAGHER LLP
1875 K. Street, N.W.
Washington, D.C. 20006
mgottlieb@willkie.com
shall@willkie.com

*/s/ Eden Quainton*
EDEN P. QUAINTON, ESQ.

1001 Avenue of the Americas, 11th Floor
New York, New York 10018
Telephone: (212) 813-8389
equainton@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I, EDEN P. QUAINTON, hereby certify that on this 13th day of January 2020, a copy of the documents entitled:

Notice of Intent to Serve Third Party Subpoena
Subpoena

Were served via electronic document transfer to the following parties.

Joshua Riley
Meryl C. Governski
BOIES SCHILLER FLEXNER LLP
1401 New York Ave, N.C
Washington, DC 20005
jriley@bsfllp.com
mgovernski@bsfllp.com

Michael J. Gottlieb
Samuel Hall
WILLKIE FARR & GALLAGHER LLP
1875 K. Street, N.W.
Washington, D.C. 20006
mgottlieb@willkie.com
shall@willkie.com

*/s/ Eden Quainton*
EDEN P. QUAINTON, ESQ.

1001 Avenue of the Americas, 11th Floor
New York, New York 10018
Telephone: (212) 813-8389
equainton@gmail.com

# EXHIBIT 22



# EXHIBIT 23



# EXHIBIT 24

| | |
|---|---|
| **From:** | Meryl Governski |
| **To:** | Eden Quainton |
| **Cc:** | Joshua Riley; Michael Gottlieb |
| **Subject:** | RE: Rich v Butowsky |
| **Date:** | Monday, October 21, 2019 5:26:05 PM |
| **Attachments:** | RE Rich v. Butowsky et al.--Responses to InterrogatoriesMeet and Confer.msg |

Mr. Quainton,

We appreciate you providing an estimate for the collection of Flock, and we would be willing to cover half of your estimated cost for that collection, which is reasonable pursuant to the federal rules.  As far as search terms, it is our position that Mr. Couch should produce any and all conversations responsive to the RFPs, which includes *inter alia* any and all communications with individuals and entities named in the complaint (RFP No. 1); about any member of the Rich family (RFP No. 2); any basis for his statements (RFP. No. 2); and any basis for his Interrogatory responses (RFP No. 6).  I am not familiar with Flock, and am not sure whether searching for terms alone would be sufficient or would exclude necessary context.  Mr. Couch is in the best position to know how he used Flock and the individuals with whom he used Flock to communicate with about the Rich family.  Therefore, we invite Mr. Couch to provide the initial suggestions for how a search might best capture responsive materials.  At a minimum, his production should include all communications with any of the Defendants (Butowsky; members of the AFM team); The Washington Times; Admiral James A. Lyons; Cassandra Fairbanks; The Gateway Pundit, Rod Wheeler; and any of the participants at the September 2017 meeting at Butowsky's home (Malia Zimmerman; Manuel Chavez (aka Defango); Thomas Schoenberger; Joshua Flippo, etc).

Relatedly, as discussed in our multiple letters, Flock appears to be only *one* of *many* platforms that Mr. Couch used to communicate about topics responsive to the outstanding RFPs but has not produced.  We, once again, suggest that it would be more effective and efficient for Mr. Couch to hire a third-party discovery vendor to collect materials from *all* of Mr. Couch's platforms, the cost of which we would be amenable to considering contributing.  We have been conferring for months, and apparently are no closer to receiving the materials to which Mr. Rich is entitled, and we have not yet received a response regarding the joint stipulation to which we had agreed in principal (reattached here).  **Please confirm that you will produce all outstanding materials—or provide an estimate for a third-party vendor to collect the materials from Mr. Couch— by November 1, or Mr. Rich reserves the right to again seek the Court to compel Mr. Couch to participate in discovery and to award the fees Mr. Rich has already incurred relating to Mr. Couch's delay.**

With respect to Mr. Couch's deposition, would December 12 work?  Alternatively, we are amenable to scheduling it during the first week of December if that works better for you and Mr. Couch.  Please confirm that this deposition would take place in Arkansas.  Mr. Rich does not plan to attend any of the depositions, and we do not believe it is appropriate for any of the Defendants to attend either, especially considering the nature of the claims and the amount of AEO-designated material.

As far as your questions relating to depositions Mr. Couch plans to take, it is not clear to us that Mr. Couch (nor Mr. Butowsky now that he is unrepresented) has the Court's permission to take depositions.   We would consider not opposing Mr. Couch moving for permission to take specific depositions once you have entered an appearance.  We would, however, object to his doing so without counsel present and before you have entered an appearance in the case.

We would be willing to consider tentatively scheduling Mr. Rich's deposition, but it is our position that Mr. Couch and the other Defendants must first coordinate amongst themselves to propose a mutually agreeable date and location in either Colorado or Washington, D.C.

As far as Joel and Mary Rich, they are represented by separate counsel with whom you should confer.  Please include us in that correspondence so we can schedule accordingly.


**Meryl Conant Governski**
Associate

BOIES SCHILLER FLEXNER LLP

1401 New York Avenue, N.W.
Washington, DC 20005
(t)  202 895 7565
(m) 301 502 5638
(f)  202 237 6131
mgovernski@bsfllp.com
www.bsfllp.com



**From:** Eden Quainton [mailto:equainton@gmail.com]
**Sent:** Monday, October 21, 2019 10:12 AM
**To:** Meryl Governski
**Cc:** Joshua Riley; Michael Gottlieb
**Subject:** Rich v Butowsky

Meryl,

I am still working on responding to your letters.  In the meantime, I am informed that Flock will charge approximately $500 to make the chats searchable.  Can you send me some proposed search terms so we can start thinking about the logistics of this? I'm assuming the $500 will not be an issue and the real challenge will be using terms that get only responsive material.

On deps, the second week of December works for us.  Can you propose a specific day?  Will Aaron be attending the deposition?  If so, we would like to do his deposition at the same time.  Also, what is the availability of Joel and Mary Rich?  Are you contemplating that Mr. Couch would need to travel to Omaha?

Please let me know.

Eden

# EXHIBIT 25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| CHAPWOOD CAPITAL INVESTMENT MANAGEMENT, LLC | ) ) ) | |
| -and- | ) ) | |
| ED BUTOWSKY | ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. _____ |
| CHARLES SCHWAB CORPORATION CHARLES SCHWAB & CO., INC. SCHWAB INSTITUTIONAL ENTERPRISE CHARLES R. SCHWAB WALTER W. BETTINGER, II BERNARD J. CLARK JOHNATHAN M. CRAIG JOSEPH R. MARTINETTO NIGEL J. MURTAGH WILLIAM BELL | ) ) ) ) ) ) ) ) ) ) ) ) | **TRIAL BY JURY IS DEMANDED** |
| -and- | ) ) | |
| KEVIN LEWIS | ) ) | |
| Defendants. | ) ) | |

# COMPLAINT

Plaintiffs, Chapwood Capital Investment Management, LLC, a Texas limited liability company ("Chapwood") and Ed Butowsky, by counsel, file the following Complaint against Defendants, Charles Schwab Corporation, Charles Schwab & Co., Inc., Schwab Institutional Enterprise, and individual Schwab officers and directors,

Charles R. Schwab, Walter W. Bettinger, II, Bernard J. Clark, Johnathan M. Craig, Joseph R. Martinetto, Nigel J. Murtagh, William Bell and Kevin Lewis, jointly and severally.

Plaintiffs seek (a) compensatory damages and punitive damages in a sum not less than **$100,000,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury from August 30, 2017 to the date of Judgment at the rate of five percent (5%) per year, and (c) costs – arising out of Schwab's defamation *per se*, business disparagement, tortious interference with contract and business expectancies, and breach of contract.

## I.  INTRODUCTION

For over ten (10) years, Chapwood enjoyed an excellent working relationship with Schwab.  That all changed on August 30, 2017, when Schwab precipitously terminated the relationship without notice, without any cause, indeed without any written or verbal explanation.  In August 2017, Schwab informed Ed Butowsky – Chapwood's managing partner – that "Senior Management" at Schwab wanted to have a conference call to discuss Butowsky's "political views and Trump".  There were no customer complaints.  Chapwood's performance was spectacular.  Butowsky wondered what in the world his "political views" or President Trump had to do with Chapwood's investment advisory business.  Although he was totally bewildered by Schwab's bizarre request, Butowsky agreed to the call.  The call never took place.  Rather, Schwab and its apex officials proceeded post-haste and with reckless disregard for the truth to defame Chapwood and Butowsky, disparage Chapwood's business, and intentionally and maliciously interfere with Chapwood's client relationships.  Schwab acted knowingly and without regard to the consequences of its actions.

In this case, Chapwood and Butowsky seek money damages for loss of business, income and clients, injury to good will, and the insult, embarrassment, humiliation and injury to reputation caused by Schwab's unwarranted and egregious actions.

## II. **PARTIES**

1.     Chapwood is a private, closely-held investment advisor registered and in good standing with the Securities and Exchange Commission (SEC # 801-65121) and the Financial Industry Regulatory Authority (CRD # 138524).  Ed Butowsky founded Chapwood in 2005.  He is the managing partner of the firm.  Kim Sams is Chapwood's Chief Financial Officer and Butowsky's partner.  Chapwood's members are all citizens of Texas.   Chapwood's established business, good will and its considerable accomplishments are described on its website [http://www.chapwoodinvestments.com/] and in its Disclosure Brochures filed with the SEC. [*See, e.g.,* https://www.adviserinfo.sec.gov/IAPD/Content/Common/crd_iapd_Brochure.aspx?BRC HR_VRSN_ID=493615].  For over twelve (12) years, Chapwood successfully focused on providing comprehensive financial counseling, portfolio management and investment advice to high net worth individuals and families.  Chapwood is compensated for its investment advisory services by a percentage of assets under management and it also receives performance-based fees.  Until Schwab defamed Chapwood and Butowsky and intentionally interfered with Chapwood's business in August 2017, Chapwood was a large advisory firm with a stellar reputation, growing business and assets under management of more than $237 Million.   Because of Schwab's intentional wrongdoing, Chapwood's assets under management plunged by over $45,000,000.00.   Chapwood lost over 268 customer accounts and suffered a substantial loss of income.

2.     Defendant, Schwab, is a publicly-traded corporation (NYSE:SCHW) that engages in wealth management, securities brokerage, banking, asset management, custody, and financial advisory services.   Schwab is a Delaware corporation, headquartered in California.  At December 31, 2017, Schwab had $3.36 trillion in client assets, $10.8 million active brokerage accounts, $1.6 million corporate retirement plan participants, and $1.2 million banking accounts.  As of December 31, 2017, Schwab had approximately 17,600 full-time employees.  Defendants, Charles R. Schwab, Walter W. Bettinger, II, Bernard J. Clark, Johnathan M. Craig, Joseph R. Martinetto, Nigel J. Murtagh, William Bell and Kevin Lewis ("Lewis"), are the individual officers and directors of Schwab who jointly instigated and directed the unlawful termination of the Agreement, the defamation, business disparagement and tortious interference at issue in this action.  A description of each individual Defendant's position at Schwab is published online [https://www.aboutschwab.com/leadership] and on their respective public profiles published by LinkedIn.  None of the individual Schwab officers and directors is a citizen of Texas.

3.     This action involves Schwab's deliberate decision to unlawfully terminate Chapwood's Investment Manager Services Agreement and to defame and disparage Chapwood in letters gratuitously sent by Schwab to Chapwood's existing clients *and* Chapwood's former clients.   In letters baked full of half-truths and insinuations of malfeasance, misfeasance and nonfeasance, Schwab painted Chapwood and its principals as unethical, dishonest and untrustworthy.   Schwab's tortious interference with Chapwood's business and its long-standing client relationships caused Chapwood to lose

over 268 accounts and $45,000,000.00 in assets under management.  Schwab's misconduct injured Chapwood and Butowsky's good will and reputation.

### III.  JURISDICTION AND VENUE

4.      The United States District Court for the Eastern District of Texas has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (Diversity Jurisdiction) and 28 U.S.C. § 1367 (Supplemental Jurisdiction).  The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

5.      The Defendants are subject to general and specific personal jurisdiction in Texas.  They transact substantial business in Texas.  They committed multiple acts of defamation and intentional torts, in whole or part, in Texas.  They have minimum contacts with Texas such that the exercise of personal jurisdiction over them comports with traditional notions of fair play and substantial justice and is consistent with the Due Process clause of the United States Constitution.  Defendants' defamation was purposefully directed at Texas and was continuous and systematic.  Chapwood and Butowsky's claims directly arise from and relate to Defendants' publication of false and defamatory statements in Texas and disparagement of a Plano-based business. *See, e.g., TV Azteca v. Ruiz*, 490 S.W.3d 29 (Tex. 2016) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) and *Calder v. Jones*, 465 U.S. 783 (1984)).

6.      Venue is proper in the Sherman Division of the United States District Court for the Eastern District of Texas because Schwab and its agents published and republished defamatory statements to a wide audience that includes persons who reside within the Sherman Division.  Schwab's defamation caused substantial harm to

Chapwood and Butowsky's reputations in Texas. A substantial part of the events giving rise to the claims stated in this action occurred in the Eastern District of Texas.

## IV.  STATEMENT OF MATERIAL FACTS

7.  On February 19, 2008, Chapwood and Schwab entered into an Investor Manager Services Agreement (the "Agreement").

8.  A true copy of the Agreement is attached as *Exhibit "A"*.

9.  Section 2 of the Agreement (General Description of Services), provides as follows:

> **General Description of Services**
> Schwab will provide you with products and services designed specifically for Investment Managers and their clientele. Such products and services include, without limitation, product and account services, administrative services and information and resource services.

10.  Section 2 of the Agreement (Relationships of Schwab, Investment Manager and Clients), *inter alia*, provides that:

> We agree that as between us, you will have primary responsibility for Client communications except for communications with Clients who are referred to you by Schwab through Schwab AdvisorSource® or other Schwab programs. Schwab has no intent to communicate with your Clients except as may be required by law, rule or regulation, as for example brokerage confirmations and account statements, and as Schwab reasonably determines necessary. Schwab will use its best efforts to limit its communications with your Clients to those designed exclusively for Schwab Institutional clientele, and as described herein. Schwab will (a) provide you with information on matters which you in your sole discretion determine to communicate to Clients and (b) use its best efforts to encourage your Clients who make inquiries to Schwab to direct these communications through you. We agree that nothing in this Agreement will limit Schwab's communications with Clients referred to you through Schwab AdvisorSource.

11.     Section 2 of the Agreement (Investment Manager's Authorization), in

pertinent part, provides that:

> You authorize Schwab to conduct such due diligence inquiries regarding you as Schwab reasonably determines necessary. Schwab will provide you with the results of such inquiries upon your request. You will promptly provide to Schwab any information reasonably requested by Schwab concerning your management of Client Accounts or your compliance with any federal or state laws.

12.     Section 2 of the Agreement (Compliance With Applicable Law) provides:

> **Compliance with Applicable Law**
>
> During the term of this Agreement, each of us and our employees and representatives will remain in substantial compliance with applicable federal and state laws, rules and regulations, as they may be amended from time to time, including, without limitation, making such disclosure as may be required by applicable law, rule or regulation.

13.     Section 2 of the Agreement (Termination) provides:

> **Termination**
>
> Either party may terminate this Agreement at any time by giving written notice to the other. Upon termination by either of us, a) Schwab will not be obligated to honor the authorizations granted to you by your Client in the respective Client Account agreements and in any written notices to Schwab; b) Client Accounts will be handled by Schwab in accordance with the termination of authorization provisions set forth in the respective Client brokerage account agreement and Schwab will consider such Client to have exclusive control over, and responsibility for, such Client Accounts; and c) Schwab will not be obligated to send you any further information with respect to Client Accounts. Upon Schwab's receipt of notice of a Client's termination of your authority with respect to a Client Account, the termination provisions of this paragraph shall apply with respect to such Client Account(s).

14.     Between February 2008 and August 1, 2017, Chapwood performed all duties and responsibilities called for by the Agreement without incident.  The business relationship between Chapwood and Schwab was excellent.

15.     On August 1, 2017, two things happened that ultimately caused Schwab to terminate the Agreement:

a.     First, at 7:23 a.m. on August 1, 2017, David Folkenflik, a media correspondent for NPR, published an article online at NPR.org entitled, "Behind Fox News' Baseless Seth Rich Story: The Untold Tale".  NPR simultaneously broadcast the story on *Morning Edition*.  [https://www.npr.org/2017/08/01/540783715/lawsuit-alleges-fox-news-and-trump-supporter-created-fake-news-story].  Folkenflik's August 1, 2017 article made and republished a number of false and defamatory statements about Butowsky, including:

●     Fox News Network ("Fox News") and Butowsky "worked in concert under the watchful eye of the White House to concoct a story" about the death of Democratic National Committee ("DNC") staffer, Seth Rich;

●     The Fox News story was a "fake news story"; and

●     The Fox News story was a "deceptive story".

Folkenflik's source was Douglas H. Wigdor ("Wigdor").  In the article, Folkenflik quoted Wigdor as follows:

> "Rod Wheeler unfortunately was used as a pawn by Ed Butowsky, Fox News and the Trump administration to try and steer away the attention that was being given about the Russian hacking of the DNC emails," says Douglas Wigdor, Wheeler's lawyer.

Many millions of NPR subscribers and listeners saw and heard Folkenflik's statements. Folkenflik's article – including the false narrative fabricated by Wigdor that Butowsky had colluded with the President and Fox News to publish "fake news" – was republished hundreds of times with no fact-checking whatsoever by other main stream media outlets and online newspaper publishers. Folkenflik tweeted (published) the article to his 75,100 followers on Twitter and NPR tweeted the article to its 3,000,000+ followers, *e.g.*:



Ultimately, Folkenflik's article was tweeted and retweeted (republished) tens of millions of times on August 1, 2017 alone.

b.      Second, after leaking the false story to Folkenflik in July 2017, on August 1, 2017 Wigdor filed a lawsuit against Butowsky and others on behalf of his client, Rod Wheeler ("Wheeler").   Wigdor's lawsuit falsely stated that Fox News reporter, Malia Zimmerman, "with knowledge and support of Butowsky, fabricated two quotations and attributed them to Mr. Wheeler:

- 'My investigation up to this point shows there was some degree of email exchange between Seth Rich and Wikileaks,' said Wheeler.'

- 'My investigation shows someone within the DC government, Democratic National Committee or Clinton team is blocking the murder investigation from going forward,' Wheeler said.  'That is unfortunate.  Seth Rich's murder is unsolved as a result of that.'"

Wigdor made multiple additional false and defamatory statements of fact about Butowsky, including that:

- Zimmerman, Butowsky and Fox had created fake news to advance President Trump's agenda.

- Butowsky and Zimmerman were not simply Good Samaritans attempting to solve a murder.  Rather, they were interested in advancing a political agenda for the Trump Administration.

- Specifically, it was Butowsky and Zimmerman's aim to have Wheeler confirm that: (i) Seth Rich was responsible for the leak of DNC emails to WikiLeaks; and (ii) Seth Rich was murdered by a Democrat operative because he leaked the emails to WikiLeaks.

- Butowsky and Zimmerman were not in this alone.  Rather, they colluded with Sean Spicer, Steve Bannon[1] and Sarah Flores to shift the blame for the DNC hacks from the Russians to Seth Rich in order to undermine reports of collusion between Russia and the Trump Administration.

---

[1]      Butowsky has not spoken with Steve Bannon in three (3) years.  Wigdor and Wheeler simply made this up to further their false narrative that President Trump was involved.

- Simultaneous with baseless claims of nonpartisanship to British regulators, Fox was contriving with Butowsky and members of the Trump Administration to publish and disseminate fake news to affect politics in America.

- Because of Fox and Butowsky's "devious scheming" British regulators have yet to provide a green light to Fox for the Sky takeover bid, and many U.K. politicians question whether Fox is capable of news dissemination in a fair and neutral manner.

- In falsely quoting Wheeler, Butowsky and Zimmerman attempted – through the publication of fake news – to accomplish what they had set out to do from the start: "solve the problem about Russians are the ones that gave the emails" and establish that "there was no collusion like trump with the Russians."

- Butowsky planned to extort Seymour Hersh in an effort to save the Fox News story.

On August 1, 2017, after setting Folkenflik lose, Wigdor cranked up his own public relations machine, and began to further defame Butowsky in main stream media.  Wigdor and Wheeler appeared on MSNBC with Ari Melber ("Melber"). [https://www.youtube.com/watch?v=VFTdWAWrocQ].  Melber republished the interview to his 38,262 Twitter followers *and* to MSNBC's 1,975,316 Twitter followers:



In addition to Twitter, the August 1, 2017 MSNBC broadcast was uploaded to MSNBC's YouTube channel – which has 689,000 subscribers.  The video was viewed over 117,000

more times.  Throughout August 2017, Wigdor continued to appear on television, where he published and republished false and defamatory statements about Butowsky. [*See, e.g.,* https://www.youtube.com/watch?v=S2BafRHiuZY (CNN Wolf Blitzer)]; [https://www.youtube.com/watch?v=d5L-NF6cDOo (CNN with Chris Cuomo)].

16.     Schwab and its Senior Management saw and/or heard Folkenflik and Wigdor's false and defamatory statements about Butowsky.

17.     Schwab and its Senior Management did absolutely no due diligence and made no effort to determine whether Folkenflik and Wigdor's statements were true.

18.     Schwab and its Senior Management blindly accepted Folkenflik and Wigdor's misrepresentations about Butowsky.  The suggestion that the President of the United States and the "Russians" (Vladimir Putin) would have colluded with Butowsky – a person unknown to either the President or Putin and with whom neither the President nor Putin has ever communicated – was preposterous.  Schwab and its Senior Management knew Wigdor and Folkenflik's representations were false.

19.     With actual knowledge of the falsity of Wigdor and Folkenflik's statements and without once considering the impact of their actions on Chapwood, its principals, and, most importantly, Chapwood's clients, the Defendants secretly implemented a plan to defame Chapwood and poach its clients.

20.     On or about August 19, 2017, Jennifer Pello, Schwab's "relationship manager", informed Butowsky that "Senior Management would like to have a call with you."  When Butowsky asked "why?", Pello reluctantly advised Butowsky that the purpose of the call was to discuss Butowsky's "political views and Trump".  Butowsky was bewildered and curious.  He did not know President Trump and had never spoken to

him.  Moreover, Butowsky's "political views" had nothing to do with Chapwood's business as a registered investment adviser and had never been questioned before by Schwab.  Except for the publicity generated by Folkenflik and Wigdor's defamatory statements, Butowsky could not imagine what Schwab's Senior Management wanted to discuss.

21.    Butowsky offered dates for a conference call, but the call never happened.

22.    Instead, beginning in late August 2017 and continuing through January 2018, the Defendants intentionally violated the Agreement by publishing multiple letters directly to Chapwood's existing clients *and* former clients – letters that are fraudulent and deceitful, laden with half-truths, and that deliberately conceal material facts.  The letters defame and disparage Chapwood and Butowsky by implication, inference and insinuation.  For instance:

a.    The letters notified clients that Schwab was terminating the Agreement and "will no longer honor any authorizations held by Chapwood and its principals, employees and agents with respect to your Schwab account".  However, Schwab concealed from clients and former clients the reason _why_ the Agreement was being terminated:  that Schwab, for political reasons and to protect its own self-interest, had concluded that it no longer wanted to do business with Chapwood and Butowsky.  Schwab's concealment was no small detail.  Schwab is the largest custodian of assets in the industry.  It would have been simple to advise clients and former clients that Schwab was terminating the Agreement without cause and for its own convenience.  Schwab deliberately withheld from Chapwood's clients the fact that Chapwood had done absolutely nothing wrong.  The timing of the Schwab letters, coming on the heals of the

13

false narrative published nationally and internationally by Folkenflik and Wigdor of collusion with "Trump" and Fox News, coupled with Schwab's concealment of the true reason for terminating the investment management relationship, implied, inferred and insinuated, indeed made it plainly appear to Chapwood's clients (a) that Butowsky had, in fact, colluded with the President and Fox to publish "fake news", (b) that Folkenflik and Wigdor's statements were true, (c) that Chapwood and its principals had engaged in serious malfeasance, misfeasance or nonfeasance, and (d) that there was, in fact, good cause to terminate Chapwood as Investment Manager.  The absence of explanation from Schwab created the implication and inference of serious legal and ethical wrongdoing. The letters caused consternation and panic.  Schwab's deliberate non-disclosure of the reason for the termination was intentional, fraudulent, deceitful and defamatory.

        b.      In the letters, Schwab told clients (and former clients) that if they wanted Chapwood or its representatives to continue to manage their brokerage account, "you will need to transfer your account to a broker-dealer or custodian other than Schwab".  Clients who chose to maintain an account at Schwab were informed that "[y]our statements will no longer have Chapwood listed on them and copies will no longer be sent to Chapwood".  These statements made it appear that Chapwood was so untrustworthy and so dishonest that Schwab would have nothing to do with Chapwood. In truth, it was the Defendants' goal in sending the letters to both existing clients and former clients of Chapwood to cause those clients to maintain their accounts at Schwab or open new accounts at Schwab.  By means of the half-truths and defamation in the letters, the Defendants intended to influence Chapwood's clients and cause them to do

business with Schwab. Defendants' motive was to steal Chapwood's clients and, thereby, injure Chapwood's business.

c. Finally, in the letters Schwab informed Chapwood's clients and former clients that Schwab "regret[ted]" the inconvenience caused to the clients, but, Schwab emphasized, it took its "obligations as the custodian of client accounts very seriously". These statements further implied, inferred and insinuated that Chapwood had engaged in "very serious" wrongdoing and that Schwab, as custodian of the assets, was "obligat[ed]" to terminate Chapwood. The letters were carefully written and crafted to deceive Chapwood's clients and to cause them to question Chapwood and Butowsky's honesty and integrity. The letters achieved their desired effect. The Defendants discredited Chapwood and Butowsky, causing a massive outflow of assets.

23.     The Defendants' letters and Chapwood's unexplained termination placed Chapwood and Butowsky in a false and offensive light. The Defendants knew that the letters would cast aspersion upon Chapwood and Butowsky. It was the Defendants' intent to do so and to take Chapwood's business. The Defendants saw the Wigdor/Folkenflik defamation as an opportunity to raid Chapwood's accounts.

24.     At the same time Defendants contacted Chapwood's clients and former clients, Defendants sent Chapwood the following letter via UPS:

Chapwood Capital Investment Management, LLC
4597 Old Pond
Plano, Texas 75024

Re: Master Account: 08010516, 08053217, 08062123, 08083484, 08114350, 08242099, 08262362, 08266195, 08291718, 08317494, 08323850, 08367550 & 08460023

Dear Mr. Butowsky:

We are writing to inform you that, effective December 1, 2017, we are terminating the Investment Manager Service Agreement (IMSA) between Chapwood Capital Investment Management, LLC ("Chapwood") and Charles Schwab & Co., Inc. Effective with this termination, Schwab will no longer honor any authorizations held by Chapwood and its principals, employees and agents with respect to accounts at Schwab, including but not limited to the accounts identified in the Schedule attached to a copy of this letter you will receive by courier delivery.

In addition, on December 1, 2017, Schwab will close your Investment Manager Master account(s) with Schwab.

**Effective as noted below:**

(1) On December 1, 2017, pursuant to the terms of the IMSA between Chapwood and Schwab, Schwab will discontinue its investment management fee payment services to Chapwood with respect to any and all Chapwood client accounts. This means that Chapwood will no longer be able to draw fees directly from client accounts through the Schwab investment management fee payment system.

(2) As a result of the decision made to terminate Schwab's relationship with your firm, **effective immediately**, Schwab will no longer accept and process new account opening documentation for clients of Chapwood. Additionally, Schwab will no longer accept or process documentation to link existing Schwab accounts to the master account(s) of Chapwood.

(3) The personal accounts of each of the principals of Chapwood held at Schwab must be moved to a broker/dealer or other financial institution of their choosing before the termination date.

Prior to sending the letters to Chapwood's clients and former clients, the Defendants did not afford Chapwood or Butowsky an opportunity to object or even to discuss the matter. The Defendants did not afford Chapwood or Butowsky the opportunity to contacts clients and let them know ahead of time that Schwab had decided to terminate Chapwood. The Defendants' letters, therefore, came as a hammer blow to clients and former clients, many of whom did not understand why they were hearing about the termination for the first time from Schwab. To Chapwood and Butowsky's dismay, embarrassment and humiliation, the way Schwab acted amplified the defamatory implication of the letters.

