UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AARON RICH,                                          Case No. 1:18-cv-00681-RJL
                                                    Honorable Richard J. Leon
Plaintiff,

v.


EDWARD BUTOWSKY,
MATTHEW COUCH,
AMERICA FIRST MEDIA,
Defendants.



## **OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL**




EDEN P. QUAINTON, ESQ. (D.C. Bar No. NY0318)
QUAINTON LAW, PLLC
1001 Avenue of the Americas, 11th Floor
New York, New York 10018
*Attorneys for Defendant Matthew Couch*

# **INTRODUCTION**

Plaintiff's Motion to Compel is based on two fundamental misconceptions.  First, Plaintiff seems to be laboring under the belief that it is <u>Defendant</u>'s burden to prove the truth of any allegedly defamatory statements.  This is obviously wrong.  It is <u>Plaintiff</u>'s burden to prove the falsity of any statements Plaintiff contends are defamatory.  Source material in Mr. Couch's possession does <u>not</u> go to the heart of any of Mr. Couch's allegedly defamatory statements: (1) that Aaron Rich participated or was in involved in the leak of emails to Wikileaks with his brother Seth, (2) that Aaron received payment for these leaks and (3) that Aaron interfered with the investigation into his brother's murder.  It is Aaron's burden to come forward with proof that these statements are false.  And despite Plaintiff's scorched earth litigation tactics, with subpoenas issuing in all directions to virtually anyone who has ever heard of Mr. Couch or Mr. Butowsky, and a team of at least 8 lawyers from two different law firms hunting down every email or text sent or received by virtually anyone with any connection to Defendants, it is the federal and local authorities, Julian Assange, or Aaron himself who possess the most probative physical evidence in this case.  Aaron also, of course, is the best source for his own and his brother's financial information and he knows exactly what he did or did not share with law enforcement and other witnesses.  The snide (and inaccurate) attacks on Mr. Couch as an "Internet provocateur" or a "conspiracy theorist" have nothing to do with the real issues in the case – whether Aaron was involved in leaking emails, whether he received payment and whether he interfered with any investigation – and are simply part of a long-standing strategy to discredit conservative media and cut off inquiry into the leak of DNC emails in the summer of 2016.

Second, Plaintiff is mistaken that independent journalists are not entitled to first amendment protection of their sources.  The First Amendment was written and adopted long before there were modern press associations or established media with the power of entities like the New York Times or the Washington Post, at a time of a great rough and tumble of competing ideas.  The idea that only a select few Brahmins anointed by an all-knowing Washington elite could qualify as "journalists" entitled to protection would have been anathema to the Framers of the Constitution.  Independent journalists such as Mr. Couch perform a vital function in the marketplace of ideas, notwithstanding Plaintiff's caricature of Mr. Couch as a disseminator of "fake news" that poisons debate.  Time and time again over the last several years, the public has witnessed the "established" "real" media miss or get stories completely wrong, from the Jesse Smollet hoax, to the slander of the Covington Catholic boys, to taking seriously the virulent attacks on Judge Kavanaugh as a serial gang rapist.  And time and again it has been the smaller, independent voices that have refused to swim with the tide and have kept the mainstream media honest.  Mr. Couch himself was one of the first to see through and publicly denounce the Jesse Smollet hoax, and it was through efforts such as his that the truth – that Mr. Smollet's elaborate anti-Trump tale was pure fabrication – eventually emerged.  The Seth Rich case has undoubtedly aroused passion on both sides of the political aisle.  But it would be a mistake and would do a disservice to the freedom of the press to decree that only one version of events – when what happened is the very thing to be established – may be published, debated, discussed.  When all is said and done, Mr. Couch will, as the name of his website indicates, ultimately be seen as the true patriot, willing to take on a legal juggernaut intent on silencing him.  For now, and for the reasons set forth below, the minimum the law requires is to provide him with a reporter's privilege, properly asserted here.

