# EXHIBIT 3

1           THE WITNESS:  I'm sorry.  What was your

2      first name?

3  BY MR. QUAINTON:

4      Q.    Well, you said you asked him the

5  question.  And I believe the record will show that

6  you said you believed.

7      A.    What was your first name, though?

8      Q.    My name is Eden.

9      A.    Eden.  Okay, Eden.

10          Now, I asked him that question on the

11  telephone when he became upset about Malia's story

12  that was going to be published the following day.  I

13  called him and told him about the story that I had

14  just learned from Malia about this FBI source.

15          And he became upset about that, and then

16  that's when I asked him the question.  I said, "Man,

17  do you want me to solve this case?"  That's how I

18  asked that question to him.

19      Q.    What did you -- when you asked that

20  question, did you think he wanted the case solved?

21          MR. GOTTLIEB:  Objection.

22          THE WITNESS:  I thought he wanted the

23      case solved.  That's why I was involved.  I

24      thought that's why I was involved, in the first

25      place.



Page 399

1    BY MR. QUAINTON:

2         Q.    Okay.

3         A.    Because they wanted the case solved.

4    Maybe I was wrong.

5         Q.    Well, I think the record will reflect

6    that you said he, in fact, didn't want the case

7    solved.  I just wanted to --

8         A.    No, I never said he didn't want the case

9    solved, not Aaron Rich.  I never said Aaron did not

10   want the case solved.  I asked him, "Do you want me

11   to solve the case?"

12        Q.    Okay.  You mentioned some elements that,

13   is it fair to say, would be inconsistent with wanting

14   the case solved.  And let me just give you a couple

15   of them.

16              When he would not give you the names of

17   the people who attended the party that Seth Rich --

18   that Seth Rich attended the night of his murder.

19              MR. GOTTLIEB:  Objection.

20              THE WITNESS:  That was troubling.

21   BY MR. QUAINTON:

22        Q.    Why was that troubling?

23        A.    Because that's investigation 101, if

24   you're doing a murder investigation, to try to find

25   out the decedent's -- the individuals that was around



1    the decedent the final hours of his or her life.  You

2    want to see if maybe that had something to do with

3    them being killed.

4            For example, let's say Seth stepped on

5    someone's shoes at the party, and the guy said, "I've

6    had it with people stepping on my shoes.  I'm going

7    to kill the next person" -- you know what I mean?

8    And then he follows him from the party.  I'm just

9    using -- facetiously.

10           And then kills the guy four hours later.

11   I don't know.  Maybe they got into a beef.  And I

12   even asked Kelsey this.  This is in the record.  You

13   know, "Was he seeing another woman?"

14           (Reporter clarification.)

15           THE WITNESS:  Okay.

16           Was Seth seeing another woman, or

17       something.  And maybe the other woman was at the

18       party, and her boyfriend.  Anything.

19           I mean, I'm looking for a reason as to

20       why somebody would want to take this man's life.

21       So I just need to know who was at the party so I

22       can see -- find out what was going on at the

23       party.

24           But the person -- his brother, Aaron,

25       said, "No, I can't tell you who was at the



Page 401

1        party."

2               MR. GOTTLIEB:  Sorry.  I objected to the

3        previous question.  It's just not showing up on

4        the bulletin.

5    BY MR. QUAINTON:

6        Q.     And I believe you testified that you had

7    one conversation with Kelsey Mulka; is that correct?

8               (Reporter clarification.)

9               MR. QUAINTON:  Mulka, M-u-l-k-a.

10              THE WITNESS:  To the best of my

11       recollection, Eden, it was one conversation.

12       Now, we could have spoken on the telephone prior

13       to meeting, but I don't recall that conversation

14       at this time.

15   BY MR. QUAINTON:

16       Q.     Do you remember when -- at the very

17   outset of that conversation, was there anything she

18   told you about the investigation?

19       A.     With Kelsey?

20       Q.     Yes.

21       A.     The first thing she said to me is, "I

22   can't talk to you about anything related to his job,"

23   before I had said a word.  And I asked her why.  She

24   said, "Because Aaron told me not to."

25       Q.     Did you follow up on that question?



Page 402

1       A.      No.   She said she couldn't talk to me

2   about his job.  I just wanted to know why.  I mean,

3   look, this is the worst case I've ever had to get

4   involved with, I'll be honest with you.

