**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AARON RICH<br><br>                              Plaintiff,<br><br>        v.<br><br>EDWARD BUTOWSKY,<br>MATTHEW COUCH, and<br>AMERICA FIRST MEDIA<br><br><br>                              Defendants. | Civil Action No. 1:18-cv-00681-RJL<br>Hon. Richard J. Leon |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION
TO ENFORCE THE COURT'S ORDER REQUIRING DEFENDANT COUCH
TO PRODUCE DOCUMENTS AND TO REMEDY DEFENDANT COUCH'S REFUSAL
TO ANSWER QUESTIONS DURING HIS DEPOSITION**

JOSHUA P. RILEY
MERYL C. GOVERNSKI
BOIES SCHILLER FLEXNER LLP
1401 New York Ave NW, Washington DC 20005

MICHAEL J. GOTTLIEB
WILLKIE FARR GALLAGHER LLP
1875 K Street NW, Washington, DC 20006

***Attorneys for Plaintiff Aaron Rich***

Defendant Matthew Couch is withholding audio recordings of and refusing to testify about certain of his communications with Defendant Edward Butowsky on the basis of a "reporter's privilege." Plaintiff Aaron Rich has filed a motion to compel production of this evidence. *See* Dkt. 95 (public); Dkt. 96 (sealed) ("Motion" or "Pl. Mot."). Defendant Couch's Opposition to the Motion either does not address or contest any of the following: that Defendant Couch failed timely to assert a reporter's privilege as a basis for withholding documents; that Defendant Couch selectively has released some of his communications with Defendant Butowsky as a sword while simultaneously shielding from production other communications with Defendant Butowsky; that Defendant Couch previously has stated in written testimony that "all" of his information about Plaintiff came from Defendant Butowsky; that Defendant Couch is not employed by anyone, much less a media organization; that Defendant Couch ███████████████████████████ ███████████████████████████████████████████████████████████. *See* Dkt. 120 ("Opposition" or "Def. Opp."). Any one of these now established points is a sufficient on which to grant Plaintiff's Motion.

Instead of addressing the factual and legal arguments relevant to this case, Defendant's brief invokes media coverage of Justice Kavanaugh, the Covington Catholic students, and Jessie Smollet in a ploy to tar Plaintiff's claims as a political assault on "conservative media." Neither this case, nor the Motion, has *anything* to do with the media's coverage of those other matters, and it is baseless to assert that Plaintiff has sought "to decree that only one version of events . . . may be published, debated, or discussed."[1] Defendants, like Plaintiff and all persons under the U.S. Constitution, are entitled to theorize, debate, and discuss issues of the day without government interference—in doing so, the First Amendment protects one's right to express an opinion that

---

[1] Def. Opp. at 2.

another person is, for example, a "provocateur," "gadfly," or "purveyor of click bait."[2]  Had Defendants only made statements of this kind regarding Plaintiff, this lawsuit never would have been filed.  Instead, Defendants have chosen, repeatedly over the course of years, to publish blatantly false factual accusations about Plaintiff, including: knowing "for a fact that Aaron Rich and Seth Rich were involved and did the leaks together" and "without the shadow of doubt" that "Aaron Rich took money from WikiLeaks," and that "Aaron Rich definitely knew the hit was coming."[3]  Those statements are the genesis for this lawsuit, and they are plainly actionable.[4]

There is considerable irony in Defendants' efforts to tar Plaintiff's lawsuit as a crusade against conservative media.[5]  One need not be political—Plaintiff certainly is not, having never donated to a political candidate or worked for the DNC or any other political organization—to object to a lengthy campaign of being falsely accused of crimes.  Unlike Defendant Butowsky— who has launched a litigation onslaught against more than fifty defendants (including National Public Radio, CNN, the New York Times, Vox, and certain of Plaintiff's counsel)—Plaintiff sued the two individuals and two entities chiefly responsible for fueling an extended defamatory campaign against him.  One of those entities, The Washington Times, promptly apologized to Plaintiff and retracted an article ████████████████████ and spread by Defendant Couch

---

[2] *See Ollman v. Evans*, 750 F.2d 970, 990-91 (D.C. Cir; 1984); *Competitive Enters. Institute v. Mann*, 150 A.3d 1213, 1241 (D.C. 2016); *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000); *compare Greenbelt Coop. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (holding "rhetorical hyperbole" was not actionable), *with* Def. Opp. at 3 ("Plaintiff's *overblown rhetoric* is demonstrably false." (emphasis added)).

[3] Dkt. 3 ¶¶ 49-55.

[4] *See Weyrich v. New Republic, Inc.*, 235 F.3d 617, 627 (D.C. Cir. 2001) (applying D.C. law); *Rosenblatt v. Baer*, 383 U.S. 75, 92-93 (1966) (Stewart, J., concurring).

[5] *See* Def. Opp. at 1-3.

as a vindication of his work.[6]  The Washington Times' retraction followed the retraction of a May 2017 Fox News article that Defendant Butowsky also orchestrated, attacking Seth Rich as WikiLeaks' supposed source of DNC documents.[7]  Other individuals and entities, including Dr. Jerome Corsi and Infowars, also have taken responsibility for publishing false information about Plaintiff and have issued their own retractions.[8]  The Defendants who remain in this case are not remotely reflective of "conservative media" or any "media" of which Plaintiff is aware—they are the outliers who have refused to take responsibility for spreading vicious falsehoods about Plaintiff and his family.

