```
1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
2

3      Aaron Rich,                      )  Civil Action
                                        )  No. 18-cv-681
4                      Plaintiff,       )
                                        )  STATUS CONFERENCE
5      vs.                              )
                                        )  Washington, DC
6      Edward Butowsky, et al.,         )  March 3, 2020
                                        )  Time:  3:00 p.m.
7                      Defendants.      )
       _____
8
                       TRANSCRIPT OF STATUS CONFERENCE
9                              HELD BEFORE
                   THE HONORABLE JUDGE RICHARD J. LEON
10                    UNITED STATES DISTRICT JUDGE
       _____
11
                       A P P E A R A N C E S
12
       For Plaintiff:      Michael J. Gottlieb
13                         WILLKIE FARR & GALLAGHER, LLP
                           1875 K Street, NW
14                         Washington, DC 20006
                           (202) 303-1442
15                         Email:  Mgottlieb@willkie.com

16     For Defendants:     Eden P. Quainton
                           QUAINTON LAW, PLLC
17                         1001 Avenue of the Americas
                           11th Floor
18                         New York, NY 10018
                           (212) 813-8389
19                         Email:  Equainton@gmail.com

20     _____

21     Court Reporter:        Janice E. Dickman, RMR, CRR, CRC
                              Official Court Reporter
22                            United States Courthouse, Room 6523
                              333 Constitution Avenue, NW
23                            Washington, DC  20001
                              202-354-3267
24

25
```

1          THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

2    This afternoon we have civil action number 18-681, Aaron Rich

3    versus Edward Butowsky, et al.

4          Will counsel for the parties please approach the

5    lectern, identify yourself for the record, and name the party

6    or parties that you represent.

7          MR. GOTTLIEB:  Good afternoon, Your Honor.  Mike

8    Gottlieb from Willkie, Farr & Gallagher on behalf of the

9    plaintiff, Aaron Rich.

10          THE COURT:  Welcome.

11          MR. QUAINTON:  Good afternoon, Your Honor.  Eden

12    Quainton for defendants Edward Butowsky and Michael Couch.

13          THE COURT:  Welcome.

14          All right.  Counsel, we're here to kind of clean this

15    docket up a little bit.  I'm going to start with the contempt

16    motion for failure to produce the audio files and the two or

17    more redacted emails.  The Court has issued orders to that

18    effect.  The plaintiffs have moved for the defendants to be

19    held in contempt for failure to produce.  And I would like to

20    hear oral argument from the plaintiff and then the defense, and

21    the Court will rule.

22          It's not the contempt motion filed today, which

23    hasn't been responded to yet.  It's a separate issue.

24          MR. GOTTLIEB:  Thank you, Your Honor.  I believe that

25    in large part components of this motion have been resolved by

1    agreement, and certain of the audio files have been produced.

2    The remainder of the audios that have not been produced relate

3    to certain redactions that defendant Couch has made

4    unilaterally in those productions, along with the refusal to

5    produce a video of an interview and, instead, to produce only

6    the audio of that particular recording.

7        We believe there is no basis for those, what we

8    believe are unilateral decisions by the defendant to do so,

9    that fly in the face of this Court's order.  We don't believe

10   that the Court authorized the defendant, Mr. Couch, to make

11   redactions within those productions that aren't based either in

12   attorney-client privilege or some other recognizable privilege

13   under law.  And so for that reason the conduct flies directly

14   in the faces of the Court's order and we believe the motion

15   should be granted.

16       THE COURT:  Of course the information would be

17   covered by the protective order the Court has already entered

18   in this case, would it not?

19       MR. GOTTLIEB:  That's exactly right, Your Honor.

20       THE COURT:  I'll hear from the other side.

21       MR. QUAINTON:  Thank you, Your Honor.  What's at

22   issue here is extremely limited.  There are two pieces to it.

23   There's one audio that was misidentified on a privilege log.

24   Shouldn't have been put on the privilege log, that's my

25   mistake.  It's a nonresponsive audio that has nothing to do

 1    with this case, and so that was withheld because it was

 2    identified in error.  It relates to an entirely separate

 3    investigation that Mr. Couch was conducting.  That's one piece.

 4         The second piece relates to an individual who, my

 5    understanding is, is seeking whistleblower protection in a

 6    separate lawsuit.  And I don't -- I haven't been able to speak

 7    to counsel in the separate lawsuit, but Sharyl Attkisson has

 8    filed a claim that's going on.  And this individual is seeking

 9    whistleblower status in that lawsuit and it would be highly

10    prejudicial, I believe, for his name or likeness to be

11    revealed.  The contents of his audio --

12         THE COURT:  These are all of the actions that counsel

13    is just referring to?

14         MR. QUAINTON:  So the redactions are two.  One is

15    simply the name of the individual.  The substance of all of the

16    audios is completely unredacted.  Every single word that he

17    said that my client has has been turned over.

18         The second redaction is simply his face has not been

19    shown.  So there's a video in which he gives his testimony and

20    there's an audio of the video.  We provided the audio of the

21    video, but not the video because we didn't want to show his

22    face.  That's it, his face and his name.  And he's seeking

23    whistleblower status protection in another lawsuit.

24         So we believe that we're doing the right thing in

25    trying to protect this individual.  We've complied with the

1      Court's order with respect to the substance of his testimony.

2      They're free to ask Mr. Couch any questions that they want, and

3      certainly they will.  So, we believe that holding Mr. Couch in

4      contempt is an extreme remedy that's not warranted under the

5      circumstances.

6              THE COURT:  Well, what are the basis for the

7      redactions, other than what you just said?

8              MR. QUAINTON:  That's the basis, Your Honor.

9              THE COURT:  That's it?  Based on he's going to seek

10     whistleblower status somewhere in another case?

11             MR. QUAINTON:  Not in this case.  Well, I mean,

12     underlying that, this is an individual who -- perhaps we could

13     have Your Honor listen to this in camera.  But the testimony

14     that he's given is highly explosive, he fears for his life.

15     And I understand that we would be giving this on an AEO basis.

16     And I have no reason not to trust my colleagues at Boies,

17     Schiller and Willkie, Farr, but things happen when emails get

18     transmitted.

