# EXHIBIT A

Page 483

1 was about one -- 1:30?
2 A. Yes.
3 Q. And we were all pretty -- at least were you -- were
4 you hungry at that point?
5 A. Yeah. I'm a big guy. I was pretty hungry.
6 Q. Were you tired at that point?
7 A. Yes.
8 Q. And I think the last question before we broke,
9 counsel said, could -- could the hit -- could the term
10 "the hit" mean -- mean anything other than the murder.
11         MS. GOVERNSKI: Objection as to
12         characterization.
13 Q. (BY MR. QUAINTON) And I believe -- we can go back.
14 I believe your answer was -- was no. Does that sound
15 about right?
16 A. Yes.
17 Q. I'd like to just explore that a little bit. When
18 you think of the word "the hit," is it -- is it, in
19 fact, correct that that term reasonably only refers to a
20 murder?
21 A. No, not -- not what I think about it, no.
22 Q. What else could a -- could a hit refer to?
23 A. It could be a hit and run. It could be getting hit
24 in the face.
25 Q. But I guess a hit and run, it's not really relevant



Page 484

1  here, is it?
2  A.    Probably not, no.
3  Q.    But a -- but a hit and run, that's something
4  that -- a hit could be a hit and run?
5  A.    Right.
6  Q.    Could -- anything else?
7  A.    It could be, you know, like a robbery.  You know,
8  like a jewelry store gets robbed, they call it a hit.
9  So it could be a robbery as well.
10 Q.    Is that an expression that people in Arkansas would
11 use?
12 A.    Yes.
13 Q.    So how -- how might they say that?
14 A.    Like, put it in a sentence or something?
15 Q.    Yeah, put it in a sentence.
16 A.    "Did you hear that" -- trying to think of a jewelry
17 store.  "Did you hear that Helzberg got hit?"
18 Q.    And that wouldn't necessarily mean that the owner
19 got murdered?
20 A.    Correct.
21 Q.    What would that mean?
22 A.    It would mean they got robbed.
23 Q.    Okay.  And the Seth Rich case, does it have
24 anything to do with a robbery?
25 A.    They claim it does, yes.



Page 485

```
 1   Q.   Okay.  So if -- if the hit -- I think you just said
 2   that could have to do with a robbery.  I think your
 3   testimony was that the -- the -- that the source that
 4   you spoke to -- maybe you can just refresh our --
 5   refresh my recollection -- indicated that Aaron had a
 6   bad vibe that something was going to happen.  Was that
 7   your testimony?
 8   A.   Yes.
 9              MS. GOVERNSKI:  Objection;
10         mischaracterization; form.
11   Q.   (BY MR. QUAINTON) That --
12   A.   Yes.
13   Q.   Okay.  And if there was a -- if Aaron had a bad
14   vibe and he thought -- hypothetically, he thought a hit
15   was coming, what might that refer to if it didn't refer
16   to a murder?
17   A.   Well, you know, we have a source -- I don't want to
18   go into a whole lot of details -- that says that, you
19   know, Seth had a thumb drive on him.  And so they
20   could -- it could have been -- you know, they claimed
21   it's a botched robbery.  It could have been the fact
22   that, you know, they were trying to get something off of
23   him.  So a hit could have been, you know, they were
24   trying to steal the thumb drive or -- or get something
25   off of him.
```



1  Q.   And why would -- why would somebody want to do
2  that?
3  A.   Well, information.  Also, if -- if there was a
4  paper trail, you know, so to speak, of that thumb drive
5  or it was a copy of a thumb drive, maybe, or a copy of
6  what he had downloaded, you know, they would not want it
7  to -- you know, the whole thing was -- was banking on
8  that they could blame Russia for this.  And so if
9  they -- you know, if -- with Seth having it, then the
10 entire, you know, Russian hacking story they've been
11 trying to sell everyone goes down the window.
12 Q.   Does this relate at all to the idea of a dead man
13 switch?
14 A.   It could have been a dead man switch.  I mean,
15 maybe he --
16 Q.   Sorry.  What is a dead man switch?
17 A.   A dead man switch is when you have ulterior means
18 of your information getting out if somebody were to kill
19 you.  And normally they give that to people they
20 trust -- two or three individuals -- and -- and then if
21 something happens to them, they are supposed to release
22 that information on behalf of that person who was -- who
23 was killed.
24 Q.   Is there anyone else who publicly stated that --
25 that there might be copies of the e-mails that were