25.    After clients brought the Schwab letters to his attention, Butowsky spoke with in-house counsel for Schwab in Austin, Texas.  Schwab's attorney stated to Butowsky that "**I heard you were running from the law**".  Butowsky asked the lawyer to explain the patently false, disparaging and offensive statement.  In response, Schwab's agent told Butowsky that "I have a doctor's appointment that is more important than you. I don't have to talk to you or give you a reason".  The lawyer hung up on Butowsky. Upon information and belief, Schwab and its agents made many false, defamatory and disparaging statements to Chapwood clients and former clients who contacted Schwab directly after August 30, 2017.

26.    Butowsky pressed for an explanation of Schwab's conduct.  Eventually, he spoke with Lewis.  Lewis had no real explanation for why Schwab had decided to terminate Chapwood.  It was obvious that Schwab had no good cause to terminate Chapwood and that Schwab was doing so because of the false narrative about Butowsky's supposed collusion with "Trump".  None of the Defendants ever bothered to seek the truth.  If they had done any due diligence, they would have learned that there was no connection at all between Butowsky and Trump.  Lewis told Butowsky that "we have processes".  He alluded to an internal "alert" in December 2016 caused by an "unusually large wire" that left a customer's account.  Lewis claimed that the wire "got the attention of compliance".  That was it.  Butowsky scratched his head.  No one from Schwab ever even contacted Chapwood about this wire in 2016.  Lewis quickly moved on to something that he said occurred in ***2006***.  Lewis claimed that a sales assistant at Chapwood had called Schwab with a client on the line.  Lewis said that Schwab was not sure if the person on the line was a client, but admitted, when questioned by Butowsky,

that this really was "not a problem". Lewis then referred to something he said occurred in 2011. A client, who was building a house, had used a wire request form to send multiple wires. The client had simply changed the amount of the wire on the second form because all the other information remained the same. When Butowsky asked what was wrong with this, Lewis had to admit again that there was nothing improper. That was it. Lewis could point to nothing that Chapwood had done or omitted to do that justified termination. Lewis concluded the conversation by stating that "we surveyed all the Schwab people on the account, and unanimously voted to end the relationship". Butowsky kept asking, "What did we do? What did we do?" Lewis had no answer.

27. Throughout the fall of 2017, Schwab continued to send letters to Chapwood clients and former clients. The insinuation and implication was clear – there was a real problem, an immediate danger, and clients and former clients needed to be constantly warned about Chapwood. Chapwood received numerous emails from clients, such as the following:

---

**From:** Carmela Pinzone <cpinzone@gmail.com>
**Date:** October 28, 2017 at 11:35:57 AM CDT
**To:** Ed Butowsky <ed@chapwoodinvestments.com>
**Cc:** Amy Surh <amy@chapwoodinvestments.com>
**Subject: Charles Schwab**

Hi Ed,
I received several letters from Charles Schwab stating that they would no longer honor authorizations by Chapwood. What is this about?

Thanks.

--
Carmela Pinzone

---

Schwab never once advised a single Chapwood's client that Chapwood and Butowsky were free of wrongdoing.  Repetition of the false and defamatory statements about Chapwood was unnecessary, insulting and malicious.

28.     Chapwood diligently searched for another broker-dealer and custodian for its clients' assets.  The process was painful.  Schwab's unexplained termination caused endless embarrassing and unanswerable questions.  Chapwood was rejected by numerous companies.  Chapwood finally secured a broker-dealer and custodian in early 2018.

29.     The Defendants' acts and omissions cast aspersion on Chapwood and Butowsky's honesty, credit, efficiency, prestige and standing in the investment advisory business.  Chapwood and Butowsky paid a huge price because of the actions of Schwab and the individual Defendants' actions.  In addition to a $45,000,000.00 loss of business and injury to Chapwood's good will, substantial increased administrative costs and other economic loss and special damages, Chapwood and Butowsky endured insult, humiliation, embarrassment and injury to their names and reputations because of the Defendants' letters and published statements.

## COUNT I – DEFAMATION *PER SE*

30.     Chapwood and Butowsky restate paragraphs 1 through 29 of this Complaint and incorporate them herein by reference.

31.     The Defendants made and published to third-parties, including clients and former clients of Chapwood, numerous false factual statements, which are detailed verbatim above, of or concerning Chapwood and Butowsky.  Defendants' statements are half-truths and, therefore, false representations of material facts relating to Chapwood's role as Investment Manager.  Considering the words themselves and all circumstances

surrounding the making and publication of the letters, Defendants' statements suggest a defamatory meaning in an indirect way, that is, by inference, implication or insinuation.

32.     The Defendants' false statements constitute defamation *per se*.    The statements accuse and impute to Chapwood and Butowsky an unfitness to perform the duties of an office or employment for profit, or the want of integrity in the discharge of the duties of such office or employment.    Defendants' statements also prejudice Chapwood and Butowsky in their profession or trade as investment advisor and manager of their clients' assets.

33.     The Defendants' false statements caused Chapwood and Butowsky to suffer actual damages, including loss and injury to business, insult, pain, embarrassment, humiliation, and injury to name and reputation.

34.     The Defendants acted with actual malice and reckless disregard for the truth for the following reasons:

     a.     The Defendants acted fraudulently and deceitfully in publishing letters to Chapwood's clients and former clients that contained half-truths and concealed material information;

     b.     The Defendants concocted a story about Butowsky "running from the law" that was knowingly false, with not a shred of supporting evidence.

     c.     The Defendants knew that Chapwood and Butowsky had done nothing wrong (indeed they had performed admirably for clients), yet the Defendants chose to promote a false narrative that implied dishonesty, unethical behavior and breach of duty by Chapwood and Butowsky;

d.      The Defendants had a predetermined agenda to get rid of Chapwood and Butowsky based on Folkenflik and Wigdor's false narrative and to poach Chapwood's clients, and they concealed that agenda from Chapwood's clients and former clients;

e.      The Defendants reiterated, repeated and continued to publish letters to Chapwood's clients and former clients out of a desire to hurt Chapwood and Butowsky and with reckless disregard for the consequences.

f.      The Defendants initiated the defamation and went out of their way to publish statements to clients _and_ former clients.  The Defendants could have communicated termination of the Agreement privately to Chapwood.  The Defendants chose to make a public spectacle of the matter, which was calculated to insult, embarrass, humiliate and cast aspersion on Chapwood and Butowsky.

35.     The Defendants lacked reasonable grounds for any belief in the truth of their statements and acted negligently in failing to determine the true facts.

36.     As a direct result of the Defendants' defamation, Chapwood and Butowsky suffered substantial damage and loss, including, but not limited to, loss of business and income, injury to good will, insult, humiliation, embarrassment, damage and injury to reputation, costs, and other out-of-pocket expenses in an amount to be determined by the Jury, but not less than $100,000,000.00.

## COUNT II – BUSINESS DISPARAGEMENT

37.     Chapwood and Butowsky restate paragraphs 1 through 36 of this Complaint and incorporate them herein by reference.

38.     The Defendants published false and disparaging information about Chapwood and Butowsky, which is detailed verbatim above.

39.     The Defendants knew their statements were false and acted with the specific intent to disparage Chapwood and Butowsky to clients and to cause clients to remain with Schwab.

40.     None of the Defendants' statements are privileged.  The Defendants had no right to publish false and disparaging information about Chapwood or Butowsky.  The Defendants knew of the falsity of their statements and acted with wanton, intentional and reckless disregard concerning publication.  The Defendants acted with ill-will and spite for Chapwood and Butowsky.  They intended to interfere with the economic interests of Chapwood and Butowsky in an unprivileged fashion.

41.     The Defendants' statements and actions constitute business disparagement under Texas law.

42.     The Defendants' business disparagement caused Chapwood and Butowsky to suffer and incur special damages, including loss of income and business and out-of-pocket expenses in an amount to be determined by the Jury, but not less than $100,000,000.00.

## COUNT III – TORTIOUS INTERFERENCE

43.     Chapwood restates paragraphs 1 through 42 of this Complaint and incorporates them herein by reference.

44.     Chapwood had valid and reasonable contracts and business expectancies in its relationships with clients and others with whom Chapwood and Butowsky were in active discussions to do new business.

45.     The Defendants knew about Chapwood's contracts and reasonable business expectancies.

46.     The Defendants intentionally interfered with Chapwood's contracts and business expectancies by, *inter alia*, sending the letters to Chapwood's customers and former customers.  The Defendants' improper methods, actions and practices were fraudulent, defamatory, unethical, oppressive, over-reaching, hostile, and sharp.

47.     As a direct result of the Defendants' tortious interference with Chapwood's contracts and valid business expectations, Chapwood suffered damage and incurred loss, including, without limitation, injury to its property and business, loss of clients and business, loss of good will, increased administrative expense, damage to reputation, credit, prestige and standing, court costs, and other damages in an amount to be determined by the Jury, but not less than $100,000,000.00.

## COUNT IV – BREACH OF CONTRACT

48.     Chapwood restates paragraphs 1 through 47 of this Complaint and incorporates them herein by reference.

49.     Schwab intentionally breach the Agreement when Schwab sent the letters directly to Chapwood's clients and former clients.

50.     Schwab's breach of the Agreement caused Chapwood direct and consequential damage and loss, including, without limitation, injury to its property and business, loss of clients and business, loss of good will, increased administrative expense, damage to reputation, credit, prestige and standing, court costs, and other damages in an amount to be determined by the Jury, but not less than $100,000,000.00.

Chapwood and Butowsky allege the foregoing based upon personal knowledge, public statements of others, and records in their possession. Chapwood and Butowsky believe that substantial additional evidentiary support, which is in the exclusive possession of the Defendants and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Chapwood and Butowsky reserve the right to amend this Complaint upon discovery of additional instances of the Defendants' defamation and wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Chapwood and Butowsky respectfully requests the Court to enter Judgment against the Defendants, jointly and severally, as follows:

A.      Compensatory damages in an amount to be determined by the Jury, but not less than $100,000,000.00;

B.      Punitive damages in the maximum amount allowed by Texas law;

C.      Prejudgment interest on the principal sum awarded to Plaintiff by the Jury from August 30, 2017 to the date of Judgment at the maximum rate allowed by law;

D.      Postjudgment interest at the maximum rate allowed by Texas law;

E.      Costs;

F.      Such other relief as is just and proper.

## TRIAL BY JURY IS DEMANDED

DATED:      April 20, 2018

CHAPWOOD CAPITAL INVESTMENT
    MANAGEMENT, LLC
ED BUTOWSKY


By:    */s/ Ty Clevenger*
    Ty Clevenger, Esquire
    Texas Bar No. 24034380
    P.O. Box 20753
    Brooklyn, NY 11202-0753
    (979) 985-5289
    (979) 530-9523 (Fax)
    Email:  tyclevenger@yahoo.com

    *Counsel for the Plaintiffs*

    Steven S. Biss (Virginia State Bar # 32972)
    300 West Main Street, Suite 102
    Charlottesville, Virginia 22903
    Telephone:    (804) 501-8272
    Facsimile:    (202) 318-4098
    Email:    **stevenbiss@earthlink.net**

    *Of Counsel for the Plaintiffs*
        *(Application for Admission Pro Hac Vice*
        *To be Filed)*

# EXHIBIT 26

Lynne Finley
District Clerk
Collin County, Texas
By Alexis Scherff Deputy
Envelope ID: 31737886

# IN THE _____ DISTRICT COURT
## OF COLLIN COUNTY, TEXAS

**Edward Butoswky, in his individual
and professional capacities,**

    Plaintiff,

**v.**

**Susman & Godfrey, LLP,**

    Defendant

Cause No. **416-01222-2019**

## ORIGINAL PETITION

NOW COMES Edward Butowsky, the Plaintiff herein, alleging and stating as follows:

### Jurisdiction and Venue

1.   This Court has jurisdiction because both parties are legal residents of Texas, and the Plaintiff seeks damages in excess of $200.

2.   Venue is proper in this Court because the Plaintiff resides in Collin County, and he was defamed in Collin County.

### Parties

3.   Plaintiff Edward Butowsky is a financial adviser who lives and works in Plano, Texas.

4.   Defendant Susman & Godfrey, LLP is a law firm and professional partnership organized under the laws of Texas and headquartered in Houston, Texas.

### Facts

5.   On July 10, 2016, Democratic National Committee ("DNC") employee Seth Rich was murdered in Washington, DC in what local police claimed was a "botched robbery." On July 22,

- 1 -

Unofficial Copy

2017, Wikileaks began publishing embarrassing emails that were either leaked or hacked from the DNC.

6.   In an unprecedented act on August 9, 2016 on Dutch television station NOS, Wikileaks founder Julian Assange spoke specifically about Seth Rich and subsequently offered a reward to identify those responsible for Rich's murder: *Whistleblowers go to significant efforts to get us material, often very significant risks. There's a 27-year-old that works for the DNC who was shot in the back, murdered, just two weeks ago, for unknown reasons as he was walking down the street in Washington… I am suggesting that our sources, ah, take risks and they, they become concerned to see things occurring like that…*" Mr. Assanged had not before, and has not since, discussed the identify of any confidential source for Wikileaks.

7.   On May 16, 2017, Fox News published an online story that claimed Seth Rich had been involved in the DNC email leak. Mr. Butowsky had assisted the reporter who wrote the story, Malia Zimmerman. On March 23, 2017, Fox News retracted the May 16, 2017 article, claiming that the article did not meet its editorial standards. Fox News did not identify any errors in the article.

8.   On March 13, 2018, one of the Defendant's partners and two associates filed *Joel and Mary Rich v. Fox News Network, LLC, et al.*, Case No  1:18-cv-02223, in the U.S. District Court for the Southern District of New York.  Mr. Butowksy was named as a defendant in the case filed by partner Arun Subramanian and associates Elisha Barron and Gloria Park.  The lawsuit alleged that Mr. Butowsky, Ms. Zimmerman, and Fox News intentionally inflicted emotional distress on the Riches because the May 16, 2017 story implied that Seth Rich was responsible for the email leaks.

9.   On the same day that the lawsuit was filed, left-wing "political communications

Unofficial Copy

consultant" Brad Bauman issued a press release on behalf of his organization, The Pastorum

Group, as well as the Defendant and law firm Massey & Gail, LLP. The press release contained

the following statement: "With disregard for the truth and for the obvious harm that their actions

would cause the Riches, Fox, Zimmerman and Butowsky propagated and developed a fictitious

story that their deceased son, Seth – not Russian hackers or anyone else – provided Democratic

National Committee emails to WikiLeaks."  That sentence is false and defamatory and it is not

attributed to the lawsuit, therefore it is not privileged. Mr. Butowsky did not disregard the truth

nor any "obvious harm," nor did he propagate or develop a fictitious story.

10.  On August 2, 2018, the Riches' lawsuit against Mr. Butowsky was dismissed for

failure to state a claim. *See Rich v. Fox News Network, LLC*, 322 F. Supp. 3d 487 (S.D.N.Y.

2018).  U.S. District Judge George B. Daniels noted the obvious, namely that a defamation claim

cannot be asserted on behalf of a dead person merely be recharacterizing it as one for intentional

infliction of emotional distress. *Id*. Any competent attorney should have known that the lawsuit

was frivolous, and that there was no probable cause for filing it.  Furthermore, one of the

Defendant's clients, Joel Rich, had admitted to Mr. Butowsky that he knew his sons had leaked

emails from the DNC. The Defendant knew about this admission, yet it filed the baseless lawsuit

anyway.

11.  The Defendant conspired with Mr. Bauman, Massey & Gail, LLP (and its attorneys)

and others (1) to falsely portray Mr. Butowsky as a liar who exploited a grieving family; and (2)

to prosecute a baseless lawsuit for the purpose of silencing Mr. Butowsky.

12.  In a letter dated February 1, 2019, counsel for Mr. Butowsky asked the Defendant to

retract the defamatory press release. The Defendant refused.

Unofficial Copy

**Claims**

13.  Mr. Butowsky asserts a claim against the Defendant for defamation.

14.  Mr. Butowsky asserts a claim against the Defendant for malicious prosecution.

15.  Mr. Butowsky asserts a claim against the Defendants under New York Judiciary Law §487.

**Prayer**

16.   The Plaintiff respectfully prays that upon a final hearing of this case, judgment be entered for him against the Defendants, for damages in an amount within the jurisdictional limits of the Court; together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate; costs of court; attorney fees; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

**THE PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,

**/s/ Ty Clevenger**
Ty Clevenger
Texas Bar No. 24034380
P.O. Box 20753
Brooklyn, New York 11202-0753
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Attorney for Plaintiff Edward Butowsky**

- 4 -

Unofficial Copy

# EXHIBIT 27

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

**Edward Butowsky, in his personal and professional capacities,**

    Plaintiff,

**v.**

**Michael Gottlieb, Meryl Governski, Boies Schiller Flexner LLP, Brad Bauman, The Pastorum Group, Leonard A. Gail, Eli J. Kay-Oliphant, Suyash Agrawal, Massey & Gail LLP, Arun Subramanian, Elisha Barron, Gloria Park, Turner Broadcasting System, Inc., Anderson Cooper, Gary Tuchman, Oliver Darcy, Tom Kludt, The New York Times Company, Alan Feuer, Vox Media, Inc., Jane Coaston, and The Democratic National Committee,**

    Defendants

**Case No. 4:19-cv-180**

## ORIGINAL COMPLAINT

NOW COMES Edward Butowsky, the Plaintiff herein, alleging and stating as follows:

## Introduction

1. Late in the summer of 2017, the lives of Edward Butowsky, his family, and his co-workers were upended by false allegations that he conspired with White House officials to divert attention away from earlier (and equally false) allegations that President

Donald Trump "colluded" with the Russian government to "steal" the 2016 Presidential election from Hillary Clinton. On August 1, 2017, New York attorney Douglas Wigdor and his partners filed a bogus lawsuit alleging that Mr. Butowsky, Fox News reporter Malia Zimmerman, and Fox News itself had fabricated a false story that a former Democratic National Committee ("DNC") employee – not the Russian government – was responsible for stealing DNC emails and giving them to Wikileaks.

2. The bogus lawsuit portrayed Mr. Butowsky as a ruthless political operative of President Trump when, in reality, he never had (and never has) met President Trump nor spoken with him. In fact, Mr. Butowsky supported three candidates other than Mr. Trump in the primary, and in 2007 he donated $2,700 to the campaign of President Barack Obama.

3. Mr. Wigdor, et al. nonetheless made the false allegations because they knew that most American journalists were (and are) consumed with hatred of President Trump, and they knew that most American media would publish or broadcast nearly anything – with little concern for accuracy – so long as it portrayed President Trump (or anyone tangentially connected to him) in a negative light. As detailed below, Mr. Wigdor, et al. planned to use the false allegations and the resulting negative publicity to extort money from Fox News.

4. Mr. Butosky is by no means the only victim of the anti-Trump confirmation bias in American media. On February 20, 2019, for example, the parents of 16-year-old Nick Sandmann sued *The Washington Post* for $250 million in damages because the newspaper smeared him with false accusations of taunting an elderly Native American

veteran following a pro-life rally. The high-school student had made one unforgivable mistake: he wore a "Make America Great Again" (or "MAGA") hat that is affiliated with President Trump's political campaign. Based on that alone, the *Post* and other media comfortably assumed that he was a prejudiced white elitist. Within a day of the incident, however, video emerged that proved Sandmann had not taunted or harassed anyone, and on March 1, 2019 the *Post* belatedly admitted that its previous coverage of Sandmann was inaccurate. Similarly, left-wing media breathlessly trumpeted allegations from actor Jussie Smollett that he had been assaulted on January 29, 2019 by men wearing MAGA hats and uttering anti-gay and racial slurs. Because of their confirmation bias, most journalists ignored immediate and obvious evidence that Smollett was lying, *i.e.*, they were so eager to believe that Trump supporters would assault a gay black man that they forgot to ask why it would have happened at 2 a.m. during a blizzard in overwhelmingly Democratic Chicago. Smollet's story soon unraveled and on March 8, 2019 was indicted on 16 felony counts for lying to police and fabricating a hoax.

5. In Mr. Butowsky's case, the disinformation campaign has taken much longer to unravel. Unscrupulous left-wing journalists and attorneys have perpetuated a myth about a myth, *i.e.*, that Mr. Butowsky pushed a fictitious story about the stolen emails in order to divert attention from the fictitious story about "collusion" with the Russian government. In reality, the "Russia collusion" conspiracy theory is the only myth, and Mr. Butowsky's statements about the stolen emails were accurate.

6. As a result of the lies fabricated and perpetuated by the Defendants, Mr. Butowsky and his family received death threats, he lost one third of his business clients,

rocks were thrown through the windows of his home, his automobiles were burglarized, his computers were hacked, he lost friendships, and he lost the opportunity to host a planned television program. Left-wing extremists even posted a clock on the internet counting down the time until Mr. Wigdor's son would return for classes at Vanderbilt University, implying that Mr. Butowsky's son would be harmed when he returned. As a result, Mr. Butowsky had to hire a bodyguard for his son.

7. The Defendants' smear campaign never should have begun, and it has lasted for far too long. Now it's time for the Defendants to answer for the lies that they spread and the harm that they caused.

## Jurisdiction and Venue

8. This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the Plaintiff resides in Texas, whereas all Defendants reside in other states.

9. Venue is proper in this district and the Court has personal jurisdiction over all Defendants because (1) they defamed him in national media, or (2) they conspired with other Defendants to defame him in national media. The injuries from such defamation occurred in this district.

## Parties

10. Plaintiff Edward Butowksy is a financial advisor who resides in Plano, Texas. He brings claims in his personal and professional capacities.

11. Defendant Michael Gottlieb is an attorney who resides in or near Washington, D.C. He was a partner at all times relevant in the Defendant law firm Boies Schiller Flexner LLP.

- 4 -

12.  Defendant Meryl Governski is an attorney who resides in or near Washington, D.C. She is an associate in the Defendant law firm Boies Schiller Flexner LLP.

13.  Defendant Boies Schiller Flexner LLP is a law firm and professional partnership organized under the laws of New York and headquartered in New York, New York.  Hereinafter, it and Defendants Gottlieb and Schiller are collectively the "Boies Schiller Defendants."

14.  Defendant Brad Bauman is a political communications consultant who lives in Washington, D.C.  He is a partner in Defendant The Pastorum Group.

15.  Defendant The Pastorum Group is a political consulting firm in Washington, D.C.

16.  Defendant Leonard A. Gail is an attorney who resides in or near Chicago, Illinois. He is a partner in the Defendant law firm Massey & Gail LLP.

17.  Defendant Eli J. Kay-Oliphant is an attorney who resides in or near Chicago, Illinois. He is a partner in the Defendant law firm Massey & Gail LLP.

18.  Defendant Suyash Agrawal is an attorney who resides in or near Chicago, Illinois. He is a partner in the Defendant law firm Massey & Gail LLP.

19.  Defendant Massey & Gail LLP is a law firm and professional partnership organized under the laws of Illinois and headquartered in Chicago, Illinois. Hereinafter, it and Defendants Gail, Kay-Oliphant, and Agrawal are collectively the "Massey & Gail Defendants."

20.  Defendant Arun Subramanian is an attorney who resides in New York, New York. He is a partner in the law firm Susman Godfrey LLP.

21. Defendant Elisha Barron is an attorney who resides in New York, New York. She is an associate in the law firm Susman Godfrey LLP.

22. Defendant Gloria Park is an attorney who resides in New York, New York. She was at all times relevant an associate in the law firm Susman Godfrey LLP. Hereinafter, Defendants Subramanian, Barron, and Park are collectively the "Susman Godfrey Defendants."

23. Defendant Turner Broadcasting System, Inc. (hereinafter "Defendant CNN") is a Georgia corporation headquartered in Atlanta, Georgia. CNN is a left-wing media brand that is wholly-owned by Turner Broadcasting System, Inc.

24. Anderson Cooper is a left-wing media personality who hosts *Anderson Cooper 360*, a program broadcast by CNN. He lives and works in New York, New York.

25. Defendant Gary Tuchman is a reporter for CNN. He lives and works in Atlanta, Georgia.

26. Defendant Oliver Darcy is a senior media reporter for CNN. He lives and works in New York, New York.

27. Defendant Tom Kludt is a media reporter for CNN. He lives and works in New York, New York.

28. Defendant The New York Times Company ("Defendant NYT") is a New York media corporation in New York, New York. It owns and publishes the *The New York Times*.

29. Defendant Alan Feuer is a court reporter for *The New York Times* and a resident of New York.

30. Defendant Vox Media, Inc. is a media company headquartered in New York, New York. It publishes *Vox* online.

31. Defendant Jane Coaston is a left-wing political activist who masquerades as the "senior political reporter" for *Vox*. She is a resident of Washington, D.C.

32. Defendant The Democratic National Committee ("Defendant DNC") is a political organization headquartered in Washington, D.C.

## Facts

### Background

33. As indicated above, this case is the consequence of a conspiracy theory, namely that President Trump "colluded" with the Russian government to swing the 2016 Presidential election in his favor. That conspiracy theory (hereinafter be identified as the "Russia Collusion Hoax" or "RCH") has been crumbling of late, as U.S. Senate Intelligence Committee Chairman Richard Burr admitted in early February that there is no evidence to support it. That has not deterred unscrupulous political activists like the Defendants herein, however, because they are emotionally invested in the RCH. Most of them have spent more than two years demonizing and defaming anyone who dares to question the RCH.

34. A key date in the Russia Collusion Hoax is July 22, 2016, when Wikileaks began publishing thousands of email that had been stolen or leaked from the Democratic National Committee ("DNC"). Those emails showed how the campaign of Democratic Presidential nominee Hillary Clinton had corruptly taken control of the DNC for the purpose of sabotaging her primary opponent, Bernie Sanders. The email release proved

damaging to Mrs. Clinton's presidential campaign and, in an effort to shift blame, Mrs. Clinton, the DNC, and the administration of President Barack Obama soon alleged that Russian hackers had stolen the emails to help the Trump campaign.

35. According to Wikileaks founder Julian Assange, however, the emails were not procured from Russian hackers. Mr. Assange plainly inferred that the emails came from Seth Rich, a DNC employee who had been murdered on July 10, 2016 in what Washington, D.C. police described as a "botched robbery." Wikileaks offered $20,000 for information leading to the capture of Mr. Rich's killers. This deeply offended anti-Trump activists like the Defendants herein, because it undermined the Russia Collusion Hoax.

36. Mr. Butowsky stumbled into the RCH crosshairs after he was contacted by a third party who had recently met with Mr. Assange in London. According to that third party, Mr. Assange said Seth and his brother, Aaron, were responsible for releasing the DNC emails to Wikileaks. At the instigation of that third party, Mr. Butowsky contacted Joel and Mary Rich, the parents of Seth, and relayed the information. During that conversation, Mr. Rich told Mr. Butowsky that he already knew that his sons were involved in the DNC email leak. Mr. Rich said he did not have enough money to hire a private investigator, so Mr. Butowsky offered to pay for one. Mr. Rich accepted the offer and thanked Mr. Butowsky in an email.

37. Mr. Butowsky referred the Riches to Rod Wheeler, a Fox News contributor and former homicide detective with the Metropolitan Police Department in Washington, D.C. Mr. Butowsky only knew Mr. Wheeler through his occasional guest appearances on

Fox News. Aaron Rich's wife, Molly Rich, drafted a retainer contract for Mr. Wheeler, and he began working directly for the Rich family. Mr. Butowsky agreed to pay from Mr. Wheeler's services, but he had no control over Mr. Wheeler's work for the Rich family.

38. On May 16, 2017, FoxNews.com published a story by Malia Zimmerman which claimed that Seth Rich had been involved in the DNC email leak. The article undermined the official narrative of the Metropolitan Police Department that Seth Rich had been murdered in a "botched robbery," and it likewise undermined the Russia Collusion Hoax. The story featured quotes from Mr. Wheeler regarding his investigation, as well as quotes from an unnamed federal official who claimed that federal investigators had copies of Seth Rich's communications with Wikileaks. Shortly thereafter, the Rich family terminated Mr. Wheeler, and Mr. Wheeler was subjected to withering scorn and criticism from anti-Trump media.

39. On May 18, 2017, Mr. Wheeler told Mr. Butowsky that he needed an attorney to pursue claims against Marina Marraco, a reporter for the local Fox affiliate in Washington, D.C. According to Mr. Wheeler, Ms. Marraco duped him into granting an interview about the Seth Rich investigation so she could "scoop" Ms. Zimmerman and publish her story one day before the Fox News network published Ms Zimmerman's story. Ms. Marraco also edited Mr. Wheeler's videotaped statements to misrepresent what Mr. Wheeler actually said to her. At Mr. Wheeler's request, Mr. Butowsky introduced Mr. Wheeler to some well-known attorneys in Dallas. Mr. Butowsky participated in the telephone conversation between Mr. Wheeler and the Dallas attorneys, and Mr. Wheeler never once indicated that he had been misquoted or mistreated by Mr. Butowsky, Ms.