**LEGAL ARGUMENT**

I.      MR. COUCH IS ENTITLED TO ASSERT A REPORTER'S PRIVILEGE

Plaintiff disparagingly dismisses Mr. Couch as an Internet "provocateur" and conspiracy theorist who disseminates "fake news."   Plaintiff's Motion and Memorandum in Support of Motion to Enforce the Court's Order Requiring Defendant Couch to Produce Documents and to Remedy Defendant Couch's Refusal to Answer Questions During his Deposition ("Pl.'s Mot."), at 21; s*ee also id.* at 2 (Couch "purveyor of inflammatory clickbait"); 8 (Couch "merely" a "provocateur"); 18 (Couch an "Internet provocateur"), 20 (Couch "peddles[s] conspiracy theories").   These unsubstantiated, defamatory attacks in a public filing, not only with no evidence, but assuming and presenting as true the very thing to be proven in this lawsuit, push the limits of the litigation privilege to its extreme.

But Plaintiff's overblown rhetoric is also demonstrably false.   While Mr. Couch is Christian conservative, he is also a reporter who performs a valuable service in the marketplace of ideas.   *See* Declaration of Matthew Couch, dated January 17, 2020 (the "Couch Decl.") at ¶¶ 2, 10.   He has a solid background in mainstream radio journalism (as host of a weekday ESPN broadcast).   *Id.* at ¶¶ 3, 4.   He currently hosts his own podcast, the "Matt Couch Show," on which he has interviewed numerous prominent conservative political personalities who have also been interviewed on mainstream television.   *Id.* at ¶ 6.   He publishes his own independent content on the website, the DCpatriot.com, has full press credentials from a non-profit organization with millions of adherents and has been accredited to the White House press pool. *Id.* at ¶¶ 7, 11.   He has broken "scoops" in the past and was one of the first reporters nationwide to correctly identify the Jessie Smollet ("this is MAGA country") fabrications as a "hoax" at a time when mainstream outlets were still bending over backwards to protect a fellow member of the media elite.   *Id.* at ¶ 8.   Finally, the information over which source protection is sought was

obtained in the course of a legitimate investigative news gathering activity of seeking information on the connections between Seth Rich and Plaintiff and Wikileaks, a highly newsworthy, if controversial, topic. *Id.*

Independent reporters and bloggers perform a valuable social function in ensuring that the oftentimes monolithic "herd-mentality" of the professional journalism elite is kept honest and is forced to confront perspectives that are often uncomfortable to those in power. *See Protecting the New Media: Application of the Journalist's Privilege to Bloggers*, 120 Harv. L. Rev. 996, 997 (2007)(noting successful application of constitutional privilege to independent media); *see also Branzburg v. Hayes*, 408 U.S. 665, 725–26 (1972)(Stewart, J., dissenting)("reporter's constitutional right to a confidential relationship with his source stems from the broad societal interest in a full and free flow of information to the public. It is this basic concern that underlies the Constitution's protection of a free press, because the guarantee is not for the benefit of the press so much as for the benefit of all of us.")(citations omitted).

While the law surrounding the protection of independent reporters and bloggers is still being developed, courts have not hesitated to extend the reporter's privilege to figures like Mr. Couch. *See In re Jan. 11, 2013 Subpoena by Grand Jury of Union Cty.*, 432 N.J. Super. 570, 592, (2013)(holding blogger qualifies for "newspaperman's privilege" based on connection of activity to media, relationship to news gathering activity and nature of information obtained in the course of news-gathering activities). Plaintiff places great reliance on *Too Much Media, LLC v. Hale*, 206 N.J. 209, 235-56 (2011), in which the New Jersey Supreme Court held that posts on an online message board do not qualify for protection under the New Jersey Shield law. But message board posts are an easy case, since they provide, and are indeed <u>designed</u> to provide, a space for anyone, including members of the public with no possible claim to reporter status, to engage in casual conversation. *See Too Much Media, LLC v. Hale*, 206 N.J. at 235 ("by simply