5              I didn't know if his death was related

6   to his job.  You know, people have problems on the

7   job, and they carry it to the street, and they kill

8   each other.  It happens all the time.  So that's what

9   I was trying to figure out.  But she said she

10  couldn't say anything about his job.

11      Q.      Did she say anything about e-mails?

12              MR. GOTTLIEB:  Objection.

13              THE WITNESS:  I didn't really ask about

14              e-mails, because she said she couldn't talk

15              about e-mails.  But I did ask about cell phones,

16              because I didn't know Seth had a second cell

17              phone until she told me.

18              Now, there was somewhere in the record

19              where it was mentioned earlier that he had a

20              second cell phone.  But she reminded me of that

21              fact.  And I wanted to know, why did he have to

22              get -- he got the second cell phone a week

23              before his death.

24              Okay.  Now, as an investigator, I need

25              to know, why did he have a need to get a second



1       cell phone with a different telephone number?

2       Something is going on here.

3               Is somebody calling him?  This is what

4       I'm thinking.  I'm speculating as an

5       investigator.  Is he receiving threatening

6       telephone calls?  Those types of thing.

7               So I asked her.  I said, "Why did he

8       have to get a new cell phone?"

9               And she said, "I don't know."

10              "Was he receiving any threats on his old

11      phone?  Was his old phone broke?"  People get a

12      new cell phone if you break your --

13              She said, "No.  Nothing was wrong."

14      That's a little strange.  So that's basically

15      what that was about.

16              MR. GOTTLIEB:  Objection to the second

17      half of the answer as nonresponsive to the

18      question.

19  BY MR. QUAINTON:

20      Q.    Did you ever find out why he got a

21  second cell phone?

22      A.    No.  And I asked Aaron about it, and

23  Aaron said, "Don't worry about it."

24      Q.    Did you ask anybody else about the

25  second cell phone?



Page 404

1      A.      Joel.

2      Q.      What did Joel say?

3              MR. GOTTLIEB:  Objection.

4              THE WITNESS:  Joel said to ask Aaron.

5      Aaron had the second cell phone.  And that's

6      when I asked Aaron, and that's when he was

7      upset -- and he told Joel, "He don't need to

8      know about the second cell phone."

9  BY MR. QUAINTON:

10     Q.      When Aaron told Joel that you don't need

11 to know about the second cell phone, was that in a

12 conversation between you, Joel and Aaron?

13             MR. GOTTLIEB:  Objection.

14             THE WITNESS:  The best that I can

15     recall, it was, because they had a heated

16     conversation.  Joel and Aaron did.  And I'm just

17     listening to the conversation as an

18     investigator.  I'm not saying anything.

19             They're going at it.  "I told you" --

20     this is what he said.  "I told you, don't be

21     sharing that kind of information.  He don't need

22     to know all of that."

23             And Joel screamed back, "He's the

24     investigator.  He needs to know this thing."

25             And I'm listening.  And I said, "Whoa,



1          what's up with this?"  I just thought that was

2          kind of strange, that interaction between them.

3                    MR. GOTTLIEB:  Objection to the answer

4          as nonresponsive to the question.

5     BY MR. QUAINTON:

6          Q.    As an investigator, did you feel that

7     that interchange -- that exchange between Joel and

8     Aaron was significant?

9                    MR. GOTTLIEB:  Objection.

10                   THE WITNESS:  I thought it was

11         significant, because I thought we were all on

12         the same page in terms of solving the murder.

13         But something just -- it just was unsettling to

14         me.

15    BY MR. QUAINTON:

16         Q.    And why was it unsettling?

17         A.    You have a father and a brother.  Both

18    have suffered this loss of their loved one.  So you

19    would think that everybody would be on the same page.

20    "Let's find out who the bad guy is.  Let's find out

21    who did this to our loved one."

22                   I didn't get -- to be honest, I didn't

23    get that feeling from Aaron.  And I know that's your

24    client.  But if you want me to be honest, I just

25    didn't get that feeling from him.  There was



1    something wrong.

2              But it could have been for the reasons

3    that we talked about earlier, maybe because of all

4    this negative stuff about e-mails and the media.  And

5    I get that, and that could have been a very valid

6    reason.

7              But there was something troubling and

8    wrong with this whole -- whole investigation.  It

9    just didn't feel right.