The standard Defendant Couch is advocating that the Court adopt with respect to himself is completely at odds with the standard that Defendants seek to apply to third parties.  In this case, Defendants have noticed third-party subpoenas to investigative journalists, including Michael Isikoff and Seymour Hersh, for documents and/or testimony.  Moreover, Defendants agree with Plaintiff that this Court should issue a Letter of Request to the United Kingdom to facilitate the deposition of Julian Assange, but remarkably, Defendants would have this Court authorize seeking Mr. Assange's testimony on a broad range of questions about Mr. Assange's sources.  Plaintiff has asserted, in writing and in public, that Mr. Assange has no reporter's privilege to assert with respect

---

[6] *See* Dkt. 116-7 at Ex. 57 (The Washington Times' Retraction); Dkt. 38 (joint motion for dismissal); Dkt. 40 (order); Matt Couch, *America First Media LIVE #SethRich #Mueller #KimDotcom #EdButowsky*, Periscope at 49:30-50:04 (Mar. 3, 2018), www.pscp.tv/RealMattCouch/1mrGmRDaYXDJy ("article was put out to help vindicate our team").  Despite Defendant Couch's claim that The Washington Times article "vindicate[d]" his own statements about Plaintiff and his family, he ignores that the same institution retracted those statements after determining them to be "false" and without basis.

[7] *See* Dkt. 116-7 at Exhibit 59.

[8] *See* Dr. Jerome Corsi, *Retraction of Dr. Jerome Corsi Regarding The Murder of Seth Rich*; Infowars, Mar. 4, 2019, https://www.infowars.com/retraction-of-dr-jerome-corsi-regarding-the-murder-of-seth-rich/.

to questions regarding Seth or Aaron Rich, since neither ever operated as a direct or indirect source to Mr. Assange or WikiLeaks.  Despite this, Defendant Couch, who publicly has declared that Mr. Assange "has always stated that he will never reveal a source, and he never has,"[9] seeks to depose Mr. Assange on the "identity" of an alleged "intermediary" between Mr. Assange and Plaintiff or his brother and the "names of other individuals and/or intermediaries likely to have knowledge as to the role of Seth Rich and Aron Rich in the transmission of emails to Mr. Assange/Wikileaks."[10] At no point does Defendant Couch offer an explanation as to why he, a party defendant in this lawsuit, should be entitled to broader protections under a "reporter's shield" than the third-party witnesses described above.

Defendant Couch cries foul to being labeled a "gadfly," "provocateur," and purveyor of "clickbait," but even a casual review of his public Twitter feed reveals the basis for these views. Defendant Couch's Twitter feed contains derisive commentary demeaning the character and intelligence of the millions of Americans who hold viewpoints different from his own, including those who he labels as "Never Trumpers," "Liberals," and more.[11]  Thus, Defendant Couch posts messages such as:

- "Trigger a Few Liberals and Share this this, I Dare You :)
  Already got to block 5 trolls off of this Tweet.  Happy Halloween

---

[9]  *See, e.g.*, Matt Couch (@RealMattCouch), Twitter (Nov. 15, 2018, 5:55 pm), https://twitter.com/RealMattCouch/status/1063249129915195396; *see also id.* (Sept. 18, 2017, 9:46 am), https://twitter.com/RealMattCouch/status/909820889432313856 ("Assange isn't giving up a Source, that will never happen…").

[10] Dkt. 100-5 at 7.

[11] *See Provocateur*, Merriam-Webster Dictionary ("one who provokes"), *Gadfly*, Merriam-Webster Dictionary ("a person who stimulates or annoys other people especially by persistent criticism"), *and Clickbait*, Merriam-Webster Dictionary ("something (such as a headline) designed to make readers want to click on hyperlink especially when the link leads to content of dubious value or interest").

America! #MAGA #Trump." (re-tweeting photo of an individual dressed as Colin Kapernick with a painted face).[12]

- "Liberals might be the biggest morons on the planet. They literally don't think the North Korea and South Korea peace talks and end of War has anything to do with President Trump. Folks this is proof that you cannot cure stupid.. Diplomacy by Strength always works #ArtofTheDeal."[13]

- "How about instead of letting the Never Trumpers and Liberal Idiot Sticks have moronic things trending, all of those that actually support the President get #BUILDTHEWALL trending. He's doing what everyone asked for, now act like it and support him! Thank You Mr. President."[14]

- "Ann Coulter is the epitome of a Never Trumper, stop defending her. She's insane.. If it weren't for Trump, you wouldn't know Otto Warmbier's name or even be talking about a Wall.. Some folks need to open their eyes, show some respect, and realize this Man works his ass off."[15]

- "Continuing in our merchandise line that triggers Never Trumpers and Liberals, we have our 'Don't Nuke Me Bro' T-Shirt. The Anti Eric 'Duke Nuke'm' Swalwell Shirt is available in our online store."[16]

---

[12] Matt Couch (@RealMattCouch), Twitter (Oct. 31, 2017, 8:15 pm), https://twitter.com/RealMattCouch/status/925561994975072256.