19             Unfortunately there have been -- I've made mistakes,

20     Your Honor knows about that.  Names that shouldn't be revealed

21     get revealed.  I'm just very nervous about this person's

22     identity being disclosed.

23             THE COURT:  When are you going to produce what you

24     say that you believe is appropriate introducing?

25             MR. QUAINTON:  We have, Your Honor.

```
 1              THE COURT:  You've already done it?

 2              MR. QUAINTON:  We've done it, yeah.  They have every

 3     single audio, every single word that this person has ever

 4     uttered that we know of has been produced to them.

 5              THE COURT:  Why don't they have his name?

 6              MR. QUAINTON:  Because we redacted it.

 7              THE COURT:  That's not what I'm asking.  The question

 8     is:  Why won't you give him the name?  They have to do their

 9     due diligence.  They might depose this person.  They need to

10     know who the person's identity is.

11              MR. QUAINTON:  Well, that's our concern.  Our concern

12     is he's -- as a whistleblower -- we've heard a lot about

13     whistleblower protections and the need to protect the identity

14     of whistleblowers.

15              THE COURT:  He isn't a whistleblower yet.

16              MR. QUAINTON:  He's seeking whistleblower protection.

17     If his name comes out --

18              THE COURT:  He's seeking it from who?

19              MR. QUAINTON:  In another lawsuit brought by Sharyl

20     Attkisson, he is seeking whistleblower protection.  He has

21     explosive testimony --

22              THE COURT:  Seeking it from an agency of the

23     United States?

24              MR. QUAINTON:  Yes.

25              THE COURT:  Which agency?
```

```
 1                    MR. QUAINTON:  I don't know the details, Your Honor.

 2                    THE COURT:  Say again?

 3                    MR. QUAINTON:  I do not know the details, Your Honor.

 4                    THE COURT:  You don't know the details?

 5                    MR. QUAINTON:  No.

 6                    THE COURT:  That's not good enough.

 7                    MR. QUAINTON:  This is a person whose life could be

 8        endangered, and taking his deposition would be -- we would

 9        certainly --

10                    THE COURT:  How would his life be in danger?  I mean,

11        come on.  Tell me.

12                    MR. QUAINTON:  Okay.  This is a person --

13                    THE COURT:  How?  Who's out there that's going to

14        want to take his life?  This is very dramatic stuff you're

15        saying.  What's your basis to state that?

16                    MR. QUAINTON:  Okay.  Mr. Burkman in this lawsuit, as

17        you know, was shot and almost killed.  His assailant is in

18        federal -- that's Mr. Doherty, he's in a federal prison.  This

19        person is making allegations that go to criminal conduct within

20        the United States government and he is making allegations that

21        people have been involved in various nefarious activities.  He

22        gave his --

23                    THE COURT:  What kind of activities?

24                    MR. QUAINTON:  The --

25                    THE COURT:  What kind of activities?
```

1            MR. QUAINTON:  His allegations?

2            THE COURT:  Yeah.  Fraud?

3            MR. QUAINTON:  No, murder.

4            THE COURT:  Murder?

5            MR. QUAINTON:  Yes, Your Honor.

6            Look, this is a person who only spoke on condition of

7      absolute anonymity.  We believed that this person -- the audios

8      never should have been disclosed.  That should have been

9      protected.  We argued that, we moved for reconsideration.  Your

10     Honor overruled that.  I'm considering seeking leave for

11     permission to file an interlocutory appeal.

12            I think it's highly prejudicial that a person who

13     comes to my client with explosive testimony on the condition of

14     anonymity, says I'll give you information, but only if you keep

15     my name and my likeness away from anybody else, and we violate

16     that trust, that's extremely serious.

17            THE COURT:  You didn't have any legal basis to give

18     him that assurance.  You didn't have any legal basis to give

19     him that assurance.

20            MR. QUAINTON:  As a news-gatherer, my client has

21     every basis to give people assurance.

22            I mean, Your Honor may not view my client as being

23     entitled to a news-gathering privilege, but I disagree.  He has

24     a blog, he has a post, he collects news, he reports on news, he

25     interviews people, he gets sources, he puts stories out there.

1    Some of them are stories that the mainstream media doesn't

2    really follow.  And this is a person who, to do his business,

3    he needs to grant his sources anonymity, just like CNN does,

4    just like Fox News does, just like *New York Times* does.  If

5    they don't grant anonymity to their sources, particularly when

6    their sources are exposing what may be criminal conduct in the

7    United States government, those people will never come forward.

8         So his basis is the basis that, unfortunately, Your

9    Honor didn't agree with.  But I maintain that is a valid legal

10   basis for not wanting to produce this in the first place.  As a

11   matter of substance, they have all of the documents, they have

12   the information; only one piece of that, of all of this is even

13   relevant.  In the audio there is an allegation that Seth Rich

14   had on his body a USB file and that the USB file was linked to

15   his murder.  That's the only piece of that that's actually

16   relevant to this lawsuit, and it only goes to whether the

17   statement, the alleged statement that Aaron Rich knew, quote,

18   the hit was coming, is based in any kind -- is based in fact or

19   not.  That's the only relevance.

20        THE COURT:  So this person who you want to protect,

21   what does he know about the -- this part of the case, these

22   facts in the case?  He has the USB file that was on his body?

23        MR. QUAINTON:  He has other contacts within various

24   federal agencies and he has a story that he's told about those

25   individuals' participation in the murder and what they were

1   after.  The USB allegation is something that other people have

2   made as well, but that's the only thing that's come up.

3          THE COURT:  Is his story, such as it is, going to be

4   part of, ultimately, part of your client's defense?  How does

5   it fit into this case?

6          MR. QUAINTON:  The only way it fits into this case,

7   as I say, is the USB drive.  There's a statement that Mr. Couch

8   made, which is that Aaron, quote, knew the hit was coming.  And

9   there's a question as to what that meant.  And did it mean that

10  Aaron knew his bother was going to be murdered?  Did it mean

11  that he thought his brother was in trouble?  Was he concerned

12  for his brother?  There's a looseness of language that

13  sometimes -- that's led to this, frankly, kind of absurd

14  lawsuit.