Page 487

```
1    downloaded?
2    A.   Yes.
3    Q.   Who was that?
4             MS. GOVERNSKI:  Objection.  This is all
5        outside the scope.
6    A.   Sy --
7             MR. QUAINTON:  This is not outside the
8        scope.  This is actually dead on the money.
9        This is about the hit.
10   A.   Seymour Hersh.  He's a Pulitzer Prize winner for
11   the New York Times.
12   Q.   (BY MR. QUAINTON) And what -- what did he state?
13   A.   He stated that -- he basically stated that -- you
14   know, that Seth had given it to several of his
15   buddies -- given copies to several of his buddies in
16   case something were to have happened to him.
17            MS. GOVERNSKI:  Objection.  This -- I'm
18        sorry.
19            THE WITNESS:  Oh, sorry.
20            MS. GOVERNSKI:  No, no.  You go.  I'm
21        sorry.
22   Q.   (BY MR. QUAINTON) And so the -- so the -- the hit
23   that Aaron might have been worried about would have been
24   what specifically?
25   A.   It could have been that, you know, that they were,
```



```
                                                         Page 488
 1   you know, worried that they were going to try to get
 2   that device off of him or try to get that thumb drive
 3   off of him.
 4   Q.   And that would probably be quite alarming to him,
 5   wouldn't it?
 6   A.   Absolutely, it would, considering it was the
 7   smoking gun to the -- to the leak.
 8   Q.   And he might have had an intuition that something
 9   bad could happen to Seth, correct?
10              MS. GOVERNSKI:  Objection; form.
11           Objection also --
12   Q.   (BY MR. QUAINTON) And none of that -- and none of
13   that would in any way suggest that he knew the murder
14   was coming, correct?
15   A.   Correct.
16   Q.   Okay.
17              MR. QUAINTON:  Do you have any redirect
18         or --
19              MS. GOVERNSKI:  Yes, I have -- I have
20         some questions for redirect.
21              MR. QUAINTON:  All right.  Well, I'll let
22         you take your hit to the witness.
23                   FURTHER EXAMINATION
24   BY MS. GOVERNSKI:
25   Q.   Mr. Couch, we have established today that during
```



Page 489

```
1   breaks you spoke with your counsel, right?
2   A.   Yes.
3   Q.   And did you speak to your counsel during every
4   break about your testimony?
5   A.   Not every -- not every break.  I think I went to
6   the restroom during one.
7   Q.   I think we've taken four breaks.  So you spoke to
8   your counsel about your testimony on three breaks?
9   A.   I believe so.
10  Q.   And during your cross you have now changed your
11  testimony based on your conversations with counsel?
12              MR. QUAINTON:  Objection.
13  A.   No.  No.  I -- not at all.
14  Q.   (BY MS. GOVERNSKI) Your counsel stated to you that,
15  based on your communication with him about the privilege
16  log, it refreshed your recollection.  He used that word
17  "refreshed," right?
18  A.   Yes.
19  Q.   So based on your communication with counsel during
20  the break, your recollection was refreshed as to the
21  privilege log?
22              MR. QUAINTON:  Objection.
23              Counsel can't get into what we may or may
24         not have discussed.  That's on the record what
25         I stated.  Anything beyond that is privileged
```



```
                                                       Page 490
 1              as to my communications with my client.
 2                   MS. GOVERNSKI:  Mr. Quainton, you
 3              solicited testimony regarding what you
 4              communicated about over the break,
 5              specifically regarding his changed testimony
 6              on the privilege log.  I'm entitled to ask him
 7              questions about why he is changing his
 8              testimony.  If you are instructing your
 9              witness not to answer, you can do that, but
10              I'm entitled to ask my questions about why he
11              has changed his testimony after conversations
12              with you.
13                   MR. QUAINTON:  I'm going to instruct him
14              not to answer that question.  I think the
15              record is clear.
16     Q.   (BY MS. GOVERNSKI) You discussed with Mr. Quainton
17     on the break other possible ways to interpret the word
18     "the hit," right?
19                   MR. QUAINTON:  Objection.
20     A.   I'm not going to talk about our conversations.
21                   MR. QUAINTON:  I'm going to instruct you
22              not to answer about what we discussed.
23                   THE WITNESS:  Yeah.
24     Q.   (BY MS. GOVERNSKI) Are you following your counsel's
25     instruction?
```