Zimmerman, or Fox News (as opposed to the local affiliate in D.C.). On the contrary, Mr.

Wheeler sent a written statement to Ms. Zimmerman at 1 p.m. on May 19, 2017 wherein

he claimed that he had shared the contents of Ms. Zimmerman's story with Joel Rich and

Aaron Rich *the night before it was published*:

> In the contract I have with the family, signed by Joel, Mary and Aaron Rich, I am
> not allowed to speak to the media on the family's behalf, but I could speak to the
> media about this investigation of Seth Rich's murder or other stories I was
> involved in. They knew I was a Fox News contributor and regularly went on
> television.
>
> I called Joel Rich the night before the Fox News story was going to be published,
> which was Monday night. During that 18-minute call (phone logs provided), I
> reviewed the story with Joel Rich, he liked it and was encouraged by the new
> leads. Joel already knew about the story because Fox had contacted him earlier in
> the day. He also suggested I contact an investigative reporter, Michelle Sigona,
> from CrimeWatch Daily with the information. I also spoke with Aaron Rich, Joel's
> son, for 21 minutes the night before the story came out and told him about the new
> information that had emerged and the story would likely be coming out in the near
> future.
>
> I told them both I would be commenting on the case and asking people to come
> forward if they had insight on the new information. I never violated the terms of
> our contract as I *never* spoke on behalf of the family.

According to Mr. Wheeler, the Riches did not object to the Fox News story when he

discussed it with them *in advance of its publication*.

40.  On May 23, 2017, Fox News retracted the May 16, 2017 article, claiming that

the article did not meet its editorial standards. Fox News did not identify any errors in the

article.

41.  About a week after speaking with the attorneys in Dallas, Mr. Wheeler told

Mr. Butowsky that he had decided to use another attorney, and that he would receive $4

million for using the other attorney. Mr. Butowsky soon learned that the other attorney

was Douglas Wigdor, an employment attorney in New York who had filed numerous discrimination lawsuits against Fox News. According to Mr. Wigdor's own public statements, he was hoping to recover $60 million in damages from the ongoing lawsuits against Fox News. Unbeknownst to Mr. Butowsky at the time, Mr. Wigdor had enlisted Mr. Wheeler in an extortion scheme. As of 2017, Fox News's parent company, 21st Century Fox, Inc., was trying to gain approval from British regulators to purchase Sky Television, and Mr. Wigdor saw Mr. Wheeler's case as an opportunity to extort money from Fox. Rather than pursue claims against the local affiliate in D.C. that had duped Mr. Wheeler and deceptively edited his statements, Mr. Wigdor convinced Mr. Wheeler to fabricate an entirely new story, *i.e.*, that Mr. Butowsky and Ms. Zimmerman had been conspiring with President Trump to divert attention from the Russia collusion narrative. Mr. Wigdor planned to use those explosive allegations to sabotage Fox's attempts to buy Sky, specifically by convincing British regulators that Fox News was entirely unethical and had acted corruptly at the behest of President Trump. In fact, Mr. Wigdor mentioned Fox's attempt to buy Sky News in the lawsuit that he subsequently filed on behalf of Mr. Wigdor, and he later testified before a British parliamentary committee in opposition to the Sky Television purchase.

42. In his bogus lawsuit, Mr. Wheeler selectively quoted texts and emails from Mr. Butowsky to make it appear that Mr. Butowsky had pushed the May 16, 2017 Fox News story at the behest of President Trump. In reality, Mr. Butowsky never had (and never has) met President Trump nor spoken with him. Although Mr. Butowsky knew people who worked in the Trump White House, he had actively supported Carly Fiorina

in the Republican primary. After she dropped out of the race, he supported Marco Rubio and Chris Christie. Nonetheless, because Mr. Butowsky knew people who worked in the White House, Mr. Wheeler repeatedly begged Mr. Butowsky for help in getting a job there, and Mr. Butowsky has numerous texts and emails to prove that. (When he recommended Mr. Wheeler to the Rich family, Mr. Butowsky did not know that Mr. Wheeler was habitually broke, nor did he know that Mr. Wheeler was fired from the Metropolitan Police Department for marijuana use). As a result of Mr. Wheeler's repeated requests for help in getting a White House job, Mr. Butowsky jokingly told Mr. Wheeler that the White House was anxiously awaiting the results of his Seth Rich investigation. Mr. Wheeler knew full well that Mr. Butowsky was joking, and Mr. Wheeler knew full well that Mr. Butowsky had no personal connection to the President.

43. When Mr. Wigdor filed suit against Mr. Butowsky, Ms. Zimmerman, and Fox News, he knew that Mr. Wheeler had <u>not</u> been misquoted in the Fox News story, and that's because Mr. Butowsky and his attorneys had provided Mr. Wigdor with texts, emails, and audio evidence proving that Mr. Wheeler had <u>not</u> been misquoted. Mr. Wigdor also knew that the Trump Administration played no role in the May 16, 2017 Fox News story. Mr. Wigdor filed the fraudulent lawsuit anyway.

44. On May 15, 2018, after Mr. Wigdor got what he needed from Mr. Wheeler in terms of political and public relations impact, Mr. Wigdor and his firm sought to drop Mr. Wheeler as a client. Judge Daniels allowed Mr. Wigdor and his partners to withdraw on May 30, 2018, and Mr. Wheeler's frivolous lawsuit was dismissed on August 2, 2018. The unscrupulous Mr. Wigdor then settled all of his remaining clients' claims against Fox

News for a $10 million lump sum (rather than the $60 million that he had originally sought), and Mr. Wigdor apportioned the $10 million among those clients.

45.   On March 13, 2018, Joel and Mary Rich sued Mr. Butowsky on the grounds of intentional infliction of emotional distress, alleging that Mr. Butowsky knowingly caused them harm by misrepresenting the circumstances of their son's death. The frivolous lawsuit was dismissed on August 2, 2018, the same day that Mr. Wheeler's frivolous lawsuit was dismissed.

**Defendants Bauman and The Democratic National Committee**

46.   In early March of 2017, Joel Rich informed Mr. Butowsky that he had received a call from Defendant Bauman, and that Defendant Bauman said he had been "assigned" to the Rich family Defendant DNC. Defendant Bauman is an unscrupulous left-wing political operative, and Defendant DNC assigned him to the Rich family in order to keep the Russia Collusion Hoax alive.  Defendant Bauman and Defendant DNC knew that Seth Rich leaked emails to Wikileaks, but Defendant Bauman's assignment was to divert attention away from Seth Rich and toward Russian hackers. At all times relevant to this lawsuit, Mr. Bauman acted as an agent of Defendant DNC. When Mr. Wigdor filed suit in New York on behalf of Mr. Wheeler, Defendant Bauman seized on the opportunity to smear and defame anyone involved suggesting that Seth Rich was involved in leaking DNC emails.

47.   As part of his strategy for keeping the RCH alive, Defendant Bauman recruited the Masey & Gail Defendants and the Susman Godfrey Defendants to file the frivolous March 13, 2018 lawsuit on behalf of Joel and Mary Rich. Premised on the

bogus Wheeler lawsuit, the Riches' lawsuit fabricated a wild tale about Mr. Butowsky, Ms. Zimmerman, and Fox News conspiring to harm them by manufacturing a conspiracy theory about the murder of Seth Rich.  Shortly thereafter, Defendant Bauman recruited the Boies Schiller Defendants to file a baseless lawsuit against Mr. Butowsky (and others) on behalf of Aaron Rich. Around the same time, Defendant Bauman filed his own frivolous lawsuit against Mr. Butowsky (and others), alleging that Mr. Butowsky had somehow defamed him by stating that Defendant Bauman had been "assigned" by Defendant DNC.  Mr. Bauman's strategy was to intimidate and discredit anyone who questioned whether the Russians were responsible for giving DNC emails to Wikileaks.

48.    As detailed below, Mr. Bauman's strategy worked, because American journalists launched a full frontal assault on Mr. Butowsky, falsely portraying him as a con man who fabricated a false story about Seth Rich.  Defendants such as CNN, *Vox*, and *The New York Times* alleged that there was "no evidence" to support the "conspiracy theory" that Seth Rich leaked emails from the DNC.  In reality, there was plenty of evidence.

49.  In an unprecedented act on August 9, 2016 on Dutch television station NOS, for example, Wikileaks founder Julian Assange spoke specifically about Seth Rich: "*Whistleblowers go to significant efforts to get us material, often very significant risks. There's a 27-year-old that works for the DNC who was shot in the back, murdered, just two weeks ago, for unknown reasons as he was walking down the street in Washington… I am suggesting that our sources, ah, take risks and they, they become concerned to see things occurring like that…*" Mr. Assanged had not before, and has not since, discussed

the identify of any confidential source for Wikileaks. Wikileaks also offered a $20,000 reward for information leading to the conviction of Seth Rich's killers, yet the anti-Trump media treated this information as if it was part of a hoax. That's a far cry from the way journalists had treated Mr. Assange and Wikileaks in preceding years, *e.g.*, when Wikileaks published documents about the Iraq War that proved harmful to the Bush Administration. Mr. Assange became a pariah as soon as anti-Trump journalists concluded that Wikileaks had done something harmful to Hillary Clinton and helpful to Donald Trump.

50. Bill Binney, a former top official at the National Security Agency ("NSA"), was applauded by American media when he exposed widespread electronic surveillance of American citizens nearly 20 years ago. Like Mr. Assange and Wikileaks, however, he became a pariah to American journalists when he questioned the Russia Collusion Hoax. Mr. Binney presented overwhelming scientific evidence that the DNC emails published by Wikileaks were obtained from an internal leak versus an external hack. He will testify that it was scientifically and technologically impossible for the Russians (or anyone else) to have downloaded the DNC emails remotely via hack. Instead, both the metadata and download time for the stolen emails indicate that they were downloaded onto a thumb drive or something similar.

51. Larry Johnson is a retired officer of the Central Intelligence Agency. He and Mr. Binney both observed in a February 14, 2019 article that while some U.S. intelligence agencies reported "high" confidence that Russians hacked the DNC, the NSA reported only "moderate" confidence. *See* "Why the DNC was not hacked by the

Russians," https://www.thegatewaypundit.com/2019/02/exclusive-cyber-security-experts-release-damning-report-why-the-dnc-was-not-hacked-by-the-russians/. As explained in the article (incorporated herein by reference), the NSA's monitoring systems would have collected an electronic record of any internet-based hack on the DNC, which in turn would have prompted a "high" confidence conclusion by the NSA that Russians were responsible for obtaining the emails. The absence of a "high" confidence conclusion means there is no electronic record of a Russian hack on the DNC. Meanwhile, agencies that expressed "high" confidence, like the FBI and CIA, have been implicated in promoting the Russia Collusion Hoax, *e.g.*, via the fraudulent dossier of Christopher Steele.

52. Even after Mr. Wheeler filed suit against Mr. Butowsky, he alleged that Ms. Brazille had improperly interfered in the Seth Rich investigation. In an August 2, 2017 interview on MSNBC, Mr. Wheeler alleged that interim DNC chairwoman Donna Brazile had called Joel and Mary Rich and asked why Mr. Wheeler was investigating the murder. If Seth Rich died as the result of a "botched robbery," Ms. Brazile should not have cared one way or another whether the Rich family hired a private detective.

53. In recorded interviews and written reports, Mr. Wheeler stated that Aaron Rich repeatedly told him not to investigate anything pertaining to Seth Rich's email communications or his work at the DNC, and that Aaron Rich denied him access to Seth Rich's computer and electronic devices. Mr. Wheeler further said Aaron Rich claimed that he had already investigated the emails on his own, and Mr. Wheeler later acknowledged that it was highly suspicious for Aaron Rich to prohibit any review of Seth

Rich's email communications and to prohibit interviews of Seth Rich's former co-workers.

54.     Aaron Rich's suspicious behavior continued after Mr. Wheeler was terminated. Mr. Rich claimed that he was only seeking the truth when he filed suit against Mr. Butowsky, but he refused to sign a waiver authorizing Wikileaks to reveal what it knows about Seth Rich's involvement in the DNC email leaks. His attorneys subsequently claimed that they would issue their own subpoena for Wikileaks. They have since reneged, however, because they realized that Wikileaks would likely construe the subpoena as a waiver, in which case it would likely release records showing that Aaron Rich and Seth Rich were both responsible for leaking the DNC emails.

55.     There are other reasons to question the official version of events about the Seth Rich murder. After the May 16, 2017 FoxNews.com article was retracted, the Metropolitan Police Department ("MPD") claimed that the FBI had never been involved in the Seth Rich investigation, and the anti-Trump media trumpeted this claim as proof that the Fox article was a fraud.  In Aaron Rich's lawsuit against Mr. Butowsky, however, he stated that he had been cooperating with "state and federal law enforcement officials" to solve his brother's murder.  Similarly, the FBI originally claimed that it had no responsive documents about Seth Rich when records were requested in 2018.  After the FBI was sued pursuant to the Freedom of Information Act ("FOIA"), counsel asked the FBI to search for records in its Washington Field Office and with its Computer Analysis Response Team ("CART"). The FBI responded that it had offered assistance to the MPD during the murder investigation and that MPD had declined the offer, but the FBI

supposedly had no records of those communications. On the other hand, the FBI flatly refused to search for responsive records in CART, even though CART is the most likely place to find any pertinent email evidence. The FOIA lawsuit remains pending.

**Massey & Gail Defendants / Susman Godfrey Defendants**

56.   On March 13, 2018, Defendants Leonard Gail, Eli J. Kay-Oliphant, Suyash Agrawal, Arun Subramanian, Elisha Barron, Gloria Park and their respective law firms filed *Joel and Mary Rich v. Fox News Network, LLC, et al.*, Case No. 1:18-cv-02223, in the U.S. District Court for the Southern District of New York.  The suit alleged that Mr. Butowsky, Ms. Zimmerman, and Fox News knowingly spread a fake narrative about the death of Seth Rich, and that they did so for the purpose of causing harm to Joel and Mary Rich. The Massey & Gail Defendants and Susman Godfrey Defendants knew that these allegations were false and frivolous when they filed the lawsuit. First, Joel Rich had already admitted that his sons were responsible for leaking emails from the DNC, and the Massey & Gail Defendants and Susman Godfrey Defendants were aware of this fact. Second, the same Defendants knew that there was (and is) no evidence that Mr. Butowsky intended to harm the Rich family.  Third, the same Defendants attempted to file a defamation claim on behalf of a dead person (*i.e.*, Seth Rich) by recharacterizing it as a claim for intentional infliction of emotional stress. Any competent attorney would have known that such a claim was frivolous.

57.   On the same day that lawsuit was filed, Defendant Bauman issued a press release on behalf of himself, the Massey & Gail Defendants, and the Susman Godfrey Defendants that contained the following statement: "With disregard for the truth and for

the obvious harm that their actions would cause the Riches, Fox, Zimmerman and Butowsky propagated and developed a fictitious story that their deceased son, Seth – not Russian hackers or anyone else – provided Democratic National Committee emails to WikiLeaks." That sentence is false and defamatory and it is not attributed to the lawsuit, therefore it is not privileged. Mr. Butowsky did not disregard the truth nor any "obvious harm," nor did he propagate or develop a fictitious story.

58. In a March 15, 2018 interview with Andrea Mitchell on MSNBC, Defendant Gail alleged that Mr. Butowsky and the other defendants "propagated a story that was false" and acted with "utter disregard for the fact that the Riches were mourning the life of their son." He further said the defendants "had their own agenda and they moved forward with something that was baseless." These allegations were false and defamatory.

59. On information and belief, Mr. Butowsky alleges that Defendant Bauman organized and coordinated the frivolous lawsuit, the press release, and the MSNBC interview along with all the other Massey & Gail Defendants and Susman Godfrey Defendants.

60. On August 2, 2018, U.S. District Judge George B. Daniels dismissed *Rich v. Fox News Network, LLC* for failure to state a claim in an order that can be found at 322 F.Supp.3d 487. That order is incorporated by reference. The Massey & Gail Defendants and the Susman Godfrey Defendants filed and prosecuted the case maliciously and in bad faith.

**The Boies Schiller Defendants**

61. On March 26, 2018, the Boies Schiller Defendants filed *Aaron Rich v.*

*Edward Butowsky, et al.*, Case No. 1:18-cv-00681, on behalf of Aaron Rich in the U.S.

District Court for the District of Columbia. According to the lawsuit, Mr. Butowsky and

others defamed Aaron Rich by alleging that he helped his brother leak DNC emails to

Wikileaks. At the time the lawsuit was filed, the Boies Schiller Defendants knew that

Aaron Rich actually had assisted his brother in leaking DNC emails to Wikileaks, ergo

they knew that they were filing suit without probable cause.

     62.  In a March 27, 2018 interview with Anderson Cooper on CNN regarding the

lawsuit, Mr. Gottlieb made false and defamatory allegations that:

  (a)  Mr. Butosky had said Aaron Rich "warned Seth Rich's girlfriend to break up with him." In reality, Mr. Butowsky never said such a thing.

  (b)  Mr. Butosky "made up a meeting that purportedly occurred at the DNC" where Aaron Rich puroportedly threw a chair. In reality, Mr. Butowksy never said such a thing.

  (c)  Mr. Butowsky's statements about Aaron Rich and Seth Rich were fabricated , *i.e.*, "all of this, all of it, is made up." Elsewhere, Mr. Gottlieb said, "It's made up – there is no money in Aaron Rich's account" and it's a "complete fabrication."

  (d)  Mr. Butowsky spread a conspiracy theory "as far as possible" to "make money off of it" from t-shirt sales, etc.  In reality, Mr. Butowsky has never spread a conspiracy, and he never made nor sought to make a penny from Seth Rich, Aaron Rich, or any conspiracy theory.

  (e)  After Aaron Rich asked for a retraction, Mr. Butowsky and the other defendants purportedly "doubled down on the lies they were telling." In reality, Mr. Butowksy never told any lies about Seth Rich or Aaron Rich.

Before filing this lawsuit, Mr. Butowsky asked Defendant Gottlieb to retract the false

allegations above, but he refused.

     63.  On May 30, 2018, Plaintiff's Counsel asked Defendant Governski if her client,

Aaron Rich, would authorize Wikileaks to reveal what it knew about whether he and his

brother were involved in leaking emails. In an email sent at 3:14 p.m., he wrote:

> I've attached a preservation letter that I sent to eBay and PayPal, and I have also attached a proposed waiver for your client. Julian Assange / Wikileaks likely will not cooperate unless your client consents to the release of information. Please let me know if he is willing to consent. Thanks.

Ms. Governski responded at 4:27 p.m.:

> We believe the appropriate mechanism for obtaining information from third parties is to serve subpoenas to those third parties as contemplated under the Federal Rules of Civil Procedure. Those rules do not require any advance waiver from any party in order to serve or enforce such a subpoena. If any third party has a request to make of our client as a result of a subpoena, we will address those requests directly with those third parties rather than through opposing counsel.

At 8:12 p.m. Plaintiff's Counsel replied as follows:

> Yes, but as a practical matter, Julian Assange, Kim Dotcom, and Wikileaks are beyond U.S. jurisdiction. Furthermore, Assange and Wikileaks have shown that they will not be coerced into revealing the identity of their sources. It is for that reason that I am asking your client to voluntarily waive any objections to the release of such information. If you are saying your client is unwilling to do that, I think the media (and the public) will find that very interesting.

Ms. Governski did not respond, so Plaintiff's Counsel sent a letter via fax and email at

7:51 a.m. on June 1, 2018 to her, Mr. Gottlieb, and a third lawyer at the firm, Randall

Jackson:

> I write concerning your client's pleadings in the case identified above. According to Fed. R. Civ. P. 11(b), an attorney's signature on the pleadings is certification that he or she has performed "an inquiry reasonable under the circumstances" to determine the accuracy and propriety of those pleadings.
>
> As you know, Ms. Governski and I have exchanged emails about whether your client, Aaron Rich, is willing to voluntarily authorize Wikileaks, Julian Assange, and/or Kim Dotcom to discuss any relationship that they may have had with Mr. Rich or his brother, Seth Rich. Thus far, it appears that your client is unwilling to authorize such disclosures.
>
> This is very telling. On the one hand, Mr. Rich boldly denies that he and/or his

brother leaked DNC emails to Wikileaks. On the other, he refuses to authorize disclosures from the witnesses who are in the best position to know who leaked those emails. That begs a question: if your client has nothing to hide, why is he hiding it?

Under Rule 11(b), you have a duty to answer that question. Furthermore, you should ask your client some pointed questions about what funds may have been transferred to him or his brother through eBay accounts. And you should remind him that every trip to a safe deposit box is recorded on video and preserved.

If the evidence leads where we expect it to lead, my client will aggressively seek sanctions against Mr. Rich and everyone else responsible for bringing meritless claims. Thank you for your attention to this matter.

At 3:20 p.m. that afternoon, Plaintiff's Counsel received an email notifying him that Defendants Gottlieb and Governski were serving a subpoena seeking records from Twitter, including private communications from the Twitter Account of Plaintiff's Counsel. In other words, Defendants Gottlieb and Governski tried to use a subpoena to obtain privileged communications from their opposing counsel. After that stunt received negative media attention, they withdrew the subpoena.

64. In a bizarre and angry five-page letter sent on June 2, 2018 (a Saturday morning), Defendant Gottlieb offered the following rationale for refusing to authorize Wikileaks to disclose what it knew about the Riches involvement in email leaks:

[P]roviding such a waiver would create precisely the impression you claim we are seeking to avoid. Namely, the mere act of granting a waiver to disclose communications to these third parties could create an impression that there exist communications that could or should be disclosed, and that is especially so if you were to follow through on your threat of disclosing such information to the media.

Defendant Gottlieb nonetheless wrote that he would be issuing subpoenas to third parties such as Wikileaks. On June 22, 2018, Defendant Governski wrote in an email that subpoenas would need to be served on Wikileaks, Julian Assange and Kim Dotcom via

letters rogatory, and that she was working on that process.  The subpoenas were not issued, however, so Plaintiff's Counsel sent a news article to Defendant Governski on August 20, 2018 noting that a federal court had authorized service of a DNC lawsuit against Wikileaks via Twitter.  Defendant Gottlieb responded with baseless accusations that Plaintiff's Counsel was practicing law in D.C. without a license.

65.  Nearly ten months after the issue was first raised, and despite repeated inquiries from Plaintiff's Counsel, no subpoenas have been issued to Wikileaks, Julian Assange, or Kim Dotcom by Defendants Governski or Gottlieb. Contrast that with the fact that Defendants Governski and Gottlieb issued a subpoena within a matter of hours for the private communications of Plaintiff's Counsel.  The reason for this disparity is straightforward: Defendants Governski and Gottlieb  know that if Mr. Butowsky issues a subpoena to Wikileaks, the subpoena will be ignored pursuant to its policies for protecting sources.  If, however, Defendants Governski and Gottlieb issue a subpoena to Wikileaks on behalf of Aaron Rich, Wikileaks will likely construe that as a waiver of confidentiality, in which case the damning emails would finally be released. That's the last thing they want, so they have reneged on their earlier statements about issuing their own subpoenas.

66.  In an October 1, 2018 story published by *Vox*, a statement from Ms. Governski is quoted as stating that the defendants – to include Mr. Butowsky – are "conspiracy theorists who spread malicious lies for personal and political gain." Ms. Governski is further quoted as saying, ""We will continue our efforts against the remaining defendants, who to this day continue to spread unconscionable lies about

Aaron in order to advance their false political narratives." On the contrary, Mr. Butowsky is not a conspiracy theorist, and he has not spread any lies – unconscionable or otherwise – nor has he done so for personal or political gain.

**The CNN Defendants**

67. For more than two years, Defendant CNN and its employees have attempted to demonize and discredit anyone who questions the official narrative about the murder of Seth Rich. During that period, CNN has generally portrayed Mr. Butowsky as an unscrupulous political activist who knowingly and maliciously concocted and spread false stories.

68. A March 14, 2018 story attributed to Defendant Darcy states that Mr. Butowsky and his co-defendants had been sued for "their roles in the publication of a baseless conspiracy theory about Rich's 2016 death." A May 21, 2018 story attributed to Defendant Darcy implicated Mr. Butowsky as someone "who pushed unfounded claims and theories about Rich's death," and an October 1, 2018 article impugned Mr. Butowsky for "peddling a conspiracy theory" without "real evidence."

69. The top of the March 14, 2018 web story is linked to a propaganda video produced by Defendant Kludt, a left-wing political activist who masquerades as a journalist. In the video, Defendant Kludt falsely states that there is no evidence that Mr. Rich leaked emails to Wikileaks."It's never been supported by any evidence," Defendant Kludt claims. "The question is this: Will the Seth Rich lie ever disappear?" Defendant Kludt also refers to people who question the official "botched robbery" narrative as "conspiracy theorists." The clear purpose of Defendant Kludt's propaganda video is to

discredit and smear anyone who dares to question the official narrative, and it is tied directly to Defendant Darcy's web story about Mr. Butowsky. In other words, Defendant Kludt and Defendant Darcy jointly and intentionally misrepresented Mr. Butowsky as a liar and a crackpot conspiracy theorist.

70. In a March 27, 2018 story on *Anderson Cooper 360* about Aaron Rich's against Mr. Butowsky, Defendant Tuchman flatly stated that there was no evidence whatsoever that Seth Rich leaked DNC emails to Wikileaks. "There wasn't any evidence at all – it was all made up," he said, further describing it as a "conspiracy theory concocted by right-wing commentators." As the anchor of the show bearing his name, Defendant Cooper decided to broadcast Defendant Tuchman's defamatory statements.

71. The March 27, 2018 story featured the interview of Defendant Gottlieb described in Paragraph 62 above, and Mr. Butowsky was mentioned by name more than once. Unsurprisingly, Defendant Cooper never pushed back on any of Defendant Gottlieb's allegations, no matter how false or outrageous. Instead, Defendant Cooper endorsed those statements, directly implying that Mr. Butowsky and his co-defendants were responsible for "promoting unfounded claims that Seth Rich was tied to the DNC hacking." In another statement, Defendant Cooper directly implied that Mr. Butowsky was responsible for traumatizing Joel and Mary Rich because of "[having their son] being accused of stuff that there's no evidence of." In yet another, Mr. Cooper alleged that Mr. Butowsky and his co-defendants had been involved in spreading "lies."

72. Defendant Governski formerly served as a spokeswoman for Defendant CNN.

73. On February 02, 2019, Mr. Butowsky (through counsel) requested retractions

from Defendants CNN, Cooper, Tuchman, Darcy, and Kludt. In a letter dated February 15, 2019, CNN Vice President and Asst. General Counsel Johnita P. Due wrote that no retractions would be forthcoming. "CNN has reported that the claims Mr. Butowsky has made about Seth Rich's connection to the Democratic National Committee (DNC) hack are 'baseless,' 'unfounded,' and 'without real evidence," she confirmed. "Indeed, there is a very long list of official sources who have either directly or indirectly said the claims about Seth Rich are not true." She then parroted the predictable list of official statements by intelligence officials, the office of Special Counsel Robert Mueller, and MPD. "In other words," she wrote, "the claims made by Mr. Butowsky are unfounded, baseless and not supported by real evidence – exactly as CNN reported."

74. As evidenced by Ms. Due's letter, leftists and American media have come full circle with respect to trusting the government and its intelligence agencies. In the 1970s, they hailed the work of Senator Frank Church and his Select Committee to Study Governmental Operations with Respect to Intelligence Activities, which exposed widespread corruption and impropriety in the CIA, FBI, and NSA, some of which dated back to the 1950s. Now, leftists and American media have blind faith in those same agencies.

**Defendants *Vox* and Coaston**

75. On April 19, 2018 and October 1, 2018, Defendant *Vox* published defamatory articles written by Defendant Coaston, a left-wing extremist who masquerades as a journalist. Both articles conveyed the false overall impression that Mr. Butowsky had lied repeatedly and abused the trust of the Rich family for purposes of advancing a

fraudulent narrative. In her April story, Defendant Coaston alleged that "the Riches' story isn't just about conspiracy theorists — it's about a conspiracy of Fox News contributors who concocted a lie while purporting to be trying to find Seth's killer." There was no conspiracy, however, and there was no lie. She further wrote that "[d]espite Butowsky's repeated questions about payments from WikiLeaks (which didn't exist), Joel and Mary repeatedly told both Zimmerman and Butowsky that the conspiracy theories about their son were 'baseless,' and provided Zimmerman with information about Seth's life for stories she said she was writing." In reality, neither Joel nor Mary Rich told Mr. Butowsky that claims of their sons' involvement with Wikileaks were "baseless." Instead, Joel Rich told Mr. Butowsky that he knew his sons were involved in the leak.