entering text into a ready-made block on a message board website, anyone can post views and reply to comments posted by others").  In *Grand Jury of Union Cty.*, the Court read the *Too Much Media* opinion carefully and underscored the importance of protecting the fundamental public interest in the "ability of the news media to maximize the free flow of information to the public that might otherwise dry up if the newsperson's source were no longer confidential." *Grand Jury of Union Cty.*, 432 N.J. Super. at 577.  Other courts have also extended protection to non-traditional media outlets.  *See O'Grady v. Superior Court*, 44 Cal. Rptr. 3d 72, 100, 105 (Ct. App. 2006) (independent news-focused websites are entitled to protection of California's shield law).[1]

If an online message board open to anyone for casual "chatting" is an easy case for declining to apply a reporters privilege, Mr. Couch represents an easy case on the other end of the spectrum: Mr. Couch has an established background in mainstream media, has been credentialed as a journalist, makes his living as a professional news gatherer and reporter, publishes his own independent content, reports on a broad range of news-worthy topics, and acquired the information at issue here with the understanding it would remain confidential, meeting the tests set forth in *Too Much Media* and *Grand Jury of Union Cty.*, and, equally importantly, satisfying the underlying public policy behind protecting the confidentiality of sources and thereby encouraging the flow of information in the marketplace of ideas.[2]

---

[1] While the California Supreme Court has refused to extend *O'Grady* to online transactions involving electronically downloadable products, *Apple Inc. v. Superior Court*, 56 Cal. 4th 128, 150 (2013), the core holding of *O'Grady* remains good law in California and its underlying rationale was embraced in *Grand Jury of Union Cty.*

[2] *See also Obsidian Fin. Grp., LLC v. Cox*, No. CV-11-57-HZ, 2011 WL 5999334, at *5 (D. Or. Nov. 30, 2011) outlining the relevant criteria, which Mr. Couch satisfies.

Plaintiff's tendentious assertion that "demonstrable falsehoods" were never meant to be protected in the marketplace of ideas may be true in the abstract, but applied in the present case represents a dangerous, authoritarian spirit inimical to the Anglo-American tradition: whether Defendant's statements are true or false is the very thing to be proven in this lawsuit, and, indeed the very thing for which, as a matter of constitutional law, Plaintiff bears the burden of proof.  If Plaintiff could pre-emptively label Mr. Couch's statements as "demonstrable falsehoods" without a trial, without even a hearing, and on that basis deny him the right to protect his sources, the present proceedings would degenerate into an authoritarian style "show trial." Nothing in law, logic, or policy warrants endorsing such an extreme, anti-democratic position.

## II.     THE REPORTERS PRIVILEGE IS PROPERLY ASSERTED HERE.

Plaintiff's core argument for denying Mr. Couch the benefit of the reporter's privilege is that the information being withheld on source-protection grounds "goes to the heart of the litigation." Pl's Mot. at ¶¶ 3, 9, 21, 22, 23.  This is completely wrong. Plaintiff fundamentally misapprehends the nature of the present litigation.  Plaintiff alleges that Mr. Couch has defamed him by stating or suggesting, (1) that Plaintiff assisted or was involved with his brother Seth in transmitting emails to Wikileaks, (2) that Plaintiff, directly or indirectly, received payment from Wikileaks for the transmitted emails, (3) that Plaintiff interfered with the "investigations" into his brother's murder and (4) that Plaintiff had knowledge that Seth was in danger prior to his murder.  Complaint, ¶¶ 44, 50, 37, 5.  Under U.S. Constitutional law, the plaintiff in a matter of public importance has the burden of proving the falsity of Defendants statements.  *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 776 (1986) (even where plaintiff is a private figure and the matter is one of public concern, plaintiff bears burden of showing falsity, as well as fault, before recovering damages).  In the District of Columbia, where a Plaintiff seeks "presumed damages," as Mr. Rich does in his lawsuit, the plaintiff must also show actual malice or the