10        Q.    And just to be clear, my client is not

11   Aaron, obviously.

12        A.    No.  I meant Mr. Gottlieb's client.

13        Q.    I understand.

14              Was there anything else that happened

15   that indicated to you that Aaron was interfering with

16   the investigation -- with your investigation?

17              MR. GOTTLIEB:  Objection.

18              THE WITNESS:  Not that I can recall

19        today.

20   BY MR. QUAINTON:

21        Q.    Did you meet Mr. Capone?

22        A.    Yes.

23        Q.    And when you met Mr. Capone, what did he

24   say to you?

25              MR. GOTTLIEB:  Objection.



Page 407

```
 1              THE WITNESS:  He's a very nice guy.  The
 2        first thing he said is he couldn't talk about
 3        e-mails, before I even opened -- before I even
 4        said "hello."  He said, "We can't talk about
 5        e-mails."
 6  BY MR. QUAINTON:
 7        Q.    Did he say why you couldn't talk
 8  about --
 9        A.    Because Aaron told him not to.
10              MR. GOTTLIEB:  Objection.
11              THE WITNESS:  He said, "Aaron told me
12        not to talk about" --
13              (Reporter clarification.)
14              MR. QUAINTON:  Why you couldn't talk
15        about e-mails.
16              MR. GOTTLIEB:  Objection.
17              THE WITNESS:  Because Aaron told him not
18        to.
19  BY MR. QUAINTON:
20        Q.    And what did you think when he told you
21  that Aaron had said he wouldn't be able to answer
22  questions about e-mails?
23              MR. GOTTLIEB:  Objection.
24              THE WITNESS:  I thought that was a
25        little strange.
```



Page 408

1    BY MR. QUAINTON:

2         Q.     What do you mean by "it was strange"?

3                MR. GOTTLIEB:  Same objection.

4                THE WITNESS:  Because I could not figure

5         out why he didn't want me to ask any questions

6         about e-mails or his job relationships, because

7         that could have been the reason he was killed.

8         I don't know.

9                Remember, I'm trying to find the killer.

10        But I couldn't ask any questioned about Door

11        No. 3.  I couldn't ask anything about Door

12        No. 3.

13   BY MR. QUAINTON:

14        Q.     And what is Door No. 3?

15        A.     In my mind?

16        Q.     In your mind.

17        A.     The way I've kind of played this whole

18   case out.  You have three doors to look at when

19   you're solving a murder.  Okay?  Door No. 1 is family

20   relationships.  Okay?  Murders are sometimes

21   committed by family members to other family members.

22   You rule out that.  And I did that.

23                Or it could have been a botched street

24   robbery.  Okay?  That's also behind Door No. 1.  But

25   I looked into that first.



1              Door No. 2 could have been a

2    relationship with his good faith, that type of thing,

3    boyfriend, because I even asked Joe Capone, "Was Seth

4    straight?  Was he gay?"

5              You have to ask these questions.  Like,

6    it's unfortunate, but when you're an investigator,

7    you try and get to the truth.  That's Door No. 2.

8              Door No. 3 involves work relationships.

9    Not e-mails, not WikiLeaks, but work relationships.

10              "Did he have a problem with anyone at

11    work."

12              "I can't talk about that."

13              "Why can't you talk about that?"

14              "I just can't talk about that."  That's

15    what everybody would tell me.

16              What's behind Door No. 3?  We can talk

17    about the relationships on the street, botched

18    robbery.  We can talk about the other stuff.  We

19    can't talk about the job relationships.

20              That's troubling.  Not just to me.  I

21    mean, maybe -- ask any detective you know.  They'll

22    tell you the same thing.

23        Q.    And just to be clear, Joe Capone said he

24    couldn't talk to you about e-mails?