[13] Matt Couch (@RealMattCouch), Twitter (Apr. 17, 2018, 8:50 am), https://twitter.com/realmattcouch/status/986270564649185280.

[14] Matt Couch (@RealMattCouch), Twitter (Feb. 15, 2019, 9:33 am), https://twitter.com/RealMattCouch/status/1096462519022092290.

[15] Matt Couch (@RealMattCouch), Twitter (Mar. 2, 2019, 7:27 pm), https://twitter.com/RealMattCouch/status/1102047739590967296.

[16] Matt Couch (@RealMattCouch), Twitter (Dec. 15, 2018, 7:04 pm), https://twitter.com/RealMattCouch/status/1074138193040171008; *see also* Matt Couch (@RealMattCouch), Twitter (Jan. 15, 2020, 9:04 am), https://twitter.com/RealMattCouch/status/1217492826767941632 ("If I ever have liberals coming over, I'll be making these :-)" (re-tweeting photo of image of Trump's face constructed out of ham and cheese)); Matt Couch (@RealMattCouch), Twitter (Jan. 13, 2020, 5:19 pm), https://twitter.com/RealMattCouch/status/1216892599329546242 ("To hell with the left, they're useless!  We end the Democrat Party on Nov 3, 2020!"); Matt Couch (@RealMattCouch), Twitter (Jan. 13, 2020, 5:45 pm), https://twitter.com/ realmattcouch/status/1216899009761202176 ("I've blocked 41 liberal trolls triggered over my tweet about President Trump . . . .").

Separately, in dozens of Tweets seeking financial contributions to his legal defense fund, Defendant Couch has claimed that he is being "Sued by the Two Biggest Democrat Law Firms in America."[17]  (Defendant Couch either does not know or does not care that one of those two law firms bears the name of Wendell Willkie, the Republican Nominee for President of the United States in 1940).[18]

All of the above underscores why Defendant Couch does not qualify as a journalist for purposes of a federal or D.C. reporter's privilege.  Living room commentators with Twitter handles are entitled to publish and speak without interference from the State, but that freedom is less extensive than the substantial breathing room that the District of Columbia and federal courts have granted to professional media organizations.

---

[17]  Matt Couch (@RealMattCouch), Twitter (Jan. 9, 2020, 7:23 pm), https://twitter.com/RealMattCouch/status/1215474288293224451; *see also, e.g.*, Matt Couch (@RealMattCouch), Twitter (Jan. 11, 2020, 3:15 pm), https://twitter.com/RealMattCouch/status/1216136475160535040 ("How many of you are aware that I'm being sued by the Two Biggest Democrat Law Firms in America trying to silence my investigations.. We could use your help in this fight for the truth!  Who will be our first $10 donation today?" (providing link to funding platform)); Matt Couch (@RealMattCouch), Twitter (Jan. 1, 2020, 4:33 pm), https://twitter.com/RealMattCouch/status/1212532232482643968 ("How many of you are aware that I'm being sued by the two most powerful Democrat Law Firms in America in an attempt to silence my Seth Rich Investigation?  I can't fight them alone, would love to have your help in fighting for the truth!" (providing link to funding platform)); Matt Couch (@RealMattCouch), Twitter (Dec. 22, 2019, 7:43 pm), https://twitter.com/RealMattCouch/status/1208956186646786051 ("How many of you are aware I'm being sued by the Two largest Democrat Law Firms in America trying to silence my Investigations?  I can't fight this alone.  We have Subpoena's, Transcripts, & Day to Day Ops we need help with.  Who will be our first $10?" (providing link to funding platform)).

[18]  Defendant Couch makes much of the size of Plaintiff's legal team, as if that had any relevance.  *See* Def. Opp. at 1 (referring to Plaintiff's "team of at least 8 lawyers from two different law firms").  Plaintiff's counsel have undertaken this engagement pro bono to obtain justice for Plaintiff, accountability for the Defendants, and, with hopes of preventing what happened to the Rich family from happening to anyone else again, to establish a precedent making clear that purveyors of fake news and conspiracy theories cannot engage in the type of abuse that took place here.

## I.     DEFENDANT COUCH HAS WAIVED ANY PURPORTED REPORTER'S PRIVILEGE.

There can be no serious question that Defendant Couch waived any reporter's privilege he might conceivably possess, and Defendant Couch's Opposition does not provide this Court with any factual or legal basis to the contrary.  The Court need not go any further in ordering Defendant Couch to produce the documents and testimony he currently is withholding on the basis of a reporter's privilege.

### A.     There Is No Dispute That Defendant Couch Failed To Raise A Purported Reporter's Privilege Until Six Months After Plaintiff Served Discovery, And He Did Not Formally Assert It Until Even Later.