15         But the issue is, when he uttered those words, what

16  was he referring to?  Did he have knowledge?  Did Aaron have

17  knowledge that his brother was in danger?  One of the

18  possibilities would be that his brother had a USB key that was

19  of value to somebody and that Aaron knew about that; that's

20  what it meant, when he said he knew the hit was coming.  So,

21  yes, it is relevant to that extent.  And that's what --

22         THE COURT:  So ultimately it's going to have to come

23  out in this case as part of your defense, sounds like.

24         MR. QUAINTON:  Not the identity of the whistleblower.

25         THE COURT:  You just said his evidence is relevant to

1    your defense, in essence.  Didn't you just say that?

2              MR. QUAINTON:  I did say that, but I think --

3              THE COURT:  Well, that's going to come out during the

4    case, either in trial or summary judgment, right?

5              MR. QUAINTON:  Look at the impeachment we just had,

6    Your Honor.  The whistleblower's testimony was supposedly

7    highly relevant, but his identity was protected.  The testimony

8    can be admitted and admissible without the identity of the

9    person being necessarily disclosed.  I mean, I can --

10             THE COURT:  Is he going to be available for cross-

11   examination in a deposition?

12             MR. QUAINTON:  I -- I haven't got -- I haven't gone

13   that far.  I have never met this person.  I have never met him.

14   All I've done is reviewed an audio and listened to my client,

15   who told me in the strongest terms to oppose the disclosure of

16   the audio, which I've tried to do.

17             THE COURT:  Mr. Gottlieb, do you plan on deposing

18   this person?

19             MR. GOTTLIEB:  Your Honor, right now there's not

20   really much of a way for us to know that, without knowing who

21   the person is.

22             THE COURT:  Put aside who the person is.  He says

23   you've got his complete statement.  So you don't have his

24   picture, but you have his statement --

25             MR. GOTTLIEB:  Correct.

1              THE COURT:  -- is that accurate?

2              MR. GOTTLIEB:  We have the audio, but what we don't

3      know, Your Honor, is we don't know if it's a complete capture

4      of the video.  We have that representation.

5              THE COURT:  Say that again.

6              MR. GOTTLIEB:  We don't know if the audio is in fact

7      the complete audio recording attached to the video.

8              THE COURT:  Why don't you know that?

9              MR. GOTTLIEB:  Because redactions have been made to

10     it.  So we don't know -- for example, without the video we

11     don't know if other changes have been.  We can accept, for the

12     sake of argument, for the Court's consideration of the motion,

13     that Mr. Quainton's representation is accurate.  Without the

14     identity of the whistleblower, we have no way -- as the Court

15     has put its finger on, we have no way of being able to do due

16     diligence on or test the veracity of the assertions.

17             And if Mr. Couch chooses to rely on this individual

18     as the basis -- or this testimony, even if it's anonymized, as

19     the basis for the statement that Aaron Rich knew the hit was

20     coming, which was the statement that Mr. Couch stands by and

21     testified about at his deposition, then we do need the ability

22     to be able to at least do basic due diligence on who the person

23     was to test reliability.  Without that the statement is

24     meaningless.

25             THE COURT:  Mr. Gottlieb, you've previously served in

1    the White House, is that not correct?

2              MR. GOTTLIEB:  That's correct.

3              THE COURT:  White House Counsel's office?

4              MR. GOTTLIEB:  Yes, Your Honor.

5              THE COURT:  You've dealt with classified information?

6              MR. GOTTLIEB:  I have, Your Honor.

7              THE COURT:  Did you ever have any allegation that you

8    leaked classified information against you?

9              MR. GOTTLIEB:  None that I'm aware of, Your Honor.

10             THE COURT:  Did you ever leak any classified

11   information?

12             MR. GOTTLIEB:  I did not, Your Honor.

13             THE COURT:  Very good.

14             Mr. Quainton, I don't need to hear any more argument.

15   I'm ordering you to make the complete audio, with his identity

16   and his name, available to Mr. Gottlieb only.  Nobody else.  He

17   is going to review it under circumstances that are totally

18   protectable.  In other words, in your office or some neutral

19   place where there's no risk of any third-party seeing it.

20   Mr. Gottlieb will get to see it.  Mr. Gottlieb has a track

21   record of dealing with classified information in his career.

22             You, yourself, have said you have no reason to

23   question his veracity, or to question his ethical nature in any

24   way, shape, or form, and the Court certainly has none either, I

25   might add.  So, I want him to review it in toto.  I want him to

1     have the name.  My order, which I will issue later today, or no

2     later than tomorrow, will also provide that he is not to reveal

3     that information to any third-party -- partner of his,

4     associate of his, investigator of his, anyone.  He will report

5     directly only to the Court thereafter as to where he sees it

6     going.  It may be, after he reviews it, he may conclude there's

7     not much here or it's of limited to no value.  He may decide he

8     needs to depose this person.

9            I don't know what's going to happen.  He doesn't know

10    what's going to happen.  But this should give more than

11    adequate assurance and protection to your client that this

12    person is not being unnecessarily or unfairly being revealed,

13    especially while he's awaiting whistleblower status, if that's

14    what he ends up seeking to get under these circumstances.

15           So I'll issue an order to that effect and that should

16    take care of the motion to compel in terms of any

17    non-production to date, either in the form of -- now, weren't

18    there some emails, Mr. Gottlieb, that had some redactions as

19    well?  Or have you -- have those been produced?

20           MR. QUAINTON:  I can respond to that.  The email is

21    the same issue.  The name --

22           THE COURT:  It's all the same issue?

23           MR. QUAINTON:  It's the same issue.  The name was

24    taken off the email.

25           THE COURT:  Okay.  Fine.  I will issue an order that

1    requires you to produce it exclusively to Mr. Gottlieb.

2    Mr. Gottlieb alone will view it.  He will be under Court order

3    not to reveal it to anyone else, including his colleagues or

4    any third-parties whatsoever.  He can discuss it only with you,

5    in terms of, you know, what he plans to do next with it and any

6    questions he has.  All right?