Page 491

1  A.    I am following -- following counsel.
2  Q.    Mr. Quainton talked to you about all the bases for
3  your statements regarding Mr. Wheeler during the break,
4  right?
5  A.    Do what?  Can you say that again?
6              MR. QUAINTON:  I'm going to instruct you
7         not to answer --
8              THE WITNESS:  Okay.
9              MR. QUAINTON:  -- what we discussed.
10             THE WITNESS:  Okay.
11 Q.    (BY MS. GOVERNSKI) Mr. Quainton suggested -- strike
12 that.
13             Mr. Quainton discussed with you the bases
14 for your statements regarding Seth Rich during the
15 break, right?
16 A.    No.  No.
17             MR. QUAINTON:  I'm going to instruct you
18         not to answer that.
19             THE WITNESS:  Okay.
20 Q.    (BY MS. GOVERNSKI) Mr. Couch, is all of the
21 testimony that you have delivered during the
22 cross-examination based on your conversation with
23 counsel during the break?
24             MR. QUAINTON:  I'm going to instruct you
25         not to answer that question.



Page 492

1      THE WITNESS:  Okay.
2   Q.   (BY MS. GOVERNSKI) Between your direct exam and
3   your cross-examination, have you now stated all of the
4   bases for the statements you have made in the complaint
5   regarding Aaron Rich?
6      MR. QUAINTON:  Object to the form.
7   A.   Yes.  Yes.
8   Q.   (BY MS. GOVERNSKI) And between your direct and your
9   cross-examination, have you now stated all of the bases
10  for the statements you have made in the complaint
11  regarding Seth Rich?
12     MR. QUAINTON:  Objection.
13  A.   Can you repeat that one more time for me?  I'm
14  sorry.
15  Q.   (BY MS. GOVERNSKI) Sure.  In between your direct
16  and your cross-examination, have you now stated all of
17  the bases for the statements you have made in the
18  complaint regarding Seth Rich?
19  A.   Yes, ma'am, to the best of my knowledge, yes.
20  Q.   When you stated that, quote, "We debunked
21  Guccifer," when you say "we" there, you don't literally
22  mean "we," right?
23  A.   No.  No, no.  I'm talking about, like, the Adam
24  Carters, the Bill Binneys.  And some -- some other folks
25  on my team, like Hannibal Moot, you know, that have dug



```
 1   into that and -- and -- and put the forensic stuff
 2   together.  I'm -- it's not me.
 3   Q.   Right.  You don't have the forensics background
 4   to --
 5   A.   No.
 6   Q.   -- debunk Guccifer?
 7            Who was the source who told you that the
 8   hit was related to a thumb drive?
 9   A.   I'm not -- I'm not going to release that
10   information.
11            MR. QUAINTON:  I'm instructing you not to
12       answer that question.
13   A.   Yeah, that's -- that's -- that's a source that I
14   don't want to release.
15   Q.   (BY MS. GOVERNSKI) Mr. Couch, you
16   volunteered testimony -- testimony on your source when
17   your counsel was asking you questions during
18   cross-examination, correct?
19   A.   Not to my knowledge, I didn't.  But -- I mean, I
20   don't think I did.  I'm just going to tell you right
21   now, that's source privilege.  I'm not going to -- I've
22   told that person I'm going to protect their family.  I'm
23   not giving you his name.  I'm not doing it.
24            MS. GOVERNSKI:  Mr. Quainton, are you
25       instructing your witness not to answer, even
```



MAGNA
LEGAL SERVICES