76. The April 19, 2018 story by Defendant Coaston included numerous other false and defamatory allegations, including the following excerpt:

> Wheeler stated later that he received text messages that day from Butowsky telling him what to say in media interviews:
>
> • "If you can, try to highlight this puts the Russian hacking story to rest"
> • "We need to emphasize the FBI has a report that has been suppressed that shows that Seth rich [sic] did this..."

> But none of this was true. As would be revealed just a few days later, Wheeler had never said that there was any emailing between Seth Rich and WikiLeaks, and everything he'd heard had been from Butowsky and Zimmerman. "I've never, ever seen Seth Rich's computer, nor have I talked with the federal investigator." And there was no FBI investigation, either — the FBI had never even seen Seth's laptop.

> In short, Butowsky and Zimmerman had worked with Rod Wheeler, told him the FBI had information about Seth Rich's alleged connection with WikiLeaks, and then set him loose — with absolutely no proof. In fact, when Joel Rich demanded a retraction, Zimmerman told him (according to Wheeler, under direction from Fox producers) that the details about their son's (completely false) WikiLeaks ties

had come from Wheeler — whom Butowsky and Zimmerman had been working with all along.

Most of the foregoing excerpt is false and defamatory. Mr. Butowsky will show that the FBI provided at least some support to the Metropolitan Police Department during the murder investigation. And Mr. Wheeler *did* say that emails were exchanged between Seth Rich and Wikileaks. Furthermore, Mr. Butowsky did not "set loose" Mr. Wheeler with "no evidence." Mr. Wheeler made some of the foregoing allegations in his lawsuit, but Defendant Coastan's allegations above were not premised on that lawsuit. And recall that Mr. Wheeler's own attorneys abandoned him and his frivolous lawsuit was dismissed.

77. Elsewhere in the April 18, 2019 article, Defendant Coaston wrote, "As recently as this month, far right media articles are still being shared detailing how Joel Rich told Butowsky that he was aware Seth had leaked the emails — all of which is false." It was not and is not false, and Defendant Coaston's allegations to the contrary are defamatory. Defendant Coaston ended the story with the following paragraph: "But by challenging how the story of their son's murder was manipulated by people who wormed their way into their inner circle — even gaining access to their religious community — the Riches could shine a light on the darkest underbelly of the conservative media apparatus." Contrary to the inferences in that paragraph, Mr. Butowsky did not manipulate anything, nor did he "worm" his way into the Riches inner circle or religious community (much less for purposes of propagating a false story).

78. The October 1, 2019 story by Defendant Coaston was comparably malicious and false. She wrote:

> ...Fox News ran a story, 'Slain DNC Staffer Had Contact with WikiLeaks, Say Multiple Sources." A second story, also published May 15, said that Wheeler was the source. But none of this was true — in fact, the only people who had told Wheeler about WikiLeaks contacts or an FBI investigation (also a part of the original, and false, story) were Butowsky and Fox News investigative reporter Malia Zimmerman.

The foregoing paragraph is false. Mr. Wheeler lied in order to serve his own interests, a fact that was known to Defendant Coaston by the time she wrote the October 1, 2019 story.  Mr. Wheeler told Mr. Butowsky and Ms. Zimmerman (as well as another journalist) that Seth Rich had contacts with Wikileaks, then he changed his story when he joined Mr. Wigdor's scheme to extort Fox News. Regardless, some of Mr. Wheeler's statements were recorded, and others were in writing, so it doesn't matter how many more times he tries to change his story.  He said what he said, and he wrote what he wrote. All of the evidence proving that Mr. Wheeler lied – including the dismissal of his lawsuit – was publicly known at the time Defendant Coaston wrote her story.  The story itself notes that Mr. Wheeler's lawsuit had been dismissed, yet Defendant Coaston repeated the false allegations as if they were true.  She did so knowingly and maliciously.

79.  The October 1, 2018 story by Defendant Coaston also contains the following false and malicious paragraphs:

> In the retracted *Washington Times* story, Butowsky is also mentioned: "According to Ed Butowsky, an acquaintance of the family, in his discussions with Joel and Mary Rich, they confirmed that their son transmitted the DNC emails to Wikileaks." But this was a lie.

> ...And for Aaron, it would only get worse. Butowsky and Matthew Couch, who began working together on the Seth Rich story in the summer of 2017, would go on to defame Aaron Rich's character and argue that he was partially responsible for his only brother's murder, even after Fox News distanced itself from its own false reporting on the Rich family.

> ...They also claimed that Aaron had refused to talk to law enforcement and stated
> that Aaron had known Seth would be murdered and had done nothing to stop it,
> aside from warning Seth's girlfriend to break up with Seth for her own safety. (To
> be crystal clear, *none of this happened*.)

Contrary to the excerpt above, Mr. Butowsky never told a "lie" about Joel Rich's

admission that his sons were involved in the leak, nor did Mr. Butowsky state that Aaron

Rich was "partially responsible for his only brother's murder." Finally, Mr. Butowsky

never "claimed that Aaron had refused to talk to law enforcement and stated that Aaron

had known Seth would be murdered and had done nothing to stop it, aside from warning

Seth's girlfriend to break up with Seth for her own safety." It was false, defamatory and

malicious to attribute the foregoing statements to Mr. Butowsky.

80.  On February 1, 2019, Mr. Butowsky (through counsel) asked Defendants *Vox*

and Coaston to retract the false statements in the April 19, 2018 and October 1, 2018

articles.  In an arrogant and condescending reply dated February 8, 2019, attorney Jeremy

A. Chase of Davis Wright Tremaine LLP wrote that Defendants Vox and Coaston would

not retract anything. He also went a step further, stating that the contents of the articles

"are demonstrably true." He will now be forced to prove that to a jury.  The April 19,

2018 and October 1, 2018 still appear on the *Vox* website, and the Defendants' refusal to

retract or correct those articles is further proof of actual malice. *See Gonzales v. Hearst

Corp.*, 930 S.W.2d 275, 283 (Tex. App.—Houston [14th Dist.] 1996, no writ)("Refusal to

print a retraction is evidence of an action *after* the publication, but it can lend support to a

claim that reckless disregard or knowledge existed *at* the time of publication")(emphasis

in original).

**Defendants *The New York Times* and Fauer**

81.  In an August 2, 2018 article written by Defendant Fauer and published in Defendant NYT, Defendant Fauer cherry-picked quotes from a court order for the purpose of creating a false impression. Defendant Fauer wrote that "[i]n his dismissal of the lawsuit [filed by Joel and Mary Rich], Judge George B. Daniels said he sympathized with Mr. Rich's parents, but added that they had not been personally defamed by the story – despite the fact that it included 'false statements or misrepresentations.'"  Elsewhere, the story reports that Mr. Butowsky was intimately involved in developing this story that purportedly included "false statements or misrepresentations."  In reality, Judge Daniels never made a factual finding that the story included "false statements or misrepresentations."  Judge Daniels's order was premised on Fed. R. Civ. P. 12(b)(6), and the order plainly states that under that rule, "a court 'accept[s] all factual allegations in the complaint as true ... and draw[s] all reasonable inferences' in favor of the plaintiff." *Rich v. Fox News Network, LLC*, 322 F. Supp. 3d 487, 498 (S.D.N.Y. 2018), citing *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009).  Throughout the order, Judge Daniels made it very clear that he was merely restating the allegations in the Rich's complaint. In one sentence, for example, Judge Daniels wrote that "the only conduct that Plaintiffs specifically attribute to Fox News relates to its publication of articles and news reports containing *allegedly* false statements." *Id*. at 501 (emphasis added). Nowhere in the order did Judge Daniels make a factual finding that the story included "false statements or misrepresentations," and that's because the Fox story did not contain any "false

statements or misrepresentations."

82. The August 2, 2018 story also included the following quote from the order: "It is understandable that plaintiffs might feel that their grief and personal loss were taken advantage of, and that the tragic death of their son was exploited for political purposes." In context, however, it is clear that the foregoing statement is premised on the *assumption* that the Rich's complaint was true. Elsewhere Defendant Fauer wrote, "Judge Daniels dismissed the accusations against [Mr. Butowsky and Malia Zimmerman], as well, saying that even though the story they had put together was untrue, their behavior did not meet the legal standard of 'extreme and outrageous conduct.'" Again, Judge Daniels made no such statement that "the story they had put together was untrue." He never reached that issue, nor could he have reached it under Rule 12(b)(6).

83. A paragraph toward the end of the August 2, 2018 article is similarly misleading about the significance of the order:

> Mr. Wheeler and his partners at Fox news had "embarked on a collective effort to support a sensational claim regarding Seth Rich's murder," Judge Daniels wrote. Mr. Wheeler, the judge concluded, "cannot now seek to avoid the consequences of his own complicity and coordinated assistance in perpetuating a politically motivated story not having any basis in fact."

The foregoing paragraph omits the fact that because Judge Daniels was ruling on a 12(b)(6) motion, he was not and could not make any factual findings. Judge Daniels was ruling *only* on Mr. Wheeler's complaint (and Mr. Wheeler had effectively plead himself out of court). Defendant Fauer's story, however, created the false impression that Judge Daniels made factual findings adverse to Mr. Butowsky.

84. Defendant Fauer normally covers court proceedings for Defendant NYT and

he knew that Rule 12(b)(6) dismissals are not factual findings, yet he deliberately misrepresented Judge Daniels's order for the purpose of discrediting someone affiliated (however loosely) with President Trump, in this case Mr. Butowsky. Mr. Butowsky (through counsel) asked Defendants Fauer and NYT to correct or withdraw the defamatory statements in a letter dated February 6, 2019, but they refused. The Defendants' refusal to retract or correct those articles is further proof of actual malice. *See Gonzales*, 930 S.W.2d at 283.

## Claims

## Defamation

85. All previous paragraphs are incorporated herein by reference.

86. Mr. Butowsky brings defamation claims against Defendants Gottlieb, Governski, Boies Schiller Flexner LLP, Bauman, The Pastorum Group, Gail, Oliphant, Agrawal, Massey & Gail LLP, Subramanian, Barron, Park, Turner Broadcasting System, Inc., Cooper, Tuchman, Darcy, Kludt, The New York Times Company, Feuer, Vox Media, Inc., Coaston, and the Democratic National Committee because they or their agents published or conspired with others to publish false and defamatory statements about Mr. Butowsky as described above. Notwithstanding any other statement in this complaint, Mr. Butowsky does not assert defamation claims based on allegations made in any lawsuit.

## Business Disparagement

87. All previous paragraphs are incorporated herein by reference.

88. Mr. Butowsky brings business disparagement claims against Defendants

Gottlieb, Governski, Boies Schiller Flexner LLP, Bauman, The Pastorum Group, Gail, Oliphant, Agrawal, Massey & Gail LLP,  Subramanian, Barron, Park, Turner Broadcasting System, Inc., Cooper, Tuchman, Darcy, Kludt, The New York Times Company, Feuer, Vox Media, Inc., Coaston, and the Democratic National Committee because they or their agents published or conspired with others to publish false and defamatory statements that caused Mr. Butowsky to lose one third of his clients, as described above. Notwithstanding any other statement in this complaint, Mr. Butowsky does not assert business disparagement claims based on allegations made in any lawsuit.

## Malicious Prosecution

89.  All previous paragraphs are incorporated herein by reference.

90.  Mr. Butowsky brings malicious prosecution claims against Defendants Bauman, The Pastorum Group, The Democratic National Committee, Gail, Oliphant, Agrawal, Massey & Gail LLP,  Subramanian, Barron, and Park because they or their agents conspired to prosecute and did prosecute *Joel and Mary Rich v. Fox News Network, LLC, et al.*, Case No. 1:18-cv-02223 (S.D.N.Y.) with malice and without probable cause.

## New York Judiciary Law § 487

91.  All previous paragraphs are incorporated herein by reference.

92.  Mr. Butowsky brings claims under New York Judiciary Law § 487 against Defendants Bauman, The Pastorum Group, The Democratic National Committee, Gail, Oliphant, Agrawal, Massey & Gail LLP,  Subramanian, Barron, and Park because they or their agents conspired and colluded to deceive the court in *Joel and Mary Rich v. Fox*

*News Network, LLC, et al.*, Case No. 1:18-cv-02223 (S.D.N.Y.).

**Civil Conspiracy**

93. All previous paragraphs are incorporated by reference.

94. Defendants Gottlieb, Governski, Boies Schiller Flexner LLP, Bauman, The Pastorum Group, Gail, Oliphant, Agrawal, Massey & Gail LLP,  Subramanian, Barron, Park, and The Democratic National Committee conspired either directly or through their agents to defame Mr. Butowsky and disparage his business.

95. Defendants Bauman, The Pastorum Group, Gail, Oliphant, Agrawal, Massey & Gail LLP,  Subramanian, Barron, Park, and The Democratic National Committee conspired either directly or through their agents with non-parties Aaron Rich, Joel Rich, and Mary Rich to maliciously prosecute *Joel and Mary Rich v. Fox News Network, LLC, et al.*, Case No. 1:18-cv-02223 (S.D.N.Y.).

96. Defendants Bauman, The Pastorum Group, Gail, Oliphant, Agrawal, Massey & Gail LLP,  Subramanian, Barron, Park, and The Democratic National Committee conspired either directly or through their agents with non-parties Aaron Rich, Joel Rich, and Mary Rich to violate New York Judiciary Law §487, and they did violate New York Judiciary Law §487 in *Joel and Mary Rich v. Fox News Network, LLC, et al.*, Case No. 1:18-cv-02223 (S.D.N.Y.).

## Request for Relief

97. The Plaintiff respectfully prays that upon a final hearing of this case, judgment be entered for him against the Defendants, for damages in an amount within the jurisdictional limits of the Court; together with pre-judgment interest at the maximum

rate allowed by law; post-judgment interest at the legal rate; back pay; costs of court; attorney fees; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

### THE PLAINTIFF DEMANDS A JURY TRIAL.

Respectfully submitted,

**/s/ Ty Clevenger**
Ty Clevenger
Texas Bar No. 24034380
P.O. Box 20753
Brooklyn, New York 11202-0753
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Attorney for Plaintiff Edward Butowsky**

# EXHIBIT 28

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
Sherman Division

ED BUTOWSKY, in his Individual )
And Professional Capacities, )
 )
      Plaintiff, )
 )
v. )        Case No. _____
 )
 )        **TRIAL BY JURY**
DOUGLAS H. WIGDOR, )        **IS DEMANDED**
 )
WIGDOR LLP )
 )
-and- )
 )
ROD WHEELER )
 )
      Defendants. )
_____)

# <u>COMPLAINT</u>

      Plaintiff, Ed Butowsky, in his personal and professional capacities, by counsel, files the following Complaint against Defendants, Douglas H. Wigdor ("Wigdor"), Wigdor LLP, and Rod Wheeler ("Wheeler"), jointly and severally.

      Plaintiff seeks (a) compensatory damages, treble damages and punitive damages in the sum of **$118,000,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury from June 23, 2017 to the date of Judgment at the rate of five percent (5%) per year, (c) attorney's fees, and (d) costs – arising out of the Defendants' defamation, business disparagement, civil conspiracy, and acts of racketeering activity.

## I. __INTRODUCTION__



1.      This is a case about greed, extortion and the malicious, corrupt and unethical business practices of Douglas H. Wigdor ("Wigdor") and his accomplices.

2.      For well over a year between 2017 and 2018, Wigdor engaged in an unrepentant, full-blown, global effort to extort money and concessions from Fox News Network LLC and Twenty-First Century Fox, Inc. (collectively, "Fox") and to destroy Fox's brand, business and value as a public company (NASDAQ: FOXA).  Acting individually and in concert with others – including Rod Wheeler ("Wheeler"), a person recruited and paid to be a "client", and David Folkenflik ("Folkenflik"), a media correspondent with an axe to grind against Fox – Wigdor used main stream media, print media and social media (Twitter, Facebook and YouTube) as weapons to publish, republish, tweet, retweet, post, share and promote false and defamatory statements about Fox.

3. In June 2017 – with actual knowledge of the falsity of his statements – Wigdor maliciously dragged Plaintiff, Ed Butowsky, an innocent citizen, into his war with Fox. Wigdor manufactured fake news about Butowsky in furtherance of a scheme to extort money from Fox. Butowsky was a very successful investment advisor with a stellar reputation and clientele throughout Texas. He was a confident, respected, well-liked, magnanimous and jovial colleague, friend, husband and father. Wigdor consciously destroyed Butowsky's name and reputation and gravely injured his business.

4. Beginning in June 2017, Wigdor knowingly manufactured and published multiple false and defamatory statements about Butowsky, including that:

- Ed Butowsky colluded with the President of the United States[1] and Fox to publish "fake news" – that murdered Democratic National Committee ("DNC") staffer, Seth Rich, leaked certain DNC/Clinton emails to WikiLeaks during the 2016 Presidential primaries – in order to obfuscate and conceal the "truth": that President Trump colluded with Russia in an attempt to influence the outcome of the Presidential election;

  -and-

- Ed Butowsky aided, abetted and enticed Fox to publish an article that fabricated and falsely attributed certain quotations to Wheeler, who was investigating the murder of Seth Rich.

Wigdor published these false and defamatory statements with actual malice. His goal in publishing the statements was to extort $60 million in settlements from Fox in sexual assault cases that Widgor had filed or was going to file against Fox. At the time he published these and many similar false and defamatory statements about Butowsky,

---

[1] In truth, Ed Butowsky has never met the President of the United States. Butowsky has never communicated with the President, directly or indirectly, by telephone, by email, by text, by direct message, or otherwise. Neither the President nor anyone in his Administration has ever asked Ed Butowsky to do anything.

Widgor knew the statements were false. Indeed, Widgor manufactured facts that he knew to be untrue and suborned Wheeler's public misrepresentations.

5.      The intensity, degree and breadth of Wigdor's media and digital campaign of defamation is unprecedented. In his effort to extort Fox, Wigdor knowingly lied and intentionally spread those lies to millions upon millions of people world-wide, causing massive loss of income and business, insult, injury, mental suffering, embarrassment and humiliation to Butowsky.

6.      In this case, Ed Butowsky seeks money damages for the destruction of his good name and reputation. Wigdor operated a fake news cartel. He recklessly embroiled an innocent Texas citizen in his war against Fox. He went to unimaginable lengths to commit extortion. Wigdor's unquestionable defamation, conspiracy, acts of racketeering activity, misconduct and indiscriminate use of the press and social media to defame must be stopped. Wigdor holds a law license. Wigdor has committed criminal or deliberately wrongful acts that reflect adversely on his honesty, trustworthiness or fitness to practice law. He has engaged in conduct involving dishonesty, fraud, deceit and misrepresentation. He and his associates cannot be allowed to create fake news and use the press and social media as a weapon to disseminate those false narratives. Wigdor and Wheeler should be punished for their unlawful actions and a very strong message needs to be sent to prevent others from acting in a similar way.

## II.  PARTIES

7.      Plaintiff, Ed Butowsky ("Butowsky"), is a citizen of Texas. Butowsky is 56 years-old. He resides with his family in Plano, Texas. He has a long history of generously helping people in need. Butowsky is an internationally recognized expert in

the investment wealth management industry. He has been in the financial services industry for over twenty-nine (29) years. He started his career with Morgan Stanley, where he was a Senior Vice President in private wealth management. In his eighteen (18) years with Morgan Stanley, Butowsky was the firm's top producer nationally as well as the first advisor to surpass one billion dollars in assets under management. He was recognized as a member of both the Chairman's Club and the Equity Club at Morgan Stanley, a distinction reserved for only the firm's top advisors. In 2005, Butowsky launched Chapwood Investments, LLC, a Plano, Texas-based, private wealth management advisory firm focused on providing comprehensive financial counseling and investment advice to wealthy families and individuals. He was nominated as Top Financial Advisor in the World by Reuters in 2007. Through his work with professional athletes, Butowsky was prominently featured in both the ESPN Movie, *Broke* [https://www.youtube.com/watch?v=1IhmiE_Hs0I], and the blockbuster Sports Illustrated article, "*How (and Why) Athletes Go Broke*". [https://www.si.com/vault/2009/03/23/105789480/how-and-why-athletes-go-broke].

8. Prior to Wigdor's character assassination, Butowsky was a frequent guest on CNN, ABC, CBS, NBC, CNBC, Fox Business News, FOX News Channel, Bloomberg TV, and China TV. Butowsky had made hundreds of appearances on national television and was often seen on "Varney and Co", "Closing Bell", "Street Signs", "Your World w/ Cavuto", "America Live" with Megyn Kelly, "Willis Report", "America's News HQ", "Taking Stock" with Pimm Fox, TheBlaze TV with Glenn Beck, and "Wilkow!" with Andrew Wilkow. He was also regularly heard on radio shows around the country such as "Mad Dog Radio" and "Bloomberg Radio", discussing wealth

management, and other subjects that are of interest and timely related to the finance/investments world.

9. Prior to the global smear campaign orchestrated by Wigdor, Butowsky enjoyed an untarnished personal and professional reputation in the community in which he lives and works, with clients, with colleagues in business, and with his many friends. Wigdor and Wheeler's defamation spread like wildfire throughout mass media, social media and over the Internet, causing Butowsky to be ostracized, causing enormous loss of business (including, without limitation, the termination and loss of Chapwood's Investment Manager Service Agreement with Charles Schwab), and causing Butowsky substantial personal injury, fear, and mental and physical pain and suffering. Butowsky has received death threats to his family, damage to his home in Plano, and thousands of *ad hominem* attacks. The ugly effect and impact of Wigdor's defamation is captured by the following Facebook post by Butowsky's daughter, Lauren:

> I will never forget going on twitter, seeing messages calling for mine and my brother's murders because "that's what Ed deserves." I will never forget people harassing my mother, brother, myself, and my grandparents for no other reason than we were related to Ed. I will never forget seeing a man tweet at my company telling them they should be ashamed to have hired me. I will never forget people tweeting pictures of my brother identifying him as Ed's son. I will never forget being so afraid for the safety of my family because of the inundation of death threats.

Butowsky and his family were attacked mercilessly on social media. "Matt Thomas" sent the following messages to Butowsky's wife and son via Facebook:





"MattThomas_zoso" tweeted the following:



Other tweets were far worse. Wigdor's defamation devastated Butowsky.

10.    The Defendants are individuals, and/or a group of individuals associated in fact and who are part of a fake news cartel (a RICO enterprise) that engages in interstate commerce by the use of one or more instrumentalities, including, but not limited to, the Internet, computers and telephone, mails and facsimile.  Through a pattern of racketeering activity, involving acts or threats of extortion chargeable under State law and punishable by imprisonment for more than one year, mail fraud and wire fraud in violation of Title 18 U.S.C. §§ 1341 and 1343, the Defendants have maintained, directly or indirectly, an interest in or control of an enterprise which is engaged in, or the activities of which affect, interstate commerce.  While employed by or associated with such enterprise, the Defendants conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.  The Defendants have engaged in activity that is prohibited by Title 18 U.S.C. §§ 1962(b), and 1962(c).

11.    Defendant, Wigdor, is an individual who is a citizen of New York.  He is a partner of Defendant, Wigdor LLP, a New York registered limited liability partnership (Widgor and Wigdor LLP are collectively referred to hereinafter as "Wigdor").  Jeanne M. Christensen ("Christensen") and Michael J. Willemin ("Willemin") are partners of Wigdor.  None of Wigdor's partners is a citizen of Texas.

12.    At all times relevant to this action, Wigdor knew that Butowsky lived and worked in Texas.  Wigdor knew that Butowsky managed a registered investment advisor in Texas.  Wigdor knew that the publication of false and defamatory statements would injure Butowsky's business and personal interests in Texas.   Wigdor purposefully published statements that hurt Butowsky in Texas.

8

13.     Wigdor operates and is associated with a fake news cartel that includes main stream media outlets used by Wigdor to further the cartel's nefarious purposes. Although Wigdor masquerades as a law firm, Wigdor employs criminal means to shake down targeted victims.   Wigdor is proud of his methods and openly brags about his "press strategy". [*See infra*].  Although Wigdor is an attorney, most of his time is spent in front of cameras or giving incendiary interviews to MSNBC, CNBC, CNN, the New York Times, Bloomberg Businessweek, and many other main stream media outlets, in which Wigdor vigorously promotes himself and his causes, ***especially*** his "crusade" against Fox.  Wigdor uses the "court of popular opinion" – *i.e., the press and social media* – to extort money, property and concessions from his enemies.  Wigdor's war against Fox is featured front and center on Wigdor's website and on his YouTube channel – *Wigdor LLP – Employment Lawyer NYC* – where publishes sound bites and personal praise. [https://www.youtube.com/channel/UCeogDStcI35nkzCJYNatVBQ].

14.     Wigdor claims to be a specialist in sexual harassment and assault cases. His website, *inter alia*, notes that he has represented "over 20 employees at Fox News in their claims of gender discrimination, race discrimination, retaliation and defamation against the network".      [https://www.wigdorlaw.com/portfolio/douglas-h-wigdor/]. Wigdor's website formerly represented that:

> "Mr. Wigdor currently represents thirteen clients who have alleged racial discrimination against Fox.  Mr. Wigdor also represents Rod Wheeler, a Fox contributor in an 'explosive' lawsuit alleging defamation in connection with a story published about murdered DNC staffer Seth Rich, Scottie Nell Hughes, a former Fox contributor in a lawsuit alleging retaliation after she complained of sexual assault by Fox Business host Charles Payne, and Lydia Curanaj, a Fox5 reporter in a lawsuit alleging gender and pregnancy discrimination against Fox News.  The lawsuits join a succession of sexual harassment allegations made against Fox, and have been extensively reported on by both national and international media and referred to as a 'Normandy like' legal assault."

Wigdor operates an active website that targets citizens of Texas, and encourages them to call Wigdor for advice and representation.

15.     Wigdor is a sophisticated expert who litigates his cases in the press.  He is a high net worth individual, who has sufficient assets and net worth to pay punitive damages in the maximum amount permitted under Texas law.

16.     Defendant, Wheeler, is a citizen of Maryland.  Wheeler is a disgraced DC police officer, who was terminated from his position in 1995 because of a history of distorting and misrepresenting facts.  Wheeler was suspended from the police force after testing positive for marijuana in a random drug test.  Eventually, he was dismissed.  After working for McDonalds for some time, Wheeler became a "crime analyst".  Wheeler is infamous for a story he concocted about an underground network of "pink pistol packing lesbian gangs" in the United States. [https://www.splcenter.org/fighting-hate/intelligence-report/2007/rod-wheeler-claims-o%E2%80%99reilly-factor-lesbian-gangs-are-raping-young-girls].  Although Wheeler held himself out to Butowsky and claimed to be a "private investigator", in truth, as Butowsky learned after-the-fact, Wheeler has no license.  All traces of Wheeler's "investigative" firm, Capitol Investigations, LLC, have been wiped from the Internet.  https://www.washingtoncitypaper.com/news/city-desk/article/20863214/nownotorious-private-investigator-in-seth-rich-case-is-unlicensed-in-dc].

17.     This action involves the Defendants' conscious decision to fabricate a false narrative and manufacture claims against Butowsky to extort settlements of putative "discrimination" claims that Widgor had filed or planned to file against Fox.  The nature

of the Defendants' racketeering activity, its continuity, relatedness and breadth, and the threat that it will continue indefinitely in the future is described below in this Complaint.

### III.   JURISDICTION AND VENUE

18.     The United States District Court for the Eastern District of Texas has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question), 28 U.S.C. § 1332 (Diversity Jurisdiction), and 28 U.S.C. § 1367 (Supplemental Jurisdiction).  The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees.

19.     The Defendants are subject to specific personal jurisdiction in Texas. They committed multiple acts of defamation and intentional torts, in whole or part, in Texas.  They have minimum contacts with Texas such that the exercise of personal jurisdiction over them comports with traditional notions of fair play and substantial justice and is consistent with the Due Process clause of the United States Constitution. Defendants' defamation was purposefully directed at Texas and was continuous and systematic.  Butowsky's claims directly arise from and relate to Defendants' publication of false and defamatory statements in Texas. *E.g., TV Azteca v. Ruiz*, 490 S.W.3d 29 (Tex. 2016) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) and *Calder v. Jones*, 465 U.S. 783 (1984)).