statement of a reckless or knowing falsehood. *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 86 (D.C. 1980). With respect to actual damages, the U.S. constitution also imposes an "actual malice" standard for actions brought by public figures, as the U.S. Supreme Court has held in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) and its progeny. In the present case, Plaintiff claims to be an "intensely" private person, Complaint at ¶ 3, but he has chosen, among other things, to make his case publicly, together with his attorneys, to a world-wide audience through the recently broadcast six-part Conspiracyland podcast produced by journalist Michael Issikof. *See* https://www.stitcher.com/podcast/yahoo-news/conspiracyland. Episode 6, at 19:41-20:23 (Aaron Rich commenting publicly on case).

In any event, the key point here is that the withheld source material has nothing to do with proving the truth or falsity of Mr. Couch's assertions. That is Mr. Rich's burden. As both the plaintiff in this case and the administrator of his brother's estate,[3] he is or must have been in possession of key relevant evidence, such as his brother's electronic devices and email accounts, his and his brother's complete bank and electronic payment records, his interactions with law enforcement, and records of his communications with potential witnesses. Not a single piece of this evidence – which does go to the "heart" of this litigation, together with information in the government's possession – is, or could possibly be, contained in the confidential source material Mr. Couch seeks to protect.

The cases Plaintiff cites illustrate the weakness of his position. *Carey v. Hume*, 492 F.2d 631 (D.C. Cir. 1974), in fact shows why the balancing of competing societal interests favors Mr. Couch. At issue in *Carey* was whether union headquarters had been burgled. *Carey*, 492 F. 2d at 632. Hume, the defendant/appellant, claimed to have eyewitness testimony that the headquarters had been

---

[3] This is a matter of public record. *See* https://eaccess.dccourts.gov/eaccess/search.page.3.1?x=u1t9BI97JsAJjhebLNxClw.

burgled. *Id.* at 633. The Court held that Hume had to divulge his eyewitness sources because "it would be exceedingly difficult for appellee to introduce evidence beyond his own testimony to prove that he did not, at any time of day or night over an indefinite period of several weeks, remove boxfuls of documents from the UMW offices." *Id.* at 636-637. But here, Mr. Couch is not suggesting that he personally observed Seth and Aaron transmitting emails to Wikileaks.

The best evidence for proving or disproving the claim that Aaron assisted or participated with Seth Rich in leaking emails would be Seth Rich's physical communications devices and his email and social media accounts – all of which Aaron Rich is far better placed than Mr. Couch to disclose – or government reports and data captures that raise separate issues discussed below. The best evidence that Mr. Rich did or did not receive payment would be Seth and Aaron's bank records, credit card statements, electronic payment records and other financial information. Mr. Rich's phone records and communications with other parties, such as Seth Rich's girlfriend, can establish whether Mr. Rich feared for Seth Rich's life; and the best evidence of whether Mr. Rich sought to restrict the private investigation into his brother's murder is the testimony of the allegedly pressured witnesses themselves, not anything in the possession of  Mr. Couch's sources.

Plaintiff's reliance on *Zerilli v. Smith*, 656 F.2d 705, (D.C. Cir. 1981), *disapproved of by Weinberger v. Maplewood Review*, 648 N.W.2d 249 (Minn. Ct. App. 2002) is curious, to say the least. *See* Pl's Mot. at 22. The *Zerilli* court not only *applied* the reporters' privilege to protect the disclosure of a confidential source, but also distinguished *Carey* on grounds that are equally applicable here.  *See Zerilli* at 713 (noting that the privilege was not recognized in *Carey* in part because the identity of the reporter's source was central to the plaintiff's proof). But the identity of Mr. Couch's sources is irrelevant to Plaintiff's burden of proof on falsity. Under the facts here, Plaintiff cannot meet his <u>own</u> burden of proof by asserting that Mr. Couch has the evidence Plaintiff needs to establish his case.