25              MR. GOTTLIEB:  Objection.



Page 410

```
 1                 THE WITNESS:  That's correct.
 2    BY MR. QUAINTON:
 3         Q.     And Kelsey told you she couldn't talk to
 4    you about e-mails?
 5                 MR. GOTTLIEB:  Objection.
 6                 THE WITNESS:  That's correct.
 7    BY MR. QUAINTON:
 8         Q.     Now, Seth had two cell phones.
 9                 Do you know whether those cell phones
10    were given over to the D.C. police for forensic
11    examination?
12         A.     I don't know, and I could not find out.
13         Q.     Did you ask?
14         A.     Yes, I did.
15         Q.     Who did you ask?
16         A.     I asked Detective DellaCamera.  And I'd
17    have to refer to my report, because I think I put it
18    in there.  He appeared surprised, I think.  I have to
19    look at the report.  But I think he was surprised to
20    learn that there was a second cell phone.
21                 Because I asked him, "Did you know that
22    there was a second cell phone?"
23                 And he said, "Really?"
24                 And I said, "Yeah."  And that's what I
25    had learned from Kelsey.  I had learned that from
```



1   Kelsey.

2           Is that what you asked me, where did I

3   learn that from?

4       Q.      Whether you had -- you said the D.C.

5   police --

6       A.      Oh, yeah.  And then I had asked Joel

7   about the second cell phone, like I said, and Joel

8   said, "I'd have to ask Aaron, because Aaron had the

9   second cell phone."

10          And then that's when Aaron told me I

11  don't need to know anything about the second cell

12  phone.  Because I said, "Well, what was the number,

13  just the telephone number?"

14          "I can't tell you.  You don't need to

15  know that."

16          "Why don't I need to know that?"

17          "Because I've already looked into that,

18  Rod."

19          "All right."

20      Q.      To your knowledge, did the D.C. police

21  know the number of the second cell phone?

22          MR. GOTTLIEB:  Objection.

23          THE WITNESS:  I'd have to look at my

24      report, but I remember -- I kind of remember

25      Detective DellaCamera seemed surprised to learn



Page 412

1      there was a second cell phone.

2              Because that could be significant in

3      solving the murder, because now you're trying to

4      figure out what was the reason for the

5      individual getting a second cell phone.  Was it

6      because he or she was being harassed?

7              That's what people do when they get a

8      second cell phone, or something like that, but I

9      never could find that out.

10 BY MR. QUAINTON:

11      Q.    Or if they feel threatened, that might

12 be --

13              MR. GOTTLIEB:  Objection.

14              THE WITNESS:  Sure, and you get a second

15      cell phone.  But all -- anything is possible, as

16      we talked about earlier.  But I didn't know.  I

17      never found it.

18 BY MR. QUAINTON:

19      Q.    Now, the first cell phone, was -- to

20 your knowledge, was that given over to the D.C.

21 police for forensic examination?

22      A.    I don't recall, but I could not get the

23 cell phone records.

24      Q.    Did you ask?

25      A.    I asked the family.  I asked Aaron.



Page 413

1        Q.      And what did he say when you asked him?

2        A.      I don't need them.

3                And then I explained to Aaron why I

4    needed the cell phone records, because I wanted to

5    see who were the people Seth talked to hours before

6    his death.

7                Everybody does that these days.  You

8    look at these records:  cell phone records, e-mail

9    records, things like computer, social media, that

10   kind of stuff.  It gives you good clues as to who

11   could have killed the person.

12               He said he had looked into all of that,

13   and I don't need to look at it.

14               VIDEOGRAPHER:  Your 15 minutes are up.

15               MR. QUAINTON:  So I guess we'll stick to

16       the 15-minute agreement, and we'll pick up --

17       yeah, I have a lot more questions.

18               THE WITNESS:  December 20th.

19               MR. QUAINTON:  December 20th.

20               VIDEOGRAPHER:  It is November 18, 2019.

21       The time is now 6:41 p.m.  Completing today's

22       deposition.  We're off the record.

23

24

25



Page 414

1          CERTIFICATE OF REPORTER/NOTARY PUBLIC

2

3               I, Goldy Gold, a Notary Public within and

4    for the State of Maryland, do hereby certify that the

5    within-named witness personally appeared before me at

6    the time and place herein set out, and after having

7    been duly sworn by me, according to the law, was

8    examined by counsel.

9               I further certify that the examination was

10   recorded stenographically by me and this transcript

11   is a true record of the proceedings.

12              I further certify that I am not of counsel

13   to any of the parties, nor in any way interested in

14   the outcome of this action.

15              As witness my hand and notarial seal this

16   4th day of December, 2019.

17

18

                        _____

19                      GOLDY GOLD, RPR

                        Notary Public

20

21

22

23

24

     My Commission Expires:  April 21, 2024

25