Defendant Couch concedes the dispositive point that he did not timely assert an objection based on a reporter's privilege.  In his Opposition, he admits that he "did not raise the reporter's privilege early,"[19] although even that admission overstates Defendant Couch's case.  As Defendant Couch's counsel concedes, neither he nor Defendant Couch raised a purported reporter's privilege at any point prior October 25, 2019—which is more than *six months* after Plaintiff served the relevant discovery requests—and even then, he raised only the potential "availability of" a privilege, not an actual assertion of such a privilege.[20]  There is no dispute that Defendant Couch did not formally assert a purported reporter's privilege until November 21, 2019—more than *two months* after he retained his current counsel's services—and even then, he did so only did so as to Dr. Tore Lindeman, whom Defendant Couch listed on his initial disclosures and on whom he expects to rely in his defense.[21]  Nor is it disputed that Defendant Couch waited until December 6,

---

[19] Def. Opp. at 13.

[20] Dkt. 120-1 ¶ 3 ("I raised the issue of the availability of a reporter's privilege at least as early as October 25, 2019 in correspondence to opposing counsel.").

[21] *Compare* Pl. Mot. at 10-12 & n.14, *with* Def. Opp.

2019 (at which point Defendant Couch's counsel also had begun representing Defendant Butowsky) to formally assert a privilege as to his communications with Defendant Butowsky and four other "sources." The record therefore presents an obvious case of waiver.[22]

**B.    Defendant Couch's Previous Status As A Pro Se Defendant Does Not Excuse His Failure To Assert A Reporter's Privilege Objection.**

Rather than attempt to argue that he timely asserted an objection based on a reporter's privilege, Defendant Couch unpersuasively claims that he should be excused from doing so based on his prior pro se status.[23] Until retaining counsel around August 2019, Defendant Couch made the decision to proceed pro se despite raising at least ████ from his followers, including to support his legal "defense," and he appears simply to have ignored this Court's prior order that he file financial documentation that would support a claim of being indigent.[24]

Regardless of *why* Defendant Couch chose to proceed pro se, the law is clear that a party cannot invoke that status to excuse his non-compliance with the Federal Rules and the rules of this

---

[22] *See* Fed. R. Civ. P. 34(b)(2); *Embassy of the Fed. Republic of Nigeria v. Ugwuonye*, No. 10-cv-1929 (BJR), 2012 WL 13047525, at *2-*3 (D.D.C. Oct. 17, 2012); *Byrd* v. *Reno*, No. CIV.A.96-2375CKK JMF, 1998 WL 429676, at *4 (D.D.C. Feb. 12, 1998).

[23] Defendant Couch attempts to blame his own failure to raise a purported reporter's privilege at any time prior to November 2019 on the Court holding an *ex parte* conference on July 31, 2019—an argument he has asserted in some form now on at least three separate occasions and which the Court has already rejected. Def. Opp. at 13; *see also* Dkt. 76 (Def. motion for reconsideration); 11/4/2019 Minute Order (Order denying Dkt. 76); Dkt. 97 at 16-17 (Def. motion to extend discovery). Defendant Couch does not explain how or why such a meeting prevented him from asserting a privilege at the time it was due (two months before the July 31 hearing), during the July 31 hearing in which he participated, or after the meeting when he was represented by counsel. He also does not explain how he possibly could be prejudiced by a meeting attended by counsel for Defendant Butowsky, with whom Defendant Couch now shares counsel, has asserted a common interest, and is attempting to protect as a "source."

[24] *See* Dkt. 116 at 12. Plaintiff's counsel is unaware of Defendant Couch having made the financial disclosure filing the Court ordered him to submit at the July 31, 2019, status conference.

Court.[25]   Tellingly, against the weight of authority establishing that pro se litigants waive objections by failing to assert them, Defendant Couch cites one case to support his assertion that he "cannot possibly have waived his rights," but that is a case from 1936 that has does nothing to do with waiver of any privilege, failure to raise objections timely, or failure to comply with the Federal or Local Rules.[26]

Even if the Court credits Defendant Couch's unsupported claim that a pro se litigant cannot waive privileges, that still would not explain (and Defendant Couch's Opposition does not address) why Defendant Couch did not assert his purported reporter's privilege for the nearly four months when he was receiving legal advice from his current counsel.[27]   As the D.C. Circuit has held, when a pro se party benefits from advice of counsel, he "should be held to the usual standards" of waiver.[28]

Nor does the Opposition address Defendant Couch's reliance on his purported pro se status during a period for which Defendant Couch simultaneously is asserting an attorney-client relationship with Defendant Butowsky's former counsel, Ty Clevenger.[29]   Either an attorney-client

---

[25] *See, e.g.*, Pl. Mot. at 12 n.12 (citing cases); *see also MacLeod v. Georgetown Univ. Med. Ctr.*, 736 A.2d 977, 979 (D.C. 1999) (pro se litigants "can expect no special treatment from the court" and "must not expect or seek concessions because of . . . inexperience and lack of trial knowledge and training" (citations and internal quotations omitted)).

[26] *See* Def. Opp. at 13 (citing *C.I.T. Corp. v. Carl*, 85 F.2d 809, 811 (D.C. Cir. 1936)). *C.I.T. Corp* involved waiver of a substantive legal argument based on a statement made outside of court to the other side's lawyer.

[27] *See* Dkt. 120-1 ¶ 2 ("I had previously provided him advice for several months before my admission to the District of Columbia District Court" on November 7, 2020); *see also* Dkt. 76 at 1 n.1; Dkt. 116 at 12.