7             MR. QUAINTON:  One question, if I may, Your Honor.

8             THE COURT:  Go ahead.

9             MR. QUAINTON:  If my client says -- if he says as a

10   matter of principle I'm not fine with the order -- and I'm not

11   going to encourage him to do that.

12            THE COURT:  He would be in contempt of the Court.

13            MR. QUAINTON:  But the remedy would be he wouldn't be

14   able to rely on that in his defense, correct?  In other words,

15   if he says, you know what --

16            THE COURT:  I will figure out what the consequence

17   will be.  I'll tell you right now, you've got 48 hours to

18   produce this stuff to Mr. Gottlieb; 48 hours from today.  If

19   it's not produced 48 hours from today, your client will be in

20   contempt of court and a fine will start accruing to the tune of

21   $2500 a day until it's produced.

22            So, he's got 48 hours to produce it, unredacted,

23   exclusively to Gottlieb.  There will be an order to that

24   effect.  All right.  That's the first issue.

25            Second issue relates to your redacting confidential

1    information of your client.  Come on up.  I warned you, if you

2    did that, that you would be fined $2500.

3              MR. QUAINTON:  Yes, Your Honor.

4              THE COURT:  Now, under the circumstances, it was,

5    after all, your client and not some third-party.  And in

6    particular, it wasn't the plaintiff's discovery.  So I'm

7    willing to make an exception in this case.  But I'm giving you

8    fair notice.  I don't know if I'll give you a second one.

9    So --

10             MR. QUAINTON:  Understood, Your Honor.

11             THE COURT:  -- you've dodged that bullet and you've

12   since cured the problem, as I understand it.

13             MR. QUAINTON:  Yes, Your Honor.

14             THE COURT:  All right.  Now, on the anti-suit

15   injunction, Mr. Gottlieb, my understanding is that the

16   magistrate judge in Texas has given plaintiff some indication

17   that -- I think it's a she, although I could be wrong.  Is it a

18   she?

19             MR. GOTTLIEB:  Yes, Your Honor.

20             THE COURT:  That she is close to making a decision on

21   motions that are outstanding.

22             MR. GOTTLIEB:  That's correct, Your Honor.

23             THE COURT:  I don't know how she defines "close."

24   But, six-month lists, obviously, drives a lot of district

25   judges and their staffs around the country.  I'm willing to

 1    give her another couple weeks, but I can tell you right now I'm

 2    inclined to grant this motion.

 3           Now, I'm going to have to get an opinion out, so if I

 4    don't hear -- I want a report from you in two weeks as to

 5    what's going on down in Texas.  And if the answer is as simple

 6    as nothing is going on, then I'm going to grant this anti-suit

 7    injunction motion because I think this suit down there is

 8    having an unnecessarily and -- complicating and unnecessarily

 9    unfair impact on the litigation of this case right here.

10           My research to date indicates that I am well within

11    my authority to grant that kind of a motion.  Never granted one

12    before, and I would rather not grant one, frankly, to be quite

13    honest with you -- and you can feel free to relay this to the

14    judge down in Texas -- I would rather not.  But I think I've

15    given her a long -- and I've given them a long time down in

16    Texas to get to the -- you know, make a decision.  As we say in

17    New England, fish or cut bait.

18           So, that's what my status is.  And if you want to

19    report that to her, you're welcome to do it.  Get the

20    transcript and show her the transcript.

21           MR. GOTTLIEB:  Thank you, Your Honor.  We certainly

22    appreciate that.  One bit of update for you, we learned several

23    hours ago that the judge had scheduled a telephonic status

24    hearing -- the magistrate has scheduled a telephonic hearing

25    for 1:30 p.m. today.  That may be happening as we are in court

1    here.  So we will report back to the Court.

2            THE COURT:  It's going on right now?

3            MR. GOTTLIEB:  It's going on right now.  We don't

4    know what it's covering, but we will report back to the Court

5    once we've heard.

6            THE COURT:  Feel free to report to your colleagues

7    who are attending this event or who may have gone to this event

8    what I've just said.  Because I've been patient and I'm just

9    increasingly convinced that this other lawsuit is having an

10   unfair and unnecessarily complicating impact on this case.

11           MR. GOTTLIEB:  Thank you, Your Honor.

12           THE COURT:  Now, let me go back to Mr. Quainton.

13           Mr. Quainton, you need to have a discussion with your

14   clients about public commentary about this case.  I know you're

15   probably the likely kind of lawyer who has already had that

16   discussion.  I'm not asking you to reveal any attorney-client

17   privileges.  But I can tell you right now, if they're going to

18   keep commenting about this case, especially comments that are

19   ridiculous and inaccurate and not productive and which could

20   maybe some day impact on a jury pool in this case, it's got to

21   stop.

22           So you can tell them from me -- they're not here

23   today, obviously -- that the Court is seriously considering a

24   gag order being issued in this case.  I'll give them a little

25   chance to exercise some self-control, but if they're not going

1    to exercise self-control, then the Court will seriously

2    consider entering a gag order in this case.  Please pass that

3    message on to your clients.

4             MR. QUAINTON:  I will, Your Honor.

5             THE COURT:  Thank you.

6             Now, last but not least, as far as I can see, there's

7    a motion for an extension of discovery another 90 days.  I'm

8    not inclined to give you 90 days --

9             MR. QUAINTON:  Your Honor --

10            THE COURT:  -- but I am inclined to give you a little

11   more time.  Go ahead.

12            MR. QUAINTON:  The motion that I just filed was for

13   60 days.

14            THE COURT:  I thought it was 90.

15            MR. QUAINTON:  Well, basically it was to go back to

16   what had been indicated in chambers, which was 90, plus an

17   option for 30, which would be 60 from the 27th of March.  So

18   that was probably confusing the way I drafted it.  But it was a

19   request for 60 days from the 27th.

20            THE COURT:  All right.  Well, I don't -- I appreciate

21   fully your client's health issue and how that would warrant

22   some accommodation to him as he's going through these very

23   challenging health situations that he has, and that alone.  But

24   that doesn't mean that the other things that need to be done in

25   discovery can't be done.  Think of it as proceeding on multiple

1    tracks.  And so while I might be willing to give him, as to his

2    situation for his deposition and for whatever, a little extra

3    time, I'm not inclined to slow everything down, stop everything

4    down, on the other hand.