20.     Venue is proper in the Sherman Division of the United States District Court for the Eastern District of Texas because Wigdor, Wheeler and their agents published and republished defamatory statements to a wide audience that includes persons who reside within the Sherman Division.  Wigdor and Wheeler's defamation caused substantial harm to Butowsky's personal and professional reputations in Texas.  A

substantial part of the events giving rise to the claims stated in this action occurred in the Eastern District of Texas.

## IV.  STATEMENT OF MATERIAL FACTS

**A.**   ***Wigdor and Wheeler Had Actual Knowledge That Their Statements Were False
       – They Defamed And Disparaged Butowsky In Spite Of That Knowledge***

21.    At all times relevant to this action, Wigdor and Wheeler had actual knowledge that their written and oral statements about Butowsky were false.  Wigdor and Wheeler knew Butowsky had never colluded with the President of the United States or with Fox to publish "fake news".  Indeed, Wigdor and Wheeler had no evidence that the President even knew Butowsky.  Wigdor also knew that Butowsky had never supported an effort by Fox to fabricate and falsely attribute quotations to Wheeler – indeed, Wigdor knew – ***actually knew*** – that Wheeler had been accurately quoted by Fox.

22.    Anyone in the same or similar circumstances as Wigdor in June 2017 would have harbored serious doubt as to whether the statements of his "source", Wheeler, were true.  Yet, in spite of the facts known to Wigdor, he and Wheeler proceeded upon a course of action in furtherance of a joint plan that was intended to profit Wigdor and Wheeler and destroy the good name and reputation of Butowsky.

23.    The truth was well-known to Wigdor and Wheeler, not only from Wheeler's own text messages and emails (described in detail below), but from public records (including videos in which Wheeler appeared and audio recordings) readily available to Wigdor on the Internet.

24.    Even if Wigdor had completely ignored (a) Wheeler's text messages and emails and other evidence in Wigdor's possession, and (b) the video and audio recordings and other information publicly available on the Internet, on June 27, 2017 Wigdor

received a letter from counsel for Butowsky, David B. Harrison, Esquire ("Harrison") that put Wigdor on actual notice of the falsity of his statements about Butowsky.

25.     On June 23, 2017, Wigdor invited Harrison to review a draft of a lawsuit. Wigdor's invitation was unsolicited and there were no settlement negotiations ongoing. Wigdor published the draft document to Harrison at Wigdor's law office. Harrison was shocked. On June 27, 2017, Harrison prepared and delivered to Wigdor a letter in response to statements Wigdor published in the draft lawsuit. Harrison's letter expressly stated how and why the statements made by Wigdor and Wheeler about Butowsky were false and utterly groundless. Harrison's letter put Wigdor on actual notice of the truth, including the fact that there was no collusion with the President and that Wheeler himself had authorized the very quotations that Wigdor claimed that Butowsky and Fox had "fabricated". Significantly, Harrison warned Wigdor that filing a lawsuit against Butowsky that contained the fabricated facts concerning collusion with the President and Fox would subject Wigdor to sanctions. Harrison emphasized to Wigdor:

> Because the claim has neither a factual nor a legal basis, it is frivolous, and you are hereby put on notice that Mr. Butowsky intends to seek sanctions and counterclaims against Mr. Wheeler and your law firm if you file the complaint. Indeed, there can be no interpretation of the inflammatory allegations made against our client as having any other purpose but to intimidate and harass him into paying off Mr. Wheeler before they become public. Mr. Butowsky will not be extorted. He will seek all sanctions available to him under the law against Mr. Wheeler and your firm, including all attorney's fees and costs associated with defending these illegitimate claims.

26.     Wigdor' misconduct was egregious. Wigdor intentionally ignored Harrison's admonition and all the documentary evidence. Wigdor checked his common sense at the door and chose to manufacture a totally make-believe fake news story about Butowsky to further Wigdor's war against Fox. Wigdor chose to attempt to extort Fox and Butowsky with threats to file the bogus lawsuit.

**B.**    *Background – The Murder of Seth Rich*

27.     In the early morning hours of July 10, 2016, a Democratic National Committee ("DNC") staffer named Seth Rich ("Rich") was shot twice in the back and badly beaten.  Police arrived on the scene almost immediately, but Rich's killers were already gone.  The killers left no shell casings and no trace evidence.  Rich later died in hospital.  At about 4:19 a.m., the 27-year-old Rich spoke to his girlfriend, Kelsey Mulka ("Mulka"), over the phone as he walked home from a bar.  As the couple talked, Mulka heard voices on the other end.  Rich abruptly ended the call.  He was steps away from his Washington D.C. apartment.  http://www.latimes.com/business/hollywood/la-fi-ct-seth-rich-conspiracy-20170523-htmlstory.html].  "There had been a struggle.  His hands were bruised, his knees are bruised, his face is bruised, and yet he had two shots to his back, and yet they never took anything," Rich's mother, Mary, told NBC shortly after his death. https://www.nbcwashington.com/news/local/Man-Shot-Killed-in-Northwest-DC-386316391.html].[2]

28.     There is no evidence that Rich's death had anything to do with Russians or Russian hacking.  [*See, e.g.,*  http://www.newsweek.com/donna-brazile-book-seth-rich-russia-white-clinton-705424 ("the FBI said that they did not see any Russian fingerprints there")].

---

[2]      Seth Rich's neighbor, Mark Mueller ("Mueller"), claims he heard sharp gun shots at 4:19 a.m., and saw the police tending to Seth Rich in the street.  At a vigil days after Rich's murder, Mueller made the following public statements: "I was there when he got shot, and they walked him past me, so I could see him and identify him as I knew him in the neighborhood.  And the police officer said, 'he didn't even know he was shot'".  [*see, e.g.,*  https://twitter.com/joshdcaplan/status/874321849701806081/video/1; http://www.thegatewaypundit.com/2017/06/alleged-eyewitness-seth-rich-murder-didnt-even-know-shot-video/].  Wheeler never interviewed Mueller in connection with the murder investigation he undertook for the Rich family.

29.     Starting on July 22, 2016 – twelve days after Rich's death – WikiLeaks released over 44,053 emails and 17,761 attachments from top DNC officials – as part one of Wikileaks' "Hillary Leaks series". [https://wikileaks.org/dnc-emails/].[3]

30.     The founder of Wikileaks, Julian Assange ("Assange"), told Ellen Ratner[4] ("Ratner") that the Hillary email leaks were not the result of Russian hacking. Rather, the leaks were from an "internal source" from within the Hillary Clinton campaign or from someone who knew Hillary Clinton, *i.e.*, Seth Rich. Assange told Ratner that "Russian got credit for something that WikiLeaks should have gotten credit for." [https://www.youtube.com/watch?v=0M3Z4eE6cJA].

31.     On August 9, 2016, Assange appeared on Dutch television. [https://www.youtube.com/watch?v=Kp7FkLBRpKg]. Assange was asked the following question, "The stuff you are sitting on. Is an October surprise in there?" Assange volunteered information about Seth Rich:

>       "ASSANGE:        … Wikileaks never sits on material. Our whistleblowers go to significant efforts to get us material and often very significant risks. There was a 27-year old who works for the DNC. He was shot in the back, murdered just two weeks ago for unknown reasons as he was walking down the street in Washington.

>       DUTCH HOST:     That was just a robbery I believe, wasn't it?

>       ASSANGE:        No, there is no finding.

---

[3]     Julian Assange confirmed that Russia was "absolutely not" involved in the leak of the DNC emails. [*See e.g.,* https://www.youtube.com/watch?v=CuRJDKEVxHY (Video at 1:34)].

[4]     Ellen Ratner is a journalist who has covered four U.S. Presidents. She serves as the Washington Bureau Chief for *Talk Media News*. On Fox, Ratner has appeared on *The Strategy Room* and *The Long and Short*. She is known for exposing bias in the media and chastising the mainstream press for its shortcomings. http://ellenratner.com/about-ellen-ratner/]. Ellen Ratner is the sister of Julian Assange and WikiLeaks' long-time US lawyer (now deceased), Michael Ratner.

DUTCH HOST:        What are you suggesting?

ASSANGE:        I am suggesting that our sources take risks and they become concerned to see things occurring like that.

DUTCH HOST:        Was he one of your sources then?  I mean…

ASSANGE:        We don't comment on who our sources are.

DUTCH HOST:        Then why make the suggestion about a young guy being shot in the streets of Washington?

ASSANGE:        Because we have to understand how high the stakes are in the United States and our sources face serious risks.  That's why they come to us so we can protect their anonymity.

DUTCH HOST:        But its quite something to suggest a murder and that is basically what you are doing.

ASSANGE:        Well others have suggested that.  We are investigating to understand what happened in that situation with Seth Rich.  I think it is a concerning situation.  There isn't a conclusion yet.  We wouldn't be willing to state a conclusion, but we are concerned about it.  And more importantly [nearing tears] a variety of Wikileaks sources are concerned when that kind of thing happens."

On August 10, 2016, Wikileaks offered a $20,000 reward for information leading to the arrest of the killers of Seth Rich.  [www.telegraph.co.uk/news/2016/08/10/wikileaks-offers-20000-reward-over-murder-of-democrat-staffer-se/].

C.    ***Wigdor Knew Butowsky Had Limited Involvement In Wheeler's Investigation***

32.    In early 2017, Butowsky contacted the family of Seth Rich to help the family investigate their son's unsolved murder.  Butowsky graciously offered to pay for a private investigator.  [https://soundcloud.com/siriusxm-news-issues/ed-butowsky-seth-richs-death].  Butowsky also donated $250 to a GoFundMe campaign started by Rich's brother, Aaron Rich, to raise money, *inter alia*, to maintain and increase the reward for

information leading to an arrest and conviction of Rich's killer. [https://www.gofundme.com/SethRich].

33.     On February 23, 2017, Butowsky contacted Wheeler via text message to see if Wheeler would be interested in investigating the murder.  Butowsky did not know Wheeler, but had seen him on television.  Wheeler appeared to be a competent investigator.

34.     Wheeler entered into a contract with the Rich family (specifically, with Aaron Rich, Joel Rich and Mary Rich) to investigate the murder of Seth Rich.   As Wheeler stated to FetchYourNews:

> The Rich's were aware of my background as a criminal investigator, specifically as a former police homicide investigator. They indicated that they had seen my many appearances on the Fox News Channel commenting and analyzing dozens of criminal cases and have always been impressed by my knowledge and experience.
>
> The Rich's engaged my services to assist with gathering information and evidence, in an effort to try to assist the Metropolitan Police Department identify the person(s) responsible for the murder of Seth.

[http://fetchyournews.com/tag/rod-wheeler/].  Butowsky is not a party to the contract and has never seen the contract.

35.     Butowsky did not participate in Wheeler's investigation and had very little communication with Wheeler.

36.     Wheeler confirmed Butowsky's limited involvement in the investigation. Wheeler represented to Sean Hannity on May 16, 2017 that "I was hired by the family, Joel and Mary Rich.  They signed the contract.  Now, the financial benefit if there were any financial benefit and by the way there wasn't much, that was actually paid for by a **third party that I have had very little communication with at all**, Sean". [https://www.youtube.com/watch?v=CuRJDKEVxHY (emphasis added)].

37. On March 1, 2017, Wheeler told Butowsky that he (Wheeler) had independently acquired some "dynamic information" from one of his sources, the "lead detective" on the Seth Rich murder case. Wheeler also claimed that he had learned and knew who was "blocking the investigation". Wheeler texted Butowsky as follows:



Wheeler told Butowsky that he was meeting with "2 inside contacts" on March 2, 2017.

38. On March 31, 2017, Wheeler appeared on television on Fox 5 DC. Wheeler uploaded and published the interview to his YouTube channel, *Rod Wheeler*. [https://www.youtube.com/user/4apryl]. He called the video "Fox 5 DC Seth Rich Death Rod Interview". [https://www.youtube.com/watch?v=D_nsLuFyb60].

39. In this interview, Wheeler announced that the Rich family had engaged him to help the police look into the murder because, according to Wheeler, "they [the Rich family] really just don't have a clue". Wheeler said he had been investigating the matter over the "past three weeks".

"[T]here has been a lot of reward money that's been offered for any information. No one has come forward. So here is the thing that is so important to realize whenever you have a lot of reward money, in this case it is over $125,000, and you don't have anyone coming forward with information. Then what that tells you as an investigator is that maybe you need to start looking at another cause or another reason as to why this guy was killed and that's what we're doing now. We're looking at uh possibly of course a street robbery, but it could, and I underline the word could, it could have been related, his death to his job, it could have been related to something else. **what I don't think it was related to though Allison is this Russian hacking thing**."

(Emphasis added). After the interviewer pointed out to Wheeler that people were "hinting at the fact that perhaps Seth Rich may have given some documents [to Wikileaks]", Wheeler, voluntarily and of his own free will, stated as follows:

"Well a lot of people have made that same observation and you have to ask yourself what is the motivation behind a person wanting to get involved and offer reward money, maybe he's just a good guy and he has a lot of money laying around so this how he wants to spend his money, but you have to be careful though when you start throwing out these conspiracy theories, they actually don't help the investigation at all ... **I haven't found one shred of evidence at all that indicates that Seth's death is the result of any Russian hacking or anything like that.** I do think it's possible and I underline the word possible that it could have been related to his job to some degree or relationships with the job, don't know that for sure but for investigators we have to go down every path until we can determine who was responsible for his death".

(Emphasis added).

40.    Malia Zimmerman ("Zimmerman") is an award-winning investigative reporter employed by FoxNews.com. Her reports for Fox largely deal with crime, terrorism in the U.S. and overseas, homeland security, illegal immigration, and political corruption. [http://www.foxnews.com/person/z/malia-zimmerman.html].

41.    Wheeler met Zimmerman in late February 2017.

42.    After he appeared on Fox 5 DC, Wheeler updated Zimmerman concerning his investigation.

43.     Specifically, Wheeler advised Zimmerman that as a result of his investigation he (Wheeler) was prepared to say that Rich's murder was **_not_** the result of a "botched street robbery". Wheeler further offered to Zimmerman that his investigation revealed a "coverup within the D.C. Govt" related to Rich's death.

44.     Wheeler and Zimmerman's exchanged text messages:



45. Despite actual knowledge that Butowsky had little communication with Wheeler and no role in the murder investigation, Wigdor and Wheeler misrepresented that Butowsky was heavily involved and fed Wheeler information.

**D.**     ***Wigdor Knew The President Was NOT Involved In Anything***

46. On April 18, 2017, Butowsky sent Wheeler a text message, inquiring whether Wheeler would be in DC on Thursday, April 20. Butowsky planned to meet with White House Press Secretary, Sean Spicer ("Spicer").

47. Wheeler had been asking Butowsky nonstop to get him an interview, so he (Wheeler) could get a job in the White House.[5] Butowsky asked Wheeler to put together a summary of his findings to date, and to bring the report with him to the meeting. Butowsky emailed Spicer, and asked for a 10-minute meeting, with no specified topic, to catch up. Butowsky informed Spicer that he would be bringing a Fox News contributor to the meeting.

48. The meeting with Spicer lasted 10-15 minutes. Most of the time was spent talking about shirts. Butowsky and Spicer bought their shirts from the same source: Jacomo Hakim's Bookatailor. At the meeting, Butowsky and Wheeler, *inter alia*, told Spicer that they were working on a story about Seth Rich and wanted Spicer to be aware of it – that was it.

---

[5]     *See, e.g.,* https://www.youtube.com/watch?v=NaNhtlS2GxE (recording of phone call in which Wheeler expresses a desire to be employed by the White House – Wheeler states: "the President can appoint me as an administrator to the President … to specifically report to him and start taking a look at all of these cases. He can do it. Because someone needs to reign this stuff in and Trump is the person to do it … Whether you like Obama or not, for eight years I think this corruption has been allowed to manifest. Now we got a new President in there and they can't be as corrupt as they used to be, and that's messing with people's minds.").

49.     The President of the United States was not at the meeting and Spicer did not inform the President about the meeting.

50.     Wigdor has never had **_any_** evidence of **_any_** connection between Butowsky and the President because there is no connection whatsoever.  In the total absence of any evidence, Wigdor chose to fabricate facts.  Wheeler advised Wigdor that he (Wheeler) had no evidence of any collusion between Butowsky and the President.  In spite of Wheeler's admission and acknowledgment, Wigdor chose to manufacture a fake narrative that included, *inter alia*, "collusion" between Butowsky and the President.

**E.     _Wigdor Knew Wheeler Interviewed Lead DC Detective Dellacamera_**

51.     On April 25, 2017, Wheeler interviewed Detective Joseph Dellacamera, the lead DC Detective investigating the murder of Seth Rich.

52.     Wheeler's notes of the interview state as follows:

> When asked specifically was there any information located on any of Seth's computers that would indicate that he did in fact send emails to WikiLeaks, DellaCamera replied, "there is certain information that I can't provide regarding the case itself, and I hope you understand, like I said, I can't reveal detailed information about the case itself." "I have strict, strict rules by my bosses, because of what this case is, that says don't provide information out, other than what is already publicly out there. I just can't go into detail with what I know."   At this time DellaCamera was asked is it a possibility that emails were found on Seth's computer related to the DNC and this could be a motivation for his being killed? DellaCamera replied, "anything's possible; I can't say one way or the other....."

DellaCamera was told that the family were told by me (Wheeler) that regardless of whatever direction the investigation goes, we need to solve the murder, identify the bad guy and get him off the street. So, in keeping with that spirit, I need to "rule out" the possibility that Seth's death could have been related to his job at the DNC. I (wheeler) haven't been able to rule out that someone from the DNC could have been responsible for Seth's death. DellaCamera was asked, "were you aware that Seth was having problems with two supervisors at his job (DNC) and he was very emotionally upset because of his problems at the DNC? DellaCamera replied, "I was aware that there were problems, but I don't know who the supervisors were that he was having problems with." Next, DellaCamera was asked if he was aware that Seth received money from WikiLeaks in exchange for the emails? Did you look into his (Seth's) financial records? DellaCamera replied, "again, I can't go into details with specifics about the case such as that...I really can't. Nothing against you, Rod but I'm just not trying to get myself jammed up." DellaCamera was asked, "so the higher-ups in the department are very aware of this case?" He replied, "Oh yeah, for sure."

I asked once again about the email records. I informed DellaCamera that we need to "disprove" the theory that Seth was killed because of this job at the DNC. DellaCamera stated, "honestly, put it this way, if Seth worked anywhere else other than the DNC, nobody would give a shit about his death. The only reason there is such interest is because of where he worked." DellaCamera was asked, "so why is that?" He replied, "again, it goes back to the DNC...a political organization and it all started stemming from around the time of the election..and it sounds like someone was trying to ruffle feathers...I mean that's what I think."

Anything's possible." "Look, look Rod, please, please do not quote me on anything.....I don't need that shit coming back on me..if I'm quoted, I will probably be reassigned to CCB somewhere.....moving property around. There's certain details of the case that we just can't renewal to anybody, just for the integrity of the case. But, do what you got to do for your business and the news story, but please don't, don't throw me under the bus Rod."

Then Wheeler asked, "did your review of Seth's computer reveal that any emails went out to WikiLeaks?" DellaCamera replied, (after a long pause), well, well...there's stuff on there that, it's its, emails are sent everyday....um...the context of the emails I can't get into the details, um, again, I don't have anything pointing the finger at the DNC other than the conspiracy theories. Nobody has come to me with direct information and provided detailed information about the DNC being involved somehow.

F.  ***Wigdor Knew About Marina Marraco***

53.     On May 11, 2017, Zimmerman sent Wheeler a rough draft of a story regarding the Seth Rich murder.

54.     In the interim between February and May 2017, Butowsky got to know Wheeler and developed a bond with the "private investigator". Butowsky knew that

Wheeler really wanted to work at the White House.  On May 14, 2017, Butowsky sent Wheeler a text message in which Butowsky joked that "[n]ot to add any more pressure but the president [Donald Trump] just read the [Zimmerman's] article.  He wants the article out immediately.  It's now all up to you.  But don't feel the pressure".  Wheeler knew Butowsky was joking.

55.     Wheeler had a crush on Fox 5 DC correspondent, Marina Marraco ("Marraco").  Wheeler called Marraco.  He gave Marraco a copy of the draft of Zimmerman's article.

56.     On May 15, 2017, Marraco interviewed Wheeler concerning his investigation of Seth Rich's murder and his findings to date as part of a Fox 5 DC "exclusive".  [https://www.youtube.com/watch?v=x48PeHvTddc].  Wheeler made the following unqualified statements on camera to Marraco:

> "MARINA MARROCO:     Today Fox 5 has learned there is new information that could prove these theorists right.  New information from the family's private investigator suggests there is tangible evidence on Seth Rich's laptop that confirms he was communicating with Wikileaks prior to his death.  Now the question is why has DC police as the lead agency on the investigation for the past 10 months insisted this was a botched robbery when until this day there is no evidence to suggest that.  The Rich family hired Rod Wheeler a former MPD homicide detective to run a parallel investigation into their son's death.  Wheeler says he believes there is a cover up and the police department has been told to back down from the investigation.
>
> WHEELER:          Neither the police department nor the FBI have been forthcoming.  They haven't been cooperating at all.  I believe that the answer to solving his death lies on that computer, which I believe is either at the police department or at the FBI.  I've been told both.[6]
>
> **MARINA MARROCO:      But <u>you</u> have sources at the FBI saying that there is information …**

---

[6]     Actually, Wheeler had been told that Aaron Rich had the computer. [https://twitter.com/wikileaks/status/892494677823434753?lang=en].

> **WHEELER:**        **For sure …**
>
> **MARINA MARRACO:**        **That could link Seth Rich to Wikileaks?**
>
> **WHEELER:**        **Absolutely, yeah, and that's confirmed.**  Actually, I have a source in the police department that has looked at me straight in the eye and said 'Rod we were told to stand down in this case and I can't share any information with you'.  Now that is highly unusual for a murder investigation, especially from a police department.  Again, I don't think it comes from the Chief's office, but I do believe there is a correlation between the Mayor's office and the DNC, and **that's the information that is going to come out tomorrow**."

(Emphasis added).  When asked by a Fox 5 DC anchor whether there would be

"evidence" to prove the statements made by Wheeler, Marraco stated as follows:

> "MARINA MARRACO:        … Rod Wheeler, the investigator, assures us Fox 5 and assures Fox News that there's a full report that contains information that will show how many times Seth Rich made contact with Wikileaks and will show exactly when this communication took place."[7]

**G.    *Wigdor and Wheeler Knew That Fox Had Accurately Quoted Wheeler – Yet, In Spite Of That Knowledge, They Represented That Wheeler Had Been Misquoted By Zimmerman In The Fox News Article Published on May 16***

57.    On May 15, 2017, Wheeler was in contact with Zimmerman multiple

times about the article Zimmerman was writing for Fox News.

**1.    *The First Email***

58.    At 1:20 p.m. on May 15, 2017, Zimmerman emailed Wheeler a "current

draft" of the article:

> From: **Malia Zimmerman** <maliamzimmerman@gmail.com>
> Date: Mon, May 15, 2017 at 1:20 PM
> Subject: small changes included - current draft
> To: Rod Wheeler <rod@rodwheeler.com>

---

[7]    In an audio recording published on YouTube on July 12, 2017, Wheeler claimed that Marraco had tricked him, that she took things out of context, that she did not "play" the whole tape of the interview, that he (Wheeler) did not know he was being recorded. [https://www.youtube.com/watch?v=2p8at6PD4L8].

59.     Wheeler received Zimmerman's email.

60.     Zimmerman's May 15 "current draft" contained the following words:

> Rod Wheeler, a former DC Homicide police detective who now runs a private detective firm and was hired to investigate Rich's murder, said he too uncovered substantial evidence and information that led him to believe the connection between Rich and Wikileaks.

61.     Zimmerman's May 15 "current draft" attributed the following quotes to Wheeler:

> "My investigation up to this point shows there was some degree of email exchange between Seth Rich and Wikileaks," said Wheeler, who also is a Fox News contributor.

> "My investigation shows someone within the DC government, Democratic National Committee or Clinton team, is blocking the murder investigation from going forward," Wheeler said. "That is unfortunately. Seth Rich's murder is unsolved as a result of that."

62.     Wheeler did not deny the quotes or object to anything Zimmerman had written in the "current draft".

63.     Wheeler was actively involved in supplying information to Zimmerman. Far from denying **_anything_** in the May 15 "current draft", Wheeler offered Zimmerman **_further_ quotes**, including the following:

> Here is another quote you may want to consider using "I sincerely believe that there is an underground culture of corruption that exist within the confines of the nations capital that includes quite possibly the crime of murder. It's time that the FBI immediately conduct a full and thorough investigation  to not only the death and who caused the
>
> death of Seth rich but those that he was involved with and others regarding the Democratic national committee."

64.     Wheeler did not inform Zimmerman that ___*any*___ of his quotes were inaccurate in any way.

65.     If he had objected to anything Zimmerman wrote, Wheeler had a duty to be truthful.   In good conscience, Wheeler should have informed Zimmerman of any inaccuracies.

66.     Wheeler knew Zimmerman and Fox were relying on Wheeler to be truthful and honest.    The quotes were either accurate or Wheeler was defrauding Zimmerman and Fox by his silence.

**2.    _The Second Email_**

67.     At 3:59 p.m. on May 15, 2017, Zimmerman emailed Wheeler a revised draft of the article.

68.     The subject line of Zimmerman's 3:59 p.m. email expressly advised and instructed Wheeler to "**<u>please read carefully</u>**" (emphasis added):

| | |
|---|---|
| **From:** | Malia Zimmerman <maliamzimmerman@gmail.com> |
| **Sent:** | Monday, May 15, 2017 3:59 PM |
| **To:** | Ed Butowsky; Rod Wheeler |
| **Subject:** | please read carefully |

69.     The revised 3:59 p.m. draft of Zimmerman's article made the following statement about Wheeler:

Rod Wheeler, a retired DC Homicide police detective who now runs a private detective firm and was hired to investigate Rich's murder, said he too uncovered evidence that confirms the connection between Rich and Wikileaks.

70.     The revised 3:59 p.m. draft of Zimmerman's article contained the following quotes attributed to Wheeler:

"My investigation up to this point shows there was some degree of email exchange between Seth Rich and Wikileaks," said Wheeler, who also is a Fox News contributor.

"My investigation also shows someone within the DC government, Democratic National Committee or Clinton team, is blocking the murder investigation from going forward," Wheeler said. "That is unfortunately. Seth Rich's murder is unsolved as a result of that."

71. After sending her email with the revised article, Zimmerman texted Wheeler via iMessage to confirm that he had received the revised article and that he could read it.

72. Wheeler confirmed that he had received Zimmerman's email and that he had read the revised article.

73. Far from denying *any* quotes attributed to him ***WHEELER OFFERED ZIMMERMAN FURTHER QUOTATIONS!!!***:



74. At no point in time did Wheeler ever deny making the statements quoted by Zimmerman. In fact, when Zimmerman asked Wheeler if she could use the quotes, Wheeler responded as follows:

75. Wheeler never hesitated, never equivocated, never prevaricated, and never denied the quotes.

76. Wheeler never attempted to correct, amend, clarify, or retract the quotes.

**3.** ***The Third Email***

77. At 4:47 p.m. on May 15, 2017, Zimmerman sent Wheeler a *third* email that included the final draft of the article. Zimmerman's email specifically advised Wheeler that the draft had been "turned in" to her editors:

| | |
|---|---|
| **From:** | Malia Zimmerman <maliamzimmerman@gmail.com> |
| **Sent:** | Monday, May 15, 2017 4:47 PM |
| **To:** | Rod Wheeler; Ed Butowsky |
| **Subject:** | draft turned in |

78. This was Wheeler's third and final chance to deny the quotes.

79. Wheeler made no attempt to stop the presses.

80. The final draft of Zimmerman's article, emailed to Wheeler at 4:47 p.m. on May 15, 2017, contained the following quotes attributed to Wheeler:

"My investigation up to this point shows there was some degree of email exchange between Seth Rich and Wikileaks," said Wheeler, who was hired to investigate Rich's murder. "I do believe that the answers to who murdered Seth Rich sits on his computer on a shelf at the DC police or FBI headquarters."

> "My investigation shows someone within the DC government, Democratic National Committee or Clinton team is blocking the murder investigation from going forward," Wheeler said. "That is unfortunately. Seth Rich's murder is unsolved as a result of that."