To the extent Plaintiff cannot prove his case because of ongoing federal and local criminal investigations, that is not Mr. Couch's fault, but Plaintiff's for bringing a case he knew he could not prove.  One of the central pieces of evidence in this case has to do with the contents and existence of an FBI report establishing that Seth Rich communicated with Wikileaks, transmitted emails and requested payment in return.  The existence of this report has been attested to by award winning journalist Sy Hersh, whose audio recording clearly describing the report Plaintiff himself has submitted to the Court. *See* Dkt. 94 2:4-5 ("what I know comes off an FBI report"), 11:10-14("he [Seth Rich] offered a sample, extensive sample. . .and said I want money"), 11:16-24 ("he said Wikileaks did get the password, he had a Dropbox, protected Dropbox, which isn't hard to do").

Mr. Couch's co-defendant, Edward Butowsky, has been diligently seeking access to the FBI report and recently obtained an admission from the government that the FBI had not searched in the location most likely to house the report. *See* Declaration of Eden P. Quainton, dated January 17, 2020 (the "Quainton Decl."), Ex. 1, at 29 ("However, a review of Mr. Hardy's Declaration indicates the FBI did not search for records regarding Seth Conrad Rich in CART or in the FBI's email system in its WFO [Washington Field Office].").  Mr. Butowsky has brought this issue to the attention of the relevant Justice Department authorities and has also offered to arrange for additional material evidence to be provided to the team of John Durham, U.S. Attorney for Connecticut who is conducting a criminal probe into the origins of the Russian investigation into the 2016 Trump campaign.  *See* Quainton Decl., Ex 2.  The additional material relates to evidence from a high-level NSA official and a government whistleblower who have indicated they are aware of additional information in the possession of government agencies relating to Seth Rich.  *Id.* at 1-2.  **This** is the evidence that goes to the heart of the case.  Such evidence would directly contradict what Aaron Rich has been saying publicly for several years –

that any Seth Rich/Wikileaks links is a politically-driven conspiracy theory – and would, therefore provide powerful circumstantial evidence of his own involvement.  Why else deny the claim so fervently if it is in fact true?[4]  Such evidence would also be critical in assessing whether Aaron withheld material evidence or had knowledge of any danger Seth Rich may have faced.

Indeed, this evidence is so critical it is difficult to see how the case can proceed at all with three pending criminal cases (the Durham investigation, the DOJ/Mueller indictment of Russian military intelligence officers,[5] and the Seth Rich DC murder investigations), all of which could reveal material evidence dispositive of the issues in the present case.

Be that as it may, at most, Mr. Couch's source information goes to the issue of actual malice or, if a lower standard is employed, of negligence.  But Mr. Couch's refusal to give up his source information does not <u>help</u> him in this regard, it affirmatively <u>hurts</u> him. The recklessness or reasonableness of his reliance on undisclosed source information will be more, not less, difficult to establish if he shields this information from scrutiny.  If Mr. Couch choses to put journalistic ethics above his own narrow self-interest as a defendant in a baseless lawsuit, he is to be commended, not criticized.

Of course, Mr. Couch has other means of establishing his absence of malice or reasonableness, should the case ever reach that point, beginning with the Sy Hersh audio discussed above, statements made to him by journalist Cassandra Fairbanks, expert testimony

---

[4] One of the two sources has indicated the government also possesses information relating to Aaron Rich.  See Quainton Decl., Ex. 2, at 2.