[28] *Shankar v. ACS-GSI*, 258 F. App'x 344, 345 (D.C. Cir. 2007).

[29] *See* Pl. Mot. at 7 n.9; Dkt. 116 at 12.  Defendant Couch's privilege log lists his communications with Mr. Clevenger on a single line, and does not provide any indication as to the dates or volume of such communications.

relationship existed between Defendant Couch and Mr. Clevenger (which forecloses Defendant Couch from claiming he has been proceeding without legal advice) or it does not (which forecloses Defendant Couch from withholding his communications with Mr. Clevenger).

### C. Defendant Couch Has Waived Any Purported Source Privilege By Using It As A Sword And A Shield.

Defendant Couch selectively has disclosed some communications with his so-called "sources," yet he insists on withholding other communications with those same "sources." Defendant Couch insists that he is "hurt[ing]" his case and acting against his own self-interest by withholding materials, [30] but it is impossible to credit his claim that he deliberately would withhold evidence that both proves his theories regarding Seth Rich and assists his defense. Defendant Couch does not even try to articulate, much less defend, the arbitrary line that he apparently has drawn as to what he will produce and what he will not produce, for example: why he should be allowed to offer testimony about his August 2017 conversations with Defendant Butowsky in his interrogatory responses (the sword) while ████████████████████████████ ████████████████████████████ (the shield); or why he is entitled to identify Dr. Lindeman as a percipient witness in his initial disclosures and use her statements as a basis for his claims in his interrogatory responses and ████████████ (the sword), ████████████ ████████████████████████ (the shield); or why he is entitled to respond to ████████████████████████████████ (the sword), while refusing ████████████████████████████ ████████████ (the shield). [31]  Perhaps Defendant Couch offers no defense for this line-drawing exercise because there is none to offer: courts have made clear that one waives the

---

[30] Def. Opp. at 13-14.

[31] *Compare* Pl. Mot. at 7, 11, 12-14, *with* Def. Opp. at 13-14; *see also* Pl. Mot. at Ex. 12.

privilege when one seeks to use otherwise privileged communications as a sword while invoking the privilege to shield other communications.[32]

The Opposition claims that Defendant Couch is driven by a desire to "respect his sources' desire for confidentiality,"[33] but that does not justify his refusal to produce materials and testimony relating to Defendant Butowsky just because Defendant Butowsky ███████████ ████████████████████████ Defendant Couch waived the right to "protect" Defendant Butowsky when he publicly (and repeatedly) outed him as his "source" beginning on August 15, 2017, admitted in discovery that all information about Plaintiff and WikiLeaks came from Defendant Butowsky, described those communications, and ███████████████ ████████████████████████████.[35]  Furthermore, Defendant Butowsky has himself extinguished any basis Defendant Couch plausibly could maintain for why he deserves confidentiality based on his own litigation and publicity blitz about his own role in propagating the false narrative about Plaintiff and his family.[36]

---

[32] *See Anderson v. Nixon*, 444 F. Supp. 1195, 1199 (D.D.C. 1978) (waiver where party uses privilege as sword and shield); *Harrison v. Spellings*, No. 03-2514 PLF/DAR, 2005 WL 8168153, at *1 (D.D.C. May 25, 2005) (finding, in case with pro se litigant, that "any privilege which might have been found to exist has been waived. . . . No party may invoke a privilege to shield material from discovery by an opposing party, and simultaneous[ly] offer the same material" during discovery (citations omitted)); *see also* Pl. Mot. at 12 & n.13 (citing cases).

[33] Def. Opp. at 14.

[34] *See* Pl. Mot. at 14.

[35] Pl. Mot. at 5-6, 10-11, 12-14.

[36] *See generally* Pl. Mot. at 14-15; Dkt. 116 at 14-18.

## II.   EVEN IF DEFENDANT COUCH HAD NOT WAIVED THE REPORTER'S PRIVILEGE, HE DOES NOT QUALIFY FOR ITS PROTECTIONS.

Defendant Couch has not met his burden of showing that he qualifies for the protection afforded by the D.C. or federal reporter's privilege.[37]   The text of the D.C. statute is unequivocal: Defendant Couch is ineligible for protection under the reporter's shield because he was not "employed by the news media" at the time he made the statements at issue in this litigation.[38] Defendant Couch offers no argument as to why the statute should be interpreted more broadly than its text provides.   Even if that were not dispositive (which it is), Defendant Couch concedes he:

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████).[39]   ████████████████████ he does not bear the indicia of a traditional journalist alone is basis to determine he is not entitled to assert a reporter's privilege as a matter of law.[40]

---

[37] *See Estate of Klieman v. Palestinian Auth.*, 293 F.R.D. 235, 241 (D.D.C. 2013).

[38] *Compare* Def. Opp. at 4-7, *and* Pl. Mot. at 15-16, *with* D.C. Code §§ 16-4702, 16-4703 (extending privilege to "any person *who is or has been employed by the news media* in a news gathering or news disseminating capacity") (emphasis added).   As explained in the Motion, Defendant Couch has gone to great lengths to assert that ██████████████████████████████ ████████.   Pl. Mot. at 16-17.

[39] *Compare* Pl. Mot. at 16, *with* Opposition at 3-6.

[40] *See* Pl. Mot. at 15-21.