5         We need to keep this thing moving forward, have to

6    keep this train moving forward.  So, I'll take a close look at

7    it.  I'm not inclined to give 90 to him, but I am inclined to

8    give him a little more time.  And I am -- but I'm not inclined

9    to shut down the entire operation.

10        MR. QUAINTON:  Your Honor, I'm not asking you to shut

11   it down.  I think -- and I almost drafted a letter and sent it

12   to you, probably I should have done that -- there may have been

13   just -- there may have been a misunderstanding in the original

14   order, because in chambers I think it was pretty clear, and I

15   think Mr. Gottlieb had the same understanding, that he would

16   have -- based on his health concerns, he would have 90 days.

17   And the order cut it back to 60, even though I put in the

18   record, you know, 250 pages of very detailed medical records

19   which substantiated the seriousness of this issue.  It's not --

20        THE COURT:  It's very serious.

21        MR. QUAINTON:  It's not a made-up thing at all.  And

22   while it's a parallel track, and I totally agree with that,

23   there are some things that I can't do.  There's some strategic

24   things I can't do.  I can't make certain decisions that affect

25   other things.  I need to have a client who's not, frankly, you

1     know, taking extreme pain killers; who's lucid, who can

2     evaluate the situation, who's not screaming out in pain, which

3     he's done on one occasion.

4           THE COURT:  He's also doing videos, you know, trying

5     to raise money and things.

6           MR. QUAINTON:  That was a video from his bedside,

7     Your Honor.  He is trying, after all, to keep his family

8     afloat.  And he is the breadwinner in the family.  I don't

9     think anybody should really fault him for wanting to try to

10    make some money so that he can, you know, pay the rent and do

11    the things that a person does.  But that was not -- that was a

12    video that was -- where he was just an audio that was recorded

13    while he was at his hospital bed.  I hardly think that's, you

14    know, playing it both ways.

15          THE COURT:  All right.  Well, I'll take another look

16    at that.  And, like I said, I'm inclined to give him a little

17    extra.  But, I don't want to slow down this discovery process

18    right now.

19          So, in fact, why don't -- Mr. Gottlieb, while we're

20    at it, when you give me that update in two weeks as to what's

21    going on with the magistrate judge, include in there an update,

22    and it can be joint, if you can agree, an update on the -- how

23    the discovery is progressing and what's left to be done, and

24    then I'll be in a better position to know how much extra time

25    to give up.

1            Mr. Gottlieb?

2            MR. GOTTLIEB:   Thank you, Your Honor.   If I could

3   just address -- I know we haven't had an opportunity to submit

4   anything in response to the extension motion.   I would like an

5   opportunity for us to be able to submit something in writing on

6   that.

7            THE COURT:   Sure.

8            MR. GOTTLIEB:   I would ask that the Court consider --

9   there is a pending motion for sanctions against Mr. Butowsky

10  for his failure to produce documents.   And there is simply no

11  reason that those documents could not have been produced to us

12  many months ago, or why they can't be produced to us this week.

13  All of this stems from a motion to compel that this Court

14  granted in July of 2019.   We've engaged for months with counsel

15  on discussions around documents.

16           Mr. Quainton has admitted there are 4,000, roughly,

17  or so, documents that he has reviewed.   Those were promised to

18  us on December 23rd.   We were told shortly thereafter that we

19  would not be getting them on December 23rd.   Mr. Butowsky's

20  health was not cited as the reason we would not be getting

21  them on December 23rd.   We still have not received them.   And

22  the notion that --

23           THE COURT:   I thought the only thing that was

24  outstanding right now was this audio file?

25           MR. GOTTLIEB:   No, no.   There's a separate motion

1      that is pending before the Court for sanctions against

2      Mr. Butowsky for his failure to produce documents.

3              THE COURT:   I thought by now all those documents had

4      been produced.

5              MR. GOTTLIEB:   No.   Mr. Couch has produced the

6      documents to us, Mr. Butowsky has made one production of

7      documents to us and it was prior to the time that Mr. Quainton

8      was his counsel in this case.   And that was subject to --

9      pursuant to this Court's order on July 31st, requiring him,

10     under a motion to compel, to produce documents to us.   We then

11     sent a deficiency letter thereafter, engaged in some back and

12     forth with Mr. Quainton; he did some searches, he reviewed some

13     documents and indicated there were about 6500 documents, give

14     or take, that he had that he needed to talk to his client

15     about.

16             He promised to produce those to us on December 23rd.

17     And then on the 22nd, or the eve of the 23rd, he told us we

18     wouldn't be getting them, that he would get back to us soon on

19     them.   Then in January we began receiving the briefing

20     regarding Mr. Butowsky's health.   And since that time

21     Mr. Quainton has claimed that he has been unable to have

22     conversations with his client about these documents or produce

23     them to us, notwithstanding the fact that Mr. Butowsky has

24     filed a new supplemental complaint in the Texas litigation,

25     he's done -- he's made pro se filings in his case in New York

1    as a plaintiff.

2              In all of the cases where Mr. Butowsky is a

3    plaintiff, he has been able to continue litigation, have

4    filings be made.  In this litigation Mr. Quainton has been able

5    to serve discovery requests on our client, more than 50

6    requests for production he has served on our client in the last

7    month alone, and yet the documents that we have requested, that

8    have been ordered to be provided to us since July, he still

9    refuses to produce those, or even give us a date when we're

10   going to be getting those documents.

11             And frankly, it's just -- I understand Mr. Butowsky's

12   condition, we understand that accommodations may need to be

13   made with respect to a deposition, but it is simply unfair to

14   plaintiff to allow the defendants to continue on in discovery,

15   serving discovery requests, serving subpoenas on third parties,

16   serving demands on plaintiffs, and not complying with

17   obligations that this Court has ordered.  So we believe that

18   that must be taken into consideration in --

19             THE COURT:  Mr. Quainton, what's your response to

20   that?

21             MR. QUAINTON:  May I respond to that?  A couple of

22   things.  First, the numbers are completely out of whack.

23   There're not 4,000 documents.  We're talking about 4,000 pages

24   of documents.