81.     In addition to the emails and text message exchanges, Wheeler confirmed verbally to Zimmerman that the article accurately quoted him, and Wheeler expressed his support for the story.  These statements occurred on conference calls several days before publication of Zimmerman's story, including telephone conversations that took place on May 10, 2017 (10:30 am), May 11, 2017 (9:52 am and 10:12 am), and May 15, 2017 (11:22 am and 1:13 am).

82.     Wheeler also confirmed verbally to Butowsky that he had independently formed the belief, before publication, that there were email communications between Seth Rich and Wikileaks.

83.     Prior to publishing false and defamatory statements about Butowsky, Wigdor knew about Wheeler's text messages and his email communications with Zimmerman on May 15, 2017 because he had received copies from Wheeler.

84.     In his blind desire to extort money from Fox, Wigdor intentionally and maliciously disregarded the very record before him.  Instead, disregarding even the advice of his own client, Wigdor fabricated a story that Butowsky colluded with the President, Spicer, Fox, Zimmerman and others to publish fake news about Seth Rich to distract from the "real" story – Russian collusion.  Wigdor thought that his false narrative would put so much pressure on Fox that Fox would settle the Wigdor Discrimination Suits (defined below) and pay Wigdor $60,000,000.00.

**H.** *Wigdor Knew About Wheeler's Representations To Hannity and Dobbs*

85.    On May 16, 2017, in the early morning, Fox published Zimmerman's story entitled, "Seth Rich, slain DNC staffer, had contact with WikiLeaks, say multiple sources".    The article included the quotes that Wheeler had approved. [http://web.archive.org/web/20170516133954/http://www.foxnews.com/politics/2017/05/16/slain-dnc-staffer-had-contact-with-wikileaks-investigator-says.html].

86.    Fox News tweeted Zimmerman's story to its 16 Million followers:



87.     On May 16, 2017 – **after publication of Zimmerman's article** – Wheeler appeared on Fox News and was interviewed by Sean Hannity ("Hannity"). [https://www.youtube.com/watch?v=CuRJDKEVxHY].

88.     Wheeler once again expressly confirmed that Seth Rich had communicated with WikiLeaks:

> "HANNITY:          The timeline is fascinating here. As I played in the last segment, Julian Assange I asked him repeatedly on radio and television if Russia was involved, absolutely not. Now believe him or not, he's the guy at WikiLeaks who has an 11-year history of never being proven wrong … I guess my question is when you look at the timeline of this, and 12 days after he was killed it shows up on WikiLeaks, what did you discover in terms of the contacts with WikiLeaks?

> WHEELER:          Right, well that is an excellent question and let me clear that up right now exactly what it was that I found. Now I have never seen the emails myself directly I haven't even seen the computer that Seth Rich used. Here is the problem with all of this: I don't even know where the computer is. I checked with the police department. They said they don't know where the computer is and the FBI they say they don't have the computer. Now, where did this information come from in terms of knowing or believing, I should say, that Seth Rich could have been in communications with WikiLeaks. There was a federal investigator that was involved on the inside of the case, a person that is very credible. And I'll tell you, let me just say this Sean, I don't like to suggest things without saying the person's name, but I can't say that person's name because that person would be thrown under the bus. And I can't do that, but **this person we checked him out, we had to check him out, very credible. He said he laid eyes on the computer, and he laid eyes on the case file, and he came across very credible. When you look at that with the totality of everything else I've found in this case, it's very consistent for a person with my experience to begin to think well perhaps there were some email communications between Seth and WikiLeaks. Everytime I talk to the police department though Sean, everytime I talk to the police department about the WikiLeaks or the emails, it's automatically shut down. That discussion is automatically shut down**.
> …

(Emphasis added). Wheeler never once informed Hannity that Butowsky, Zimmerman or Fox had misquoted him. Wheeler never claimed that Fox, with Butowsky's support, had

"fabricated" quotes or that the Zimmerman article was "fake news". Wheeler went on to tell Hannity that:

> "[i]f this is just a murder investigation, first of all why would the FBI be involved? The only reason the FBI would be involved just so that the viewers understand is if this has some degree of national exposure, meaning because maybe it is related to the DNC. We don't know that. We don't know that for sure. It could have been a botched robbery, but my point is this Sean and I've been investigating murders for a while you have to look at every possibility you can't just look at one thing say well that has to be it … But here is the thing, and this is so important, there has been a $125,000 reward out for information pertaining to the death of Seth Rich. Not one person has come forward. Here is one other thing that is going to be startling and I'm just going to say this right now. I reached out to the police department way back in March when the family first hired me right to get involved. I didn't hear anything from the police department for 2-3 days. Guess what I leaned yesterday [May 15, 2017] from the family of Seth Rich? The police department did not call me back because someone, a high-ranking official at the DNC, check this out, a high-ranking official at the DNC, when I called the police department. They got that information and called the Rich family wanting to know why was I snooping around?
>
> …
>
> I don't know for sure. **I don't know as a matter of fact if the emails went out to the WikiLeaks or anybody else, but <u>it sure appears that way</u>**."

(Emphasis added). Prior to June 27, 2017, Wigdor knew all about Wheeler's appearance on Hannity, just like he knew about Wheeler's appearances on Fox 5 DC and his on-air statements to Marraco, and the admissions in Wheeler's extensive text and email communications with Zimmerman. Wigdor knew that Wheeler – who held himself out as a seasoned DC homicide investigator – confidently opined that it "sure appears" there were email communications between Seth Rich and WikiLeaks.

89. Wigdor also knew that Wheeler had disclosed to Zimmerman what the Rich family had said. In text messages on May 15, 2017, Wheeler expressly advised Zimmerman as follows:

"Joel [Rich] said that when I called the police department, right after that Donna Brazile called him and was asking him why I was snooping around asking questions about death of Seth and his working relationships at the DNC. **I was startled to learn that Donna Brazile even knew that I reached out to the police department**. So basically, when I called the police department that information was automatically given to Donna Brazile and she called Joel wanting to know why I was inquiring about Seth relationships at the DNC. **As a police investigator that automatically makes me think that Donna Brazile is in a category of persons of interest as it relates to the death of Seth Rich.** I also spoke with another source who informed me that not only was Donna Brazile snooping around wanting to know what I was learning with regards to the DNC and Seth Rich, but also **I was told that Debbie Wasserman Schultz was snooping around wanting to know how much it was I [sic] learning**."

"I just read the email you sent. **Joel [Rich] informed me that Donna Brazile called him not the police department asking why I was snooping around**. My question is how did she know I called the detective so quick."

(Emphasis added).

90.     On May 16, 2017, in addition to Hannity, Wheeler appeared on Fox Business with Lou Dobbs ("Dobbs") to discuss the Seth Rich murder investigation. [https://www.youtube.com/watch?v=2tqckO7bBjk].  Dobbs asked Wheeler about "this federal investigator, we're in an unusual situation, an FBI forensic report showing 44,000 emails 18,000 attachments, that approximates just about what was released by WikiLeaks … do you think that is a coincidence?"  Wheeler replied without hesitation,

"WHEELER:         No, I actually don't think it's a coincidence… his information that he shared with Fox News is pretty consistent with everything else I've been learning including the fact that right now no one seems to know where the computers are that belonged to Seth Rich, the computers obviously were confiscated at some point."

When Dobbs asked about the claim that DC detectives were told to "stand down", Wheeler stated:

WHEELER:        And that is a claim I actually heard myself from a detective, who said 'Rod we were told not to investigate this fully'.  Now see that's interesting because that is consistent with what this federal investigator said.  The federal investigator never knew Lou, that I had heard from a detective in the police department to stand down.  Well if this guy says the same thing, you have to start saying to yourself well maybe there is some truth behind this.  So, that's why I think when you look at the totality of everything we have right now it is very consistent with what this federal investigator has said.

…

We also don't have body cameras that I know police officers were wearing on the scene the night in which Seth was killed.  That's a problem because we know for a fact those officers had on body cameras.  No one knows where the video is.  I think we are going to have to continue to look at this case and hope more will come out as time goes by Lou."

91.     No one made Wheeler talk to Fox 5 DC correspondent, Marina Marraco.

92.     No one made Wheeler confirm the accuracy of his quotations to Zimmerman … three (3) times.

93.     No one made Wheeler go on Hannity or Dobbs.[8]

---

[8]     As was well-known to Wigdor prior to publication of the false and defamatory statements at issue in this action, Wheeler made repeated positive statements to multiple people, and then, in less than 48 hours, claimed that his own statements were fabricated.  Wheeler did a colossal flip-flop.  **It was obvious to everyone that Wheeler was an incredible, unbelievable and unreliable source, whose veracity was seriously in question**.  Blake Hounshell, POLITICO Magazine's Editor-in-Chief, observed:



**I.**      <u>*Wigdor Knew That Wheeler Had A Strong Motive To Lie*</u>

94.      On May 16 or May 17, 2017, one or more members of Seth Rich's family or a spokesman for the Rich family threatened to sue Wheeler for violating the terms of his contract by speaking with Marraco, Zimmerman, Hannity and Dobbs. [*See* https://www.nbcnews.com/politics/justice-department/slain-dnc-staffer-s-family-orders-blabbing-detective-cease-desist-n762211].

95.      Counsel for the Rich family, Joseph A. Ingrisano, Esquire, of Kutak Rock, notified Wheeler that his "statements and actions have caused, and continue to cause, the [Rich] Family severe mental anguish and emotional distress. Your behavior appears to have been deliberate, intentional, outrageous, and in patent disregard of the Agreement and the obvious damage and suffering it would cause the Family." Ingrisano further advised Wheeler that his "improper and unauthorized statements, many of which are false and have no basis in fact, have also injured the memory and reputation of Seth Rich and have defamed and injured the reputation and standing of the members of the Family".

96.      Rich family spokesman, Brad Bauman ("Bauman"), also issued a public statement. Bauman emphasized that "[a]nyone who continues to push this fake news story after it was so thoroughly debunked is proving to the world they have a transparent political agenda or are a sociopath". "In either case, they should be taken off the air because they are either blind to the damage they are doing to a murder victim's family or don't care, showing a profound lack of judgement and common decency." [http://www.chicagotribune.com/news/nationworld/ct-seth-rich-slaying-conspiracy-20170520-story.html; https://www.thedailybeast.com/the-big-money-pr-war-over-seth-richs-death].

97.     The threats from the Rich family and Bauman provided Wheeler with a strong motive, self-interest and reason to backtrack and to distance himself from the quotes and statements he had made to Marraco, Zimmerman, Hannity and Dobbs.

98.     Wigdor knew that Wheeler's liability to the Rich family provided Wheeler with a motive to lie about Butowsky, Zimmerman and Fox.

99.     Wigdor also knew that there was significant conflict between Wheeler and Aaron Rich.  Wigdor knew that in a YouTube video recording (published July 12, 2017) Wheeler had accused Aaron Rich of obstructing the murder investigation by prohibiting Wheeler from making any inquiries about the "emails" on Seth Rich's computer. [https://www.youtube.com/watch?v=2p8at6PD4L8;  https://bigleaguepolitics.com/audio-rod-wheeler-explains-fox-news-fiasco-claims-brother-blocked-wikileaks-inquiries/]. BigLeaguePolitics.com summarized the audio tape of Wheeler's accusations of obstruction as follows:

> Wheeler said that brother Aaron Rich tried to block Wheeler from looking at Seth's computer, even though there could be evidence on it. "He said no, he said I have his computer, meaning him," Wheeler said. "I said, well can I look at it?...He said, what are you looking for? I said anything that could indicate if Seth was having problems with someone. He said no, I already checked it. Don't worry about it."
>
> Wheeler said that Seth's girlfriend told him that Aaron Rich had possession of Seth's cell phones, but Aaron denied it and said "we're not going to worry about the cell phones."
>
> Aaron also blocked Wheeler from finding out about who was at a party Seth attended the night of the murder.
>
> "All I want you to do is work on the botched robbery theory and that's it," Aaron told Wheeler, according to Wheeler's claim on the audio. Wheeler said that Seth's father Joel "does not appear to have any hidden agenda."

Aaron Rich's obstruction and refusal to permit Wheeler to investigate Seth Rich's emails caused Wheeler to conclude that there were, in fact, email communications between Seth Rich and Wikileaks.  Wheeler stated point blank, "**with everybody pushing back on this email thing in the family and they're so protective of the email, it leads me to think that <u>perhaps there were some communications between Seth Rich and Wikileaks</u>**." (Emphasis added).[9]  Wheeler confirmed that he recorded all of this in a "report", which Wheeler characterized as a "running resume" consisting of notes of "every discussion".

100.    The conflict between Wheeler and Aaron Rich and Wheeler's statements about the Seth Rich email communications with WikiLeaks should have caused Wigdor to seriously question Wheeler's veracity.  In light of the audio recording and Wheeler's "report", how could Wheeler deny the connection between Seth Rich and WikiLeaks? However, Wigdor had a predetermined agenda – to extort money from Fox with a fabricated story about Butowsky colluding with the President.  The truth – that Seth Rich was in communication with WikiLeaks – cut the legs out from under Wigdor's false narrative.  Wigdor was determined to squelch the truth.

**J.**     <u>*Wigdor Knew That Wheeler Back-Tracked 100% and Could NOT Be Trusted*</u>

101.    In an article published on May 17, 2017 at 12:42 a.m., BuzzFeed News quoted Wheeler as follows:

> "That story on Fox 5 last night was inaccurate," said Wheeler, a former DC homicide detective. "I don't even know where the computers are."

---

[9]     Wheeler's representations in the audio recording published in July 2017 are identical to the representations he made to Zimmerman.  Wheeler told Zimmerman that there was "some degree of email exchange between Seth Rich and WikiLeaks".

https://www.buzzfeed.com/claudiakoerner/the-private-detective-who-ignited-a-clinton-conspiracy?utm_term=.cmYQ8ZrbEz#.xr04N76J3z].

102.    On May 17, 2017 at 11:32 p.m., Fox 5 DC published an editor's note.  The note emphasized that what Wheeler told Fox 5 DC on camera on Monday, May 15, 2017 regarding Seth Rich's murder investigation is in "clear contrast" to his representations "over the last 48 hours".  Fox 5 DC pointed out that Wheeler "backtracked" completely on his assurances to Fox 5 DC and Fox News.  After Wheeler backtracked, Fox 5 DC attempted incessantly to communicate with him, but he did not return calls or emails.  On May 17, 2017, "just before our newscast, Wheeler responded to our requests via a telephone conversation, where he now backtracks his position and Wheeler characterizes his on-the-record and on-camera statements as 'miscommunication.'" [http://www.fox5dc.com/news/local-news/private-investigator-there-is-evidence-seth-rich-contacted-wikileaks-prior-to-death].[10]

## K.    *Wigdor Knew About Wheeler's Statement to FetchYourNews*

103.    After May 17, 2017, Wheeler continued to publish statements that should have caused Wigdor to doubt Wheeler's veracity.  Wigdor never once doubted Wheeler because Wigdor did not care whether Wheeler was telling the truth.  Wigdor disregarded the truth because Wigdor intended to fabricate and publish a story about collusion with the President and "fake news".  Wigdor swept Butowsky up into the false narrative.

---

[10]    Widgor had every reason to doubt Wheeler's veracity.  Wheeler's backtracking and lies were a matter of public record.  Wigdor intentionally and recklessly disregarded the truth when he deliberately republished Wheeler's false and defamatory statements about Butowsky and Fox.  Widgor advocated the false narrative out of a calculated desire to extort a $60,000,000.00 settlement out of Fox.

104.    On May 22, 2017, Wheeler released a statement concerning the death of Seth Rich that was published by Brian K. Pritchard, FetchYourNews.com. [http://fetchyournews.com/tag/rod-wheeler/]:



105.    In his written statement published by FetchYourNews, Wheeler publicly represented that Zimmerman's article was "**essentially correct** and worthy of further investigation". (Emphasis added).[11]  Wheeler's own statement reads:

---

[11]    Despite Wheeler's own words that the Fox News article was "essentially correct", Wigdor and Wheeler claimed that on May 16, 2017 Wheeler called Zimmerman and confronted her about the use of false quotations in the Fox News article.  Wigdor and Wheeler ginned up a story that Zimmerman told Wheeler that she would have the quotations removed from the article and, when they were not removed, that Zimmerman told Wheeler that she had been instructed by her bosses at Fox News to leave the false quotes in the story.  Wigdor and Wheeler made up facts out of whole cloth.  **If Wheeler was upset about purportedly fabricated quotes of a highly politically-charged nature being falsely attributed to him, why would he admit in a written statement on May 22, 2017 – a full *six days after* publication of the article on May 16, 2017 – that Zimmerman's story was "essentially correct and worthy of further investigation"???  In truth, Wheeler admitted to FetchYourNews on May 22, 2017 that Zimmerman's article was on the money.**

> Since accepting the request of the Rich family to assist them in this investigation, I have always been focused on one thing, and one thing only; finding out who is responsible for the death of Seth. I feel as if I was making good progress and getting very close to developing a motive. Further, I can say that I have developed what I believe to be persons of interest, that I essentially would like to talk to further regarding information that they may have surrounding Seth's death. I am of the personal opinion that the information/article reported by FoxNews Channel last Tuesday was essentially correct and worthy of further investigation. That is exactly why when I first heard of this new information developed by a FoxNews investigative journalist, I immediately called the DC Police to inform them.

106.    Rupert Murdoch's daughter-in-law, Kathryn Murdoch (wife of James Murdoch), worked for the Clinton Foundation and is a friend of the Clintons. [http://www.qdvm.org/kathrynmurdoch/].  Kathryn Murdoch is also an outspoken critic of President Trump.

107.    At Kathryn Murdoch's request, and for no other reason, Fox pulled Zimmerman's article.

108.    On May 23, 2017, Fox retracted the article with the following explanation:

"On May 16, a story was posted on the Fox News website on the investigation into the 2016 murder of DNC Staffer Seth Rich.  The article was not initially subjected to the high degree of editorial scrutiny we require for all our reporting.  Upon appropriate review, the article was found not to meet those standards and has since been removed.

We will continue to investigate this story and will provide updates as warranted."

[http://www.foxnews.com/politics/2017/05/23/statement-on-coverage-seth-rich-murder-investigation.html].

109.    On June 5, 2017, Wheeler appeared in an interview published on YouTube channel, *Crowdsource The Truth*. [https://www.youtube.com/watch?v=yDI0AFOHuNI]. At 17:30 of the video, Wheeler told the hosts that "I haven't walked back anything.  As a matter of fact, in my statement that I released a week ago, I mean I said then in my statement in writing that **I do believe that there was some communication between**

**Seth and WikiLeaks and I believe that based on common sense … and you know from information that we're getting from various sources.**" (Emphasis added).[12]

Wheeler also confirmed that he had hired an "attorney".

110.    On June 19, 2017, Wheeler made the following statements on YouTube channel, *Jamarl Thomas*:

> "what happened was the Fox 5 reporter, a woman named Marina Marroco, she reached out to me on that particular Monday.  She had been following the Seth Rich case herself for a while for Fox 5 … So, I had not read the actual report that was going to be released by the Fox News reporter on Tuesday, but I had heard there was going to be a report released.[13]  So the Fox 5 reporter asked could I give her a comment just a teaser, okay just teaser for the 10 o'clock news … I stepped outside from dinner literally … to give her a quick teaser.  Now she asked me about 3 or 4 or 5 questions before the camera guy could get set up.  Now the truth of the matter is that the camera guy was already set up and rolling if you will without me even knowing that we were being recorded and that's fine.  I mean I don't have a problem with that … So, she asked me, and this is important she said so you have information from a source that they have seen emails from Seth Rich computer?  And I said I think I said something yes, confirmed.  Now what did I mean by that?  I meant that it was confirmed by the Fox News reporter who had just told me about this guy, not that it was confirmed that I saw it with my own eyes.  So, I never really back tracked on anything.  The reporter from Fox News who told me yes it's confirmed that this guy that this guy saw the emails, okay and so basically what I did was repeated that but not once have I ever said I saw the computer."

[https://www.youtube.com/watch?v=er8PhSOk85s].   Wheeler confirmed that his work for the Rich Family was "done".  Wheeler stated that he declined to keep working on the Seth Rich murder case because "my family and me has [sic] taken so much of a hit in the media over the past couple of weeks.  To be honest, I've never had to deal with anything

---

[12]    This is the exact same thing that he said to Zimmerman and that she quoted in the May 16, 2017 Fox News story.

[13]    This is a patently false statement.  As evidenced by the emails and text messages on May 15, 2017, Wheeler **_had_** read Zimmerman's report.

like this before.  You know what I mean? … It takes a toll on you, so I decided I really

don't even want to be involved in this case anymore."

**L.**      _**Wigdor and Wheeler Concoct A Fake Story**_

111.    As of June 2017, Wigdor had filed and/or had threatened to file numerous

lawsuits against Fox, including, without limitation,

- _Ujkic v. Twenty-First Century Fox, Inc. et al._, Case 1:16-cv-09608
  (filed 12/13/2016);

- _Brown et al. v. Twenty-First Century Fox, Inc. et al._, Case 22446/2017E
  (filed 03/28/2017);

- _Blanco v. Twenty-First Century Fox, Inc. et al._, Case 1:17-cv-03017
  (filed 04/25/-2017);

- _Lee v. Twenty-First Century Fox, Inc. et al._, Case 1:17-cv-03835
  (filed 05/22/2017)

- _Farrow v. Twenty-First Century Fox, Inc. et al._, Case 1:17-cv-03836
  (filed 05/22/2017)

- _Hughes v. Twenty-First Century Fox, Inc. et al._, Case 1:17-cv-07093
  (filed 09/18/2017)

- _Gollohor v. Twenty-First Century Fox, Inc. et al._, Case 1:17-cv-08232
  (filed 10/25/2017)

(the "Wigdor Discrimination Suits").

112.    On or before June 5, 2017, Wigdor met Wheeler.  Wigdor and Wheeler

agreed, associated, mutually undertook, concerted and combined together for the

unlawful purpose of manufacturing claims of defamation against Butowsky, Zimmerman

and Fox.  Upon information and belief, the conspiracy was launched by a phone call.

113.    The purpose of the conspiracy was to extort a settlement of the Wigdor

Discrimination Suits by means of a threat to publish fake news.

114.   By fabricating a story about Fox colluding with the President to produce "fake news" about Seth Rich, Wigdor believed he could pressure Fox into a huge settlement.   Fox had made a bid to acquire shares of "Sky" – the British media conglomerate that delivers internet, television and mobile services to more than 22 million customers in the U.K., Ireland, Germany, Austria and Italy (Fox, which holds a 39% stake in Sky, announced in December 2016 its bid to purchase the remaining shares for $11.1 billion).   Wigdor knew that the British regulators were sensitive to "fake news".   Wigdor believed that Fox would pay him $60,000,000.00 to keep the fabricated story about collusion with the President quiet.   It was blackmail and extortion pure and simple.

115.   Wigdor propositioned Wheeler:   Wigdor agreed to pay Wheeler $4,000,000.00 from the proceeds of settlement of the Wigdor Discrimination Suits if Wheeler went along with a false narrative about Fox, the President, "fake news", collusion, and the Russians.

116.   Wigdor believed the made-up story was so salacious that the mere threat of publication of the false narrative would intimidate and coerce Fox into settling the Wigdor Discrimination Suits.

117.   Wheeler, who was broke and in financial *in extremis*, took Wigdor's offer and agreed to participate in the conspiracy.

**M.**     ***Wigdor Attempted To Extort Fox***

118.   Prior to June 23, 2017, in anticipation of a mediation of the Wigdor Discrimination Lawsuits, Wigdor prepared a draft of a complaint against Fox, Zimmerman and Butowsky.

119.    Wigdor planned to publish the unprivileged draft document to Fox at the mediation.

120.    Wheeler told Wigdor that he (Wheeler) had no evidence of any collusion between Butowsky and the President and not to include allegations of collusion in any complaint.  Wigdor intentionally disregarded Wheeler's advice and direction.  Wigdor included in the draft document salacious, scandalous and impertinent allegations about collusion, the President and "fake news".  Consistent with a common scheme and routine business practice, Wigdor drafted the pleading solely for its shock effect.  Wigdor intended to use the draft document in an attempt to extort a global settlement of the Wigdor Discrimination Suits from Fox at the mediation.

121.    In order make Wheeler's claim look like a "discrimination" lawsuit, so that Wigdor could interject the scandalous allegations about the President in the upcoming mediation, Wigdor and Wheeler falsified a claim of "discrimination".  Wigdor claimed that Wheeler was the subject of "discrimination" because "white colleagues [at Fox News] with comparable or inferior skills, expertise and experience have received more air time, made more appearances and been hired into full time positions".  The "discrimination" was factually and legally baseless and was inserted in the draft complaint for the improper purpose of extorting Fox.  Wigdor knew that Wheeler could not assert a Title VII "discrimination" claim because Wheeler had not filed a charge of discrimination or exhausted his administrative remedies with the Equal Employment Opportunity Commission ("EEOC").  The "discrimination" claim was pure sophistry.

122.    In July 2017, Wigdor and Fox engaged in a mediation.  Wigdor did not invite Butowsky or Butowsky's attorney, Harrison, to the mediation.

123.    At the mediation, Wigdor published the draft document to counsel for Fox

– DLA Piper, LLP.

124.    The unprivileged draft document falsely stated that Zimmerman, "with

knowledge and support of Butowsky, fabricated two quotations and attributed them to

Mr. Wheeler:

- 'My investigation up to this point shows there was some degree of email
  exchange between Seth Rich and Wikileaks,' said Wheeler.'

- 'My investigation shows someone within the DC government, Democratic
  National Committee or Clinton team is blocking the murder investigation
  from going forward,' Wheeler said. 'That is unfortunate. Seth Rich's
  murder is unsolved as a result of that.'"

125.    Wigdor knew these allegations were false. He knew, for instance, (a) that

Wheeler had made the statements publicly to Marraco, (b) that Wheeler had actually

confirmed the quotations three (3) times to Zimmerman in emails and text messages, (c)

that Wheeler had actually affirmed the substance of the quotations with Hannity and

Dobbs on May 16, 2017, and (d) that Wheeler had actually told FetchYourNews that

Zimmerman's story was "essentially correct".

126.    The unprivileged draft document made multiple additional false and

defamatory statements of fact of and concerning Butowsky, including that:

- Zimmerman, Butowsky and Fox had created fake news to advance
  President Trump's agenda.

- Butowsky and Zimmerman were not simply Good Samaritans attempting to solve a murder.[14]  Rather, they were interested in advancing a political agenda for the Trump Administration.

- Specifically, it was Butowsky and Zimmerman's aim to have Wheeler confirm that: (i) Seth Rich was responsible for the leak of DNC emails to WikiLeaks; and (ii) Seth Rich was murdered by a Democrat operative because he leaked the emails to WikiLeaks.

- Butowsky and Zimmerman were not in this alone.  Rather, they colluded with Sean Spicer, Steve Bannon[15] and Sarah Flores to shift the blame for the DNC hacks[16] from the Russians to Seth Rich in order to undermine reports of collusion between Russia and the Trump Administration.

- President Trump wanted Zimmerman's article published to help lift the cloud of the Russia investigation.[17]

- Simultaneous with baseless claims of nonpartisanship to British regulators, Fox was contriving with Butowsky and members of the Trump Administration to publish and disseminate fake news to affect politics in America.

---

[14]    Butowsky was not trying to solve the murder of Seth Rich.  The Rich family engaged Wheeler – not Butowsky or Fox – to help solve the murder.  Wheeler is the one who determined that Seth Rich's murder was **_not_** the result of a botched robbery.  Wheeler is the one who told Marina Marraco on camera that **he** had sources at the FBI who said there is information that could link Seth Rich to WikiLeaks.  "**Absolutely, yeah, and that's confirmed**".  These are Wheeler's own words.

[15]    Butowsky has not spoken with Steve Bannon in three (3) years.  Wigdor and Wheeler simply made this up to further their false narrative that the President was involved.

[16]    No one "hacked" the DNC servers.   Wigdor statements are patently false.  The files were too large to "hack".  In truth, emails and attachments were downloaded to a flash drive, not hacked. [https://consortiumnews.com/2017/07/24/intel-vets-challenge-russia-hack-evidence/].  **None of Wigdor's representations were true.  They constitute fake news wrapped in more fake news**.

[17]    Wheeler told Wigdor there was **_no evidence_** of any collusion between Butowsky, Fox and the President and not to include these allegations in any lawsuit.  Wigdor disregarded Wheeler's advice and pursued the false narrative.