[5] It is important to note that the Russian defendants <u>must</u> be presumed innocent.  Robert Mueller himself has made this point publicly. *See* https://thefederalist.com/2019/07/11/doj-attorney-says-russian-government-nothing-troll-farms/("These indictments contain allegations, and we are not commenting on the guilt or the innocence of any specific defendant. Every defendant is presumed innocent unless and until proven guilty.")  While Mueller was speaking about the Russian troll farm case, the principle, uncomfortable as this may be for Plaintiff, is the same in the hacking indictment: there is not, <u>and cannot be</u>, any <u>proof</u> of the hacking stemming from Mueller's indictment.

expected to be presented demonstrating that the leak to Wikileaks must have been a local

download and could not have been a remote Russian hack, and the deposition testimony of Rod

Wheeler, who confirms that Aaron Rich directed witnesses not to discuss certain matters, a

portion of which is set forth on Quainton Decl. Ex 3, and as the extracts below indicate:

> Q. Okay. You mentioned some elements that, is it fair to say, would be inconsistent with wanting the case solved. And let me just give you a couple of them.
> When he would not give you the names of the people who attended the party that Seth Rich attended – that Seth Rich attended the night of his murder.
> Mr. Gottlieb: Objection.
> Witness: That was troubling.

Ex. 3, 399:12-20

> Mr. Quainton: Do you remember when – at the very outset of that conversation, was there anything she told you about the investigation?
> A.  With Kelsey?
> Q:  Yes. The first thing she said to me is, "I can't talk to you about anything related to his job," before I had said a word.  And I asked her why.  She said, "Because Aaron told me not to."

Ex. 3, 401:16-24

> Q:  Did she say anything about e-mails?
> Mr. Gottlieb: Objection
> The Witness: I didn't really ask about emails, because she said she couldn't talk about e-mails.  But I did ask about cell phones, because I didn't know Seth had a second cell phone until she told me.

Ex 3, 402:11-17

> Q. What did Joel say?
> Mr. Gottlieb: Objection.
> The Witness: Joel said to ask Aaron.  Aaron had the second cell phone. And that's when I asked Aaron, and that's when he was upset – and he told Joel, "He don't need to know about the second cell phone."
> By Mr. Quainton: When Aaron told Joel that you didn't need to know about the second cell phone, was that a conversation between you, Joel and Aaron?
> Mr. Gottlieb. Objection.
> The Witness: The best I can recall, it was, because they had a heated conversation.  Joel and Aaron did.  And I'm just listening to the conversation as an investigator.  I'm not saying anything. They're going at it.  "I told you" – this is what he said.  "I told you, don't be sharing that kind of information.  He don't need to know all of that."  And Joel screamed back, "He's the investigator.  He needs to know this thing."

Ex. 3, 404:2-24

> The Witness: . . .But there was something troubling and wrong with this whole – whole investigation. It just didn't feel right.

Ex. 3, 406:7-9

> Mr. Quainton: Did you meet Mr. Capone?
> A.  Yes.
> Q.  And when you met Mr. Capone, what did he say to you?
> Mr. Gottlieb: Objection.
> The Witness: He's a very nice guy.  The first thing he said is he couldn't talk about e-mails, before I even opened – before I even said "hello." He said, "We can't talk about emails."
> Mr. Quainton: Did he say why you couldn't talk about –
> A.  Because Aaron told him not to.

Ex. 3, 406:21-25 – 407:1-9

Aaron's burden is to explain the interactions described by Mr. Wheeler above.  He is after all, the Plaintiff, seeking not only money damages, but an injunction stifling Defendants' freedom of expression.  He and his lawyers routinely besmirch and degrade Mr. Couch and Mr. Butowsky, labelling Mr. Couch, without evidence, as an "Internet provocateur", Pl's Mot. at 2 and accusing him of being a "purveyor of inflammatory clickbait." *Id.*  While Plaintiff has received very favorable press, willing to take at face value and without asking any questions Plaintiff's statements that the Seth Rich/Wikileaks story <u>must</u> be a falsehood, <u>must</u> be a conspiracy theory, this is not the way things work in a court of law.  If Plaintiff wants to come into court with scorched earth tactics, he needs to remember that his own conduct is necessarily under scrutiny and he, not Defendants, must establish the falsity of the allegations he finds so troubling and has expended such energy to prevent from being explored.  In reality, Plaintiff's Motion to Compel, like Plaintiff's lawsuit itself, is nothing more than a bullying attempt to pry loose any and all information relating to Seth and Aaron Rich in the hopes that, if Plaintiff can effectively silence Defendants with his strong-arm tactics, all potentially damaging evidence will be permanently buried.  Plaintiff's attack on the reporters' privilege should not be enlisted in service of this goal.