Defendant Couch nevertheless claims that he "represents an easy case" for applying the privilege based on assertions that he makes in his declaration accompanying his opposition.[41] Defendant Couch's assertions entirely ignore or directly contradict the facts in the record (not to mention his own social media), and in fact the Opposition does not cite a single piece of factual support beyond Defendant Couch's own declaration.  The sum of Defendant Couch's claimed "background in mainstream media" appears to be that he hosted an ESPN talk radio show in 2011 and 2012 that focused exclusively on sporting events and that he has "been the host of Extreme Wrestling Radio."[42]  His claimed "credential[s] as a journalist"— ███████████████ ———consist of (1) credentials that he claims to have received from the National Rifle Association ("NRA"), even though Defendant Couch publicly has stated that the NRA "denied our press credentials,"[43] and (2) his uncorroborated and notably vague claim to have "been accredited to the White House press pool,"[44] a claim that he ███████████████.[45]

---

[41] Dkt. 120-5.

[42] *See Def.* Opp. at 5; Dkt. 120-5 ¶¶ 3-4; *see also* Dkt. 96 at Exhibit 7 at 415:2-417:17.  Defendant Couch claims the In The Zone Show aired on ESPN and that ████████████████, but neither his LinkedIn page nor the In The Zone Facebook page makes reference to ESPN, and each describes the show as one solely in the state of Arkansas.  *Compare* Dkt. 120-5 ¶ 3, *and* Dkt. 96 at Exhibit 7 at 415:2-417:17, *with* Matthew Couch, LinkedIn, https://www.linkedin.com/in/matt-couch-a598a853/; In The Zone Show, Facebook, https://www.facebook.com/pg/IntheZoneShow/about/?ref=page_internal.

[43] *See Def.* Opp. at 5; Dkt. 120-5 ¶ 11; Matt Couch, *NRA Dumpster Fire… My God…*, Periscope (April 27, 2019), https://www.pscp.tv/w/1ynJORbYrVrGR at 2:15.

[44] Def. Opp. at 3. ████████████████████████████ ████████████████████████████

[45] Defendant Couch publicly has derided the White House Press Corp.  *See, e.g.,* Matt Couch (@RealMattCouch), Twitter (Nov. 18, 2018, 10:26 am), https://twitter.com/RealMattCouch/status/1064223381925625856 (even though Defendant Couch publicly has stated s own public statements belie that assertion: "Is there one reporter in the White House Press Corp with the testicular fortitude to ask about Seth Conrad Rich?  You and I both know the answer.  Solving this doesn't fit the narrative of the Washington Elites.  The Media is complicit in the cover up, as well as the Hoax.")

The individuals in the cases on which Defendant Couch relies are not "figures like" him,[46] and the case law does not support extending the reporter's privilege to him. The Opposition relies almost entirely on *In re January 11, 2013 Subpoena by Grand Jury of Union County*,[47] in which a New Jersey Superior Court found a third party qualified for the state's reporter's privilege because *inter alia* the reporter deployed a process "sufficiently similar to the methods used by traditional news media entities," published content on the website of a 501(c)(3) organization "with all the attributes of traditional news media," and wrote "original content" about the county's "political activities, descriptions of actions taken at county freeholder meetings, information on pending county ordinances and budgets, information obtained in OPRA requests and court filings against the county, and county hiring and employment decisions."[48] Defendant Couch does not employ any of these attributes of traditional news media.

Defendant Couch fails in his attempt to distinguish the case law Plaintiff cites. The Opposition claims that *Too Much Media, LLC v. Hale*, 206 N.J. 209 (2011), is inapposite because "message board posts are an easy case, since they provide, and are indeed <u>designed</u> to provide, a space for anyone, including members of the public with no possible claim to reporter status, to engage in casual conversation."[49] Apparently lost on Defendant Couch is the irony that the social media websites where he posts the majority of his content—and, indeed, virtually all of the

---

[46] Def. Opp. at 4.

[47] *See* Def. Opp. at 4-5.

[48] 432 N.J. Super. 570, 586-91 (2013). The court contrasted this type of content that reflects "certain journalistic standards in their writing and conduct" from the non-newsworthy content on the blog, such as calling county employees "psychopaths" and "Nazis." *Id.* at 588. In contrast, Defendant Couch does not post any content that reflects "journalistic standards in . . . writing and conduct." This case is further inapposite legally because it relies on applying New Jersey law, which is amongst the broadest laws in the country, including by extending the privilege to those not employed by the news media (in contrast to D.C.'s law).