25             Secondly, just to go back to this --

1          THE COURT:  Whoa, whoa, whoa.  Slow down.  4,000

2     pages?

3          MR. QUAINTON:  4,000 pages of documents.  It's a lot

4     of duplicates.

5          So let me just give you the background of this so you

6     can understand where we are.  When I came on board in November

7     of 2019, one production had been done and plaintiff was

8     dissatisfied with that production.  And we had a back and forth

9     and we tried to work collaboratively to get discovery done.

10    What I recommended was that Mr. Butowsky engage a professional

11    discovery vendor, and that was amenable to plaintiff.

12         Mr. Butowsky is represented -- is covered by an

13    insurance company.  These insurance companies move at a snail's

14    pace.  So once we had the agreement that the discovery vendor

15    would do a collection of Mr. Butowsky's documents and apply the

16    search terms that plaintiff wanted to those documents, the

17    discovery vendor -- who's been burnt many times on these things

18    before -- did not want to start working until they got their

19    retainer paid.  And that took -- I don't have the dates

20    exactly, but that took a month.  That slowed us down.

21         So the commitment I had made to get the documents by

22    December 23rd was slowed down by the fact that my discovery

23    vendor didn't start for a month after the time that he was

24    supposed to start.

25         THE COURT:  Where is he now?

```
 1            MR. QUAINTON:  Who?  The discovery vendor?

 2            THE COURT:  No, how far has he got?

 3            MR. QUAINTON:  So, what's happened is those documents

 4   have all been collected and the next thing that has to happen,

 5   as Your Honor knows, is they have to be reviewed both for

 6   privilege and to figure out how they fit into our defense.

 7   That's been done.  But that process couldn't start by this 23rd

 8   date because there was a delay in collecting the documents as a

 9   result of the retainer not being paid to the discovery vendor.

10            By the time I had the documents, Mr. Butowsky was in

11   and out of the hospital.  And, frankly, it's grotesque, Your

12   Honor --

13            THE COURT:  Do you have the documents now?

14            MR. QUAINTON:  I do have them.  But let me finish my

15   thought.  It's grotesque to ask me to ask my client, in a

16   hospital bed, when he's on Morphine, whether he thinks this

17   document or that document is relevant or responsive.  I can't

18   do it, Your Honor.  It violates my basic ethical sense.  I want

19   my client to be lucid, I want him not to be in pain.  They're

20   going to get the documents.  This case is going to go forward,

21   probably going to go to trial, but I'm not going to sit there

22   and badger my client about privilege issues, about

23   responsiveness when he's in extreme pain and he is crying out

24   in pain over the phone.

25            So, he's out of the hospital now.  My plan is and my
```

1  plan has been for the last six weeks, my plan has been to go

2  over the documents with him.  There are a lot of duplicates.

3  When I say 4,000 pages, the production of those documents, all

4  kinds of attachments were produced over and over again, and I

5  don't know if that makes sense.  We actually have to have a

6  discussion.  I can't make those decisions for him, it wouldn't

7  be right.

8           THE COURT:  When can you leave for Texas?

9           MR. QUAINTON:  When can I leave for Texas?

10          THE COURT:  You have to go down and met with him,

11  right?

12          MR. QUAINTON:  No, I can do it over the phone.  I

13  don't have to meet with him.  But I can't do it when he's in

14  the hospital.  He has to be lucid and not on drugs.

15          THE COURT:  He's out of the hospital.  Can you get it

16  done by Monday?

17          MR. QUAINTON:  No.

18          THE COURT:  Why?

19          MR. QUAINTON:  Well, for one thing, we have a

20  deposition tomorrow in this case in Florida, so I'm going to be

21  in Florida tomorrow.  We have another deposition on Friday

22  in -- back in D.C.

23          THE COURT:  Which is more important, Mr. Gottlieb,

24  the depositions being done this week or the documents being

25  produced ASAP?

1           MR. GOTTLIEB:  Well, Your Honor, I have my opinion on

2     that, but in fairness --

3           THE COURT:  Who scheduled the depositions?

4           MR. GOTTLIEB:  The depositions are scheduled, they're

5     third-party depositions.  And I think it would be unfair to

6     witnesses to cancel those depositions when travel arrangements

7     have been made.

8           THE COURT:  All right.  Go ahead.

9           MR. QUAINTON:  The other thing Your Honor has to

10    realize, and it's in the papers, and hopefully we can get this

11    done before the other big event happens, which is the major

12    complete hip revision that's going to happen in two weeks.  So

13    I think what would make sense and what I would certainly commit

14    to doing, is to do my best to get all of this done before he

15    goes into that surgery because then there's going to be another

16    period and that would slow things down.  So I can certainly

17    make -- I'm not a magician.

18          THE COURT:  I don't want to hear, "Do my best," I

19    want hear, "I'm going to get it done by such and such date."

20    When is the operation scheduled for?

21          MR. QUINTON:  Two weeks from now, so the 17th.

22          THE COURT:  17th?

23          MR. QUINTON:  Right.  Why he's even going back to the

24    hospital, what's happened is there's a fluid buildup and blood

25    hemorrhaging.  So he gets out of the hospital, he starts doing

1    better and then gets rushed back in.  So if that happens again,

2    you know, that's out of my control.  If he stays healthy, I can

3    commit to getting it done before going back into surgery on the

4    17th.

5              THE COURT:  I'll schedule a conference call on the

6    13th, which is Friday.  I want a status conference, 3 o'clock

7    on Friday, the 13th of March, as to where you are with that

8    reviewing of all those documents.  If you're not completed,

9    then I want some assurance, a level of assurance that it will

10   all be done by Monday, the 16th, before the operation on the

11   17th.

12             All right.  So I'll put it down as a status

13   conference, telephonic conference with you and Mr. Gottlieb.

14   By then Mr. Gottlieb will have had a chance to review the

15   audio, unredacted audio, and he can also fill me in on that as

16   well.

17             Three o'clock on the 13th, Counsel.

18             MR. QUAINTON:  Yes, Your Honor.

19             THE COURT:  Any questions?

20             MR. GOTTLIEB:  Your Honor, I just didn't have a

21   chance to finish the thought, we got diverted there.