- Because of Fox and Butowsky's "devious scheming" British regulators[18] have yet to provide a green light to Fox for the Sky takeover bid, and many U.K. politicians question whether Fox is capable of news dissemination in a fair and neutral manner.

- In falsely quoting Wheeler, Butowsky and Zimmerman attempted – through the publication of fake news – to accomplish what they had set out to do from the start: "solve the problem about Russians are the ones that gave the emails" and establish that "there was no collusion like trump with the Russians."

- Butowsky planned to extort journalist, Seymour Hersh, in an effort to save the May 16, 2017 Seth Rich story.[19]

127. As part of the extortion scheme, Wigdor notified Fox that he intended to

publish the unprivileged draft document or republish its contents to Ofcom – the

---

[18]     Butowsky never once communicated with the British regulators, and never advocated a position regarding Fox's bid for Sky.

[19]     In an audio recording published on July 11, 2017, Hersh stated:

"What I know comes off an FBI Report … The kid [Seth Rich was] … a nice boy, twenty-seven.  He was not an IT expert, but he learned stuff.  He was a data programmer … Here's what nobody knows … when you have a death like that, DC cops … have to get to the kid's apartment and see what you can find … so they get a warrant … They go in the house and they can't do much with his computer … They have a cyber unit in DC, and they're more sophisticated.  They come and look at it.  The idea is that maybe he's had a series of exchanges with somebody who's said 'I'm going to kill you, you motherfucker' … and they can't get in … So, they call the FBI cyber unit.  The DC … Washington Field Office is a hot shit unit … There's a cyber unit there that's excellent … The Feds get through and here's what they find.  This is according to the FBI Report … What the Report says is that sometime in late Spring … early Summer, he [Seth Rich] makes contact with WikiLeaks.  That's in his computer … They found what he had done.  He had submitted a series of documents … juicy emails from the DNC … He [Seth Rich] offered a sample, an extensive sample … of emails, and said I want money.  Later, WikiLeaks did get the password.  He had a … protected dropbox … He also, and this is in the FBI Report, he also let people know with whom he was dealing … The word was passed, according to the FBI Report, 'I also shared this box with a couple of friends, so if anything happens to me, it's not going to solve your problems' … WikiLeaks got access before he was killed."

https://www.youtube.com/watch?v=giuZdBAXVh0].     Wigdor completely disregarded Hersh's recorded statement.

communications regulation agency tasked with investigating Fox in connection with the Sky bid and issuing a report as to whether Fox had a "commitment to broadcasting standards".  Wigdor intended to use his fabricated story to argue that Fox was unfit, that Fox was a purveyor of "fake news".  Wigdor intended to argue that Zimmerman's article demonstrated Fox's willingness and determination to negatively influence the news agenda and the political process by knowingly generating and publishing "fake news to further its own political agenda."  Indeed, after Fox refused to be extorted by Wigdor, Wigdor acknowledged that he contacted British regulators in an attempt to influence them:



Wigdor Law
@WigdorLaw

Wigdor LLP sends Rod Wheeler complaint to UK's #Ofcom and Karen Bradley: scrutiny of #Fox's Sky bid continues.

9:27 AM · Aug 7, 2017

128.    Wigdor knew that publication of the false and defamatory statements about Butowsky, the President and Fox would cause an immediate and irreversible maelstrom of controversy.  Fox wanted to acquire Sky.  Wigdor threatened to scuttle the transaction if Fox did not pay up.

129.    To its credit, Fox refused Wigdor's extortive demands.

**N.**    ***Wigdor Leaked The Fabricated Story About Butowsky To Folkenflik/NPR***

130.    Wigdor was not deterred by Fox's refusal to give in to the $60,000,000.00 settlement demand.

131.    Instead of filing his complaint in a court of law, however, Wigdor did the unimaginable:   he leaked the fabricated story about Butowsky colluding with the President and Fox to main stream media ***prior to commencement of a judicial proceeding***.

132.    After he failed to convince DLA Piper to settle, Wigdor's goal was to use main stream media and the Internet as the ultimate hammer to extort and pressure Fox, to insult, embarrass and humiliate Fox, and, ultimately, to enrich himself and Wheeler.

133.    Wigdor's use of the press and Internet as an echo chamber multiplied the devastating effect of his defamation upon Butowksy.

134.    In July 2017 – after Fox refused to give in to his demands – Wigdor leaked the false statements to National Public Radio ("NPR").

**1.      *The Leaks To Folkenflik and NPR***

135.    Between July 24, 2017 and July 31, 2017, Wigdor leaked and published his unprivileged draft complaint and discussed its false statements with David Folkenflik ("Folkenflik"), media correspondent for NPR News.[20]

136.    At 7:23 a.m. on August 1, 2017 – before any courts were open – Folkenflik published an online article entitled, "Behind Fox News' Baseless Seth Rich Story: The Untold Tale". [https://www.npr.org/2017/08/01/540783715/lawsuit-alleges-

---

[20]      The selection of Folkenflik for leaking the false and defamatory statements was no coincidence.  Wigdor knew that Folkenflik had been a vocal critic of Fox for years, even writing a book about the network and its Chairman Rupert Murdoch entitled, "Murdoch's World:  The Last of the Old Media Empires." [https://www.npr.org/2013/10/21/238899506/inside-murdochs-world-a-peek-into-a-media-empire].

fox-news-and-trump-supporter-created-fake-news-story].  The Folkenflik article appears on NPR.org as follows:

> MEDIA
>
> # Behind Fox News' Baseless Seth Rich Story: The Untold Tale
>
> August 1, 2017 · 7:23 AM ET
> Heard on Morning Edition
>
> DAVID FOLKENFLIK

137.    In his article, Folkenflik republished Wigdor and Wheeler's false and defamatory statements in the unprivileged draft document.  Wigdor and Wheeler are liable for all of Folkenflik republications.

138.    The Folkenflik article quotes Wigdor as follows:

> "Rod Wheeler unfortunately was used as a pawn by Ed Butowsky, Fox News and the Trump administration to try and steer away the attention that was being given about the Russian hacking of the DNC emails," says Douglas Wigdor, Wheeler's lawyer.

Wigdor misrepresented to Folkenflik that Butowsky used Wheeler "as a pawn"; misrepresented that the "Trump administration" was involved, implying collusion; and misrepresented that there was an effort on anybody's part to "steer" "attention" away from the non-existent "Russian hacking of the DNC emails".  Wigdor's statements were all-around intentionally false.  Wigdor's published statements were calculated to support the now debunked fake news story of "Russian collusion".

139.    In his article, Folkenflik confirmed that he spoke with Spicer on Monday, July 31, 2017.  According to Folkenflik, Spicer stated:

"'Ed's been a longtime supporter of the president and asked to meet to catch up,' Spicer tells NPR on Monday night.

'I didn't know who Rod Wheeler was. Once we got into my office, [Butowsky] said, 'I'm sure you recognize Rod Wheeler from Fox News.'

Spicer says Butowsky laid out what had been found about the case. 'It had nothing to do with advancing the president's domestic agenda — and there was no agenda,' Spicer says. 'They were just informing me of the [Fox] story.'

Spicer says he is not aware of any contact, direct or not, between Butowsky and Trump. And Butowsky now tells NPR he has never shared drafts of the story with Trump or his aides — that he was joking with a friend.'"

Folkenflik confirmed in his article that the Rich family "torch[ed]" Wheeler because of his discussions with the press.

140.     Folkenflik's article represents that Wigdor had "filed" the lawsuit. Folkenflik concealed his collusive arrangement with Wigdor. Folkenflik concealed the fact that Wigdor filed the complaint ***after*** leaking and publishing a draft to Folkenflik and ***after*** Folkenflik and NPR had already written the story.

### a.     *The Sheer Breadth Of Folkenflik's Republication*

141.     The Folkenflik article was viewed by millions of subscribers to NPR.org. [*See* https://www.npr.org/about/press/NPR_Fact_Sheet.pdf (The total number of monthly unique visitors to NPR.org is 36.8 million. Monthly visits to NPR Digital Properties, including NPR.org and NPR apps exceeds 114.4 million)].

142.     People accepted Folkenflik and Wigdor's statements as though it were fact. Folkenflik's article, including the false narrative and defamatory statements fed to Folkenflik by Wigdor, was republished hundreds of times, with no fact-checking whatsoever, by other main stream media outlets and online newspaper publishers. [*E.g.,*

https://www.mediaite.com/online/fox-news-published-fabricated-quotes-in-seth-rich-conspiracy-according-to-lawsuit/;

http://kut.org/post/behind-fox-news-baseless-seth-rich-story-untold-tale;

http://www.wbur.org/npr/540783715/lawsuit-alleges-fox-news-and-trump-supporter-created-fake-news-story;

http://keranews.org/post/behind-fox-news-baseless-seth-rich-story-untold-tale;

https://ww2.kqed.org/forum/2017/08/02/lawsuit-claims-white-house-involvement-in-discredited-fox-news-story/;

http://boisestatepublicradio.org/post/lawsuit-alleges-fox-news-and-trump-supporter-created-fake-news-story#stream/0;

https://www.opb.org/news/article/npr-behind-fox-news-baseless-seth-rich-story-the-untold-tale/;

http://kzyx.org/post/behind-fox-news-baseless-seth-rich-story-untold-tale#stream/0;

http://www.wvia.org/blogs/npr-news/lawsuit-alleges-fox-news-and-trump-supporter-created-fake-news-story/;

http://www.cpr.org/news/npr-story/behind-fox-news-baseless-seth-rich-story-the-untold-tale;

http://wglt.org/post/lawsuit-alleges-fox-news-and-trump-supporter-created-fake-news-story#stream/0;

https://wfpl.org/behind-fox-news-baseless-seth-rich-story-the-untold-tale/;

https://www.wmfe.org/behind-fox-news-baseless-seth-rich-story-the-untold-tale/76249;

https://news.wbhm.org/npr_story_post/2017/behind-fox-news-baseless-seth-rich-story-the-untold-tale/;

https://www.hollywoodreporter.com/thr-esq/fox-accused-lawsuit-publishing-fake-news-at-donald-trumps-behest-1025708;

https://www.reddit.com/r/washingtondc/comments/6qw5z6/from_npr_behind_fox_news_baseless_seth_rich_story/?st=jc3nc6qp&sh=f8c35be4;

https://newrepublic.com/article/144200/meet-reporter-driving-fox-newss-biggest-craziest-stories;

https://www.memeorandum.com/170801/p30#a170801p30;

https://www.si.com/tech-media/2017/12/10/best-journalism-writing-reporting-2017-media-circus;

http://es.redskins.com/topic/414681-npr-behind-fox-news-baseless-seth-rich-story-the-untold-tale/;

https://thinklab.com/content/510254;

https://muckrack.com/davidfolkenflik/articles;

https://www.huffingtonpost.com/entry/fox-news-white-house-seth-rich_us_59809958e4b0d6e28a10cb6e;

https://mediaequalizer.com/brian-maloney/2017/08/cnn-gleefully-exploits-bizarre-lawsuit-filed-against-fox-news;

https://www.mediamatters.org/video/2017/08/01/CNNs-Brian-Stelter-explains-how-new-Seth-Rich-report-shows-the-connections-between-Fox-and/217471].      Print media, including *Vanity Fair*, also republished Wigdor's false and defamatory statements to NPR.      https://www.vanityfair.com/news/2017/08/white-house-fox-news-seth-rich

("'Rod Wheeler unfortunately was used as a pawn by Ed Butowsky, Fox News, and the Trump administration to try and steer away the attention that was being given about the Russian hacking of the D.N.C. e-mails,' Douglas Wigdor … told NPR.")].  Mediaite called the Folkenflik article a "bombshell NPR report":



143.    In addition to the Folkenflik article, NPR simultaneously broadcast and republished Wigdor's false and defamatory statements in a different format – to its *Morning Edition* radio audience.

144.    The NPR radio broadcast was heard by millions of people across the Country.  [*See* https://www.npr.org/about/press/NPR_Fact_Sheet.pdf (Weekly Listeners for all NPR Stations is 37.7 million.  Weekly Listeners for NPR Programming and Newscasts is 30.2 million)].

b.     *Abuse Of The Twitter Echo Chamber*

145.    On August 1, 2017, Folkenflik also published his article to a new target audience – **his *75,100* followers on Twitter**:



146.    Folkenflik's tweet, with the attached article, was retweeted 5,220 times and was liked 7,124 times…on August 1, 2017 alone.

c. ___Massive Republication Via Twitter___

147.    Folkenflik's article was republished on Twitter millions of times.   On August 1, 2017 **prior to 12:00 p.m. Noon (EST) alone**, the article was tweeted (*i.e.* published) by the following persons and many others:

- _NPR Politics_ – **2,930,748 followers**



- _NPR Business_ – **19,216 followers**
- _N/A_ – **8,505 followers**
- _Mark Memmott_ – **5,559 followers**
- _Steven D'Souza_ – **13,819 followers**

58

- *Donna Brazile* – **657,492 followers**

- *LiA* – **49,239 followers**

- *J.M. Berger* – **44,835 followers**

- *Jackson Proskow* – **37,347 followers**

- *91.5 KRCC* – **4,380 followers**

- *Muckmaker* – **67,438 followers**

- *Puppymnkey* – **142,686 followers**

- *Greg Pinelo* – **14,774 followers**

- *audie cornish* – **120,241 followers**

- *MiddleclassVote* – **3,825 followers**

- *John Adams* – **3,940 followers**

- *Diana Butler Bass* – **28,251 followers**

- *Michael Weiss* – **103,206 followers**

- *Veterans United March* – **3,089 followers**

- *Andy Kroll* – **16,921 followers**

- *The Gospel of Hemp* – **4,055 followers**

- *Sunbeams Are Free* – **2,281 followers**

- *Zeke Miller* – **206,497 followers**

- *Caroline O* – **311,000 followers**.

148.    One of the persons who republished (*i.e.,* retweeted) Folkenflik's tweet was Brian Stelter ("Stelter"), host of CNN's @ReliableSources and senior media correspondent for CNN.  Stelter had **552,000 followers on Twitter** as of August 1, 2017.

149.    Stetler retweeted Folkenflik's article to his 552,000 followers, stating:



150.    Many of Stelter's followers, including "Southern Highlander", replied to Stelter's retweet, further publishing the Folkenflik article to a steadily, ever-increasing massive audience:



151.   Donna Brazile – former Chair of the DNC – had **657,500 Twitter followers** on August 1, 2017:


**Donna Brazile** ✔
@donnabrazile

Fellow, Shorenstein Center, Harvard's Kennedy School. Former Chair, Democratic National Committee (DNC).

📍 Washington, DC   🔗 donnabrazile.com

**3,662** Following   **657,502** Followers

Ms. Brazile republished Folkenflik's article to her 657,500 followers as follows:



152.    Bauman – the consultant and spokesperson assigned to the Rich family by the DNC – republished Folkenflik's article to his **3,127 Twitter followers**. Bauman claimed that he was left "literally speechless" by the Folkenflik/Wigdor statements about Butowsky:



153. One of the broadest republications of the Folkenflik article occurred when

"Muckmaker" tweeted the article to his/her **67,000 followers**:

> **Muckmaker**
> @RealMuckmaker
>
> All the news,views,opinions and cartoons for the left because they're right!
> Follow Muck as he does battle with the Russian trolls and bots! #TheResistance
>
> ⊙ Montana, USA
>
> **68,286** Following   **67,335** Followers

Muckmaker republished the Folkenflik article multiple times on August 1, 2017,

including the following:



154.    One of Muckmaker's followers is Soledad O'Brien.  O'Brien had **796,570 Twitter followers** on August 1, 2017:



Within minutes of receiving Muckmaker's tweet at 5:29 p.m., O'Brien republished Muckmaker's tweet as follows:



O'Brien did no fact-checking. She believed every word of the fabricated story republished by Folkenflik. She believed the false narrative, as most did, as if it were fact.

O'Brien was so impacted by the falsehoods that she felt compelled to mass publish it to her 800,000 followers.

d.   ___Wigdor Joined In The Gang-Tweeting___

155.   On August 1, 2017 – before the Courts were even open – Widgor retweeted (republished) Folkenflik's tweet and Stelter's tweet to Wigdor's 400 followers. Wigdor's retweets were then retweeted and liked thousands of times:



Wigdor also encouraged his Twitter followers to listen to the NPR radio broadcast:



> **Wigdor Law** ⌄
> @WigdorLaw
>
> Listen to today's NPR broadcast discussing Rod Wheeler, @FoxNews, the White House & Seth Rich murder conspiracy: n.pr/2f40DtO
>
> > "Rod Wheeler unfortunately was used as a pawn by Ed Butowsky, Fox News and the Trump administration to try and steer away the attention that was being given about the Russian hacking of the DNC e-mails."
> >
> > -Douglas H. Wigdor, Founding Partner Wigdor LLP
>
> 9:38 AM · Aug 1, 2017

156.    Folkenflik was not done.   On August 1, 2017, Folkenflik republished Wigdor and Wheeler's false statements during an interview with PBS News Hour. [https://www.youtube.com/watch?v=FJvgHjisz8c].  Folkenflik, *inter alia*, confirmed that:

> "You have a guy [Wheeler] who basically is saying that Fox News as a news organization and a Trump backer [Butowsky] are working in concert to try to arrive at a preconceived narrative and story rather than simply following journalistic effort to figure out what the facts are."

157.    The PBS News Hour broadcast was watched by hundreds of thousands of viewers.  [*See*  https://www.pbs.org/newshour/press-releases/pbs-newshour-sets-record-growth-in-q1-2016 (According to Nielsen national ratings, NewsHour's P2+ average audience for February 2016 was 1,083,000)].

158.    PBS News Hour has a YouTube channel with over **540,000** subscribers. The Folkenflik interview was uploaded to YouTube and viewed over 10,000 more times.

159.    After August 1, 2017, Folkenflik gave further interviews in which he continued to push the false narrative created by Wigdor and Wheeler.  Folkenflik told

*Mediaite* columnist John Ziegler that "Butowsky's narrative is 'inconsistent'". Without a shred of proof, Folkenflik falsely repeated that "collaboration" between Butowsky and the President "is still a plausible assumption with the current evidence." [https://www.mediaite.com/online/david-folkenflik-very-hard-to-rule-out-white-house-involvement-in-seth-rich-conspiracy/].

### 2.   *Wigdor Wehrmacht*

160.    On August 1, 2017, after setting Folkenflik lose, Wigdor cranked up his own public relations wehrmacht, and began a blitzkrieg of defamation in main stream media, all of which was televised and broadcast in Texas.

161.    Wigdor and Wheeler appeared on MSNBC with Ari Melber ("Melber"). [https://www.youtube.com/watch?v=VFTdWAWrocQ].

162.    In addition to the millions of people who, upon information and belief, watched the MSNBC interview live, Melber republished the interview to his **38,262 Twitter followers** *and* to MSNBC's **1,975,316 Twitter followers**:



163.    In the interview with Melber, Wheeler made the following statements:

"That's right well I was asked to get involved in conducting an investigation, a murder investigation of Seth Rich and that why I got involved, so I could try and find out who killed this guy. During the course of my investigation, there was a lot of things that came up uh there was a lot of suspicious information that I was learning about possibly the DNC being involved to some degree, I don't know. What I decided to do was to take all my information and give it to the police department like you should do in any case and go from there. But halfway through the investigation and up the point this article was released by Fox, there were these quotes in there from me supposedly saying that I knew for a fact that Seth Rich the decedent had been in contact with WikiLeaks emailing them emails, that was not true.

…

I think uh well I know for a fact Ed Butowsky, who was the individual that was funding the investigation, he had been in contact with people from the White House and he was the one that was pushing this Russian hacking narrative, by the way that I didn't know a whole lot about because I wasn't you know trying to debunk a narrative or support a narrative I was trying to find a murderer.

I do know that, and Ed even admitted it himself. And I think the bottom line from all of this, Ari, is the reporter herself from Fox News she even admitted it that she lied and put those quotes in there. I mean she admitted that but at the same time to this day they have not retracted that as a result of those quotes and her story it's then damaged my credibility and my integrity."

When asked about Butowsky's May 14, 2017 text, Wheeler stated:

"Well first of all, I'm thinking why would the President have to review a story pertaining to a death, to the murder of a guy in DC, why would the President even be involved in this, but at that point, Ari, it was rather obvious to me that they actually lured me into this investigation.[21] They meaning this Fox News reporter and Ed Butowsky to substantiate this Russian narrative thing or to debunk that when in fact they told me that I was really getting involved just to solve a murder. All I want them to do is to correct the record, to tell the truth."

When asked about the "explosive allegations" in the complaint about the White House,

Wigdor stated:

---

[21]     Wheeler's statements to Melber are revealing. Wheeler clearly did not believe the President was involved in anything. And, if Wheeler knew "at that point" – May 14, 2017 – that he had been "lured into this investigation", **why did Wheeler continue to communicate with Zimmerman on May 15, 2017?** Wheeler did not tell *anyone* he was "lured" into *anything* until *after* publication of Zimmerman's article on May 16, 2017 and *after* Wheeler was threatened with litigation by the Rich family and Bauman.

"You don't need them, but it's the backdrop for why they defamed Rod. And you know it's really interesting because you read the statement by Fox they say that our claims are erroneous … **We are going to take discovery in this case. We are going to see the emails and the texts the phone calls or the visits to the White House between Ed Butowsky and President Trump and other people in the White House** and we are going to get even more information in the case and what's really amazing, last point, is that the General Counsel of 20th Century Fox … was in England trying to convince the regulators in England they should be able to purchase Sky and that they met the broadcasting standard by implementing new policies the day before this article came out."

(Emphasis added). Wigdor had no good faith basis to believe he was going to see emails, or text or phone calls between Butowsky and President Trump. These scandalous statements made to main stream media were solely intended to fuel the media frenzy created and stirred by Wigdor.

164. In addition to Twitter, the August 1, 2017 MSNBC broadcast was uploaded to MSNBC's YouTube channel – which has **689,000 subscribers**. The YouTube video was viewed over 117,000 times.

165. On August 2, 2017, Wigdor appeared on CNN with Wolf Blitzer, where he published the following false and defamatory statements about Butowsky:

"I watched that interview last evening with your colleague, Chris Coumo, and it was actually highly entertaining because much of what he [Butowsky] said made absolutely no sense. You know take for instance the text message that he sent to Rod Wheeler. He said that the President read the article. He wanted it out immediately and now he's trying to say that text was somehow a joke. I mean this was not a laughing matter. This was a text message. There was no emoji at the end of it. There was no smiley face. It wasn't a joke. Ed Butowsky, as he said in texts, was in conversations with the White House, with the President."

[https://www.youtube.com/watch?v=S2BafRHiuZY].

166. Wigdor's entire narrative regarding Butowsky's connection to the Administration, particularly the President, is knowingly false. Butowsky has never spoken to the President, nor has he claimed to have ever spoken to the President. Wigdor

intentionally disregarded Wheeler's advice that there was no evidence of collusion, failed to conduct any investigation, failed to interview a single person, and even disregarded Spicer's statements to Folkenflik that he (Spicer) was not aware of any contact between Butowsky and the President. It is axiomatic and obvious that "collusion", *i.e. between Butowsky and the President or between the Trump Administration and the "Russians"*, cannot occur if the people have never met or communicated. "Collusion", by definition, requires cooperation or agreement to act in concert. The suggestion that the President of the United States would have colluded with Butowsky – a person unknown to the President and with whom the President has never communicated – is preposterous. Wigdor knew that the representations were false, and Folkenflik shamelessly republished the obviously fake news.

167.    Wigdor recklessly and irresponsibly created and perpetuated a false narrative to further his goal of extorting Fox. Wigdor's actions were highly unethical, deceitful, fraudulent and unlawful acts of racketeering activity, clearly calculated to intimidate and injure Butowsky.

168.    In his interview with CNN, Wigdor further misrepresented:

> "Why do they want to attribute quotes to him that weren't true? And as we set forth in the complaint, the reason for that was because that the White House in conjunction with Fox wanted to steer the narrative away from the Russian hacking scandal and steer that towards Seth Rich, which is really a tragedy. I feel my heart really goes out to the Seth Rich family for being part of this.
> …
> What he [Wheeler] was hired to do was to do an investigation into the murder of Seth Rich, he wanted to do that, unfortunately he was used as a pawn in this case by Ed Butowsky and Fox News, he was used as a pawn again to steer away the narrative and that's all documented not only in text messages, but also in voice recordings, the case is strong and not only were the statements made in the May 16 article false but you also have Ed Butowsky and Malia Zimmerman admitting those quotations were false."

169.    The CNN/Wolf Blitzer interview was viewed live by hundreds of thousands of people, perhaps millions world-wide.  It was uploaded to YouTube by Wigdor and viewed at least 228 more times.

170.    Indeed, as part of Wigdor's defamation campaign, he regularly uploaded videos to his YouTube channel, *Wigdor LLP – Employment Lawyer NYC.* [https://www.youtube.com/channel/UCeogDStcI35nkzCJYNatVBQ].

171.    On August 3, 2017, Wigdor partner Christensen appeared with Wheeler on CNN with Chris Cuomo ("Cuomo").  [https://www.youtube.com/watch?v=d5L-NF6cDOo].  Wheeler published the following false and defamatory statements about Butowsky:

> "CUOMO:          Alright so let's get to some of the allegations and as you know we interviewed Ed Butowsky here.  He had some stiff responses and I want to get your response to his argument.  The main allegation in the lawsuit is that they used you to forward a lie essentially that they misquoted you, is that accurate?  Is that your argument here?

> "WHEELER:          That's exactly my argument, Chris … I really tried hard to find a murderer not to debunk a Russian narrative … And while I was in the process of trying to find that murderer behind the scenes what I did not know is that this reporter and this rich guy, Ed Butowsky, had another plan in mind and that's why they brought me into this thing and I realize that now. …

> As far as I'm concerned, this man [Butowsky] knew he was lying.  He's been lying the entire time. …

> We had this meeting [with Sean Spicer on April 20, 2017].  We met for about 10 -15 minutes and I'll tell you real quickly how the meeting ended:  Sean Spicer said, 'I'm not sure how I can help with this investigation'.  He said, 'Rod if you want to talk some more about this or maybe if you want me to put you in touch with somebody at the Justice Department'.  He gave me his business card … He also gave me his personal cell phone number … This is what he gave me, and he said if you need some more help give me a call.  I've never called Sean Spicer after that, but that's the truth and that's what happened.

CUOMO: … This is not the court of public opinion. In a court of law you only know what you show and you're going to have to demonstrate that Sean Spicer, if you're going to include the White House in a concocted story scheme, then you're going to have to show that they knew something about it and that they wanted to advance it and there is some merit to this suggestion the President of the United States had seen this article and wanted it advanced, do you have any proof to do any of that?

CHRISTENSEN: We just filed a lawsuit as you know on the first [of August] and … the defendants are entitled to answer and then we will proceed to discovery and we will obtain that information that we believe is out there and will prove Rod's story."

Wheeler's own words prove that the White House did not know and was not involved any scheme to publish "fake news". Christensen's words demonstrate that Wigdor published false statements without evidentiary support. The false accusation of collusion with the President, Spicer, Bannon, Flores, etc., was invented out of whole cloth. Wigdor republished the Christensen/Wheeler interview to Wigdor's Twitter followers:



172. On August 3, 2017, Wigdor told James Goodnow that "[i]t seems that Fox is a fake-news factory. It seems that they keep on putting out things to help the president, even if it's not true." [https://abovethelaw.com/2017/08/fire-fury-and-fox-news/].

Wigdor knew his statements would be republished by Goodnow and, indeed, Wigdor's words appeared in an *Above The Law* article published on August 11, 2017.

173.    On August 3, 2017, Wigdor wrote an eight-page letter to British regulators, in which he repeated the false and defamatory statements about Butowsky. [https://www.thedailybeast.com/fox-news-fake-news-could-doom-rupert-murdochs-dream].   Wigdor's letter to Ofcom, *inter alia*, states that "Butowsky's representations suggest something more than 'low' broadcasting standards.  His claims suggest a failure to adhere to any standards.  Fox must account for this failure and demonstrate why the public should have confidence in its commitment to broadcasting standards."