III.     MR. COUCH HAS NOT WAIVED THE REPORTER'S PRIVILEGE

Plaintiff relies heavily on the argument that Mr. Couch has waived the reporter's

privilege, primarily by not raising it in his opposition to a prior motion to compel.  Pl.'s Mot. at

9-15.  As with other aspects of Plaintiff's motion, Plaintiff's reliance on this argument is

surprising, to put it mildly.  The central reason Mr. Couch did not raise the reporters' privilege

early is that he was a *pro se* defendant until recently, with a limited knowledge of legal arcana.

Quainton Decl. at ¶ 2.  Most notably, at the end of July, Plaintiff obtained an order from this

Court to compel compliance with discovery when Plaintiff had not provided Mr. Couch with an

opportunity to respond to the motion.  *See* Dkt. 76.  It is axiomatic that a defendant should have

an opportunity to be heard before an order is taken against him.  *Mathews v. Eldridge*, 424 U.S.

319, 333 (1976).  Mr. Couch subsequently learned that counsel for Plaintiff and counsel for Mr.

Butowsky had participated in an *ex parte* hearing in the Court's chambers during which the

Court reached its decision on the discovery motions.  Couch Decl. at ¶ 5.  It appears no effort

was made to inform the Court that Mr. Couch had not yet had an opportunity to respond to the

motion concerning him.  *Id.*  Under these circumstances, Mr. Couch cannot possibly have waived

his rights.[6]  *C.I.T. Corp. v. Carl*, 85 F.2d 809, 811 (D.C. Cir. 1936) ("Waiver requires intentional

relinquishment of a known right.")(internal quotation omitted).

Plaintiff's argument that Mr. Couch is using the reporter's privilege as a "sword" is also

completely wrong. Pl's Mot. at 12 -14.  As discussed above, Mr. Couch's protection of his

sources <u>hurts</u> his case.  He does not have to prove the truth of the alleged defamatory statements

and the only "value" of the statements in the present legal proceedings is to establish an absence

---

[6] Mr. Quainton promptly raised the issue with opposing counsel, even before he formally entered
an appearance. Quainton Decl. at ¶ 3.

of malice or reasonableness.  To the extent Mr. Couch is protecting the confidentiality of his sources or confidential interviews with his sources, he is doing precisely what a journalist is supposed to do, even if it works against his own self-interest.  It would be the height of unfairness to find that Mr. Couch is not a reporter because he does not meet the criteria set forth in cases such as *Obsidian Fin Grp*., *supra*, and then turn around say that his reliance on one of the key criteria is proof the privilege does not apply.  This is, of course, non-sensical.  Mr. Couch's confidentiality arrangements with his sources are an important aspect of his work as a reporter, as well they should be.  *See supra* at 4.

Plaintiff is right that the privilege attaches to the reporter not the source. Pl.'s Mot. at 14. However, a reporter's desire to protect the confidentiality requested by a source, if it works against his interest as a defendant in a civil defamation case, does <u>not</u> work against his reliance on a source privilege, it strengthens it.  If Mr. Couch acquired a reputation as a reporter who did not respect his sources' desire for confidentiality, he would be quickly out of business.

## **CONCLUSION**

For the reasons set forth above, Plaintiff's motion to compel Mr. Couch to disclose the content of his communications with his sources should be denied.

Dated January 17, 2020

/s/ Eden Quainton
EDEN P. QUAINTON, ESQ. (D.C. Bar No. NY0318)
QUAINTON LAW, PLLC
1001 Avenue of the Americas, 11th Floor
New York, New York 10018
Telephone: (212) 813-8389
E-mail: equainton@gmail.com
*Attorneys for Defendant Matthew Couch*

14