[49] Def. Opp. at 4 (emphasis in original).

statements at issue in this litigation—are essentially message boards "<u>designed</u> to provide, a space for anyone, including members of the public [like Defendant Couch] with no possible claim to reporter status, to engage in casual conversation."  The Opposition does not attempt to (and could not) distinguish Defendant Couch from the *Too Much Media* defendant, whom the court found "exhibited *none* of the recognized qualities or characteristics traditionally associated with the news process" and had no "established connection or affiliation with any news entity," both of which were necessary lest individuals like Defendant Couch—"self-appointed journalists or entities with little track record" and "no connection to traditional media," "as well as anyone with a Facebook account"—try to assert a reporter's privilege.[50]

The Opposition acknowledges that the other case Plaintiff cites, *Obsidian Finance Group, LLC v. Cox*, No. CV–11–57–HZ, 2011 WL 5999334 (D. Or. Nov. 30, 2011), "outlin[es] the relevant criteria" and states without elaboration that "Mr. Couch satisfies" them.[51]  But as discussed in the Motion, the court in *Obsidian Finance rejected* a claim of privilege by a "self-proclaimed 'investigative blogger'" who had merely labelled herself a journalist but (like Defendant Couch) did not bear the indicia of a traditional reporter.[52]

The Motion before the Court is about the reporter's privilege, not Defendant Couch's freedom to speak under the First Amendment.  As discussed in the Motion, the reporter's privilege affords journalists an immunity to which other members of the public are not entitled, namely the

---

[50] *Id.* at 222-23, 242 (emphasis in original).

[51] Def. Opp. at 5 n.2.

[52] *See* Pl. Mot. at 17-18.  Defendant Couch does not address (and therefore concedes) the various decisions from this District Court that are instructive in showing the types of facts that are not present here but which could support invocation of the reporter's privilege, and which again support applying the reporter's privilege only to those individuals who exhibit traditional journalistic standards.  *See* Pl. Mot. at 18-21.

right to not comply with otherwise lawful judicial process, in exchange for certain professional standards.[53]  In D.C., in particular, the relevant statute makes plain that the additional protection of immunity is limited to actual employees of news organizations.  Thus, it is Defendant Couch's claim to immunity that would have been "anathema" to the Framers of the Constitution.[54]

## III.   WHATEVER REPORTER'S PRIVILEGE MAY EXIST IN THIS CASE IS OVERCOME BECAUSE THE INFORMATION SOUGHT GOES TO THE HEART OF PLAINTIFF'S CASE.

Defendant Couch asserts that the information he is withholding does not go to the "heart of the litigation" based on the unremarkable proposition that it is Plaintiff's burden to prove the falsity of Defendant's statements.[55]  But the Opposition concedes both that Plaintiff bears the burden of proving fault (actual malice or negligence),[56] and that Defendant Couch's "source information goes to the issue of actual malice or, if a lower standard is employed, of negligence" and that the "recklessness or reasonableness of his reliance on undisclosed source information will

---

[53] *See* Pl. Mot. at 20-21.

[54] *See also Carey v. Hume*, 492 F.2d 631, 640-41 (D.C. Cir. 1974) (McKinnon, J., concurring) ("[T]he constitutional grant of 'freedom . . . of the press' does not convey an absolute immunity to the press to publish libelous information that it receives and then protect itself and then protect itself and the source by exercising a privilege that prevents the victim from proving the malicious intent of the source or publisher.  The constitutional privilege contemplates a responsible press.  To grant the media what as a practical matter amounts to absolute immunity—absolute privilege— would tend to lead to irresponsible journalism which would be . . . 'corrupting to the whole journalistic process.'" (first ellipses in original)).

[55] Def. Opp. at 1, 6-9.  Defendant Couch spends multiple pages discussing what statements the Plaintiff must prove false and what evidence he may or may not need or have to prove them false. *Id.*  But all of this misses the point.  The information Defendant Couch possesses goes to the "heart of the matter" because (as discussed herein), Plaintiff must prove Defendant Couch acted with negligence or actual malice, not solely that his statements are false.  Therefore, this reply does not address the assertions Defendant Couch makes with respect to "falsity" and incorporates by reference Plaintiff's opposition to the Defendants' motion for an extension, which addresses the substantive inaccuracies, inconsistencies, and flaws of the assertions Defendant Couch repeats here.

[56] *Id.* at 6.

be more, not less, difficult to establish if he shields the information from scrutiny."[57]   That his

withholding of information will make it "more, not less, difficult" to prove fault is precisely why

that information goes to the heart of the matter.

Defendant Butowsky appears to agree with Plaintiff, rather with his co-Defendant.  In his

lawsuit against NPR, Defendant Butowsky has argued that where media defendants'

"'newsgathering techniques' are directly at issue," they "have no right . . . to withhold the names

of their sources or what the sources supposedly said" because the plaintiff "is absolutely entitled

to develop this evidence to support his claim, alleged in the Complaint, that [the media defendant]

knew his statements were false or harbored serious doubt as to the veracity of his sources" because

the plaintiff "is entitled to discover evidence of Defendants' actual malice."[58]   It is unclear how or

why Defendants, who share a common interest and are represented by the same counsel, believe

that Defendant Butowsky's argument as to NPR in Texas should not apply to Defendant Couch

here.

Defendant Couch does not attempt to reconcile (1) his concession that Plaintiff must prove

fault and his acknowledgement that the evidence he is withholding goes directly to that burden

with (2) his argument that such information does not go to the "heart of the case."   Instead,

Defendant Couch applies tunnel vision to the precedent he cites and asks this Court to ignore

binding law.   Defendant Couch asserts that *Carey v. Hume*, stands for the proposition that

---

[57] *Id.* at 10.  The parties have not yet briefed Plaintiff's status as a private plaintiff or whether the statements at issue are a matter of public importance, and Plaintiff does not herein concede any related arguments.  The Opposition challenges the fact that Plaintiff is an intensely private person because he discussed this litigation in a podcast in the summer of 2019, even though it is black letter law that a person does not lose his private status by defending himself against false and defamatory statements.  *Hutchinson v. Proxmire*, 443 U.S. 111, 135-36 (1979).