22             The one thing I would ask the Court to consider in

23   fashioning an order with respect to the discovery schedule, is

24   whether it applies across-the-board, whether it is an extension

25   only for allowing for Mr. Butowsky's document production or

1    deposition?  Because Mr. Quainton has also not made Mr. Couch

2    available to the plaintiffs during the exten -- or, current

3    discovery period, for the second deposition that the Court

4    ordered.  We gave Mr. Quainton the opportunity for coming back

5    for that deposition or agreeing to a stipulation, he chose the

6    deposition.

7           We had a date that was agreed to, he then told us

8    Mr. Couch was not available on that date.  And then we were

9    essentially given the option of a date that was yesterday, on

10   about three or four days notice, which Mr. Quainton told us

11   would result in bankrupting Mr. Couch, which we thought was not

12   fair or agreeable, or dates that were after the end of the

13   discovery period.

14          And we were given many explanations for this, but

15   this is a pattern at this point of delaying compliance with the

16   Court's schedule and the Court's orders, whether it's

17   deposition dates, whether it is production of documents.  And

18   if this Court allows for another -- however many additional

19   days the Court allows in the schedule, our position is it

20   should not be an across-the-board extension.

21          Mr. Quainton should be held to the deadlines that

22   exist for -- whether they're third-party depositions,

23   subpoenas, document requests, those different tools that are

24   available during the discovery period should not just be

25   extended indefinitely because of Mr. Butowsky's health

1    concerns, particularly with respect to the third-party

2    depositions that Mr. Quainton has had a month now since the

3    last time we were before the Court to move forward with, and we

4    haven't held a single one of those yet.

5           We've had one -- excuse me, there was one deposition

6    that was held, which was the day two of the Wheeler deposition.

7    But with respect to that, we still haven't held any additional

8    third-party depositions; some are noticed, some are not for

9    various reasons Mr. Quainton has provided to us.

10          But it is simply unfair to the plaintiff to keep

11   extending this schedule out and allowing the defendants to

12   delay while they continue to file a barrage of discovery

13   requests on us that are long beyond the time period that was

14   contemplated by this Court's orders or the reasons the Court

15   granted the extension, frankly.

16          So we will take the opportunity to lay those

17   positions out in the responsive papers to the motion Mr.

18   Quainton filed today.

19          THE COURT:  The Court fully expects and -- hopes and

20   expects that the production of the documents for Mr. Butowsky

21   will be completed by the 16th of March, before his next

22   operation.  That's why I'm doing a status hearing on the 13th.

23   I'm expecting and hoping to hear on the 13th that they're done

24   and they'll be produced by Monday, the 16th, or they'll be

25   working all weekend to make sure it's done so they can be

1    produced on Monday, the 16th.  That's what I'm hoping,

2    expecting to hear.

3            And in the meantime, I'm going to withhold the

4    decision on how much longer to extend the discovery period

5    until I get that update on the 13th and we know what we'll

6    discuss on the 16th.

7            MR. GOTTLIEB:  Okay.  Thank you, Your Honor.

8            One other motion that is pending before the Court, if

9    I just could draw the Court's attention to it, that is

10   affecting the timing of discovery in the case, is that there

11   was a motion to quash the deposition subpoena for Malia

12   Zimmerman filed by Ms. Zimmerman and Fox News.  That motion has

13   been fully briefed.  I believe counsel for Fox News is present

14   in the court today.

15           And there are two depositions that are keyed to the

16   Court's resolution of that issue; one is Ms. Zimmerman's, who

17   is the subject of the motion, but then plaintiffs had also

18   noticed and served a deposition notice for Mr. Adam Housley,

19   who is a former Fox News employee as well.  And when

20   Ms. Zimmerman and Fox News filed their motion, we all agreed it

21   would be wise to hold that deposition in abeyance because the

22   Court's order could affect whether that should go forward, or

23   the content of the testimony that would be permissible.  So

24   that is a motion that is -- that affects the ability of being

25   able to move forward with two depositions that are pending.

```
 1              THE COURT:  Okay.  I'll take a look at it.
 2              MR. QUAINTON:  Your Honor, if I could just briefly
 3      correct the record.
 4              With respect to Mr. Couch, we did make Mr. Couch
 5      available.  We did make him available yesterday.  And it's true
 6      that the original date that had been suggested didn't work
 7      because of visitation.  Mr. Couch has two daughters from two
 8      different marriages, he's a single dad.  He's got to take care
 9      of his kids.  And so we told the plaintiff that he would be
10      willing to have the deposition on the 2nd.  This was last week,
11      I can't remember whether it was Wednesday -- Tuesday, Wednesday
12      or Thursday.  I can't remember when it was.  But they have
13      seven lawyers on the case.  Mr. Couch and Mr. Butowsky have
14      yours truly.  They easily could have sent somebody down to
15      Arkansas.  I was willing to fly down to Arkansas for a
16      three-hour deposition; they refused to do that.
17              Mr. Couch is free on the 28th, the day after
18      discovery closes.  I spent I don't know how many hours going
19      back and forth with Mr. Gottlieb's partner, Mr. Riley, about
20      the significance of doing it on the 28th or the 29th or the
21      30th, which is the Monday, rather than the 27th.  Couldn't
22      figure out why they were making this huge issue out of it.  We
23      made him available on the 2nd, that didn't work for them, and
24      now they come and tell you that we're trying somehow to violate
25      our discovery obligations.  That's unfair.
```

 1           Now, with respect to the third-party depositions and

 2    other depositions of Mr. Butowsky, it's been difficult to get

 3    clarity from him on what I should prioritize.  That has

 4    hampered me in my ability to protect Mr. Butowsky's rights.

 5    It's not fair to him to put a gun to his head and say you

 6    haven't been able to evaluate strategy and all of a sudden the

 7    door is shut in terms of who you can pursue, what evidence you

 8    can pursue.