174.    On Tuesday, August 8, 2017, the New York Times published an expose entitled, "Fox Is Said to Have Declined to Settle Suits for $60 Million". https://www.nytimes.com/2017/08/08/business/media/fox-is-said-to-have-declined-to-settle-suits-for-60-million.html].   The article describes Wigdor's motive for defaming Butowsky.  The New York Times reported that:

> "At a confidential mediation proceeding in late July [2017][22], the lawyer Douglas H. Wigdor asked for more than $60 million to settle several disputes with Fox News and 21st Century Fox, according to two people familiar with the matter.  Mr. Wigdor proposed that the settlement be paid in a lump sum, giving him the discretion to distribute the payments, according to one of the people.
>
> Those cases included gender and racial-discrimination lawsuits against the company that Mr. Wigdor had filed on behalf of more than 20 current and former employees in the last several months and at least one explosive complaint that had not yet been made public.

---

[22]    It was at this mediation proceeding in July 2017 that Wigdor published the unprivileged draft complaint containing false and defamatory statements about Butowsky.  Wigdor published the statements in an attempt to extort a settlement of the Wigdor Discrimination Suits.

The company would not accept Mr. Wigdor's offer and no resolution was reached, said the people, who requested anonymity to discuss a confidential matter.  Mr. Wigdor's proposal to settle the disparate cases all together is considered unusual, as it is rare that there are multiple suits with the same lawyer against the same party.  Also, cases typically vary greatly in their merit, making them difficult to value as a group.

After mediation failed, Mr. Wigdor went public last week with that explosive case, filing a defamation and racial-discrimination lawsuit against 21st Century Fox and Fox News that focused on an article about the death of Seth Rich, a young aide for the Democratic National Committee.  The suit included accusations that the White House and a wealthy Trump supporter pushed Fox News to publish an article on its website as part of a scheme to end speculation about the president's ties to Russia.  Mr. Wigdor brought the suit on behalf of Rod Wheeler, a private detective involved in the case who said that Fox News had fabricated quotations from him in the article.  Fox News, which later retracted the article, has denied the claims."

The New York Times article further noted that within a week after filing the Wheeler lawsuit, Wigdor published "a letter to the British authority scrutinizing 21st Century Fox's $15 billion bid for Sky, a European satellite giant."

"In the letter, he [Wigdor] outlined evidence that he said showed that the company had not been transparent during the regulatory review; failed to adequately clean house after its harassment scandals; knowingly disseminated fake news, including the Seth Rich article; and did not live up to an earlier agreement to change its corporate culture.

The British Culture Ministry announced on Tuesday that it had written to the Office of Communications, or Ofcom, seeking clarification on its earlier review of whether the company had met British broadcasting standards.  In June, Ofcom ruled that Rupert Murdoch, executive chairman of 21st Century Fox, and other company executives were 'fit and proper' to hold broadcasting licenses in Britain, even as it concluded that the sexual harassment scandal at Fox News had amounted to 'significant corporate failures.'"

Wigdor told the New York Times that "[w]e went public with Rod Wheeler's complaint, and we did that because they [Fox] weren't willing to take certain steps that we thought were warranted.  Since we went public with it, of course we let Ofcom know about it."

Wigdor used the false and defamatory statements about Butowsky colluding with the

President and Fox as part of his war against Fox.  Butowsky was mere collateral damage to Wigdor.  At all times relevant to this action, Wigdor acted with reckless disregard for the truth, and to further his personal agenda – to get Fox and to retaliate against Fox because Fox spurned Wigdor's efforts to extort the $60 million settlement.  As evidenced by Wigdor's preconceived plan to extort Fox, his blatant disregard of Harrison's June 2017 letter, his conscious disregard of both Wheeler's texts, emails, recorded interviews, and statements, and the public record, his desire to get Fox and his willingness to manufacture fake news about collusion between Butowsky, Fox and the President, Wigdor harbored ill-will, spite, actual malice and a desire to hurt Butowsky.

175.    On August 8, 2017, Wigdor partner Willemin appeared live on "Make it Plain", and repeated the false and defamatory statements about Butowsky. [https://www.facebook.com/MakeItPlain/videos/10155724601497048/?hc_ref=ARQ_eG Fxdz7Z8iaysXagWN8LiJeuY9RU_0w0_y1CVKs3cxKPRfXuHnxegLDnvxNK-yw].

176.    On September 12, 2017, Wigdor appeared on BBC Television and gave an interview.  [https://www.youtube.com/watch?v=EQBRqKuLZt4].    Wigdor made the following statements:

> "The decision that Ofcom originally made was before we filed a lawsuit on behalf of Rod Wheeler.  It involved a very complicated set of facts, but the bottom line was that Fox News was creating fake news, and what you really have is you have the Murdoch empire from top to bottom, this isn't just Fox News, this is the New York Post, this is everything the Murdochs touch."

177.    On September 19, 2017, Wigdor spoke with CNN Media's Oliver Darcy ("Darcy").     [http://money.cnn.com/2017/09/19/media/fox-news-court-dismiss-lawsuit-seth-rich/index.html].    Wigdor made the following false and defamatory statements to Darcy:

"We are confident that our client will ultimately be vindicated in a public court of law that will expose how Fox and the individually named defendants created fake news in an attempt at diverting attention away from the Russian hacking scandal."

178.    On September 22, 2017, the New York Times published an article about Wigdor's war against Fox entitled, "Leading the Legal War Against Fox". https://www.nytimes.com/2017/09/22/nyregion/douglas-wigdor-fox-news.html].  Wigdor did not conceal his feelings for Fox: "My view of 21st Century Fox and Fox News is that from top to bottom there is a systemic culture of not only discriminating against people based on their gender and color, but also of retaliating against them when they stand up to voice complaints," he told the New York Times, reaffirming the harsh assessment of Fox. "Am I at war with Fox?" Widgor added, repeating a question he was asked. "Yeah, I guess I am."

179.    The New York Times noted that:

"Many lawyers are content to let their paperwork speak for them, but in the middle of his flurry of litigation, Mr. Wigdor opened a new and seemingly damaging front in his war against the network.  At his own expense, he flew to London in May to testify in front of British regulators who were trying to determine whether 21st Century Fox was 'fit and proper' to acquire the satellite broadcaster Sky.  Mr. Wigdor said it was not, making his case in a 167-page memo.[23]  Before flying back to New York City, he lobbed a last extralegal bomb at his antagonists.  In a series of interviews with the British media, he started referring to the network as '18th Century Fox.'

If all of this sounds personal, it is.  While Mr. Wigdor stands to make a fortune if his lawsuits are successful, he seems less interested in collecting contingency fees — he is already a wealthy man — than in pursuing what amounts to a crusade."

180.    On September 22, 2017, Bloomberg Businessweek published an article entitled, "The Trump-Loving Lawyer Who Won't Stop Suing Fox News". [https://www.bloomberg.com/news/features/2017-09-22/the-trump-loving-lawyer-who-

---

[23]    Wigdor's 167-page memo, upon information and belief, contains further false and defamatory statements about Butowsky.

[won-t-stop-suing-fox-news](#)].   The Bloomberg article captured Wigdor's malice and

disdain for "19th Century Fox".   Wigdor told Bloomberg Businessweek that "[w]hen we

write our complaints, there's an effort on our part to make it as colorful as possible.

We're writing in a way that puts the company on its heels.   Because we know that these

companies have multimillion [dollar] marketing resources.   Now we're suing this

company and trying to change the public perception."   The Bloomberg article observed

that:

> "In July, according to a report in the New York Times, Wigdor proposed in a
> mediation proceeding to settle all of the outstanding suits against 21st Century
> Fox for more than $60 million—a proposal Fox rejected. (Wigdor and Fox
> declined to comment on the negotiations.)  Shortly thereafter, on Aug. 1, Wigdor
> filed a seventh suit against Fox News.  This time his client was Rod Wheeler, a
> black contributor who said he'd been discriminated against by the network and
> that his reputation had been marred by his association with the manufacturing of a
> fake news story about Seth Rich, a young Democratic National Committee staffer
> who'd been murdered.

> The complaint read like a D.C. spy noir, rife with double-dealing and subplots.
> Among other things, it alleged that Fox News had colluded with members of the
> White House to gin up a bogus news narrative about Rich's murder, aiming to
> deflect scrutiny from the Trump campaign's contacts with Russian political
> operatives during the 2016 election.  Wheeler, an ex-homicide detective, claimed
> that quotes had been fabricated under his name in a FoxNews.com story that
> sought to bolster the ungrounded theory that it might have been Rich, not the
> Russians, who provided WikiLeaks with a cache of stolen emails from the DNC.
> The story has since been retracted.

> The White House denied the allegations in the complaint, as did Fox News
> President Jay Wallace, who called them "completely erroneous."  In a motion to
> dismiss, lawyers for the network have argued that Wheeler was 'neither
> misquoted nor defamed' and that, in any case, he was contractually bound to
> pursue such claims in arbitration, not court.  Even so, the wild, confusing
> allegations spawned countless news stories on both sides of the Atlantic—and, in
> the end, helped to persuade British authorities to nudge 21st Century Fox's
> pending acquisition of Sky deeper into the regulatory thicket."

Wigdor told Bloomberg that part of his "press strategy" was to go "on the TV news

circuit.  Sometimes he stages press conferences.  Often he grants in-depth access to a

single reporter from a prominent news outlet, on the condition that the story be embargoed until the day a suit is filed, when it can be set off like a firecracker."[24]

181.   On October 23, 2017, Wigdor appeared on CNBC's Closing Bell. [https://www.youtube.com/watch?v=KgmfpGdgaTg].   The following exchange took place concerning Fox's bid to acquire Sky:

> "CNBC ANCHOR:       I'm curious why you would be called to testify in this particular case.  This is about them being able to buy another company and whether or not they are fit to buy that company.  You're suing them.  Of course, you are going to say they are not fit.  You have an axe to grind here.
>
> WIGDOR:            That's a good question.  I'm glad you asked it actually because what they are trying to determine is whether Fox should purchase Sky, the Foxification of Sky.  Whether they meet broadcasting standards, whether or not they are fit and proper.  Believe it or not I have not told the competitions and market authority what they should or should not do.  I have not made any recommendations, but I feel obligated that I have a lot of information.  I have 22 clients and I believe in transparency … I'm giving them information.  They can do with that what they feel appropriate.
> …
>
> CNBC ANCHOR:       I'm coming off cynical here, but another part of me thinks, okay, you're doing this to gain leverage with the company because you're in negotiations with them.  You can use this as leverage with them, to get a better settlement, maybe you don't go [to England] the second time if you get decent settlements for your 22 clients.
>
> WIGDOR:            I'm just trying to represent my clients zealously under the under the auspices of the law.  I've never tried to use this in my negotiations with them … I represent Rod Wheeler in the Seth Rich murder fake news case.  I mean that goes to the very heart of broadcasting standards, and whether the British people want the Foxification of Sky is a serious issue for them to consider."

On October 24, 2017, Wigdor republished the CNBC interview to his Twitter followers:

---

[24]      Consistent with his business model, Wigdor used Folkenflik as rocket fuel to ignite a main stream media feeding frenzy.  Wigdor's "press strategy" was to put Fox on its heels in order to extort a settlement in the face of all the bad press.



**Wigdor Law**
@WigdorLaw

Douglas Wigdor on CNBC – Fox News Hits New Hurdle in Sky Deal – Bill O'Reilly Allegations – 10.23.17:
youtu.be/KgmfpGdgaTg?a via

Douglas Wigdor on CNBC – Fox News Hits New Hurdle in Sky Deal – Bill...
www.youtube.com

12:17 PM · Oct 24, 2017

182.    In addition to using main stream media and print media to harm Butowsky's reputation, Wigdor used Twitter and Facebook.

### 3.    *Wigdor Personally Used Twitter and Facebook To Harm Butowsky*

183.    Wigdor used his Twitter account, @WigdorLaw, to simultaneously republish to a new target audience – **Wigdor's 421 Twitter followers** – virtually every false and defamatory statement Wigdor ever made to main stream media and print media. [https://twitter.com/WigdorLaw?ref_src=twsrc%5Egoogle%7Ctwcamp%5Eserp%7Ctwgr%5Eauthor].   Wigdor also republished every television interview given on and after August 1, 2017.  Wigdor also retweeted and republished articles that contained false and defamatory statements about Butowsky. [https://www.thedailybeast.com/trump-told-fox-news-to-publish-seth-rich-murder-hoax-lawsuit-claims?via=twitter_page].

184.    Wigdor republished to his 112 public Facebook followers the false and defamatory statements made to main stream media and print media, including the statements he made to Folkenflik and republished by Folkenflik and NPR.

[https://www.facebook.com/WigdorLaw/].  Wigdor's Facebook posts were "liked" and "shared" by multiple third-parties.  Wigdor even thanked "Super Lawyers" for republishing his false and defamatory statements:



**4.** ***Wigdor Used His Own Website to Promote Defamation***

185.    In addition to Folkenflik, Twitter and Facebook, Wigdor used his own website to promote and republish false and defamatory statements about Butowsky.

[https://www.wigdorlaw.com/wheeler-case-involving-fox-news-trump-administration-seth-rich/].

186.    Wigdor's website republishes multiple false and defamatory statements about Butowsky, including the following oft-repeated quote:

> "Rod Wheeler unfortunately was used as a pawn by Ed Butowsky, Fox News and the Trump administration to try and steer away the attention that was being given about the Russian hacking of the DNC e-mails."

Wigdor's infamous quote, repeated hundreds of times by third-parties in articles, blogs, tweets and posts throughout the Internet, has been republished numerous times within the past two (2) years, including by Newsweek on March 29, 2018 in the following online article:



187. Wigdor's intention to extort Fox with the fabricated story about collusion with the President is exemplified by the picture Wigdor chose to publish and publicize on his website:



188. Wigdor and Wheeler's intentionally false and defamatory statements, republished by third-parties hundreds of times in the past year, have devastated Butowsky. His name and reputation have been globally impugned. Through millions upon millions upon millions of publications and republications, tweets and retweets, posts, likes and shares, Butowsky has suffered unimaginable insult, shame, humiliation and embarrassment.

189. In spite of Butowsky's efforts to get Wigdor to refrain from publishing and retract the false and defamatory statements, Wigdor refused.

## <u>COUNT I – DEFAMATION</u>

190. Butowsky restates paragraphs 1 through 189 of this Complaint and incorporates them herein by reference.

191.    Wigdor and Wheeler made and published to numerous third-parties –
including Folkenflik, NPR, main stream media, print media, Wigdor's Twitter followers
and subscribers to Wigdor's YouTube channel – false factual statements, which are
detailed verbatim above, of or concerning Butowsky.

192.    By giving interviews, appearing on television, uploading, posting,
tweeting and retweeting, Wigdor and Wheeler knew or should have known that their false
and defamatory statements would be republished over and over by third-parties millions
of times to Butowsky's detriment and injury.  Republication by main stream media, print
media and on social media was the natural and probable consequence of Wigdor and
Wheeler's actions and was actually and/or presumptively authorized by Wigdor and
Wheeler.  Wigdor and Wheeler are liable for the millions of republications of the false
and defamatory statements by third-parties.

193.    Wigdor and Wheeler's false statements constitute defamation *per se*.  The
statements accuse and impute to Butowsky the commission of crimes involving moral
turpitude and for which Butowsky may be punished and imprisoned in a state or federal
institution.  The statements impute to Butowsky an unfitness to perform the duties of an
office or employment for profit, or the want of integrity in the discharge of the duties of
such office or employment.  Wigdor and Wheeler's statements also prejudice Butowsky
in his profession or trade.

194.    Wigdor and Wheeler's false statements caused Butowsky to suffer loss
and injury to his business, insult, pain, embarrassment, humiliation, and mental suffering,
harm to Butowsky's name and reputation, and out-of-pocket loss.

195.    Wigdor and Wheeler acted with actual malice and reckless disregard for the truth for the following reasons:

a.    Wigdor disregarded the advice of Wheeler and, in breach of his fiduciary duties and professional responsibilities, promoted the pre-determined false narrative that Butowsky colluded with the President to create "fake news".

b.    Wigdor and Wheeler had a motive to lie about Butowsky, and a motive to fabricate charges collusion and "fake news".

c.    Wigdor and Wheeler concocted their scheme and manufactured false statements about Butowsky out of whole cloth in order to extort money from Fox and, in Wigdor's case, to scuttle the Sky deal and negatively impact Fox's stock price.

d.    The statements were knowingly false, with not a shred of supporting evidence.  In addition to Wheeler's advice and admonition that he (Wheeler) had no evidence that Butowsky colluded with the President and not to make any such allegations, Wigdor was in possession of Wheeler's email communications and text messages with Zimmerman, audio recordings on the Internet and other evidence that flatly and unequivocally showed the statements to be false.  Wigdor consciously and intentionally ignored the evidence.  He consciously and deliberately ignored Harrison's letter.  Wigdor chose to promote a predetermined false narrative that he knew would injure Butowsky.

e.    Wigdor and Wheeler chose to manufacture and publish false statements and use unnecessarily strong and violent language, disproportionate to the occasion.

f.      Wigdor and Wheeler did not act in good faith because, in the total absence of evidence, they could not have had an honest belief in the truth of their statements about Butowsky.

g.      Wigdor and Wheeler reiterated, repeated and continued to publish the false defamatory statements out of a desire to hurt Butowsky and Fox and with reckless disregard for the consequences.

h.      Wigdor and Wheeler initiated the defamation and went out of their way in the press and on social media to publish extra-judicial statements about Butowsky.

i.      Wigdor employed agents to digitally assassinate Butowsky's reputation.

196.    Wigdor and Wheeler lacked reasonable grounds for any belief in the truth of their statements and acted negligently in failing to determine the true facts.

197.    As a direct result of Wigdor and Wheeler's defamation, Butowsky suffered substantial damage and loss, including, but not limited to, pain and suffering, emotional distress and trauma, insult, anguish, stress and anxiety, public ridicule, humiliation, embarrassment, indignity, damage and injury to his personal and professional reputations, attorney's fees, costs, and other out-of-pocket expenses in the sum of $118,000,000.00 or such greater amount as is determined by the Jury.

## COUNT II – BUSINESS DISPARAGEMENT

198.    Butowsky restates paragraphs 1 through 197 of this Complaint and incorporates them herein by reference.

199.    Wigdor and Wheeler published false and disparaging information about Butowsky, which is detailed verbatim above.

200.    Wigdor and Wheeler knew their statements were false and acted with the specific intent to extort money from Fox and injure Butowsky.

201.    None of Wigdor or Wheeler's statements are privileged.  Wigdor and Wheeler had no right to publish false and disparaging information about Butowsky. Wigdor and Wheeler knew of the falsity of their statements and acted with wanton, intentional and reckless disregard concerning publication.  Wigdor and Wheeler acted with ill-will and they intended to interfere with the economic interests of Butowsky in an unprivileged fashion.

202.    Wigdor and Wheeler's statements and actions constitute business disparagement.

203.    Wigdor and Wheeler's business disparagement caused Butowsky to suffer and incur special damages, including loss of income and business and out-of-pocket expenses in the sum of $118,000,000.00 or such greater amount as is determined by the Jury.

## COUNT III – CIVIL CONSPIRACY

204.    Butowsky restates paragraphs 1 through 203 of this Complaint and incorporate them herein by reference.

205.    Beginning in June 2017 and continuing through the present, Wigdor combined, associated, agreed or acted in concert with Wheeler and with Folkenflik for the express purpose of injuring Butowsky in his business and reputation through the publication and republication of false and defamatory statements.  In furtherance of the

conspiracy and preconceived joint plan, Wigdor orchestrated a scheme the unlawful purpose of which was to defame Butowsky, disparage his business and destroy his name and reputation. Acting in concert with Wheeler and Folkenflik, Wigdor utilized the Internet and various main stream media outlets and social media properties to publish, republish and spread the defamation and character assassination.

206. Wigdor acted intentionally, purposefully, without lawful justification, and with the express knowledge that he was injuring Butowsky.

207. Wigdor joint actions with Wheeler and Folkenflik constitute a civil conspiracy under Texas law.

208. As a direct result of Wigdor's misconduct, Butowsky suffered damage and loss, including, but not limited to, injury to and loss of business, injury to his reputation, insult, pain, humiliation, embarrassment, mental suffering, attorney's fees, court costs, and other damages in the sum of $118,000,000.00 or such greater amount as is determined by the Jury.

## **COUNT IV – CIVIL RICO**

209. Butowsky restates paragraphs 1 through 208 of this Complaint and incorporates them herein by reference.

210. Butowsky has been injured in his business and property by reason of Defendants' multiple violations of Title 18 U.S.C. § 1962, described above.

211. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962, Butowsky suffered injury and loss of property in an amount to be determined by the Jury, but not less than $118,000,000.00.

212.    In accordance with 18 U.S.C. § 1964(c), Butowsky seeks threefold the damages he has sustained, the costs of this suit, and his reasonable attorney's fees incurred.

Butowsky alleges the foregoing based upon personal knowledge, public statements of others, and records in his possession.  Butowsky believes that substantial additional evidentiary support, which is in the exclusive possession of Wigdor, Wheeler and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Butowsky reserves the right to amend this Complaint upon discovery of additional instances of Wigdor and Wheeler's wrongdoing.

## CONCLUSION AND REQUEST FOR RELIEF

WHEREFORE, Ed Butowsky respectfully requests the Court to enter Judgment against Wigdor, Wigdor, LLP and Wheeler, jointly and severally, as follows:

A.    Compensatory damages, Punitive damages and Treble damages in the sum of $118,000,000.00 or such greater amount as is determined by the Jury;

B.    An Order imposing reasonable restrictions on the future activities of Wigdor, including, but not limited to, prohibiting this attorneys and law firm from engaging in the same type of endeavors as the enterprise engaged in;

C.    Reasonable attorney's fees;

D.    Prejudgment interest on the principal sum awarded to Butowsky by the Jury from June 23, 2017 to the date of Judgment at the maximum rate allowed by law;

E.   Postjudgment interest at the maximum rate allowed by Texas law;

F.   Such other relief as is just and proper.


**TRIAL BY JURY IS DEMANDED**


DATED:     July 31, 2019


ED BUTOWSKY,
In his Individual and Professional Capacities


By:___*/s/ Ty Clevenger*_____
Ty Clevenger, Esquire
Texas Bar No. 24034380
P.O. Box 20753
Brooklyn, NY 11202-0753
(979) 985-5289
(979) 530-9523 (Fax)
Email:  **tyclevenger@yahoo.com**

*Counsel for the Plaintiff*

Steven S. Biss (VSB # 32972)
300 West Main Street, Suite 102
Charlottesville, Virginia 22903
Telephone:     (804) 501-8272
Facsimile:     (202) 318-4098
Email:          **stevenbiss@earthlink.net**

*Of Counsel for the Plaintiff*
        *(Application for Admission Pro Hac Vice
        To be Filed)*

# EXHIBIT 29

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

Edward Butowsky, in his personal and
professional capacities,

    Plaintiff,

v.

Democratic National Committee;
CrowdStrike, Inc.; and

    Defendants

Case No. 4:19-cv-582

## <u>ORIGINAL COMPLAINT</u>

NOW COMES Edward Butowsky, the Plaintiff herein, alleging and stating as follows:

### <u>Introduction</u>

1.  The events in this case overlap with those in *Edward Butowsky v. Michael Gottlieb, et al.*, which is presently pending before this Court as Case No. 4:19-cv-180-ALM. The SECOND AMENDED COMPLAINT from *Gottlieb* is attached as Exhibit 1 and incorporated herein by reference.

### <u>Jurisdiction and Venue</u>

2.  This Court has jurisdiction under 28 U.S.C. § 1331 because the Plaintiff asserts federal claims.

3.  Venue is proper in this district and the Court has personal jurisdiction over all

Defendants because they participated in intentional torts that were designed to hurt the Plaintiff in Texas. Furthermore, all of the Defendants regularly conduct business in Texas.

## Parties

4. Plaintiff Edward Butowksy is a financial advisor who resides in Plano, Texas. He brings claims in his personal and professional capacities.

5. Defendant Democratic National Committee ("DNC") is a political organization headquartered in Washington, D.C. It regularly conducts business throughout the United States, including the Sherman Division of the Eastern District of Texas.

6. Defendant CrowdStrike, Inc. is an internet security company headquartered in Sunnyvale, California. It regularly conducts business throughout the United States, including the Sherman Division of the Eastern District of Texas.

7. Defendant Perkins Coie LLP is an international law firm and professional partnership with an office in Dallas, Texas.

## Facts

8. As set forth in the incorporated complaint from Gottlieb, the Defendants participated in the Russian collusion hoax ("RCH"), a conspiracy to frame their political opponents with false charges. At all times relevant, Brad Bauman was acting as an agent of the DNC. Furthermore, Defendant DNC retained Defendant Perkins Coie for the purpose of hiding the RCH behind the cloak of attorney-client privilege. In turn, Defendant Perkins Coie retained CrowdStrike for the purpose of creating the false narrative that the Russian government had hacked the DNC's servers.

9.  All of the Defendants herein conspired to advance the false narrative that Russians hacked the DNC servers. Furthermore, the Defendants or their agents conspired with former FBI Deputy Director Andrew McCabe, Deputy Special Counsel Andrew Weissman, and Washington, D.C. Mayor Muriel Bowser for the purpose of covering up Seth Rich's role in leaking emails from the DNC. Mr. Butowsky's injuries in *Gottlieb* were foreseeable results of the larger RCH conspiracy.

## Claims

### Defamation

10.  All previous paragraphs are incorporated herein by reference.

11.  Mr. Butowsky brings defamation claims against all Defendants because they, their agents, and/or co-conspirators published or conspired with others to publish false and defamatory statements about Mr. Butowsky as described herein and in the *Gottlieb* complaint. Mr. Butowsky does not assert defamation claims based on allegations made in *Aaron Rich v. Edward Butowsky, et al*.  As set forth in the *Gottlieb* complaint, some of the defamation claims are governed by New York law.

### Business Disparagement

12.  All previous paragraphs are incorporated herein by reference.

13.  Mr. Butowsky brings business disparagement claims against all Defendants because they, their agents, and/or co-conspirators published or conspired with others to publish false and defamatory statements about Mr. Butowsky as described herein and in the *Gottlieb* complaint. Mr. Butowsky's work is regulated by the Securities and Exchange Commission, and allegations of fraud or dishonesty can cost him his professional

licenses.  Likewise, the Defendants allegations of fraud and dishonesty have cost him the trust (and business) of approximately one third of his clients.  Mr. Butowsky does not assert business disparagement claims based on allegations made in *Aaron Rich v. Edward Butowsky, et al.*

**Malicious Prosecution**

14.  All previous paragraphs are incorporated herein by reference.

15.  Mr. Butowsky brings defamation claims against all Defendants because they, their agents, and/or co-conspirators prosecuted *Joel and Mary Rich v. Fox News Network, LLC, et al.*, Case No. 1:18-cv-02223 (S.D.N.Y.) and *Brad Bauman v. Edward Butowsky, et al.*, Case No. 1:18-cv-01191 (D.D.C.) with malice and without probable cause.  Claims arising from the New York case are governed by New York law, and claims arising from the D.C. case are governed by D.C. law.

**New York Judiciary Law § 487**

16.  All previous paragraphs are incorporated herein by reference.

17.  Mr. Butowsky brings claims under New York Judiciary Law § 487 against all Defendants because they, their agents, or their co-conspirators engaged in deceit and collusion during the prosecution of *Joel and Mary Rich v. Fox News Network, LLC, et al.*, Case No. 1:18-cv-02223 (S.D.N.Y.).

**Civil Rights Violations**

18.  All previous paragraphs are incorporated by reference.

19.  Mr. Butowsky brings claims against all Defendants under 42 U.S.C. §§1983 and 1985 because they, their agents, or their co-conspirators conspired with government

actors to violate the equal protection rights of the Plaintiff and to inhibit his right of access to the courts as guaranteed by the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, and the Fifth and Fourteenth Amendment Due Process Clauses.

## Civil Conspiracy

20.  All previous paragraphs are incorporated by reference.

21.  All of the Defendants aided and abetted the *Gottlieb* defendants' overarching conspiracy to defame, discredit, intimidate, and silence Mr. Butowsky, and they are fully liable for one another's torts and statutory violations.

## Request for Relief

The Plaintiff respectfully prays that upon a final hearing of this case, judgment be entered for him against the Defendants, for damages in an amount within the jurisdictional limits of the Court; together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate; back pay; costs of court; attorney fees; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

**THE PLAINTIFF DEMANDS A JURY TRIAL.**

Respectfully submitted,

**/s/ Ty Clevenger**
Ty Clevenger
Texas Bar No. 24034380
P.O. Box 20753
Brooklyn, New York 11202-0753
(979) 985-5289
(979) 530-9523 (fax)
*tyclevenger@yahoo.com*

**Attorney for Plaintiff Edward Butowsky**