[58] Opp. to Defs.' Mot. to Stay, *Butowsky v. Folkenflik, et al.*, No. 4:18-cv-00442-ALM (E.D. Tex. Dec. 14, 2018), Dkt. 41 at 4.

information only goes to the "heart of the matter" if it relates to falsity, but he ignores the very

next lines that say the opposite:

> "***Even if he did prove that the statements were false, Sullivan also requires a showing of malice or reckless disregard of the truth***. That further step might be achieved by proof that appellant in fact had no reliable sources, that he misrepresented the reports of his sources, or that reliance upon those particular sources was reckless.
>
>  Knowledge of the identity of the alleged sources would logically be an initial element in the proof of any of such circumstances. ***Although it might be possible to submit the question of malice to the jury simply on the basis of the conflicting allegations of the parties, that procedure would seem to provide the plaintiff little prospect of success in view of his heavy burden of proof***. Consequently, we find that the identity of appellant's sources is critical to appellee's claim." [59]

What Defendant Couch's "sources" told him is equally as vital in assessing whether a reasonable

person would have published the same statements based on the same information.[60]   Defendant

---

[59] 492 F.2d at 637 (emphasis added); *contra* Def. Opp. at 7-8.   Defendant Couch also calls Plaintiff's reliance on *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981), "curious" because the "identity of Mr. Couch's sources is irrelevant to Plaintiffs burden of proof on falsity."   Def. Opp. at 8.   Again, Defendant Couch ignores that *Zerilli* proves that falsity is not the only element that goes to the heart of a defamation matter: "Proof of actual malice will frequently depend on knowing the identity of the newspaper's informant, since a plaintiff will have to demonstrate that the informant was unreliable and that the journalist failed to take adequate steps to verify his story." *Zerilli*, 656 F.3d at 714.

[60] *See Dowd v. Calabrese*, 577 F. Supp. 238, 242 (D.D.C. 1983) (identify of sources and sources' testimony goes towards both falsity and "malice or negligence" because it would show whether the moving party "in fact had no reliable sources, or that reliance upon those particular sources was reckless"); *see also Carey*, 492 F.2d at 640 (MacKinnon, J., concurring) (if immunity applied to defamation defendants, "an injured plaintiff attempting to prove his case would face a blank wall, with practically no opportunity to discover the identity of the alleged source upon which the defense claims reliance" and "private individuals would be equally prevented from securing fair compensation for their injury")*; Carroll v. TheStreet.com, Inc.*, No. 11-CV-81173, 2014 WL 5474048, at *8 (S.D. Fla. Apr. 10, 2014) (disclosure of source to private plaintiff necessary "to demonstrate that the Journalists did not use 'reasonable care' in publishing the allegedly defamatory article").

Couch provides no answer for why he admits to possessing information that goes to Plaintiff's burden to prove fault but why that same information does not go to the "heart of the case."

## CONCLUSION

For the reasons herein discussed, Plaintiff respectfully requests that the Court grant this Motion and enter the Proposed Order accompanying the Motion, which asks that the Court order Defendant Couch immediately to produce the documents he is withholding and provide Defendant Couch a choice as between stipulating to certain facts articulated in the Proposed Order or sitting for three-and-a-half additional hours of deposition questioning at his (or his counsel's) expense.[61]


Dated: January 22, 2020

/s/  *Joshua P. Riley*                      
JOSHUA P. RILEY (D.C. Bar No. 1026900)
MERYL C. GOVERNSKI (D.C. Bar No. 1023549)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave NW, Washington DC 20005
Tel: (202) 237-2727 / Fax: (202) 237-6131
jriley@bsfllp.com
mgovernski@bsfllp.com

MICHAEL J. GOTTLIEB (D.C. Bar No. 974960)
WILLKIE FARR GALLAGHER LLP
1875 K Street NW, Washington, DC 20006
Tel: (202) 303-1442 / Fax: (202) 303-2000
mgottlieb@willkie.com

***Attorneys for Plaintiff Aaron Rich***

---

[61] Defendant Couch does not challenge (and therefore concedes) the propriety of the proposed remedies.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel certifies that on January 22, 2020, the foregoing document was filed through the CM/ECF system and thereby served electronically on counsel for Defendant Edward Butowsky and Matthew Couch. A courtesy copy of the foregoing document also was emailed to their counsel, Eden Quainton, at equainton@gmail.com. Mr. Quainton has agreed to convey served and filed documents to Defendant America First Media through Defendant Couch as necessary.


Dated: January 22, 2020

<div style="margin-left:40%;">

/s/ *Joshua P. Riley*

JOSHUA P. RILEY (D.C. Bar No. 1026900)
MERYL C. GOVERNSKI (D.C. Bar No. 1023549)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave NW, Washington DC 20005
Tel: (202) 237-2727 / Fax: (202) 237-6131
jriley@bsfllp.com
mgovernski@bsfllp.com

</div>