 9           In addition, many of these witnesses are extremely

10    hard to get ahold of.  And I don't know if -- what exactly is

11    happening, but we've tried for a while now to get Mr. Hersch

12    served, unsuccessfully.  We've tried to get Mr. Bauman served,

13    unsuccessfully.  Ms. Ratner has moved, apparently.  It's very

14    difficult to get these things scheduled.  I finally did manage,

15    for Mr. Couch, to get Kelsey Mulka's deposition scheduled, but

16    this took probably, you know, several weeks of unanticipated

17    back and forth because counsel was involved in arbitration and

18    didn't get back to me.

19           So there are all kinds of factors that come into it

20    in terms of whether -- once you locate the witness, once

21    they're served, actually finding a date.  And I just don't

22    think it's fair that Mr. Butowsky should be, you know, put in a

23    situation where he doesn't even have a chance to present his

24    case when he's -- you know, he is trying his best under the

25    circumstances; I'm certainly trying my best.

```
 1            So I would just submit -- request Your Honor take
 2       that into consideration.
 3            THE COURT:  Mr. Gottlieb, to the extent it's in the
 4       interests of your client to be helpful in getting these
 5       depositions scheduled, I would strongly encourage you to be of
 6       assistance.
 7            MR. GOTTLIEB:  Your Honor, we have tried to be of
 8       assistance.  Let me just take a couple of the examples that
 9       Mr. Quainton listed to explain why I think continuing to extend
10       out the discovery schedule is problematic.  With respect to
11       Mr. Hersch, you're talking about a journalist who will
12       undoubtedly invoke the news-gathering privilege, that the
13       defendants have yet to serve Mr. Hersch with a subpoena.  Once
14       it is served, that's going to get -- will surely get litigated
15       here in this court, and the question is if that can continue to
16       just be postponed out and out, meaning that the briefing
17       doesn't get done longer and longer.
18            I don't know what efforts have been made to negotiate
19       with Mr. Hersch's counsel.  I don't know -- I can't make those
20       representations for Mr. Quainton, but I believe his counsel is
21       known to Mr. Quainton and I believe that those discussions
22       could be had and they could perhaps agree upon some type of a
23       briefing schedule in this court.  But it hasn't been done to
24       date, it's just been sort of kicked down the road.
25            With respect to Ms. Ratner, Ms. Ratner has been
```

1      deposed in this case.  It was a Rule 31 deposition.  The

2      questions for that -- it's a deposition by written question.

3      The questions that we submitted to Ms. Ratner were submitted to

4      Mr. Quainton and the defendants in advance of that deposition

5      taking place.  They declined to submit their own questions in

6      response and so the deposition went forward.

7              Mr. Quainton doesn't like the results of that

8      deposition, which is fine, and they're perfectly within their

9      rights to try to notice and serve an additional deposition, but

10     they can't be heard to be complaining about being unable to

11     serve or locate Ms. Ratner for a deposition when they had an

12     opportunity to submit written questions to her under Rule 31

13     for a deposition, submitted none, and then took no action on it

14     until after they read the transcript and decided they didn't

15     like it.  And these are all more examples of the kinds of

16     delays that they have engaged in in this litigation.

17             With respect to Brad Bauman, they complain about the

18     ability to not find Mr. Brad Bauman.  Brad Bauman was a

19     plaintiff in a litigation in this case, represented by counsel.

20     He's a defendant in the Texas litigation, also represented by

21     counsel.  He's got lawyers that could be sought out and

22     conversations could be had with.  I'm not Mr. Bauman's lawyer,

23     but those are matters of public record, they're on the dockets

24     in those cases and it shouldn't be that difficult to have

25     conversations with those lawyers about locating and tracking

1      some of these witnesses down.

2               To the extent we can be helpful with that, to the

3      extent Mr. Quainton has asked us questions about that, we have

4      done our best to provide him with information on those

5      witnesses, Your Honor.

6               THE COURT:  Very good.  Counsel, I think you need to

7      work together, continue to work together and use your

8      resources, such as they are, pooled together to get these

9      people together and get this discovery completed.  I don't

10     think the defendant should count on getting an extension for 90

11     days.  Like I said, I'm not inclined to give him 90 days.  But,

12     I'm inclined to give him a little added for the benefit of

13     Mr. Butowsky because of his health, but not for Mr. Couch.

14               MR. QUAINTON:  Understood, Your Honor.

15               THE COURT:  Mr. Couch is on a different track, as far

16     as I'm concerned.  And those documents that need to get

17     produced from Mr. Butowsky need to get done by the 16th.  And

18     the Court is expecting that to be done.  I'll have a status

19     hearing again on the 13th, telephonically, to get an update on

20     that and I'm hoping that will be done.  If not, that weekend

21     better be held aside to get it done, get the job done that

22     weekend so that on the 16th they can be produced.

23               MR. QUAINTON:  Thank you, Your Honor.  I would say

24     one thing for the record with respect to Ms. Ratner.  There was

25     an element of sandbagging, frankly, with that whole Rule 31

1    deposition.  The face of the deposition said that it would be

2    held at a date of her choosing before January 15th.  And

3    counsel may not have a technical obligation to inform me, but

4    they certainly never reached out to me or gave me any

5    indication of when that deposition was going to occur.  And on

6    the 14th I called them and said, When - I think it was maybe

7    the 15th, I called them and said, When is this happening?

8    Thinking that there -- not having heard, and they said, Well,

9    it's taking place now, essentially.

10         So that was an unfair situation.  It wasn't just that

11   I didn't like the answers, it's I didn't like the whole

12   procedure.  I want to get live testimony from Ms. Ratner, to

13   confront her with a video that's out there where she says that

14   there's a DNC insider who's the source for the WikiLeaks leak.

15   And I don't want to have written questions, I wanted her

16   credibility and her testimony on that extremely important

17   issue.

18         THE COURT:  Very good.  We'll stand in recess.

19                         *   *   *

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4        I, JANICE DICKMAN, do hereby certify that the above and

5     foregoing constitutes a true and accurate transcript of my

6     stenographic notes and is a full, true and complete transcript

7     of the proceedings to the best of my ability.

8                         Dated this 11th day of March, 2019

9

10

11                       _____

12                       Janice E. Dickman, CRR, CMR, CCR
                         Official Court Reporter
13                       Room 6523
                         333 Constitution Avenue, N.W.
14                       Washington, D.C.  20001

15

16

17

18

19

20

21

22

23

24

25